**THE ROSEN LAW FIRM, P.A.**
Laurence Rosen, Esq.
One Gateway Center, Suite 2600
Newark, NJ  07102
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| MICHAEL V. MALLOZZI, Individually and on behalf of all others similarly situated, <br><br>     Plaintiff, <br><br>     v. <br><br> INNOVATIVE INDUSTRIAL PROPERTIES, INC., PAUL SMITHERS, CATHERINE HASTINGS, and ANDY BUI, <br><br>     Defendants. | **Case No:** <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> <u>JURY TRIAL DEMANDED</u> |

Plaintiff Michael V. Mallozzi ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, and announcements made by Defendants, public filings, wire and press releases published by and regarding Innovative Industrial Properties, Inc. ("Innovative Industrial Properties" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Innovative Industrial Properties securities between May 7, 2020 and April 13, 2022, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Innovative Industrial Properties securities during the Class Period and was economically damaged thereby.

7.     Innovative Industrial Properties purports to be an internally-managed real estate investment trust ("REIT") focused on the acquisition, ownership and management of specialized industrial properties leased to experienced, state-licensed operators for their regulated state-licensed cannabis facilities.

8.     The Company is incorporated in Maryland and its head office is located at 1389 Center Drive, Suite 200, Park City, Utah 84098. Innovative Industrial Properties' common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "IIPR" and Innovative Industrial Properties' preferred stock trades on the NYSE under the ticker symbol "IIPR-PA."

9.     Defendant Paul Smithers ("Smithers") has served as the Company's Chief Executive Officer, President, and a Director since the Company's formation.

10.     Defendant Catherine Hastings ("Hastings") has served as the Company's Chief Financial Officer since June 2017, as the Company's Treasurer since January 2017, and served as the Company's Chief Accounting Officer from January 2017 through January 2021.

11.     Defendant Andy Bui ("Bui") has served as the Company's Chief Accounting Officer and Vice President since January 2021. Previously, Defendant Bui served as the Company's Controller starting in May 2017.

12.     Defendants Smithers, Hastings, and Bui are collectively referred to herein as the "Individual Defendants."

4

13.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

14.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

15.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

16.    The Company and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS
### Materially False and Misleading
### Statements Issued During the Class Period

17.    On May 7, 2020, the Company filed with the SEC its quarterly report for the period ended March 31, 2020 (the "1Q20 Report") signed by Defendants Smithers and Hastings. Attached to the 1Q20 Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Smithers and Hastings attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

18.    The 1Q20 Report stated the following, in pertinent part, regarding Innovative Industrial Properties' business scheme and customers:

> *We are an internally-managed real estate investment trust ("REIT")* focused on the acquisition, ownership and management of specialized properties leased to *experienced*, state-licensed operators for their regulated state-licensed cannabis facilities. We have acquired and intend to continue to acquire our properties through sale-leaseback transactions and third-party purchases. *We have leased and expect to continue to lease our properties on a triple-net lease basis, where the tenant is responsible for all aspects of and costs related to the property*

*and its operation during the lease term, including structural repairs, maintenance, taxes and insurance.*

19.    The 1Q20 Report stated the following, in pertinent part, regarding Innovative Industrial Properties' properties' values:

**Innovative Industrial Properties, Inc.**

**Condensed Consolidated Balance Sheets**
**(Unaudited)**
*(In thousands, except share and per share amounts)*

| | March 31, 2020 | December 31, 2019 |
|---|---|---|
| **Assets** | | |
| Real estate, at cost: | | |
| Land | $ 51,712 | $ 48,652 |
| Buildings and improvements | 464,267 | 382,035 |
| Tenant improvements | 173,974 | 87,344 |
| Total real estate, at cost | 689,953 | 518,031 |
| Less accumulated depreciation | (17,077) | (12,170) |
| Net real estate held for investment | 672,876 | 505,861 |

*      *      *

**Acquisition of Real Estate Properties.** Our investment in real estate is recorded at historical cost, less accumulated depreciation. ***Upon acquisition of a property, the tangible and intangible assets acquired and liabilities assumed are initially measured based upon their relative fair values. We estimate the fair value of land by reviewing comparable sales within the same submarket and/or region, the fair value of buildings on an as-if vacant basis and may engage third-party valuation specialists.*** Acquisition costs are capitalized as incurred. All of our acquisitions to date were recorded as asset acquisitions.

*      *      *

**Investments in Real Estate**

The Company acquired the following properties during the three months ended March 31, 2020 (dollars in thousands):

| Property | Market | Closing Date | Rentable Square Feet [1] | Purchase Price | Transaction Costs | Total | |
|---|---|---|---|---|---|---|---|
| Green Leaf VA | Virginia | January 15, 2020 | 82,000 | $ 11,740 | 72 | 11,812 | [2] |
| Cresco OH | Ohio | January 24, 2020 | 50,000 | 10,600 | 12 | 10,612 | [3] |
| GTI OH | Ohio | January 31, 2020 | 21,000 | 2,900 | 23 | 2,923 | [4] |
| LivWell CO - Retail Portfolio | Colorado | Various | 8,000 | 3,300 | 23 | 3,323 | [5] |
| GTI IL | Illinois | March 6, 2020 | 231,000 | 9,000 | 17 | 9,017 | [6] |
| Parallel FL | Florida | March 11, 2020 | 373,000 | 35,300 | 20 | 35,320 | [7] |
| **Total** | | | **765,000** | **$ 72,840** | **$ 167** | **$ 73,007** | |

(Emphasis added.)

20.    On February 26, 2021, the Company filed with the SEC its annual report for the year ended December 31, 2020 (the "2020 Annual Report") signed by Defendants Smithers, Hastings, and Bui. Attached to the 2020 Annual Report were certifications pursuant to SOX signed by Defendants Smithers and Hastings attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

21.    The 2020 Annual Report stated the following, in pertinent part, regarding Innovative Industrial Properties' business scheme and customers:

> **We are an internally-managed REIT** focused on the acquisition, ownership and management of specialized industrial properties leased to **experienced**, state-licensed operators for their regulated state-licensed cannabis facilities. We have acquired and intend to continue to acquire our properties through sale-leaseback transactions and third-party purchases. We have leased and expect to continue to lease our properties on a triple-net lease basis, where the tenant is responsible for all aspects of and costs related to the property and its operation during the lease term, including structural repairs, maintenance, real estate taxes and insurance.

\*     \*     \*

*As of December 31, 2020, the tenant at each of our leased properties is responsible for paying all structural repairs, maintenance expenses, insurance and real estate taxes related to the property during the term of the applicable lease.*

\*     \*     \*

● **Demonstrated Investment Acumen**.
*We utilize rigorous underwriting standards for evaluating acquisitions and potential tenants to ensure that they meet our strategic and financial criteria. Our extensive experience and relationships in the real estate and regulated cannabis industry enable us to identify, negotiate and close on acquisitions and leases with established operators and other operators who have been among the top candidates in the rigorous state licensing process.*

\*     \*     \*

As a result, many banks are hesitant to offer any banking services to cannabis-related businesses, including opening bank accounts. While we currently maintain banking relationships, our inability to maintain those accounts or the lack of access to bank accounts or other banking services in the future, would make it difficult for us to operate our business, increase our operating costs, and pose additional operational, logistical and security challenges. *Similarly, if our proposed tenants are unable to access banking services, they will not be able to enter into triple-net leasing arrangements with us, as our leases will require rent payments to be made by check or wire transfer.*

\*     \*     \*

*We have been organized and operate our business so as to qualify, to be taxed as a REIT for U.S. federal income tax purposes.*

(Emphasis added.)

22.    The 2020 Annual Report stated the following, in pertinent part, regarding Innovative Industrial Properties' properties' values:

**ITEM 2. PROPERTIES**

As of December 31, 2020, we owned the following 66 properties, which were 99.3% leased (based on square footage) with a weighted-average remaining lease term of approximately 16.6 years:

| Property | Market | Closing Date | Rentable Square Feet | Investment |
|---|---|---|---|---|
| | | | | (in thousands) |
| Pharm AZ | Arizona | December 15, 2017 | 358,000 | $ 20,000 |
| Pharm AZ Retail | Arizona | September 19, 2019 | 2,000 | 2,500 |
| Sacramento CA | California | February 8, 2019 | 40,000 | 12,710 |
| Kings Garden CA Portfolio | California | Various | 594,000 | 89,972 |
| Esperanza CA | California | July 23, 2019 | 35,000 | 15,000 |
| Vertical CA Portfolio | California | Various | 79,000 | 17,300 |
| Columbia Care CO | Colorado | October 30, 2018 | 58,000 | 11,250 |
| Lo-Vail CO Retail Portfolio | Colorado | Various | 8,000 | 3,349 |
| Trulieve FL | Florida | October 22, 2019 | 120,000 | 17,500 |
| Parallel FL Portfolio | Florida | Various | 590,000 | 60,308 |
| Ascend IL | Illinois | December 21, 2018 | 165,000 | 41,891 |
| Cresco IL Portfolio | Illinois | October 19, 2019 | 90,000 | 45,454 |
| Curaleaf IL | Illinois | October 30, 2019 | 120,000 | 23,300 |
| PharmaCann IL | Illinois | October 30, 2019 | 66,000 | 27,426 |
| GTI IL | Illinois | March 6, 2020 | 231,000 | 55,855 |
| Holistic MD | Maryland | May 26, 2017 | 72,000 | 23,721 |
| PharmaCann MA | Massachusetts | May 31, 2018 | 58,000 | 30,500 |
| Holistic MA | Massachusetts | July 12, 2018 | 55,000 | 34,750 |
| Trulieve MA | Massachusetts | July 26, 2019 | 150,000 | 43,500 |
| Ascend MA | Massachusetts | April 2, 2020 | 199,000 | 35,775 |
| Cresco MA | Massachusetts | June 30, 2020 | 118,000 | 8,904 |
| 4Front MA | Massachusetts | December 17, 2020 | 67,000 | 15,500 |
| Green Peak MI | Michigan | August 1, 2018 | 56,000 | 15,799 |
| Emerald Growth MI | Michigan | June 7, 2019 | 45,000 | 10,000 |
| Ascend MI | Michigan | July 2, 2019 | 145,000 | 39,750 |
| Lo-Vail MI | Michigan | October 9, 2019 | 136,000 | 41,500 |
| Green Peak MI Retail Portfolio | Michigan | Various | 31,000 | 11,784 |
| Cresco MI | Michigan | April 22, 2020 | 113,000 | 10,510 |
| Holistic MI | Michigan | September 1, 2020 | 65,000 | 7,904 |
| Vireo MN | Minnesota | November 8, 2017 | 89,000 | 9,710 |
| Mhardin NV | Nevada | July 12, 2019 | 40,000 | 9,489 |
| Curaleaf NJ | New Jersey | July 10, 2020 | 115,000 | 18,940 |
| Columbia Care NY Portfolio | New Jersey | July 16, 2020 | 54,000 | 13,035 |
| PharmaCann NY | New York | December 16, 2016 | 127,000 | 30,000 |
| Vireo NY | New York | October 23, 2017 | 40,000 | 6,717 |
| Curaleaf ND | North Dakota | December 30, 2019 | 33,000 | 12,590 |
| PharmaCann OH | Ohio | March 13, 2019 | 58,000 | 20,000 |
| Vireo OH | Ohio | May 14, 2019 | 11,000 | 3,550 |
| Cresco OH | Ohio | January 24, 2020 | 50,000 | 10,800 |
| GTI OH | Ohio | January 31, 2020 | 101,000 | 9,366 |
| Jushi PA | Pennsylvania | April 6, 2018 | 89,000 | 13,381 |
| Maitri PA | Pennsylvania | April 24, 2019 | 51,000 | 25,462 |
| Green Leaf PA | Pennsylvania | May 20, 2019 | 266,000 | 13,592 |
| PharmaCann PA | Pennsylvania | August 9, 2019 | 54,000 | 25,750 |
| GTI PA | Pennsylvania | November 12, 2019 | 148,000 | 39,600 |
| Curaleaf PA | Pennsylvania | December 26, 2019 | 72,000 | 25,749 |
| Holistic PA | Pennsylvania | June 30, 2020 | 108,000 | 15,007 |
| Green Leaf VA | Virginia | January 11, 2020 | 82,000 | 19,750 |
| 4Front WA | Washington | December 17, 2020 | 114,000 | 17,500 |
| Total | | | 5,563,000 | $ 1,022,696 |

23.    On February 24, 2022, the Company filed with the SEC its annual report for the year ended December 31, 2021 (the "2021 Annual Report") signed by Defendants Smithers, Hastings, and Bui. Attached to the 2021 Annual Report were certifications pursuant to SOX signed by Defendants Smithers and Hastings attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

24.    The 2021 Annual Report stated the following, in pertinent part, regarding Innovative Industrial Properties' business scheme and customers:

*We are an internally-managed REIT* focused on the acquisition, ownership and management of specialized industrial properties leased to *experienced*, state-licensed operators for their regulated state-licensed cannabis facilities. We have acquired and intend to continue to acquire our properties through sale-leaseback transactions and third-party purchases. *We have leased and expect to continue to lease our properties on a triple-net lease basis, where the tenant is responsible for all aspects of and costs related to the property and its operation during the lease term, including structural repairs, maintenance, real estate taxes and insurance.*

\*     \*     \*

*As of December 31, 2021, the tenant at each of our leased properties is generally responsible for paying all structural repairs, maintenance expenses, insurance and real estate taxes related to the property during the term of the applicable lease.*

\*     \*     \*

**Tenant Concentration**

As of December 31, 2021, all of our revenues were derived from 103 properties. The following table sets forth the five tenants in our property portfolio that represented the largest percentage of our total rental revenue (including tenant reimbursements) for the year ended December 31, 2021:

| Tenant(1) | Number of Leases | Percentage of Rental Revenue |
|---|---|---|
| PharmaCann Inc. | 5 | 12 % |
| SH Parent, Inc. ("Parallel") | 4 | 10 % |
| Ascend Wellness Holdings, Inc. | 3 | 9 % |
| Cresco Labs Inc. | 5 | 8 % |
| Kings Garden Inc. | 6 | 8 % |
| Totals | 23 | 47 % |

\*     \*     \*

*We have been organized and operate our business so as to qualify, to be taxed as a REIT for U.S. federal income tax purposes.*

(Emphasis added.)

25.    The 2021 Annual Report stated the following, in pertinent part, regarding Innovative Industrial Properties' properties' values:

11

**Innovative Industrial Properties, Inc.**

**Consolidated Balance Sheets**

*(In thousands, except share and per share amounts)*

| Assets | December 31, 2021 | December 31, 2020 |
|---|---|---|
| Real estate, at cost: | | |
| Land | $ 122,386 | $ 75,660 |
| Buildings and improvements | 979,417 | 644,932 |
| Tenant improvements | 620,301 | 339,647 |
| Total real estate, at cost | 1,722,104 | 1,060,239 |
| Less accumulated depreciation | (81,938) | (40,195) |
| Net real estate held for investment | 1,640,166 | 1,020,044 |

\*       \*       \*

▶ **Investments in Real Estate** ◀

*Acquisitions*

▶ The Company made the following acquisitions during the year ended December 31, 2021 (dollars in thousands): ◀

| Property | Market | Closing Date | Rentable Square Feet (1)(2) | Initial Purchase Price | Transaction Costs | Total |
|---|---|---|---|---|---|---|
| Trulieve FL | Florida | January 22, 2021 | 295,000 | $ 23,800 | $ 16 | $ 23,816 (2) |
| King's Garden CA | California | February 5, 2021 | 180,000 | 1,350 | 7 | 1,357 (3) |
| Parallel TX | Texas | March 10, 2021 | 63,000 | 3,400 | 17 | 3,417 (4) |
| GPI MI Davis Hwy | Michigan | April 16, 2021 | 175,000 | 15,550 | 4 | 15,554 (5) |
| Parallel PA | Pennsylvania | May 13, 2021 | 239,000 | 41,750 | 11 | 41,761 (6) |
| Sozo MI | Michigan | May 14, 2021 | 85,000 | 10,250 | 9 | 10,259 (7) |
| Temescal MA | Massachusetts | May 26, 2021 | 71,000 | 3,100 | 9 | 3,109 (8) |
| 4Front IL | Illinois | August 3, 2021 | 250,000 | 3,348 | 18 | 3,366 (9) |
| Trulieve MD | Maryland | August 13, 2021 | 112,000 | 16,615 | 21 | 16,636 (10) |
| Calyx MO | Missouri | September 17, 2021 | 83,000 | 1,530 | 11 | 1,541 (11) |
| Vireo NY | New York | September 24, 2021 | 324,000 | 10,225 | 12 | 10,237 (12) |
| Gold Flora CA | California | October 15, 2021 | 201,000 | 51,000 | 13 | 51,013 (13) |
| LivWell MI | Michigan | December 9, 2021 | 15,000 | 34,150 | 8 | 34,158 (14) |
| CO/PA/ND Portfolio | Various | December 14, 2021 | 179,000 | 71,585 | 143 | 71,728 (15) |
| Total | | | 2,272,000 | 287,653 | 299 | 287,952 (16) |

26.   The statements contained in ¶¶ 17-25 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (1) that Innovative Industrial Properties' focus is to be a cannabis company lender rather than a REIT; (2) that the true values of Innovative Industrial Properties' properties are significantly lower than Innovative Industrial Properties represents; (3) existential issues in its top customers; (4) that as a result, its top customers may not be able to continue making payments to Innovative Industrial Properties and

Innovative Industrial Properties would face significant issues replacing these customers; and (5) that as a result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH EMERGES

27.   On April 14, 2022, before market hours, market researcher Blue Orca Capital released a report on Innovative Industrial Properties (the "Report"), which described the Company, in summary, as "a marijuana bank masquerading as a REIT. IIPR's model is to conduct sale-leaseback transactions with cannabis producers who are otherwise prohibited from borrowing money because of federal regulations."

28.   The Report stated the following, in relevant part, regarding Innovative Industrial Properties' true business focus of a cannabis company lender:

> *In exchange for overpaying for properties from cannabis companies and funding the tenant improvements to build out the facilities, IIPR receives repayment of the loan in the form of long-term lease agreements at 11–14% yields. In effect, IIPR is less of a traditional REIT, and more of a marijuana bank, lending to cannabis companies who otherwise would not have access to the banking system to grow their businesses.* This works so long as the tenants can repay their loans by continuing to make their lease payments, meaning IIPR's business and valuation is contingent on high quality tenants. …
>
> IIPR trades like a safe, boring REIT, at a 3.7% dividend yield. In reality, we think it is marijuana bank whose loan portfolio looks at risk for substantial impairment. *Unlike with other REITs, IIPR cannot expect to recover the lost income from defaulting tenants because it appears*

13

*that the actual values of its properties are substantially below their carrying value on IIPR's balance sheet.*

\*       \*       \*

Whereas most REITs can simply re-lease vacant properties in the event of tenant default, we think IIPR will struggle to replace the lost income. That's because *IIPR's model is to overpay cannabis companies for properties as a form of lending, recouping the loan through an above market, long-term lease*. This means a risk of severe markdowns if Parallel defaults. IIPR purchased its Pittsburgh property from Parallel for $42 million, nearly double the price paid by Parallel to acquire the same property the day before Parallel flipped it to IIPR. With a further $26 million in tenant improvements, *IIPR effectively loaned $46 million to Parallel on top of the real estate purchase on the promise that Parallel would repay the loan in the form of a long-term lease*. If we look at the portfolio of Parallel properties, based on the price paid by Parallel before flipping them to IIPR, we estimate that the residual value of the properties is a fraction of the carrying value of the properties on IIPR's balance sheet and that even assuming a 10% yield, rent from a replacement tenant would likely be 70% lower.

\*       \*       \*

But we think IIPR is more akin to a high-risk cannabis bank, providing de facto loans to cannabis companies in exchange for long term leases.

\*       \*       \*

*Ultimately, IIPR's stock price is simply a bet that its cannabis tenants can continue to pay rent at above market rates for the next 15–20 years.* Tenant quality is paramount, making the severe financial distress and likely default of IIPR's largest tenant a hammer blow to IIPR's perception as a safe, boring REIT.

\*       \*       \*

*IIPR is a marijuana bank whose loan portfolio is only partially secured by the properties it owns. As we know from Parallel and other examples, IIPR's sale-leaseback model is to purchase properties from*

*its cannabis tenants at above market rates so as to loan its tenants money to build their businesses.*

(Emphasis added.)

29.     The Report stated the following, in relevant part, regarding Innovative

Industrial Properties' the true value of its properties:

> **• Substantial Property Value Impairment and ~70% Downside in Rental Income in the Event of Parallel Default.**
> If IIPR's tenants default on their leases, the premise underpinning IIPR's stock price collapses. The reason is that *the market value of the properties appears to be substantially lower than they are carried at on IIPR's balance sheet*. *This is because IIPR, by design, executes the sale-leaseback transaction with cannabis companies at above market prices to in effect loan money to its tenants who otherwise cannot borrow from the banking system.* The problem is that if the tenant defaults, IIPR is left with a property that is by definition worth substantially less than it paid for it.
>
> *IIPR's investors take comfort in the belief that IIPR's long term leases are secured by a valuable real estate portfolio – which IIPR carries at cost on its balance sheet. Investors are led to believe that this real estate can be re-leased in the event of tenant default.* …
>
> IIPR acquired the 239,000 sq. ft warehouse from Parallel in May 2021 for $41.8 million. In addition to the initial acquisition price, IIPR reimbursed Parallel a further $26 million of tenant improvement costs. At a total cost of nearly $68 million, the Pittsburgh acquisition represented 11% of IIPR's new investments in 2021.
>
> [Image omitted.]
>
> Tax records for Allegheny County show that on May 6, 2021, Parallel paid $22 million to acquire the property from a local real estate company – the Buncher Co. Prior to the acquisition, Parallel already committed to lease the property from the Buncher Co in February 2021.

*Yet just one day after Parallel acquired the building from its owner for $22 million, Parallel flipped the asset to IIPR in a sale-leaseback deal for $42 million – a 90% markup.*

| Allegheny County Real Estate Portal | | Search | Contact Us |
|---|---|---|---|

Parcel ID : 0044-C-00100-0000-00     Municipality : 127 27th Ward - PITTSBURGH

Property Address : 2840 -2920 NEW BEAVER AVE     Owner Name : IIP-PA 8 LLC

PITTSBURGH, PA 15233

Deed Book : 18438     Deed Page : 10

| Owner | Sale Date | Sale Price |
|---|---|---|
| IIP-PA 8 LLC | 5/7/2021 | $41,750,000 |
| GBC PA PITTSBURGH LLC | 5/6/2021 | $22,000,000 |
| BUNCHER COMPANY | 7/3/1975 | $404,980 |

*Source: Allegheny County*

*Note: GBC PA Pittsburgh LLC is a legal entity for Goodblend – a subsidiary of Parallel*

**Parallel Pittsburgh Transaction Timeline**

| Date | | $m | Markup % |
|---|---|---|---|
| 2-Jan-21 | Parallel committed to a long-term lease with Buncher Co. | | |
| 6-May-21 | Parallel acquired building from Buncher Co. | 22 | |
| 7-May-21 | IIPR acquired building from Parallel | 42 | 90% |

*Source: Allegheny County, News Articles*

*Parallel bought the property for $22 million and flipped it to IIPR the next day for $42 million, pocketing the spread as a loan to build its business.* That's why we think of IIPR as a marijuana bank and not a traditional REIT.

In addition to the $42 million purchase price, IIPR also reimbursed Parallel a further $26 million of tenant improvement costs. It is unclear what – if any – residual value they would carry in the event of Parallel's default, especially considering that IIPR depreciates these tenant improvements over the course of the lease.

*The Parallel transaction shows, in our opinion, the actual market value of the Pittsburgh property is substantially less than the carrying value of the property value of the property on IIPR's balance sheet.* Clearly, this is less of an issue if Parallel was able to make its lease payments to IIPR for the next 15-20 years.

But, if Parallel defaults on its lease, a scenario that based on the lawsuits appears likely, the market rental value of the property on an "as is" basis is likely substantially lower than the current rent IIPR receives from Parallel. *We see the same pattern with other Parallel properties.*

**• Parallel Lakeland – IIPR paid $19.6 million for a property sold for $3.6 million one-year prior**
For example, in September 2020 IIPR acquired Parallel's greenhouse facility in Lakeland, Florida for $19.6 million.

[Image omitted.]

*Local tax records for Polk County show that just 19 months, in February 2019, Parallel acquired the same property for just $3.58 million – 82% less than the price paid by IIPR.*

| Date | Type Inst | Vacant/ Improved | Grantee | Sales Price |
|------|-----------|------------------|---------|-------------|
| 09/2020 | Q | I | IIP FL 2 LLC | $100 |
| 09/2020 | W | I | IIP FL 2 LLC | $19,550,000 |
| 02/2019 | W | V | SURTERRA LAKELAND LLC | $275,000 |
| 02/2019 | W | I | SURTERRA LAKELAND LLC | $3,302,000 |
| 02/2019 | Q | I | SURTERRA LAKELAND LLC | $100 |
| 07/2007 | W | V | TREMEL JAD S | $245,000 |
| 07/2007 | W | V | SUNSHINE LAKELAND PROPERTIES INC | $350,000 |
| 06/2004 | Q | V | JBR KEATING LC | $100 |

*Source: Polk County*

**• Parallel Wimauma – IIPR paid $35 million for a property sold for $9.2 million three years prior**
Similarly, in March 2020 IIPR acquired Parallel's greenhouse facility in Wimauma, Florida for $35.3 million.

[Image omitted.]

*Yet local tax records for Hillsborough County show that just three years before, in September 2017, Parallel (at the time called Surterra) acquired the same property for just $9.2 million – 74% less than the price paid by IIPR.*

| Official Record Book / Page | Instrument Number | Date Month | Year | Type Inst | Qualified or Unqualified | Vacant or Improved | Sale Price |
|---|---|---|---|---|---|---|---|
| | 2020098064 | 03 | 2020 | WD | Unqualified | Improved | $35,300,000 |
| 25263 / 1198 | 2017302562 | 09 | 2017 | WD | Qualified | Improved | $9,200,000 |
| 22490 / 0242 | 2014087013 | 03 | 2014 | WD | Unqualified | Improved | $632,500 |
| 21755 / 0227 | 2013110209 | 12 | 2012 | WD | Qualified | Improved | $2,100,000 |
| 9980 / 0356 | 1999395333 | 11 | 1999 | WD | Unqualified | Improved | $1,000,000 |
| 6598 / 0599 | 92095893 | 05 | 1992 | WD | Qualified | Vacant | $92,300 |

*Source: Hillsborough County*

The point is this. If we use the price paid by Parallel prior to flipping the properties to IIPR in a sale-leaseback transaction, which we believe is a better proxy for the residual value of the properties, ***in the event of default that the properties would be worth closer to $34.8 million – 64% less than IIPR paid to acquire the assets***.



**Parallel Acquisition Prices vs Historical Transactions**

*Source: Company Filings, Local Tax Records*
*Note: Excludes Parallel San Marco asset which is under development.*

In addition, IIPR funded $73.7 million of tenant improvements across the three properties, which we generously value at 45% of cost in the event of default. We think this is highly generous considering these tenant improvements are depreciated over the term of the lease, and it is unclear what value, if any, will remain from such improvements in the event of Parallel's default.

**Parallel Properties as Carried on IIPR's Balance Sheet**

| Property | State | Year Built/Renovated | Initial Costs Land | Initial Costs Building and Improvements | Costs Capitalized Subsequent to Acquisition | Total Costs Land | Total Costs Building and Improvements | Total | Accumulated Depreciation | Net Cost Basis |
|---|---|---|---|---|---|---|---|---|---|---|
| Parallel FL Portfolio | Florida | Various(5) | 3,258 | 51,625 | 52,336 | 3,258 | 103,961 | 107,219 | (3,388) | 103,831 |
| Parallel PA | | Pennsylvania | 1976/2021 | 6,979 | 34,781 | 25,890 | 6,979 | 60,671 | 67,650 | (1,050) | 66,600 |

Source: *IIPR Annual Report 2021*

**Parallel Properties – Book Value vs Estimated Market Value**

| $m | |
|---|---|
| Acquisition Prices Paid by IIPR | 96.7 |
| Tenant Improvements Funded (Net) | 73.7 |
| Net Book Value 2021 (IIPR Reported) | 170.4 |
| Historical Acquisition Prices Paid by Parallel | 34.8 |
| Adjustment for Price Appreciation @ 5% pa | 4.0 |
| Tenant Improvements @ 45% | 33.2 |
| Market Value (BOC Estimate) | 71.9 |
| % downside | -58% |

Source: Company Filings, Local Tax Records
Note: 1. Excludes Parallel San Marco asset which is under development.
2. Market value estimate is based on the most recent purchase price adjusted for
property price appreciation at 5% per annum.

IIPR currently expects to earn $24 million of annual rent from Parallel. Yet we estimate that the market value of the properties is as little as $72 million based on historical transactions and assumed salvage value for tenant improvements of 45%. Even if we generously assume that IIPR is able to let these properties at a 10% yield, we estimate that the implied market rent in a default scenario from a new cannabis tenant would be 70% less than the current rental income for the properties.

**Parallel Properties – Current Rental Income vs Estimated Market Rental Income**

| $m | |
|---|---|
| Rental income from Parallel (Q4 2021) | 6 |
| Rental income from Parallel (annualized) | 24 |
| Est. market value of properties leased to Parallel | 72 |
| Est. rental yield | 10% |
| Est. market rent for properties leased to Parallel | 7 |
| % downside | -70% |

Source: *Company Filings, Blue Orca estimate*

**• Residual Value of Kings Garden Properties Likely Substantially Less than Book Value.**

*As with Parallel, county records for the Kings Garden properties appear to indicate that they are worth substantially less than IIPR paid for them – and marks them on the balance sheet. In all cases, local transaction records show that Kings Garden acquired the buildings for a fraction of the price, before flipping them on to IIPR in a sale-leaseback transaction at a substantial markup.* As with Parallel, this should alarm investors because it indicates that IIPR's real estate will provide much less residual value in the event of tenant default than investors are led to believe.

**• IIPR paid $17.5 million to acquire Kings Garden Mclane Street, which was acquired / renovated for a combined cost of $4.9 million just three years earlier**

For example, in May 2020, IIPR acquired Kings Garden's warehouse at 19533 Mclane Street Palm Springs for $17.5 million.

[Image omitted.]

*Yet tax records for Riverside County show that Kings Garden acquired the same building – just three years earlier – in May 2017 for $3.75 million.*

Transfer History

| Date | Document # | Sale Price |
|------|------------|------------|
| 5/13/2020 | 2020-0204265 | $17,500,000 |
| 8/14/2018 | 2018-0325614 | $0 |
| 5/1/2017 | 2017-0172475 | $3,750,000 |
| 12/29/2014 | 2014-0495362 | $0 |
| 10/1/2014 | 2014-9030419-UC | $0 |
| 8/25/2008 | 2008-0468399-S | $0 |

*Source: Riverside County*

In the time between the two sales, Kings Garden spent $1.1 million on improvements at the property; nowhere near enough to explain the markup.

[Image omitted.]

All considered, the tax county records indicate that the building is worth substantially less than IIPR paid for it.



**Kings Garden Acquisition Prices vs Historical Transactions**

*Source: Company Filings, Riverside County Tax Records, Grizzly Research*
*Note: Excludes $25.4 million Nov-20 acquisition and $1.4 million Feb-21 acquisition,*
*McLane Street and N 19th Avenue include tenant improvements incurred by Kings Garden*
*prior to IIPR's purchase.*

In total, IIPR paid $45 million to acquire these four Kings Garden properties. ***But based on the historical transaction records, we estimate that the market value of the properties may be as low as $20 million – or 62% lower than IIPR reports on its balance sheet.***

**Kings Garden Acquisition Prices vs Historical Transactions**

| $m | |
|---|---:|
| Acquisition Prices Paid by IIPR | 44.6 |
| Tenant improvements Funded (Net) | 8.1 |
| Net Book Value 2021 (IIPR Reported) | 52.7 |
| Historical Acquisition Prices Paid by Kings Garden | 14.6 |
| Adjustment for Price Appreciation @ 5% pa | 2.0 |
| Tenant Improvements @ 45% | 3.6 |
| Market Value (BOC Estimate) | 20.3 |
| % downside | -62% |

*Source: Company Filings, Riverside County, Grizzly Research*
*Excludes $25.4 million Nov-20 acquisition and $1.4 million Feb-21 acquisition.*
*2. Market value estimate is based on the most recent purchase price adjusted for*
*property price appreciation at 5% per annum.*

*Applying the same analysis as with Parallel, we estimate that IIPR's long term rental income from these properties would decline more than 80% in the event of tenant default.* This analysis is extremely generous as it gives full credit to the book value ($26.8 million) reported by IIPR for the two properties that we were not able to diligence.

**Kings Garden Properties – Current Rental Income vs Estimated Market Rental Income**

| $m | |
|---|---|
| Rental income from Kings Garden (Q4 2021) | 6 |
| **Rental income from Kings Garden (annualized)** | **25** |
| Est. market value of properties leased to Kings Garden | 20 |
| IIPR acquisition cost of other Kings Garden properties | 27 |
| Est. rental yield | 10% |
| **Est. market rent for properties leased to Kings Garden** | **5** |
| % downside | -81% |

*Source: Company Filings, Blue Orca Calculation*
*Note: Assuming non-diligenced Kings Garden properties are worth what IIPR paid and reimbursed for them.*

*This analysis shows that even assuming IIPR can re-lease the properties out at a 10% yield (a generous assumption), in the event of tenant default or distress, IIPR's estimated replacement rent would be likely more than 80% less than IIPR's investors are modelling over the next decade.*

(Emphasis added.) (Internal emphasis and footnotes omitted.)

30.     The Report stated the following, in relevant part, regarding Innovative

Industrial Properties' existential issues in its customers:

In the last 18 months, we think IIPR's loan book appears to have degraded significantly as the sector has become more competitive and IIPR stretched for lower quality tenants in search of continuing growth. IIPR's largest tenant is a failed SPAC that appears in severe financial distress and was recently sued by investors accusing it of securities fraud and being in effect a Ponzi scheme.

\*      \*      \*

**1. Parallel: IIPR's Largest Tenant in Default on Debt and Accused of Being Ponzi Scheme in March 2022 Investor Lawsuits.** IIPR's largest tenant is cannabis company Parallel, which tried to go public via SPAC in 2021. The deal collapsed when the sponsor (led by Justin Bieber's manager Scooter Braun) reportedly pulled out after losing confidence in Parallel's business and financial projections. In March 2022, several investors filed a lawsuit in Florida against Parallel and its former CEO alleging securities fraud. In the complaint, which was only unredacted last week, investors allege that Parallel misrepresented its financial projections, is in default on $350 million in debt, hemorrhages cash and is in essence a "Ponzi scheme." A group of creditors filed another lawsuit in N.Y. last month, alleging that Parallel defrauded them and was in default on its debts. Taken together, these lawsuits suggest that Parallel is in severe distress and faces imminent risk of default on its leases.

\*      \*      \*

**2. Second Largest Tenant Accused of Fraud in Lawsuit between Founders.** IIPR's second largest tenant is a private California cannabis company, Kings Garden. In May 2021, its co-founder sued Kings Garden and its executives alleging unlawful and fraudulent conduct with respect to Kings Garden's financial, regulatory and tax reporting. Notably, the lawsuit accused Kings Garden of falsifying books and records and of selling substantial quantities of illegal cannabis on the black market. The complaint was recently refiled in Florida court. In another action filed in 2019, an investor filed a complaint alleging self-dealing and "irregular" transactions. While we have no view on the merits of the complaints and none of these lawsuits have resulted in adverse outcomes for the cannabis company, the Kings Garden allegations should concern investors not only because of conduct alleged but also because the market value of the properties appears to be substantially lower than IIPR carries them on its balance sheet – a theme consistent across IIPR's portfolio. If we look at the portfolio of Kings Garden properties, based on the price paid by Kings Garden before flipping them to IIPR, we estimate that the residual value of the properties is a fraction of the carrying value of the properties on IIPR's

balance sheet and that even assuming a 10% yield, rent from a replacement tenant would likely be more than 80% lower.

\*     \*     \*

**3. IIPR's Listed Tenants Struggling with Falling Share Prices (-46%) and worsening cash flows.** The problems extend beyond Parallel. Nine of IIPR's tenants are publicly listed, representing 52% of IIPR's portfolio by square footage. ***On average, the stock prices of these tenants are down 46% in the past twelve months, which is particularly deadly for cannabis companies that must issue equity to raise capital. This creates a cycle of equity raises and falling stock prices, raising their cost of capital. Most of these companies report negative net income and negative free cash flows.*** This matters because IIPR's stock price is contingent on the financial health of its tenant portfolio and the ability of its cannabis companies to continue to pay high lease rates over the next 15-20 years. We think falling share prices and deteriorating financials amongst IIPR's borrowers should cause investors to reprice IIPR's shares, given the mounting risks to its long-term loan book.

\*     \*     \*

*The imminent risk of default of IIPR's largest tenant highlights this critical difference. Unlike with other REITs, IIPR cannot expect to recover the lost income and we suspect will most likely need to book a significant impairment on the assets.*

Wet think of Parallel as the canary in the coal mine – demonstrative of broader risk that we believe exists across much of IIPR's portfolio; long-term leases made to low credit quality tenants with significant downside in the event of default.

\*     \*     \*

Parallel is a private cannabis company based in Florida. In February 2021, Parallel announced it was going public via SPAC at a valuation of $1.9 billion. In its SPAC presentation, Parallel projected that it would achieve revenues of $785 million in 2022, which turned out to be fiction.

Six months later, in September 2021, the sponsor, led by Justin Bieber's manager Scooter Braun, called off the SPAC deal. Although no reason was officially given, it was reported that the sponsor backed out of the deal because it had lost confidence in Parallel's business and its ability to deliver on its lofty financial projections. Two months later, Parallel's CEO resigned following the disclosure that Parallel had defaulted on its debt. The SPAC deal appears to have been Parallel's last chance at avoiding implosion.

In March 2022, several investors filed a lawsuit in the Southern District of Florida against Parallel and its former CEO alleging securities fraud. In a complaint that was only unredacted last week, investors claimed that Parallel misrepresented its financial projections, was in default on $350 million in debt, was hemorrhaging cash and was in essence a "Ponzi scheme."

[Image omitted.]

That same month, senior secured lenders filed a separate lawsuit against Parallel in New York. According to the NY lawsuit, Parallel was "experiencing financial distress" throughout 2021, and "missed its projections so badly" that it was "unable to meet its debt obligations as they came due."

[Image omitted.]

Both lawsuits paint a picture of Parallel as a company in severe financial distress.

*     *     *

In May 2021, Kings Garden co-founder Paul King filed a lawsuit against Kings Garden and its executives including his brother – Kings Garden CEO – Michael King. The suit alleged that Michael King had engaged in fraudulent and deceitful business practices, including "deliberately and blatantly falsifying" the books and records of the cannabis company.

[Image omitted.]

Most troubling from the perspective of IIPR and its shareholders, the suit accused Kings Garden of unlawful and fraudulent activities with respect to Kings Garden's financial, regulatory and tax reporting, including arranging for the sale of millions of dollars of black-market cannabis grown at Kings Garden facilities and sold in violation of state and local laws.

*    *    *

It is also not the first time that Kings Garden faced allegations of self-dealing, poor corporate governance, and a lack of transparency around its financial affairs. In January 2019, an investor sued Kings Garden in California alleging that it had not received any of the quarterly distributions owed to it by the cannabis company under the terms of its investment.

*    *    *

***Like Parallel, if Kings Garden finds itself in a distress, IIPR will struggle to replace this income stream with a new tenant.*** This is because historical transactions suggest that the Kings Garden properties are worth substantially less than IIPR carries them on its balance sheet, and clearly, in a release scenario, we doubt that IIPR would achieve anywhere near a 17%–30% yield.

*    *    *

**IIPR's Listed Tenants Struggling with Falling Share Prices (-46%) and worsening cash flows.**

Parallel is the most salient example of the eroding quality of IIPR's tenant portfolio over the past 18 months. Yet looking at IIPR's listed tenants, which comprise 52% of the Company's loan portfolio by square footage, shows that IIPR's counterparties are beset by falling stock prices, net losses and plummeting free cash flows. This matters because IIPR's stock price is contingent on the financial health of its tenant portfolio and the ability of its cannabis companies to continue to pay high lease rates over the next 15–20 years.

26

IIPR has current sale-leaseback arrangements with nine publicly traded companies. Together, these cannabis companies constitute 52% of the properties in IIPR's portfolio by square footage.

*     *     *

**_Plummeting stock prices are particularly problematic for cannabis companies for whom traditional debt financing is either inaccessible or prohibitively expensive. Rather, cannabis companies must typically issue equity. When their share prices decline, they are forced to issue equity at lower prices, further depressing their share price and further increasing their cost of capital. It creates a vicious cycle._**

(Emphasis added.) (Internal emphasis and footnotes omitted.)

31.    On this news, the Company's share price fell $13.76 per share, or 7.5%, to close at $169.68 per share on April 14, 2022, on unusually heavy trading volume, damaging investors.

32.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

33.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Innovative Industrial Properties securities publicly traded on the NYSE during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their

legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

34.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Innovative Industrial Properties securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

35.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

36.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

37.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of Innovative Industrial Properties securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

38.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it

impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

39.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Innovative Industrial Properties securities met the requirements for listing, and were listed and actively traded on the NYSE, an efficient market;

- As a public issuer, the Company filed public reports;

- the Company communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

40.    Based on the foregoing, the market for the Company securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the common units, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

41.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## <u>COUNT I</u>
### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder <u>Against All Defendants</u>

42.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

43.    This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

44.    During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they

contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

45.   Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

46.   Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue

of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

47.     Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Innovative Industrial Properties personnel to members of the investing public, including Plaintiff and the Class.

48.     As a result of the foregoing, the market price of Innovative Industrial Properties securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Innovative Industrial Properties securities during the Class Period in purchasing Innovative Industrial Properties securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

49.     Had Plaintiff and the other members of the Class been aware that the market price of Innovative Industrial Properties securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Company securities at the artificially inflated prices that they did, or at all.

50.      As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

51.     By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Innovative Industrial Properties securities during the Class Period.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

52.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

53.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because

of their senior positions, they knew the adverse non-public information about the Company's misstatement of revenue and profit and false financial statements.

54.      As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

55.      Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Company securities.

56.      By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)     declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)     awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)     awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: April 25, 2022                **THE ROSEN LAW FIRM, P.A**

/s/ Laurence M. Rosen
Laurence M. Rosen, Esq.
One Gateway Center, Suite 2600
Newark, NJ 07102
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*