# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MICHAEL V. MALLOZZI, Individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>INNOVATIVE INDUSTRIAL PROPERTIES, INC., PAUL SMITHERS, CATHERINE HASTINGS, and ANDY BUI,<br><br>    Defendants. | Case No: 2:22-cv-02359-EP-JRA<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>JURY TRIAL DEMANDED</u> |

Lead Plaintiff Alejandro Handal, and Named Plaintiff Stephen R. Forrester (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants Innovative Industrial Properties, Inc. ("IIPR"), Paul Smithers ("Smithers"), Catherine Hastings (Hastings"), Alan D. Gold ("Gold"), Tracie J. Hager ("Hager"), Benjamin C. Regin ("Regin"), and Andy Bui ("Bui") (collectively, "Defendants"), alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public

documents, and announcements made by Defendants, public filings, filings in other lawsuits involving Defendants, wire and press releases published by and regarding IIPR, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION AND OVERVIEW**

1.    This is a federal securities class action on behalf of a class consisting of all persons or entities other than Defendants who purchased or otherwise acquired IIPR's securities between August 7, 2020 and August 4, 2022, both dates inclusive ("Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against IIPR and certain of its top officials.

2.    On April 14, 2022, before the market opened, short seller Blue Orca Capital ("Blue Orca") released a report[1] detailing that Michael Kings, co-founder and CEO of one of IIPR's largest tenants, Kings Garden, Inc. ("Kings Garden"), had a background filled with fraud and theft allegations, name changes, and litigation, and that this information was available from early 2019, before IIPR ever

---

[1] Attached as Exhibit 1 is the April 14, 2022 Blue Orca report.

contracted with Kings Garden. Further, Blue Orca detailed that IIPR had purchased properties at far higher prices than the sellers they entered into sale-leaseback transactions had paid for the properties, and that by recording the fair value of the properties as the purchase price, IIPR was hiding its true financial condition. On this news IIPR's stock fell by 7.5%, falling from $183.44 at the close of trading on April 13, 2022, to close at $169.68 on April 14, 2022, damaging investors.

3.     That same afternoon, April 14, 2022, IIPR released a statement dismissing the Blue Orca report in its entirety, stating that it was altogether wrong, containing "false and misleading statements" and "disinformation" about IIPR, that the author "fails to have any comprehension" about IIPR's business, and that the report "does not warrant a [further] response from" IIPR. Doubling down after during IIPR's May 5, 2022 earnings conference call, held weeks after the Blue Orca report, Defendant Gold stated that "[w]e have been Kings Garden's partner for 3 years now and believe Michael King and his team have one of the best reputations for product quality and consistency and perhaps the single largest cannabis market in the world." In the context of the California state and local regulatory environment, Gold continued, "we believe Kings Garden has navigated this environment well. And our firm believe[s] that high-quality producers like Kings Garden will continue to effectively adapt to the changing landscape in California." Continuing IIPR's praise of Kings Garden and Michael King, during IIPR's May 5,

2022 earnings call—in the wake of the short seller report—Defendant Regin stated that in May 2020, on the heels of a $17.5 million investment in Kings Garden, on top of a $27 million 2019 investment, that "Kings Garden announced the initiation of a quarterly dividend to its stockholders. . . ." Regin conceded that KG paying its own shareholders a dividend "was and is considered highly unusual among any prominent brand in the industry" but concluded that the dividend "demonstrates their belief in the long-term prospects in the business."

4.     On July 14, 2022, after the market closed, and in spite of Defendants' vociferous denial of misdeeds by Kings Garden and by Michael King, IIPR announced that Kings Garden had failed to pay its July 2022 rent under any of its leases. In direct response to this news, IIPR's stock price fell by 14.3%, from a close of $111.61 on July 14, 2022, to a July 15, 2022 closing price of $95.70, damaging investors.

5.     On August 4, 2022, after the market closed, IIPR filed its Q2 2022 10-Q, stating that on July 25, 2022, IIPR had filed a civil lawsuit against Kings Garden, Michael King, and related parties, alleging fraud, theft, and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). In direct response to this news, IIPR's stock price fell by 4%, from a close of $98.40 on August 4, 2022, to an August 5, 2022 closing price of $94.41, damaging investors.

6.    Throughout the Class Period, Defendants told investors that they had always performed extensive background checks on IIPR's prospective tenants/operators ("operators"), and withheld cash from operators until IIPR assured itself that the money had been spent on approved projects. During an August 5, 2021, earnings conference call, Defendant Gold told investors that IIPR spent "a great deal of time focus[ed] not only on the … proposed real estate transaction," but "a lot of time with the management team" doing "background checks on these tenants, understanding where they've come from and their reputations …."

7.    Defendants were severely reckless in continuing to praise Kings Garden and IIPR's investment therein because Kings Garden and Michael King were fraudsters and thieves, something that Defendants should have known, but ignored, even before their first transaction with Kings Garden, but certainly no later than August of 2020. Kings Garden submitted obviously forged invoices to IIPR starting before the Class Period began, and during the Class Period IIPR accepted all of these obvious forgeries and paid Kings Garden $49 million for work and improvements that had not been done.

8.    A background check of Michael King did or would have uncovered, as Defendants admitted after the Class Period, that Michael King and Kings Garden were, from the outset, thieves. In an amended complaint filed by IIPR on August 2,

2022, in a suit against Kings Garden and Michael King,[2] and in an *ex parte* application to appoint a receiver filed in the same case on August 16, 2022,[3] IIPR stated that Kings Garden was not a "legitimate business enterprise," and its actions constituted "red-flags of a Madoff-style Ponzi Scheme."[4] As for Michael King, he had changed his name in 2006, was a serial litigator, and had been sued for fraud by his own brother and others. Further, during the Class Period IIPR paid Kings Garden $49 million dollars for work that Kings Garden had not performed, based on multiple forged invoices. Defendants admit that they discovered that the work had never been performed *with a single phone call*. Further, Defendants admit that it took no great effort to discover that the invoices were obvious forgeries. Finally, Defendants admit that the Kings Garden financial statements provided to IIPR during the Class Period showed millions of dollars disappearing from Kings Garden's accounts, with no obvious explanation.

---

[2] Attached as Exhibit 3 is the Amended Complaint in *IIP-CA 2 LP v. Kings Garden, Inc., et al.*, No. CVPS2202975 0000029320444 (Sup. Ct. of Calif., Cty. Of Riverside Aug. 2, 2022). Among many counts, the Action alleged that defendants committed fraud, theft, and civil RICO violations. In papers filed in the lawsuit, IIPR calls Kings Garden and Michael King "fraudsters." IIP-CA 2 LP is a wholly owned subsidiary of IIPR.

[3] Attached as Exhibit 4 is the *ex parte* application to appoint a receiver in the same case.

[4] In a Form 8-K filed on September 16, 2022, IIPR announced that the parties to the lawsuit entered into a "confidential, conditional settlement agreement."

9.      In addition to the Kings Garden allegations, Defendants also violated straightforward Generally Accepted Accounting Principles ("GAAP") throughout the Class Period. As the Blue Orca report noted, IIPR listed the fair values of properties it purchased at the purchase price, even as the operators themselves had paid substantially less for the properties, sometimes only a day earlier. As an example contained in GAAP and mirroring the facts of IIPR's property purchases makes plain, GAAP forbids recording the purchase price as fair value. The GAAP violations allowed IIPR during the Class Period to overstate rental revenues, real estate held for investment, net book value, earnings, net earnings, and earnings per diluted share. Further, IIPR's GAAP violations led to it filing false financial statements, preventing investors from fairly evaluating the risk of investing in IIPR.

## JURISDICTION AND VENUE

10.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

12.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged

misstatements entered and the subsequent damages took place in this judicial district.

13.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## **PARTIES**

14.    Lead Plaintiff Alejandro Handal, as set forth in his Certification attached as an exhibit to his Lead Plaintiff Motion, (Dkt. No. 14-5), incorporated by reference herein, purchased IIPR securities during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

15.    Named Plaintiff Stephen R. Forrester, as set forth in his Certification attached hereto as Exhibit 2, purchased IIPR securities during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

16.    IIPR, founded on June 15, 2016, is an internally-managed real estate investment trust ("REIT") focused on the acquisition, ownership, and management of specialized industrial properties leased to experienced, state-licensed operators for their regulated state-licensed cannabis facilities. IIPR is incorporated in

Maryland, with its headquarters located at 1389 Center Drive, Suite 200, Park City, Utah 84098. IIPR's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "IIPR" and IIPR's preferred stock trades on the NYSE under the ticker symbol "IIPR-PA."

17.    Defendant Smithers co-founded IIPR, and has served as IIPR's Chief Executive Officer ("CEO"), President, and a Director since IIPR's founding.

18.    Defendant Hastings has served as IIPR's Chief Financial Officer ("CFO") since June 2017, as IIPR's Treasurer since January 2017, and served as IIPR's Chief Accounting Officer ("CAO") from January 2017 through January 2021.

19.    Defendant Gold is a co-founder of IIRP, and at all relevant times has served as the Executive Chairman of IIPR's Board of Directors.

20.    Defendant Hager has served as IIPR's Vice President of Asset Management since October 2019. She claims 30 years of experience in commercial property management, overseeing management teams and properties in the U.S. and U.K.

21.    Defendant Regin has served as IIPR's Vice President of Investments since January 2020, and before that as IIPR's Director of Finance & Investments since 2017.

22.    Defendant Andy Bui ("Bui") has served as IIPR's CAO and Vice President since January 2021. He previously served as IIPR's Controller, starting in May 2017.

23.    Defendants Smithers, Hastings, Gold, Hager, Regin, and Bui are collectively referred to herein as the "Individual Defendants."

24.    For IIPR's quarterly reports for the periods ending: June 30, 2020 ("Q2 2020 10-Q"); September 30, 2020 ("Q3 2020 10-Q"); March 31, 2021 ("Q1 2021 10-Q"); June 30, 2021 ("Q2 2021 10-Q"); September 30, 2021 ("Q3 2021 10-Q"); May 31, 2022 ("Q1 2022 10-Q"); and for the annual reports for the periods ending December 31, 2019 ("2019 10-K"), December 31, 2020 ("2020 10-K"), and December 31, 2021 ("2021 10-K"), Defendants Smithers and Hastings each certified, Pursuant to Section 302 of the Sarbanes-Oxley Act of 2022, that:

> 1)    I have reviewed this [Quarterly Report on Form 10-Q/Annual Report on Form 10-K] of Innovative Industrial Properties, Inc.;
>
> 2)    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3)    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4)    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (c)  Disclosed in this report, any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5)    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting, which are reasonably likely to adversely affect the registrant's ability to record,

process, summarize and report financial information; and

(b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

25.     Defendants Smithers and Hastings each further certified in each filing listed above that, "pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002," the quarterly and annual filings "fully compl[y] with the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934," and that the "information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of IIPR."

26.     Each of the Individual Defendants, because of their positions with IIPR, possessed the power and authority to control the contents of IIPR's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of IIPR's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been

disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

27.    IIPR is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

28.    The scienter of the Individual Defendants and other employees and agents of IIPR is similarly imputed to IIPR under *respondeat superior* and agency principles.

<u>**SUBSTANTIVE ALLEGATIONS**</u>

<u>**Background**</u>

29.    IIPR, founded in 2016, is an internally-managed real estate investment trust ("REIT") focused on the acquisition, ownership, and management of specialized industrial properties leased to experienced, state-licensed operators for their regulated state-licensed cannabis facilities. As a REIT, IIPR is required to distribute 90% of its taxable income annually in the form of dividends to its investors.

30.    IIPR acquires and manages these specialized cannabis facilities and

leases them to experienced, state-licensed operators. IIPR acquires its properties through sale-leaseback transactions and third-party purchases. IIPR leases its properties under long-term, triple-net lease agreements, where the tenant is responsible for all aspects of and costs related to the property and its operation during the lease term, including capital improvements, structural repairs, maintenance, real estate taxes, and insurance. IIPR's typical leases with its operators are from 15-20 years.

31.    IIPR delivers returns to its stockholders by collecting rent payments from its operators, and, as such, relies upon those operators to run their facilities profitably and in compliance with the vast legal and regulatory obligations faced by cannabis facilities. Due to the legal and operational complexity of running large cannabis-growing operations, and the limited number of state-licensed operators in the industry, Omega must be careful in selecting and sensitive to the problems of its operators, as finding new operators for its facilities is time-consuming and expensive.

32.    Because marijuana has not been legalized federally, banks will not issue loans to marijuana growers, who are forced to seek capital elsewhere. IIPR took advantage of this, buying land from operators at prices far higher than the growers themselves had paid for the property, with the excess sales price (sometimes 300% higher than the actual value of the property) extended back to the operator to invest

and buy the necessary equipment to successfully farm and sell marijuana. Because of the newness of the market and the lack of available traditional financing sources, IIPR was able to charge high interest rates on its loans, usually approximately 11%-15%.

33.     Because finding a replacement operator to run a functioning marijuana facility would be extremely difficult, and likely involve lowered rents due from the replacement operators, IIPR told investors that it had always performed extensive background checks on its prospective operators. During an August 5, 2021, earnings conference call ("Q2 2021 call"), Defendant Gold told investors that IIPR spent "a great deal of time focus[ed] not only on the … proposed real estate transaction," but "a lot of time with the management team" doing "background checks on these tenants, understanding where they've come from and their reputations …." During a February 25, 2021, earnings conference call, Defendant Gold struck the same note, stating that "we tend to add new growers very carefully and with a lot of consideration because of that commitment to be able to provide them future capital."

**Kings Garden**

34.     In 2019 IIPR entered into sale leaseback transactions for properties with Kings Garden, led by its Founder, Chairman, and CEO, Michael King. Kings Garden had only been founded in 2015, and had only been licensed to cultivate and distribute marijuana in California that same year, 2019. In its 2022 lawsuit against

Kings Garden and Michael King, IIPR admitted that it relied heavily on the newly-acquired California licensure and IIPR's "long-standing reputation" in choosing to contract with Kings Garden, and that it knew that Mr. King did not personally have a license to cultivate and distribute marijuana in California. In that same lawsuit, IIPR admitted that rather than check whether Mr. King had been cleared by the United States Department of Justice for federal licensing and had been "screened and cleared at all levels," IIPR simply accepted Michael King's "personal represent[ation]" that this was true. Taking the word of a person whom it later alleged was the operator of a "Ponzi Scheme," is far from doing what it told investors it was going to do to ensure investors that it was not risking their money getting into business with unethical, criminal perpetrators of fraud.

35.    IIPR failed to perform anything close to an adequate background check on Mr. King, much less spent "a great deal of time focus[ed]" on "background checks on [Michael King]." Indeed, it later took IIPR minimal effort to confirm that Kings Garden had, from its very first submission of an invoice seeking money back from IIPR for improvements and construction purportedly completed, submitted obviously forged invoices and forms to IIPR, with the fraud totaling millions of dollars. IIPR could have avoided the damage eventually suffered by carrying out what it told investors was so important, conducting a background review of Michael King before giving him and Kings Garden tens of millions of dollars.

36.     IIPR bought five fully-operational facilities located in California from Kings Garden at prices far higher than Kings Garden had paid for the properties, and immediately leased them back to Kings Garden on triple-net leases As with all of IIPR's sale-leaseback or third-party transactions, Kings Garden was responsible for all aspects of upgrading the facility, and growing and selling the cannabis. IIPR's interest was in collecting rents from Kings Garden, and earning interest on loans it made available to Kings Garden.

37.     Immediately after the Kings Garden purchases, Kings Garden became IIPR's third largest operator. During the second quarter of 2019, ending on June 30, 2019, Kings Garden accounted for 10% of IIPR's rental revenue. In the third quarter of 2019, ending September 30, 2019, Kings Garden accounted for 8% of IIPR's rental revenue.

38.     In its Q2 2021 10-Q, IIPR disclosed that in Q2 of 2021, Kings Garden accounted for 7% of its rental revenues, the fifth highest of any operator. Three months later, in IIPR's Q3 2021 10-Q, Defendants disclosed that in the third quarter, Kings Garden accounted for 8% of its rental revenues, the third highest of any operator. As disclosed in IIPR's 2021 10-K, for the full year 2020 Kings Garden accounted 8% of IIPR's total rental revenue, its fifth largest operator in terms of rental revenue.

39.     In its Q1 2022 10-Q, IIPR disclosed that Kings Garden represented 8% of its total rental revenue.

40.     In the 2020 10-K, IIPR disclosed that as of December 31, 2020, its largest investment in any operator was in Kings Garden, with an investment of approximately $70 million.

41.     In the 2021 10-K, IIPR disclosed that as of December 31, 2021, its investment in Kings Garden was approximately $83 million, its third largest investment in any operator.

42.     During the August 5, 2021 earnings conference call, Defendant Regin stated that IIPR's total investment in Kings Garden was approximately $150 million.

43.     Throughout the Class Period, IIPR issued risk warnings about the risks of contracting with the wrong tenants. For example, in the risk warning section of the 2019 10-K, IIPR warned that "the success of our investments will be materially dependent on the financial stability of these tenants. ***We rely on our management team to perform due diligence investigations of our potential tenants….***"

44.     Also throughout the Class Period, IIPR lauded its relationship with Kings Garden, and indeed lauded Michael King personally.

45.     During the February 25, 2021 earnings conference call, Defendant Regin championed both Kings Garden and Michael King:

18

> Kings Garden is one of the top operators in California, consistently ranking in the top 5 of flower and concentrate sales in the state, and as you may recall, was one of the first cannabis operators to commence regular quarterly dividends to its shareholders in June 2020, a remarkable achievement for a company continuing on its rapid expansion path.
>
> . . . .
>
> **We are proud partners of Michael King and his great team** and look forward to supporting them through the development and redevelopment of state-of-the-art facilities to dramatically expand production capacity and continue to deliver the highest-quality product that they are known for.
>
> . . . .
>
> But needless to say, we are thrilled to team with Kings Garden in California.

46. During the August 5, 2021 earnings conference call, Defendants continued lionizing Kings Garden, even as Kings Garden was already submitting forged documents to IIPR and stealing what IIPR admits was "millions of dollars."[5] For example, Defendant Regin stated:

> Kings Garden has developed a truly distinguished brand in California and consistently ranks as a top producer in sales in a state that represents the largest market in the world
>
> . . . .
>
> Kings Garden is yet another example of our tenant partners

---

[5] In a filing in its lawsuit against Kings Garden and Michael King, IIPR states that there is "[u]ndisputed evidence that Defendants obtained $49 million in construction funds using forged general contractor forms AIA G-702." *IIP-CA 2 LP v. Kings Garden, Inc., et al.* ("Plaintiff IIP-CA G 2 LP Supplemental Reply in Support of Application to Appoint Receiver") (No. CVPS2202975 0000033454127) (filed August 26, 2022).

focused on long-term, responsible, sustainable production.

47.    Also during the August 5, 2021 call, in response to an analyst question about how IIPR evaluates whether to make investments in potential operators, Defendant Gold stated:

> We spent a great deal of time focus not only on the real estate -- the proposed real estate transaction that brings those tenants to IIPR. ***But we spent a lot of time with the management team, evaluating their skills and expertise*** in running not only a business, but in marketing and then most specifically in growing. ***And we utilize our existing network of growers to do background checks on these tenants, understanding where they've come from and their reputations in the specific state or just in the industry in general.***

48.    During the February 24, 2022 earnings conference call, Defendants continued praising Kings Garden, with Defendant Regin stating:

> With their brand reputation and operational expertise driving financial results, the Kings Garden team has also been one of the uniquely positioned operators to return capital to its long-term owners in the form of dividends, including $3 million in each of the last 2 years. We are excited to be working closely with Kings Garden as they complete full build-out of their production capacity in the months to come.

49.    Finally, during the May 5, 2022 earnings conference call, held after the Blue Orca report had been released setting out multiple allegations of fraud and thievery against Michael King, and after IIPR's swift public rejection of everything in the Blue Orca report, Defendants went full-bore extolling both Kings Garden and

20

IIPR's investment decisions. After Defendant Gold told investors that "we plan to focus on 2 of our tenant partners, Parallel and Kings Garden,[6] and do a deeper dive into our underwriting fundamentals, as applied specifically to these 2 private company tenants," Defendant Regin stated:

> We made our initial investment with Kings Garden in April 2019 …. [a]t that time, we evaluated Kings Garden, as a leading indoor cannabis operator in California with profitable operations and a distribution agreement with one of the largest distributors in the state, delivering Kings Garden products to over 60% of the state's regulated dispensaries. In May of 2020, we followed with the acquisition of a fully operational property …. [s]hortly after that closing, Kings Garden announced the initiation of a quarterly dividend to its stockholders, something that was and is considered highly unusual among any prominent brand in the industry and which demonstrates their belief in the long-term prospects in the business.[7]

**IIPR's Failure to Investigate Kings Garden and Michael King Allowed Kings Garden to Defraud IIPR Out of Millions of Dollars**

50.    In IIPR's lawsuit against Kings Garden, Michael King, and others, as well as in the related *ex parte* motion to appoint a receiver, IIPR lays out Kings

---

[6] The Blue Orca report also discussed Parallel at length.

[7] Through the end of the Class Period, IIPR did not address whether the "highly unusual" dividends Kings Garden issued to its stockholders, including Michael King, was in any way related to the millions of dollars that mysteriously left Kings Garden, which IIPR noticed in the Kings Garden financial statements it reviewed only after the theft was complete.

Garden defrauded IIPR. The facts IIPR describes are not kind to Defendants, as they show that Defendants should have know about Michael's King's background before they even contracted with Kings Garden, and that the actual theft, committed over an extended period of time by what IIPR admits were easy-to-discover forgeries, should have been discovered immediately, and certainly far earlier than they were. Indeed, after Blue Orca released its April 14, 2022 report, Defendants went back and looked closely at the very first Draw Request for funds it received from Kings Garden, and discovered quickly, simply by looking at it, that it was an obvious forgery.

51.    According to the multiple leases IIPR and Kings Garden entered into between April 16, 2019, and March 25, 2021, IIPR was required to reimburse Kings Garden for approved expenditures to improve the facilities, with IIPR to supply supporting documentation in support of any reimbursement. To avoid even the possibility of fraud, any such "Draw Request" would be sent to IIPR's "Construction Team," which reported to Defendant Hastings, IIPR's CFO. The Construction Team would, according to IIPR, "review [any request for reimbursement] "for accuracy and compliance with acceptable construction parameters." IIPR's Construction Team failed miserably for years in reporting (or noticing) Kings Garden's blatant forgeries and thefts.

52.    Even before entering into the Leases with Kings Garden, IIPR had

22

multiple "meetings, e-mails, teleconferences, and video calls" with Kings Garden and all of its principals, including Michael King. The topic of all of these meetings and communications was "the financial condition of [Kings Garden]." IIPR claims that Kings Garden had "a duty … to correct errors in any information provided from [Kings Garden] to [IIPR]." IIPR does not mention, however, its own duty to scrutinize the financial information it received from Kings Garden to assure that it was true.

53.    In November 2020, IIPR entered into a sale-leaseback transaction with Kings Garden for the San Bernardino Project, with allowance for up to $25 million in Draw Requests. The lease specified that IIPR would fund  construction projects to approve the property. Between July 29, 2021, and June 1, 2022, Kings Garden submitted six Draw Requests totaling approximately $21.6 million. All but the last Draw Request was received, approved, and paid before Blue Orca released its report on April 14, 2022.

54.    In February 2021, IIPR entered into a sale-leaseback transaction with Kings Garden for the 19th Street Property, with allowance for up to $51.4 million in Draw Requests. The lease specified that IIPR would fund  construction projects to approve the property. Between September 3, 2021, and June 1, 2022, Kings Garden submitted six Draw Requests totaling approximately $26.9 million. All but the last Draw Request was received, approved, and paid before Blue Orca released its report

on April 14, 2022.

55.     Even while attempting to unburden itself of its recklessness for failing to notice large-scale fraud, Defendants admit that their Construction Team "regularly requested, and received, construction updates and/or site visits directly from [Kings Garden][.]"

56.     Only after Defendants read the April 14, 2022 Blue Orca report (which they publicly dismissed out of hand that same day) did Defendants ever look closely at the Draw Requests to see if there were any irregularities.

57.     On June 1, 2022, Kings Garden submitted its sixth Draw Request for the 19th Street Property. For the first time, Defendants looked closely and asked questions of Kings Garden. Noticing that the numbers on the Draw Request simply did not match the supporting documentation, the Construction Team called Kings Garden and asked for additional documentation. Kings Garden stated that it did not have access to additional information, and asked Defendants to fund the Draw Request anyway. IIPR refused, and convened a video call, during which Kings Garden admitted that its own personnel had always been forging the Draw Requests and related forms by preparing and authenticating them internally, when only the general contractor was supposed to prepare and authenticate these forms. IIPR had finally noticed Kings Garden's forgeries and theft.

58.     IIPR decided to go back and perform a "retro-active review of [Kings

Garden's] past Draw Requests" for both projects, all of which it had approved, paying Kings Garden millions of dollars. Looking closely (likely for the first time) at ***the very first Draw Request Kings Garden had ever submitted***, for almost $1.5 million, IIPR noticed "inconsistent font types and text boxes that appeared to have been added to an old invoice." Further, a simple examination of the "metadata from the *pdf of this particular form indicated that the base form was created in 2017," years before IIPR and Kings Garden ever connected. The very first Draw Request was an obvious forgery.

59.    Only then, according to IIPR, did it began examining Kings Garden's financial statements, even as during the initial negotiations it had demanded such documents from Kings Garden, and, in fact, in a (self-serving) Declaration Michael King filed in the lawsuit brought by IIPR against him, King stated that "[s]ince November 2019, Kings Garden has provided, on a quarterly basis, quarterly and annual financial information, including balance sheets and income statements, to IIP[R]."[8] Upon finally looking closely at Kings Garden's financials, IIPR quickly discovered that "well over $15 million" had exited Kings Garden's accounts in 2021 and 2022, including "suspicious loans'" to "individuals [who] have ties to organized crime," evidencing a "business conducting a fraudulent business operation."

---

[8] *IIP-CA 2 LP v. Kings Garden, Inc., et al.* (No. CVPS220975 0000033280630), filed September 9, 2022.

60.    IIPR's Construction Team then belatedly contacted the contractor listed on invoices for both the 19th Street expansion and the San Bernardino Property, who told IIPR that there were many forged invoices, documents, and signatures. The total of the forged invoices was millions of dollars.

61.    IIPR's construction Team then belatedly contacted parties that had allegedly actually performed work on the two Projects, and, despite claiming earlier that they had done site visits, visited the properties. IIPR learned that the discrepancy between the invoices paid and the value of actual work performed was also in the millions of dollars.

62.    In June 2022 IIPR told Kings Garden that it would provide no more funding for Draw Requests until all discrepancies were resolved. In response, Kings Garden told IIPR that "it was out of money and would not be paying its July 2022 rent on the Premises," or for that matter any more rent whatsoever. For want of looking closely at the very first Draw Request submitted by Kings Garden at the time it was submitted, an obvious forgery, IIPR had given away millions and millions of dollars to a not-so-sophisticated thief, and had also lost 8% of its annual rental revenue.

63.    In documents filed in its lawsuit against Kings Garden, IIPR called Kings Garden's forgeries a "Madoff-style Ponzi Scheme," carried out through "pervasive" forgeries. Suddenly succeeding in investigating Michael King's

background, IIPR discovered "a history of deception: over 32 lawsuits, felony charges, name changes, and fraudulent conduct," as well as that Michael King has been sued for fraud by his own family members.

**The Blue Orca Report**

64.    On April 14, 2022, before the market opened, Blue Orca released its report. The report laid out, sourced and in detail, negative information about Michael King, with the information pre-dating IIPR's original purchase from Kings Garden.

65.    The Blue Orca report also laid out, sourced with tax records, that IIPR recorded the fair value of its purchases from Kings Garden and Parallel at its purchase price, when the true fair value of those properties, as evidenced by the amounts Kings Garden and Parallel paid for them, was exponentially lower. Blue Orca thus described that the market value of these properties was far lower than the carrying amounts on IIPR's balance sheets.

66.    With respect to Michael King, Blue Orca reported on a January 2019 lawsuit filed in California state court by Swiss American Investment Corporation, one of Kings Garden's investors.[9] January 2019 was months before IIPR entered into its first transaction with Kings Garden. Swiss American alleged, as Blue Orca

---

[9] The lawsuit is *Swiss American Investment Corp. v. Kings Garden, LLC et al.*, No. 37-2019-00005548-CU-WM-CTL (Cal Sup. Ct., Cty. Of San Diego). The case was eventually referred to non-public arbitration.

summarized, "self-dealing, poor corporate governance, and a lack of transparency around its financial affairs." Specifically, Swiss American alleged that Kings Garden had never paid it any of the quarterly distributions owed to it under the terms of its investment with Kings Garden.

67.    The Blue Orca report further detailed Swiss American's claims that it had "discovered a series of 'irregular' transactions involving millions of dollars between Kings Garden and its managing directors, including loans of [millions of dollars] made to purchase real estate which was then leased back to IIPR." Swiss American also alleged multiple related-party transactions between Kings Garden and entities owned or controlled by its managing members.

68.    The Blue Orca report also detailed a May 2021 lawsuit brought by Paul King, a co-founder of Kings Garden and Michaels King's brother, against Michael King and Kings Garden.[10] Paul King alleged that Michael King "deliberately and blatantly falsified books and records to personally enrich himself, and swindle money from investors." Michael King also "repeatedly misrepresented that funds were being used for business purposes when in fact they were exclusively used for M. King's personal benefit." Further, "M. King used and continues to use Kings Garden as his personal piggy back thereby … decreasing the value of … investors'

---

[10] The lawsuit is *Paul King v. Michael King, et al.*, No. 21-23889 (S.D. Fla. 2021).

ownership interests in IIPR by millions of dollars."

69.     Perhaps more troubling, Paul King's lawsuit accused Kings Garden of selling millions of dollars' worth of cannabis on the black market, in violation of state and local laws, and putting at risk the "permits, licenses and regulatory approvals held by Kings Garden and its subsidiaries." Paul King also claimed Kings Garden committed fraud with respect to its financial, regulatory, and tax reporting.

70.     The Blue Orca report described multiple sale-leaseback transaction by IIPR with Kings Garden or Parallel.[11] In each transaction, IIPR paid a far higher price for the properties than Kings Garden or Parallel had paid, and in each case IIPR recorded the purchase price as the fair value (book value) of its purchase, in violation of GAAP.

71.     In April 2019, IIPR purchased its first property from Kings Garden, the N. 19th Avenue Property, for $15 million. One year earlier, in April 2018, Kings Garden had acquired the property for $3.9 million.

72.     Also in April 2019, IIPR purchased the N. Anza Road #1 Property from Kings Garden for $5.8 million In January 2017, Kings Garden had acquired the property for $2.5 million.

73.     In April 2019, IIPR also purchased the N. Anza Road #2 Property from

---

[11] Like Kings Garden, Parallel was one of IIPR's top five operators.

Kings Garden for $6.3 million In May 2016, Kings Garden had acquired the property for $3.3 million.

74.    In May 2020, IIPR acquired the Mclane Street Property from Kings Garden for $17.5 million. The Mclane Street Property had been acquired by Kings Garden in May 2017 for only $3.75 million.[12]

75.    Starting in 2020, IIPR acquired four properties in sale-leaseback transactions from Parallel, investing $203 million. Blue Orca provided details about three of these transactions.

76.    In March 2020, IIPR paid Parallel $35.3 million for a property in Wimauma, Florida. In September 2017, Parallel (at the time known as Surterra) had purchased the property for $9.2 million.

77.    In September 2020, IIPR paid Parallel $19.6 million for a property in Lakeland, Florida. In February 2019, Parallel had purchased the property for $3.62 million.

78.    In May 2021, IIPR paid Parallel $41.8 million for the Northside Commerce Center Property in Pittsburgh, Pennsylvania. Just one day earlier, Parallel had purchased the property for $22 million.

---

[12] The Blue Orca report discussed only these four of IIPR's six properties purchased from Kins Garden, stated that it was "unable to due diligence" the other two properties.

30

## **IIPR's GAAP Violations**

79.    Throughout the Class Period, IIPR recorded the fair value of its sale-leaseback purchases from both Kings Garden and Parallel at its purchase price, even as the price it paid was many times the purchase price paid by Kings Garden and Parallel for the properties not long before the sale-leaseback transaction.

80.    IIPR's accounting for these transactions violated several GAAP provisions, and throughout the Class Period IIPR's quarterly and annual financial statements were materially false, presenting a false picture of IIPR's finances to investors.

### GAAP- Generally

81.    GAAP refers to the framework of guidelines for financial accounting used to prepare financial statements. The SEC has the statutory authority to set accounting standards and has delegated that authority to the Financial Standards Accounting Board ("FASB").

82.    The FASB accounting standards codification ("ASC") and the SEC rules and interpretive releases are sources of authoritative GAAP for SEC registrants. SEC Staff also issues Staff Accounting Bulletins ("SABs") which represent practices followed by the SEC staff in administering SEC disclosure requirements. ASC 105-10-05-1.

83.    SEC rules and regulations require that publicly traded companies

include GAAP-compliant financial statements in their annual and quarterly reports filed with the SEC. *See* Section 13 of the Exchange Act; SEC Rule 10-01(d) of Regulation S-X ("Reg. S-X"). SEC Rule 4-01(a) of Reg. S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1).

84.     According to the FASB Statement of Financial Accounting Concepts ("CON") No. 8, "[t]he omission or misstatement of an item in a financial report is material if, in light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item." CON 8 ¶ QC11. According to SAB 99, evaluating materiality requires viewing the facts in the context of surrounding circumstances or as a "total mix," considering both quantitative and qualitative factors. SAB 99 recognizes that a 5% threshold in relation to individual line-item amounts, subtotals, or totals in the financial statements is often used as a "rule of thumb" in assessing materiality but cautions that such evaluation should be only the beginning of a materiality assessment and "cannot appropriately be used as a substitute for a full analysis of all relevant considerations." Misstatements of financial statements which are less than 5% "could well be material. Qualitative factors may cause misstatements of

quantitatively small amounts to be material." *Id.* According to the SEC staff, "[t]he materiality of a misstatement may turn on where it appears in the financial statements" and "whether the misstatement masks a change in earnings or other trends … [or] concealment of an unlawful transaction." *Id.*

85.    The Public Company Accounting Oversight Board ("PCAOB"), a nonprofit corporation established by Congress to oversee the audits of public companies, established auditing standards that provide that "[t]he financial statements are management's responsibility … Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements." PCAOB Auditing Standard ("AS") 1001.03. Further, an "entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management ... Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility." *Id.*

<u>IIPR Violated GAAP in Accounting for its Sale-Leaseback Transactions</u>

86.    ASC 842, *Leases*, governs the accounting for leases, including sale-leaseback transactions. Throughout the Class Period IIPR violated ASC 842 in accounting for its sale-leaseback transactions with two of its largest operators, Kings

Garden and Parallel.

87.     GAAP required IIPR to allocate the total cost of the acquired assets to individual assets (*e.g.*, building vs. land) based on their relative fair values. ASC 805-50-30-3. Fair value is defined in GAAP as the price that would be received from the sale of an asset or paid to transfer a liability in an orderly transaction between market-participants. ASC 820-10-20.

88.     When entering into sale-leaseback transactions, IIPR was required to determine whether its sale-leaseback transactions were done "at fair value on the basis of difference between either of the following, whichever is more readily determinable:

(a) The sale price compared to the fair value of the underlying asset.

(b) The present value of the contractual lease payments compared to the present value of fair market value lease payments." ASC 842-40-30-1.

89.     IIPR should have maximized the use of observable prices and observable information (such as recent sales data of the underlying assets) when making this assessment given, as IIPR stated in its 2021 10-K, the "uncertain regulatory environment in the United States relating to the medical-use cannabis industry and the uncertainty of collectability of lease payments from each tenant due to its limited operating history," which led IIPR to record rental revenues on a cash basis.

90.    In fact, not only is the accounting guidance related to sales at other than fair value clearly stated in GAAP, ASC 842 even includes the following example, which closely fits the fact pattern of the sale-leaseback transactions at issue in this case:[13]

> An entity (Seller) sells a piece of land to an unrelated entity (Buyer) for cash of $2 million. … At the same time, Seller enters into a contract with Buyer for the right to use the land for 10 years (the leaseback), with annual payments of $120,000 payable in arrears. This Example ignores any initial direct costs associated with the transaction. The terms and conditions of the transaction are such that Buyer obtains substantially all the remaining benefits of the land on the basis of the combination of the cash flows it will receive from Seller during the leaseback and the benefits that will be derived from the land at the end of the lease term. In determining that a sale occurs at commencement of the leaseback, Seller considers that, at that date, all of the following apply:
>
> a.  Seller has a present right to payment of the sales price of $2 million.
>
> b.  Buyer obtains legal title to the land.
>
> c.  Buyer has the significant risks and rewards of ownership of the land because, for example, Buyer has the ability to sell the land if the property value increases and also must absorb any losses, realized or unrealized, if the property value declines.
>
> The observable fair value of the land at the date of sale is $1.4 million. **Because the fair value of the land is**

---

[13] Parts of the example which discuss seller's accounting for the transaction have been removed as they are not relevant to IIPR's accounting as the buyer.

**observable, both Seller and Buyer utilize that benchmark in evaluating whether the sale is at market term. Because the sale is not at fair value (that is, the sales price is significantly in excess of the fair value of the land), both Seller and Buyer adjust for the off-market terms in accounting for the transaction. … The amount of the excess sale price of $600,000 ($2 million – $1.4 million) is recognized as additional financing from Buyer to Seller (that is, Seller is receiving the additional benefit of financing from Buyer).** … The leaseback is classified as an operating lease.

\*                                                                    \*        \*

Also, at the commencement date, Buyer recognizes the land at a cost of $1.4 million and **a financial asset for the additional financing provided to Seller of $600,000.** Because the lease is an operating lease, at the date of sale Buyer does not do any accounting for the lease.

In accounting for the additional financing to Seller, Buyer uses 6 percent as the applicable discount rate, which it determined in accordance with paragraphs 835-30-25-12 through 25-13. Therefore, **Buyer will allocate $81,521 of each lease payment to Buyer's financial asset and allocate the remaining $38,479 to lease income.** After initial recognition and measurement at each period of the lease term, Buyer will do both of the following:

a        Decrease the financial asset for the amount of each lease payment received that is allocated to that obligation (that is, $81,521) and increase the carrying amount of the obligation for interest accrued on the financial asset using Seller's incremental borrowing rate of 6 percent. Consistent with Seller's accounting, at the end of Year 1, the carrying amount of the financial asset is $554,479 ($600,000 – $81,521 + $36,000).

      b      Recognize the interest income on the financing obligation (for example, $33,269 in Year 2) and $38,479 in operating lease income.

At the end of the lease term, the carrying amount of the financial asset is $0, and Buyer continues to recognize the land. [Emphasis added.]  ASC 842-40-55-23 – 30.

91.    AS the example makes clear, recording IIPR's entire purchase price as fair value violates GAAP. As detailed in the Blue Orca report, IIPR rental properties which it purchased from and leased back to Parallel and Kings Garden, two of its largest tenants, were valued significantly less than IIPR's purchase price. When purchasing assets from cannabis producers at more than their fair value, GAAP required IIPR to adjust the sale price, record the acquired assets at fair value, and account for the excess of IIPR's costs over the fair value of the assets acquired as additional financing provided by IIPR to the cannabis producers. ASC 842-40-30-2. Accounting for the excess purchase price involves recording the assets at a lower value and recording an advance receivable from the cannabis producers. Subsequent rent payments received by IIPR had to be allocated between rental income and debt service (i.e., interest income and payment of principal on the advance receivable). ASC 842-40-55-23 – 30. Yet IIPR chose not to apply ASC 842's straightforward requirements, or the guidance offered in that provision under a similar fact pattern.

92.    Instead of following the clearly defined accounting standards, IIPR recorded the assets it acquired in sale-leaseback transactions from Parallel and Kings

Garden at their full cost without recognizing excess of cost over fair value as advances to these cannabis producers, thus overstating the initial carrying values of IIPR's real estate assets and completely avoiding showing advances to these cannabis producers on IIPR's balance sheet. This practice enabled IIPR to hide the true extend of its lending activities. Moreover, because none of the rental payments IIPR received were allocated to debt service, its rental revenues were overstated during the Class Period.

### IIPR Violated GAAP by Failing to Impair the Carrying Values of Its Real Estate Investments

93.     ASC 360, *Property, Plant, and Equipment*, is the authoritative accounting standard which governs the accounting for long-lived assets, including evaluation of these assets for impairment. Throughout the Class Period IIPR violated ASC 360 in accounting for rental properties it leased to Parallel and Kings Garden as part of sale-leaseback transactions.

94.     In addition to costs to acquire real estate, IIPR also capitalized various other costs, such as tenant allowances and building improvements, incurred subsequent to acquisition. IIPR provided such generous tenant allowances that at the end of 2021, IIPR's costs capitalized subsequent to acquisition exceeded IIPR's initial costs to acquire its rental properties. These capitalized costs further inflated the carrying values of IIPR's real estate assets.

95.     Subsequent to their acquisition, GAAP required IIPR to measure its

38

rental properties leased to cannabis producers for impairment in accordance with the guidance in ASC 360-10-35. ASC 842-30-35-6. Under ASC 360-10-35, IIPR was required to regularly review the carrying value of its rental properties and write down the value of those assets whose values were not recoverable. More specifically, GAAP required IIPR to carry out the following steps:

  (a) <u>Step 1</u>: Consider whether indicators of impairment were present. ASC 360-10-35-21.

  (b) <u>Step 2</u>: If impairment indicators were present, or if other circumstances indicate that an impairment might exist, perform a recoverability test by comparing the sum of the estimated undiscounted future cash flows attributable to each property in question to its carrying amount. ASC 360-10-35-17; ASC 360-10-35-23, ASC 360-10-35-29 – 35.

96.

  (a) <u>Step 3</u>: If the undiscounted cash flows used in the test for recoverability were less than the carrying amount of a property, determine the fair value of such property and recognize an impairment loss if the carrying amount exceeds the property's fair value. ASC 360-10-35-17; ASC 360-10-35-36.

97.

98. GAAP provides the following non-exclusive list of examples of events or changes in circumstances that indicate the carrying amount of a long-lived asset might not be recoverable to assist management in determining when long-lived assets should be evaluated for impairment:

  (a) A significant decrease in the market price of a long-lived asset (asset group)

    (b) A significant adverse change in the extent or manner in which a long-lived asset (asset group) is being used or in its physical condition

99.

    (a) A significant adverse change in legal factors or in the business climate that could affect the value of a long-lived asset (asset group), including an adverse action or assessment by a regulator

100.

    (a) An accumulation of costs significantly in excess of the amount originally expected for the acquisition or construction of a long-lived asset (asset group)

101.

    (a) A current-period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with the use of a long-lived asset (asset group)

102.

    (a) A current expectation that, more likely than not, a long-lived asset (asset group) will be sold or otherwise disposed of significantly before the end of its previously estimated useful life. The term more likely than not refers to a level of likelihood that is more than 50 percent. ASC 360-10-35-21.

103.

104.   IIPR disclosed that it evaluates the following indicators on a property-by-property basis to determine whether an impairment evaluation is necessary:

- significant fluctuations in estimated net operating income
- occupancy changes
- significant near-term lease expirations
- current and historical operating and/or cash flow losses
- construction costs
- estimated completion dates

- rental rates, and other market factors
- deterioration in rental rates for a specific property
- deterioration of a given rental submarket
- significant change in strategy or use of a specific property or any other event that could result in a decreased holding period, including classifying a property as held for sale, or significant development delay
- evidence of material physical damage to the property
- default by a significant tenant when any of the other indicators above are present (See 2001 Form 20-K, pages 69 and F-8 – F-9)

105.  GAAP provides the following guidance, with respect to estimating future cash flows used to test long-lived assets for recoverability in Step 2:

> Estimates of future cash flows used to test the recoverability of a long-lived asset (asset group) shall include only the future cash flows (cash inflows less associated cash outflows) that are directly associated with and that are expected to arise as a direct result of the use and eventual disposition of the asset (asset group). Those estimates shall exclude interest charges that will be recognized as an expense when incurred.

> Estimates of future cash flows used to test the recoverability of a long-lived asset (asset group) shall incorporate the **entity's own assumptions** about its use of the asset (asset group) and shall consider all available evidence. The assumptions used in developing those estimates shall be reasonable in relation to the assumptions used in developing other information used by the entity for comparable periods, such as internal budgets and projections, accruals related to incentive compensation plans, or information communicated to others. However, if alternative courses of action to recover the carrying amount of a long-lived asset (asset group) are under consideration or if a range is estimated for the amount of possible future cash flows associated with the likely course of action, the likelihood of those possible outcomes shall be considered. **A probability-weighted approach**

41

**may be useful in considering the likelihood of those possible outcomes.**

........................................................

Estimates of future cash flows used to test the recoverability of a **long-lived asset (asset group) that is in use**, including a long-lived asset (asset group) for which development is substantially complete, **shall be based on the existing service potential of the asset (asset group) at the date it is tested.** The service potential of a long-lived asset (asset group) encompasses its remaining useful life, cash-flow-generating capacity, and for tangible assets, physical output capacity. Those estimates shall include cash flows associated with future expenditures necessary to maintain the existing service potential of a long-lived asset (asset group), including those that replace the service potential of component parts of a long-lived asset (for example, the roof of a building) and component assets other than the primary asset of an asset group. **Those estimates shall exclude cash flows associated with future capital expenditures that would increase the service potential of a long-lived asset (asset group).** Estimates of future cash flows used to test the recoverability of a long-lived asset (asset group) that is under development shall be based on the expected service potential of the asset (group) when development is substantially complete. Those estimates shall include cash flows associated with all future expenditures necessary to develop a long-lived asset (asset group), including interest payments that will be capitalized as part of the cost of the asset (asset group). [Emphasis added.] ASC 360-10-35-29–33.

106.    For those properties whose carrying value was not recoverable (*i.e.*, the net undiscounted cash flows were below the net book value), IIPR was required to perform Step 3, measure the fair value of the rental properties and recognize an impairment loss equal to the excess of their carrying value over their respective fair

value.

107.   As detailed in the Blue Orca report, IIPR rental properties which it purchased from and leased back to Parallel and Kings Garden, two of its largest tenants, were valued significantly less than IIPR's initial purchase price and subsequent carrying values. Moreover, according to the Blue Orca report, many of IIPR's tenants were experiencing financial difficulties and wrestling with falling stock prices and worsening cash flows. The Blue Orca report specifically highlighted quality and solvency problems at Parallel and Kings Garden. As a matter of fact, King Garden's financial difficulties culminated in its default on rent in July 2022, shortly after the end of the Class Period. These conditions should have triggered IIPR to evaluate its properties for impairment, particularly those rented to Parallel and Kings Garden, as early as 2019, even before the start of the Class Period, and certainly no later than the start of the Class Period.

108.   IIPR claimed in its 2020 10-K and 2021 10-K that when triggering events or impairment indictors were identified, it "review[ed] an estimate of future undiscounted cash flows for the properties, including, if necessary, a probability-weighted approach if multiple outcomes are under consideration." In each case IIPR did not record an impairment because it concluded that the property's carrying value was recoverable as it was below IIPR's projected undiscounted cash flows over the holding period:

> For each property where such an indicator occurred, we completed an impairment evaluation. After completing this process, we determined that for each of the operating properties evaluated, undiscounted cash flows over the holding period were in excess of carrying value and, therefore, we did not record any impairment losses for these properties for the years ended December 31, 2021 and 2020.

109.    However, the only way that IIPR could conclude that the carrying value of its real estate assets (including substantial costs capitalized subsequent to acquisitions) was recoverable was to either ignore or not assign sufficient appropriate weight to the possibility that cannabis producers would not be able to make future rental payments to IIPR. In fact, the level of uncertainty regarding the regulatory environment in the United States relating to the medical-use cannabis industry and the uncertainty of collectability of lease payments from each tenant due to their limited operating history was so high that it required IIPR to record rental revenues on a cash basis (*i.e.*, when and if collected). According to the Blue Orca report, many of IIPR's tenants were experiencing declines in financial performance and wrestling with falling stock prices and worsening cash flows. The Blue Orca report specifically highlighted quality and solvency problems at Parallel and Kings Garden. As a matter of fact, King Garden's financial difficulties culminated in its default on rent in July 2022, shortly after the end of the Class Period. However, these conditions were apparently either ignored or not given enough weight by Defendants

when developing IIPR-specific projections of future undiscounted cash flows.

110.   If IIPR had performed a proper impairment analysis of its Parallel and Kings Garden properties, it would have determined that the carrying value of these properties was not recoverable and recorded an impairment charge no later than during fiscal 2020. IIPR's failure to timely record appropriate impairment charges resulted in an overstatement of its real estate investments and total asset balances as well as overstatement of IIPR's income from operations, net income, and earnings per share during the Class Period.

### IIPR Violated GAAP by Failing to Develop an Estimate of Expected Credit Losses on its Advances to Cannabis Producers

111.   As discussed above, IIPR failed to follow GAAP and recognize as advances receivable the excess of IIPR's purchase price over the fair value of properties IIPR purchased from and leased back to Parallel and Kings Garden. Consequently, the balances of these advances were recorded as part of the carrying value of the underlying properties on IIPR's balance sheet and was subject to evaluation for impairment in accordance with ASC 360.

112.   However, had IIPR properly recorded these advances on its balance sheet, as required by GAAP, it would have been also required to evaluate the collectability of these advances using a new accounting standard for measuring credit losses on financial instruments – Accounting Standards Update ("ASU") 2016-13, *Financial Instruments—Credit Losses (Topic 326): Measurement of Credit*

*Losses on Financial Instruments*. IIPR adopted the new guidance, which contains significant changes in accounting for credit losses, on January 1, 2020. The new standard's goal was to improve financial reporting by requiring earlier recognition of credit losses on financing receivables and other financial assets in its scope. Entities in the financial service industry, particularly banks and others with lending operations, were most notably impacted by the adoption of the new standard. Because IIPR had hidden the extent of its lending activities through improper accounting for its sale-leaseback transactions, it avoided being significantly impacted by the new standard, disclosing only that the new standard did not have a material impact on IIPR's financial statements:

> In June 2016, the FASB issued ASU 2016-13, Financial Instruments-Credit Losses, which changes the impairment model for most financial assets and certain other instruments. For trade and other receivables, held-to-maturity debt securities, loans and other instruments, companies will be required to use a **new forward-looking "expected loss" model that generally will result in the earlier recognition of allowances for losses.** In November 2018, the FASB issued ASU 2018-19, Codification Improvements to Topic 326, Financial Instruments - Credit Losses, which among other updates, clarifies that receivables arising from operating leases are not within the scope of this guidance and should be evaluated in accordance with Topic 842. For available-for-sale debt securities with unrealized losses, companies will measure credit losses in a manner similar to what they do today, except that the losses will be recognized as allowances rather than as reductions in the amortized cost of the securities. **These standards were effective for IIPR on January 1, 2020 and did not have a material**

**impact on our consolidated financial statements.**
[Emphasis added.]

113.   The Blue Orca report specifically highlighted quality and solvency problems at Parallel and Kings Garden. As a matter of fact, King Garden's financial difficulties culminated in its default on rent in July 2022, shortly after the end of the Class Period. However, because, IIPR never recorded advances it made to Parallel and Kings Garden, in violation of GAAP, it avoided having to evaluate the impact of these conditions on the collectability of these advances or develop an estimate of expected credit losses thereon. As IIPR itself admitted, the new standard is forward-looking which could result in recognizing credit losses sooner. Any credit losses on advances to cannabis producers would have reduced IIPR's total assets, income from operations, net income, and earnings per share during the Class Period.

114.   The charts below summarize the effects of IIPR's GAAP violations during the Class Period:

| | Quarter Ended | | Year Ended | | Quarter Ended | | | Year Ended |
|---|---|---|---|---|---|---|---|---|
| (in thousands) | Jun 30, 2020 | Sep 30, 2020 | Dec 31, 2020 | Mar 31, 2021 | Jun 30, 2021 | Sep 30, 2021 | Dec 31, 2021 | |
| **Balance Sheet** | | | | | | | | |
| | | | | | | | | |
| Net real estate held for investment | | | | | | | | |
| As reported | $ 791,569 | $ 885,027 | $ 1,020,044 | $ 1,133,530 | $ 1,276,859 | $ 1,400,882 | $ 1,640,166 | |
| Lessee financing - Parallel | (24,538) | (39,884) | (39,376) | (38,869) | (57,991) | (57,236) | (56,482) | |
| Lessee financing - Kings Garden | (29,694) | (29,308) | (28,921) | (28,534) | (28,148) | (27,761) | (27,375) | |
| Impairments - Parallel | - | - | (3,985) | (3,985) | (3,985) | (3,985) | (42,542) | |
| Impairments - Kings Garden | - | - | - | - | - | - | (6,349) | |
| Adjusted | $ 737,337 | $ 815,836 | $ 947,762 | $ 1,062,142 | $ 1,186,736 | $ 1,311,900 | $ 1,507,419 | |
| *Overstated $* | *$ 54,232* | *$ 69,191* | *$ 72,282* | *$ 71,388* | *$ 90,123* | *$ 88,982* | *$ 132,747* | |
| *Overstated %* | *7.4%* | *8.5%* | *7.6%* | *6.7%* | *7.6%* | *6.8%* | *8.8%* | |
| | | | | | | | | |
| Advances to lessees | | | | | | | | |
| As reported | $ - | $ - | $ - | $ - | $ - | $ - | $ - | |
| Lessee financing - Parallel | 24,752 | 40,286 | 40,059 | 39,828 | 59,297 | 58,949 | 58,595 | |
| Lessee financing - Kings Garden | 30,371 | 30,193 | 30,011 | 29,826 | 29,638 | 29,446 | 29,251 | |
| Adjusted | $ 55,123 | $ 70,478 | $ 70,070 | $ 69,654 | $ 88,935 | $ 88,395 | $ 87,846 | |

| (in thousands, except per share amounts) | Jun 30, 2020 | Sep 30, 2020 | Dec 31, 2020 | Mar 31, 2021 | Jun 30, 2021 | Sep 30, 2021 | Dec 31, 2021 |
|---|---|---|---|---|---|---|---|
| | Quarter Ended | | Year Ended | Quarter Ended | | | Year Ended |
| **Income Statement** | | | | | | | |
| Revenues | | | | | | | |
| As reported | $ 24,346 | $ 34,327 | $ 116,896 | $ 42,885 | $ 48,867 | $ 53,856 | $ 204,551 |
| Lessee financing - Parallel | (587) | (637) | (2,311) | (957) | (1,205) | (1,423) | (5,008) |
| Lessee financing - Kings Garden | (601) | (729) | (2,507) | (729) | (729) | (729) | (2,915) |
| Adjusted | $ 23,158 | $ 32,962 | $ 112,077 | $ 41,199 | $ 46,933 | $ 51,704 | $ 196,628 |
| *Overstated $* | *$ 1,188* | *$ 1,365* | *$ 4,819* | *$ 1,686* | *$ 1,934* | *$ 2,152* | *$ 7,923* |
| *Overstated %* | *5.1%* | *4.1%* | *4.3%* | *4.1%* | *4.1%* | *4.2%* | *4.0%* |
| | | | | | | | |
| Income from Operations | | | | | | | |
| As reported | $ 14,176 | $ 20,423 | $ 69,737 | $ 27,676 | $ 32,940 | $ 36,293 | $ 135,371 |
| Lessee financing - Parallel | (276) | (299) | (1,085) | (449) | (566) | (668) | (2,352) |
| Lessee financing - Kings Garden | (282) | (342) | (1,178) | (342) | (342) | (342) | (1,369) |
| Impairments - Parallel | - | - | (3,985) | - | - | - | (38,557) |
| Impairments - Kings Garden | - | - | - | - | - | - | (6,349) |
| Adjusted | $ 13,618 | $ 19,782 | $ 63,489 | $ 26,884 | $ 32,032 | $ 35,283 | $ 86,744 |
| *Overstated $* | *$ 558* | *$ 641* | *$ 6,248* | *$ 792* | *$ 908* | *$ 1,010* | *$ 48,627* |
| *Overstated %* | *4.1%* | *3.2%* | *9.8%* | *2.9%* | *2.8%* | *2.9%* | *56.1%* |
| | | | | | | | |
| Net Income Attributable to Common Stockholders | | | | | | | |
| As reported | $ 12,972 | $ 18,877 | $ 64,378 | $ 25,589 | $ 29,339 | $ 29,756 | $ 112,638 |
| Lessee financing - Parallel | 175 | 188 | 683 | 277 | 347 | 407 | 1,430 |
| Lessee financing - Kings Garden | 173 | 208 | 715 | 202 | 198 | 195 | 786 |
| Impairments - Parallel | - | - | (3,985) | - | - | - | (38,557) |
| Impairments - Kings Garden | - | - | - | - | - | - | (6,349) |
| Adjusted | $ 13,320 | $ 19,273 | $ 61,790 | $ 26,067 | $ 29,884 | $ 30,357 | $ 69,949 |
| *Over(under)stated $* | *$ (348)* | *$ (396)* | *$ 2,588* | *$ (478)* | *$ (545)* | *$ (601)* | *$ 42,689* |
| *Over(under)stated %* | *-2.6%* | *-2.1%* | *4.2%* | *-1.8%* | *-1.8%* | *-2.0%* | *61.0%* |
| | | | | | | | |
| Diluted Earnings Per Share | | | | | | | |
| As reported | $ 0.73 | $ 0.86 | $ 3.27 | $ 1.05 | $ 1.17 | $ 1.20 | 4.55 |
| Lessee financing - Parallel | 0.01 | 0.01 | 0.04 | 0.01 | 0.01 | 0.02 | 0.05 |
| Lessee financing - Kings Garden | 0.01 | 0.01 | 0.04 | - | - | - | 0.03 |
| Impairments - Parallel | - | - | (0.20) | - | - | - | (1.47) |
| Impairments - Kings Garden | - | - | - | - | - | - | (0.24) |
| Adjusted* | $ 0.75 | $ 0.88 | $ 3.13 | $ 1.06 | $ 1.20 | $ 1.22 | 2.93 |
| *Over(under)stated $* | *$ (0.02)* | *$ (0.02)* | *$ 0.14* | *$ (0.01)* | *$ (0.03)* | *$ (0.02)* | *$ 1.62* |
| *Over(under)stated %* | *-2.7%* | *-2.3%* | *4.5%* | *-0.9%* | *-2.5%* | *-1.6%* | *55.3%* |

*\* - may not foot due to rounding.*

## IIPR's Sale-Leaseback Transactions with Kings Garden or Parallel

115.   On April 16, 2019, before the start of the Class Period, IIPR acquired a portfolio of properties in South California from Kings Garden at a total price of $27.1 million. Using the most recent sale data for the underlying properties cited in the Blue Orca report, and assuming a 5% per annum property price appreciation (same as in the Blue Orca report) indicates that IIPR's total purchase price for this portfolio

of properties exceeded its $8.1 million fair value at the time of the acquisition by approximately $19 million (or 234%), which IIPR failed to record as an advance to Kings Garden and instead included in the cost of IIPR's real estate assets in violation of ASC 842.

116. On March 11, 2020, IIPR acquired a 373,000 sq. ft. property from Parallel in Wimauma, Florida for $35.3 million. Using the most recent sale data for the underlying property cited in the Blue Orca report, and assuming a 5% per annum property price appreciation (same as in the Blue Orca report) indicates that IIPR's total purchase price for this property exceeded its $10.4 million fair value at the time of the acquisition by approximately $24.9 million (or 239%), which IIPR failed to record as an advance to Parallel and instead included in the cost of IIPR's real estate assets in violation of ASC 842.

117. On May 12, 2020, IIPR acquired a 70,000 sq. ft. property at 19533 Mclane Street in Palm Springs, CA from Kings Garden for $17.5 million. According to the data cited in the Blue Orca report, Kings Garden purchased this property for $3.75 million three years earlier and also made $1.1 million worth of improvements to it. Using this data and assuming a 5% per annum property price appreciation (same as in the Blue Orca report), indicates that IIPR's total purchase price for this property exceeded its $5.6 million fair value at the time of the acquisition by approximately $11.9 million (or 212%), which IIPR failed to record as an advance to Kings Garden

and instead included in the cost of IIPR's real estate assets in violation of ASC 842.

118.    On September 18, 2020, IIPR acquired a 220,000 sq. ft. property from Parallel in Lakeland, Florida for $19.6 million. Using the most recent sale data for the underlying property cited in the Blue Orca report, and assuming a 5% per annum property price appreciation (same as in the Blue Orca report) indicates that IIPR's total purchase price for this property exceeded its $3.9 million fair value at the time of the acquisition by approximately $15.7 million (or 405%), which IIPR failed to record as an advance to Parallel and instead included in the cost of IIPR's real estate assets in violation of ASC 842.

119.    On May 7, 2021, IIPR acquired a 239,000 sq. ft. property from Parallel in Pittsburgh, PA for $41.8 million. However, as noted in the Blue Orca report, Parallel had purchased this property for only $22 million on May 6, 2021, just one day prior to flipping it to IIPR for a 90% markup, which IIPR failed to record as an advance to Parallel and instead included in the cost of IIPR's real estate assets in violation of ASC 842.

## FALSE AND MISLEADING STATEMENTS AND OMISSIONS

120.    Defendants incorporated by reference, in their entirety, the risk factors from their Annual Report on Form 10-K for the period ended December 31, 2019, filed with the SEC on March 2, 2020 ("2019 10-K") into their Q2 2020 10-Q for the period ended June 30, 2020. Thus, in the Q2 2020 10-Q, by reference, Defendants

warned that:

> the success of our investments will be materially dependent on the financial stability of these tenants." They continued, "[w]e rely on our management team to perform due diligence investigations of our potential tenants, related guarantors and their properties, operations and prospects, of which there is generally little or no publicly available operating and financial information." In addition, they warned, that they "may not learn all of the material information we need to know regarding these businesses through our investigations, and these businesses are subject to numerous risks and uncertainties, including but not limited to regulatory risks and the rapidly evolving market dynamics of each state's regulated cannabis program. As a result," they concluded, "it is possible that we could enter into a sale-leaseback arrangement with tenants or otherwise lease properties to tenants that ultimately are unable to pay rent to us, which could adversely impact our cash available for distributions.

121.   With respect to risk management the Q2 2020 10-Q includes the 2019 10-K disclosure that "[w]e evaluate the credit quality of our tenants and any guarantors *on an ongoing basis* by reviewing, where available, the publicly filed financial reports, press releases and other publicly available industry information regarding our tenants and any guarantors." Defendants continued that,"[i]n addition, we monitor the payment history data for all of our tenants and, in some instances, we monitor our tenants by periodically conducting site visits and meeting with the tenants to discuss their operations," concluding that "[i]n many instances, we will generally not be entitled to financial results or other credit-related data from our

tenants."

122.    Against this backdrop, claiming to have carefully evaluated their tenants both initially and on an ongoing basis, in the Q2 2020 10-Q, Defendants disclosed, for the first time, IIPR's relationship with Kings Garden. Including more robust disclosure about their credit concentration risk, the Q2 2020 10-Q claims that for the three months ended June 30, 2019, Kings Garden had five leases with IIPR that comprised 10% of IIPR's Rental Revenue and that as of May 12, 2020, IIPR had acquired properties affiliated with Kings Garden representing 70,000 rentable square feet for $17.5 million. During Defendants' August 6, 2020, Earnings Conference Call ("Q2 2020 Call"), Defendant Gold boasted of $225 million in second quarter 2020 acquisitions, including "follow-on transactions" with Kings Garden. Defendant Regin continued about California acquisitions, describing that "[i]n May, we acquired a 70,000-square-foot industrial property in Southern California for $17.5 million and entered into a long-term lease with Kings Garden." According to Regin, with that acquisition, IIPR "leased 5 properties to Kings Garden. . . totaling 102,000 square feet that we acquired in April of last year." Regin continued that "Kings Garden is a leading cannabis cultivation, processing and manufacturing operator, having developed a tremendous brand and reputation for consistent top-shelf quality," concluding that "[n]otably and highly unique in this industry, Kings Garden declared its first quarterly dividend in June of this year to its

equity investors."

123.   The foregoing was false and misleading because, for the reasons stated above, Defendants recklessly disregarded but were duty bound to disclose that:

(a)   The risks warned of had materialized. A simple investigation of public records revealed that Michael King was, as Defendants described him, a "fraudster." In fact, from well before the start of the Class Period, King and Kings Garden had submitted material forged and fraudulent Draw Requests and invoices that Defendants did not verify. Kings Garden was stealing from IIPR. Defendants had not performed a "due diligence investigation[] of our potential tenants, related guarantors and their properties, operations and prospects," and had not "evaluated the credit quality of our tenants and any guarantors *on an ongoing basis*" by reviewing publicly filed information.

(b)   Upon disclosing the investments in Kings Garden, and its contribution to rental revenue, Defendants were duty bound to disclose but omitted the full truth that Michael King and Kings Garden were, in Defendants' words, "fraudsters," and that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices.

124.   On August 5, 2020, Defendants issued a press release, titled, "Innovative Industrial Properties Reports Second Quarter Results, Investments Drive 183% Total Revenues, 322% Q2 Net Income and 263% Q2 AFFO Growth

Year-over-Year." In the Q2 2020 10-Q, and in the August 5, 2020, press release, Defendants included IIPR's Financial Results. The Company reported net real estate held for investment at the end of the quarter of approximately $791.6 million, quarterly revenues of approximately $24.3 million and income from operations of approximately 13.6 million.

125.    The foregoing was materially false and/or misleading because Defendants recklessly:

(a)    In violation of GAAP provision ASC 842, failed to record the advances IIPR made to Parallel and Kings Garden in connection with sale-leaseback transactions with these tenants;

(b)    In violation of GAAP provision ASC 842, improperly included in the cost of IIPR's real estate assets the advances IIPR made to Parallel and Kings Garden in connection with sale-leaseback transactions with these tenants;

(c)    In violation of GAAP provision ASC 842, failed to allocate any portion of lease payments IIPR received from Kings Garden or Parallel to debt service on advances IIPR made to these tenants in connection with sale-leaseback transactions with these tenants;

(d)    As a result of these GAAP violations, Defendants overstated IIPR's net real estate held for investment balance by approximately $54.2

million (or 7.4%), and failed to report the approximately $55.1 million balance of advances to Parallel and Kings Garden on IIPR's balance sheet at the end of Q2 2020;

(e)    As a result of these GAAP violations, Defendants overstated IIPR's Q2 2020 quarterly revenues by approximately $1.2 million (or 5.1%) and operating income by $558,000 (or 4.1%).

126.   On November 5, 2020, Defendants filed with the SEC their Q3 2020 10-Q for the period ended September 30, 2020 Defendants incorporated into the Q3 2020 10-Q, by reference, in their entirety, the risk factors from their 2019 10-K. Thus, in the Q3 2020 10-Q, by reference, Defendants warned that, "the success of our investments will be materially dependent on the financial stability of these tenants." They continued, "[w]e rely on our management team to perform due diligence investigations of our potential tenants, related guarantors and their properties, operations and prospects, of which there is generally little or no publicly available operating and financial information." In addition, they warned, that they "may not learn all of the material information we need to know regarding these businesses through our investigations, and these businesses are subject to numerous risks and uncertainties, including but not limited to regulatory risks and the rapidly evolving market dynamics of each state's regulated cannabis program. As a result," they concluded, "it is possible that we could enter into a sale-leaseback arrangement

with tenants or otherwise lease properties to tenants that ultimately are unable to pay rent to us, which could adversely impact our cash available for distributions."

127.    With respect to risk management the Q3 2020 10-Q includes the 2019 10-K disclosure that "[w]e evaluate the credit quality of our tenants and any guarantors on an ongoing basis by reviewing, where available, the publicly filed financial reports, press releases and other publicly available industry information regarding our tenants and any guarantors." Defendants continued that,"[i]n addition, we monitor the payment history data for all of our tenants and, in some instances, we monitor our tenants by periodically conducting site visits and meeting with the tenants to discuss their operations," concluding that "[i]n many instances, we will generally not be entitled to financial results or other credit-related data from our tenants."

128.    Against this backdrop, claiming to have carefully evaluated their tenants both initially and on an ongoing basis, in the Q2 2020 10-Q, Defendants reiterated IIPR's relationship with Kings Garden. Including more robust disclosure about their credit concentration risk, the Q2 2020 10-Q shows that for the three months ended June 30, 2019, Kings Garden had five leases with IIPR that comprised 10% of IIPR's Rental Revenue and that as of May 12, 2020, IIPR had acquired properties affiliated with Kings Garden representing 70,000 rentable square feet for $17.5 million.

129.   The foregoing was false and misleading because, for the reasons stated above, Defendants recklessly disregarded but were duty bound to disclose that:

(a)    The risks warned of had materialized. A simple investigation of public records revealed that Michael King was, as Defendants described him, a "fraudster." In fact, from well before the start of the Class Period, King and Kings Garden had submitted material forged and fraudulent Draw Requests and invoices that Defendants did not verify. Kings Garden was stealing from IIPR. Defendants had not performed a "due diligence investigation[] of our potential tenants, related guarantors and their properties, operations and prospects," and had not "evaluated the credit quality of our tenants and any guarantors *on an ongoing basis*" by reviewing publicly filed information.

(b)    Upon disclosing the investments in Kings Garden, and its contribution to rental revenue, Defendants were duty bound to disclose but omitted the full truth that Michael King and Kings Garden were, in Defendants' words, "fraudsters," and that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices.

130.   On November 5, 2020, Defendants issued a press release, titled, "Innovative Industrial Properties Reports Third Quarter 2020 Results, Investments Drive 197% Q3 Total Revenues, 205% Q3 Net Income and 192% Q3 AFFO Growth Year-over-Year." In the Q3 2020 10-Q, and in the November 5, 2020, press release,

Defendants included IIPR's Financial Results. The Company reported net real estate held for investment at the end of the quarter of approximately $885.0 million, quarterly revenues of approximately $34.3 million, and income from operations of approximately $20.4 million.

131.   The foregoing was materially false and/or misleading because Defendants recklessly:

(a)    In violation of GAAP provision ASC 842, failed to record the advances IIPR made to Parallel and Kings Garden in connection with sale-leaseback transactions with these tenants;

(b)    In violation of GAAP provision ASC 842, improperly included in the cost of IIPR's real estate assets the advances IIPR made to Parallel and Kings Garden in connection with sale-leaseback transactions with these tenants;

(c)    In violation of GAAP provision ASC 842, failed to allocate any portion of lease payments IIPR received from Kings Garden or Parallel to debt service on advances IIPR made to these tenants in connection with sale-leaseback transactions with these tenants;

(d)    As a result of these GAAP violations, Defendants overstated IIPR's net real estate held for investment balance by approximately $69.2 million (or 8.5%) and failed to report the approximately $70.5 million

balance of advances to Parallel and Kings Garden on IIPR's balance sheet at the end of Q3 2020;

(e)    As a result of these GAAP violations, Defendants overstated IIPR's Q3 2020 quarterly revenues by approximately $1.4 million (or 4.1%) and operating income by $641,000 (or 3.2%).

132.  On February 24, 2021, Defendants issue a press release, disclosing IIPR's financial results for the year ended December 31, 2020. About investment and leasing activity, Defendants disclose that in the fourth quarter of 2020, IIPR acquired four new properties and financed additional land expansion in a fifth, totaling 848,000 rentable square feet for an aggregate of $254.1 million. According to Defendants, they expanded an existing tenant relationship with Kings Garden, among others.

133.  On February 26, 2021, Defendants filed with the SEC IIPR's 2020 10-K. Defendants warned that, "the success of our investments will be materially dependent on the financial stability of these tenants." They continued, "[w]e rely on our management team to perform due diligence investigations of our potential tenants, related guarantors and their properties, operations and prospects, of which there is generally little or no publicly available operating and financial information." In addition, they warned, that they "may not learn all of the material information we need to know regarding these businesses through our investigations, and these

businesses are subject to numerous risks and uncertainties, including but not limited to regulatory risks and the rapidly evolving market dynamics of each state's regulated cannabis program. As a result," they concluded, "it is possible that we could enter into a sale-leaseback arrangement with tenants or otherwise lease properties to tenants that ultimately are unable to pay rent to us, which could adversely impact our cash available for distributions."

134.  With respect to risk management the 2020 10-K disclosed that "[w]e evaluate the credit quality of our tenants and any guarantors *on an ongoing basis* by reviewing, where available, the publicly filed financial reports, press releases and other publicly available industry information regarding our tenants and any guarantors." Defendants continued that,"[i]n addition, we monitor the payment history data for all of our tenants and, in some instances, we monitor our tenants by periodically conducting site visits and meeting with the tenants to discuss their operations," concluding that "[i]n many instances, we will generally not be entitled to financial results or other credit-related data from our tenants."

135.  About Kings Garden, the 2020 10-K disclosed that as of December 31, 2020, Kings Garden accounted for the second most rentable square feet in IIPR's portfolio for the largest single investment in any tenant of nearly $70 million, including "four properties acquired on April 16, 2019, one property acquired on May 12, 2020, consisting of 70,000 square feet for a purchase price of $17.5 million, and

one property acquired on November 16, 2020," consisting of 192,000 rentable square feet for an initial purchase price of $17.5 million. These amounts exclude "available tenant improvement allowance of $25.0 million." In addition, under "subsequent events," the 2020 10-K disclosed that on February 5, 2021, IIPR lent $1.35 million to purchase land on which Kings Garden purportedly agreed to build two buildings of a combined 180,000 rentable square feet "for which [IIPR] agreed to provide reimbursement of up to approximately $51.4 million. As of February 24, 2021, we had not funded any of the tenant improvement allowance."

136.   The foregoing was false and misleading because, for the reasons stated above, Defendants recklessly disregarded but were duty bound to disclose that:

(a)   The risks warned of had materialized. A simple investigation of public records revealed that Michael King was, as Defendants described him, a "fraudster." In fact, from well before the start of the Class Period, King and Kings Garden had submitted material forged and fraudulent Draw Requests and invoices that Defendants did not verify. Kings Garden was stealing from IIPR. Defendants had not performed a "due diligence investigation[] of our potential tenants, related guarantors and their properties, operations and prospects," and had not "evaluated the credit quality of our tenants and any guarantors *on an ongoing basis*" by reviewing publicly filed information.

(b)   Upon disclosing the investments in Kings Garden, and its

contribution to rental revenue, Defendants were duty bound to disclose but omitted the full truth that Michael King and Kings Garden were, in Defendants' words, "fraudsters," and that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices.

137.   On February 26, 2021, the Company filed its 2020 10-K, for the period ended December 31, 2020. On February 25, 2021, IIPR issued a press release regarding its financial results for the fourth quarter of 2020 and year ended December 31, 2020.In both documents Defendants revealed IIPR's financial results. IIPR reported net real estate held for investment at the end of the year of approximately $1.0 billion, annual revenues of approximately $116.9 million, income from operations of approximately $69.7 million, net income attributable to common stockholders of approximately $64.4 million, and net income attributable to common stockholders per diluted share of $3.27.

138.   The foregoing was materially false and/or misleading because Defendants recklessly:

(a)    In violation of GAAP provision ASC 842, failed to record the advances IIPR made to Parallel and Kings Garden in connection with sale-leaseback transactions with these tenants;

(b)    In violation of GAAP provision ASC 842, improperly included in the cost of IIPR's real estate assets the advances IIPR made to Parallel and

Kings Garden in connection with sale-leaseback transactions with these tenants;

(c)    In violation of GAAP provision ASC 842, failed to allocate any portion of lease payments IIPR received from Kings Garden or Parallel to debt service on advances IIPR made to these tenants in connection with sale-leaseback transactions with these tenants;

(d)    In violation of ASC 360 failed to record a $4.0 million impairment of the Parallel properties;

(e)    As a result of these GAAP violations, Defendants overstated IIPR's net real estate held for investment balance by approximately $72.3 million (or 7.6%) and failed to report the approximately $70.1 million balance of advances to Parallel and Kings Garden on IIPR's balance sheet at the end of 2020;

(f)    As a result of these GAAP violations, Defendants overstated IIPR's 2020 annual revenues by approximately $4.8 million (or 4.3%), operating income by approximately $6.2 million (or 9.8%), net income attributable to common stockholders by approximately $2.6 million (or 4.2%), and net income attributable to common stockholders per diluted share by $0.14 (or 4.5%).

139.  On February 25, 2021, Defendants convened an Earnings Conference

Call ("Q4 2020 Call"). Defendant Regin described the fourth quarter acquisitions, "touch[ing] on each . . . by state and also provid[ing] some information about each tenant and our portfolio overall in the state." About Kings Garden, he stated, "[w]e have been fairly active in California in recent months with our 2 transactions with Kings Garden . . . ." He continued that in California's robust cannabis market "Kings Garden is one of the top operators . . ., consistently ranking in the top 5 of flower and concentrate sales in the state," continuing that Kings Garden "was one of the first cannabis operators to commence regular quarterly dividends to its shareholders in June 2020, a remarkable achievement for a company continuing on its rapid expansion path." Defendants Regin noted that IIPR now leased six properties to Kings Garden, "representing well over 0.5 million square feet, including projects under development and a total investment of nearly $150 million, including commitments to fund future development and redevelopment." He expressed that IIPR were "proud partners of Michael King and his great team and look forward to supporting them through the development and redevelopment of state-of-the-art facilities to dramatically expand production capacity and continue to deliver the highest-quality product that they are known for." Later in the Q4 2020 Call, Regin stated that IIPR was "thrilled to team with Kings Garden in California, one of the top operators in the largest regulated cannabis market in the world."

140.  Supporting these comments, generally, during the Q4 2020 Call, in

response to analysts' questions, Defendant Gold stated that "we tend to add new growers very carefully and with a lot of consideration because of that commitment to be able to provide them future capital" and with respect to yields from deals with new tenants versus existing tenants, "[w]e evaluate and underwrite every single one of our transactions individually. We underwrite the quality of the tenant, the quality of the location, the deal terms and the complexity of the transaction," creating what IIPR "think[s] is an appropriate yield for the capital that we intend to offer.

141.   The foregoing was false and misleading because, for the reasons stated above, Defendants recklessly disregarded but were duty bound to disclose that:

(a)   The risks warned of had materialized. A simple investigation of public records revealed that Michael King was, as Defendants described him, a "fraudster." In fact, from well before the start of the Class Period, King and Kings Garden had submitted material forged and fraudulent Draw Requests and invoices that Defendants did not verify. Kings Garden was stealing from IIPR. Defendants had not performed a "due diligence investigation[] of our potential tenants, related guarantors and their properties, operations and prospects," and had not "evaluated the credit quality of our tenants and any guarantors *on an ongoing basis*" by reviewing publicly filed information;

(b)   Having discussed and praised Kings Garden, Defendants were duty bound to disclose but omitted the full truth that Michael King and Kings

65

Garden were, in Defendants' words, "fraudsters," and that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices;

(c)    Upon disclosing the investments in Kings Garden, and its contribution to rental revenue, Defendants were duty bound to disclose but omitted the full truth that Michael King and Kings Garden were, in Defendants' words, "fraudsters," and that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices.

142.   On  May 5, 2021, Defendants issued a press release titled "Innovative Industrial Properties Reports First Quarter 2021 Results, Acquisitions and Portfolio Performance Drive Q1 Y-O-Y Growth of 103% in Total Revenues, 122% in Net Income and 116% in AFFO." In the May 5, 2021, press release, about investments in Kings Garden and its other tenants, Defendants stated that:

> "[f]rom January 1, 2021 through today, made four acquisitions (including three new properties and additional land expansion at an existing property) for properties located in California, Florida, Michigan and Texas; and executed three lease amendments to provide additional tenant improvements at properties located in Michigan, New York and Pennsylvania. In January 2021, executed a new long-term lease with Holistic Industries Inc. (Holistic) for IIP's Los Angeles, California property, bringing IIP's property portfolio to 100% leased. In these transactions, established a new tenant relationship with Harvest Health & Recreation Inc., while expanding existing relationships with Green Peak Industries, LLC (Skymint), Holistic, Jushi Holdings Inc., Kings Garden

Inc., LivWell Holdings, Inc., Parallel and PharmaCann Inc.

143.    On May 6, 2021, Defendants filed IIPR's Q1 2021 10-Q. Defendants incorporated by reference their risk disclosures from the 2020 10-K, warning that, "the success of our investments will be materially dependent on the financial stability of these tenants." They continued, "[w]e rely on our management team to perform due diligence investigations of our potential tenants, related guarantors and their properties, operations and prospects, of which there is generally little or no publicly available operating and financial information." In addition, they warned, that they "may not learn all of the material information we need to know regarding these businesses through our investigations, and these businesses are subject to numerous risks and uncertainties, including but not limited to regulatory risks and the rapidly evolving market dynamics of each state's regulated cannabis program. As a result," they concluded, "it is possible that we could enter into a sale-leaseback arrangement with tenants or otherwise lease properties to tenants that ultimately are unable to pay rent to us, which could adversely impact our cash available for distributions."

144.    With respect to risk management, reiterating the 2020 10-K's disclosure, the Q1 2021 10-Q stated, "[w]e evaluate the credit quality of our tenants and any guarantors on an ongoing basis by reviewing, where available, the publicly filed financial reports, press releases and other publicly available industry

information regarding our tenants and any guarantors." Defendants continued that,"[i]n addition, we monitor the payment history data for all of our tenants and, in some instances, we monitor our tenants by periodically conducting site visits and meeting with the tenants to discuss their operations," concluding that "[i]n many instances, we will generally not be entitled to financial results or other credit-related data from our tenants."

145.    About Kings Garden, the Q1 2021 10-Q disclosed that during the quarter ended March 31, 2021, IIPR had acquired three properties, including one from Kings Garden. The Q1 2021 10-Q repeated the details of the February 5, 2021, transaction in which IIPR lent $1.35 million to purchase land on which Kings Garden purportedly agreed to build two buildings of a combined 180,000 rentable square feet "for which [IIPR] agreed to provide reimbursement of up to approximately $51.4 million."

146.    The foregoing was false and misleading because, for the reasons stated above, Defendants recklessly disregarded but were duty bound to disclose that:

(a)     The risks warned of had materialized. A simple investigation of public records revealed that Michael King was, as Defendants described him, a "fraudster." In fact, from well before the start of the Class Period, King and Kings Garden had submitted material forged and fraudulent Draw Requests and invoices that Defendants did not verify. Kings Garden was stealing from

IIPR. Defendants had not performed a "due diligence investigation[] of our potential tenants, related guarantors and their properties, operations and prospects," and had not "evaluated the credit quality of our tenants and any guarantors *on an ongoing basis*" by reviewing publicly filed information.

(b)    Upon disclosing the investments in Kings Garden, and its contribution to rental revenue, Defendants were duty bound to disclose but omitted the full truth that Michael King and Kings Garden were, in Defendants' words, "fraudsters," and that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices.

147.    On May 5, 2021, IIPR issued a press release regarding its financial results for Q1 2021. On May 6, 2021, the Company filed its Q1 2021 10-Q, for the period ended March 31, 2021. In both documents Defendants disclosed Q1's financial results. IIPR reported net real estate held for investment at the end of the quarter of approximately $1.1 billion, revenues of approximately $42.9 million, and income from operations of approximately $27.7 million.

148.    The foregoing was materially false and/or misleading because Defendants recklessly:

(a)    In violation of GAAP provision ASC 842, failed to record the advances IIPR made to Parallel and Kings Garden in connection with sale-leaseback transactions with these tenants;

(b)    In violation of GAAP provision ASC 842 improperly included in the cost of IIPR's real estate assets the advances IIPR made to Parallel and Kings Garden in connection with sale-leaseback transactions with these tenants;

(c)    In violation of GAAP provision ASC 842, failed to allocate any portion of lease payments IIPR received from Kings Garden or Parallel to debt service on advances IIPR made to these tenants in connection with sale-leaseback transactions with these tenants.

(d)    In violation of GAAP provision ASC 360, failed to timely record a $4.0 million impairment of the Parallel properties;

(e)    As a result of these GAAP violations, Defendants overstated IIPR's net real estate held for investment balance by approximately $71.4 million (or 6.7%) and failed to report the approximately $69.7 million balance of advances to Parallel and Kings Garden on IIPR's balance sheet at the end of Q1 2021;

(f)    As a result of these GAAP violations, Defendants overstated IIPR's Q1 2021 quarterly revenues by approximately $1.7 million (or 4.1%) and operating income by $792,000 (or 2.9%).

149.    On August 5, 2021, Defendants filed with the SEC IIPR's Q2 2021 10-Q, its Quarterly Report for the period ended June 30, 2021. Defendants incorporated

relevant risk warnings from the 2020 10-K, warning that, "the success of our investments will be materially dependent on the financial stability of these tenants." They continued, "[w]e rely on our management team to perform due diligence investigations of our potential tenants, related guarantors and their properties, operations and prospects, of which there is generally little or no publicly available operating and financial information." In addition, they warned, that they "may not learn all of the material information we need to know regarding these businesses through our investigations, and these businesses are subject to numerous risks and uncertainties, including but not limited to regulatory risks and the rapidly evolving market dynamics of each state's regulated cannabis program. As a result," they concluded, "it is possible that we could enter into a sale-leaseback arrangement with tenants or otherwise lease properties to tenants that ultimately are unable to pay rent to us, which could adversely impact our cash available for distributions."

150.   With respect to risk management, the Q2 2021 10-Q incorporated the 2020 10-K disclosure that "[w]e evaluate the credit quality of our tenants and any guarantors on an ongoing basis by reviewing, where available, the publicly filed financial reports, press releases and other publicly available industry information regarding our tenants and any guarantors." Defendants continued that,"[i]n addition, we monitor the payment history data for all of our tenants and, in some instances, we monitor our tenants by periodically conducting site visits and meeting with the

tenants to discuss their operations," concluding that "[i]n many instances, we will generally not be entitled to financial results or other credit-related data from our tenants."

151.    About Kings Garden, the Q2 2021 10-Q repeated the details of the February 5, 2021, transaction in which IIPR lent $1.35 million to purchase land on which Kings Garden purportedly agreed to build two buildings of a combined 180,000 rentable square feet "for which [IIPR] agreed to provide reimbursement of up to approximately $51.4 million." With respect to "Concentration of Credit Risk," Defendants stated that Kings Garden was among the top five contributors to IIPR revenue, accounting for 7% of total rental revenue for the three months ended June 30, 2021.

152.    The foregoing was false and misleading because, for the reasons stated above, Defendants recklessly disregarded but were duty bound to disclose that:

(a)    The risks warned of had materialized. A simple investigation of public records revealed that Michael King was, as Defendants described him, a "fraudster." In fact, from well before the start of the Class Period, King and Kings Garden had submitted material forged and fraudulent Draw Requests and invoices that Defendants did not verify. Kings Garden was stealing from IIPR. Defendants had not performed a "due diligence investigation[] of our potential tenants, related guarantors and their properties, operations and

prospects," and had not "evaluated the credit quality of our tenants and any guarantors *on an ongoing basis*" by reviewing publicly filed information;

(b)    Upon disclosing the investments in Kings Garden, and its contribution to rental revenue, Defendants were duty bound to disclose but omitted the full truth that Michael King and Kings Garden were, in Defendants' words, "fraudsters," and that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices.

153.    On August 5, 2021, Defendants convened and the Q2 2021 Call. Discussing IIPR's "most significant tenants," Defendant Regin stated that Kings Garden, "represent[ed] a total commitment of nearly $150 million and which is expected to encompass over 500,000 square feet of space upon completion of development and redevelopment at certain properties." He continued that "Kings Garden has developed a truly distinguished brand in California and consistently ranks as a top producer in sales in a state that represents the largest market in the world." More specifically, Regin noted, "[w]ith production of 40,000 pounds of cannabis flower annually and continuing to ramp significantly, it is the leading top-quality producer in the state." He boasted of Kings Garden's recycling, water reclamation, and environmentally friendly power efforts. He concluded, "[w]e highlighted a number of environmental initiatives of our tenant partners in their operations and our inaugural ESG report posted to our website. And Kings Garden

is yet another example of our tenant partners focused on long-term, responsible, sustainable production."

154.   Parroting Defendant Regin during the Q2 2021 Call, Defendant Gold referred to tenants like Kings Garden, stating "we are thrilled with the quality of our tenant roster and the continued demonstrated strength and resilience of our tenant partners and their execution on operations." Defendant Hastings stated, "As Ben previously mentioned, we've been proud to continue to partner with many of our tenant operators and amend the leases to provide for additional expansion capital at our facilities for a corresponding increase in base rent."

155.   The foregoing was false and misleading because, for the reasons stated above, Defendants recklessly disregarded but were duty bound to disclose that:

(a)      The risks warned of had materialized. A simple investigation of public records revealed that Michael King was, as Defendants described him, a "fraudster." In fact, from well before the start of the Class Period, King and Kings Garden had submitted material forged and fraudulent Draw Requests and invoices that Defendants did not verify. Kings Garden was stealing from IIPR. Defendants had not performed a "due diligence investigation[] of our potential tenants, related guarantors and their properties, operations and prospects," and had not "evaluated the credit quality of our tenants and any guarantors *on an ongoing basis*" by reviewing publicly filed information;

(b)    Having discussed and praised Kings Garden, Defendants were duty bound to disclose but omitted the full truth that Michael King and Kings Garden were, in Defendants' words, "fraudsters," and that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices;

(c)    Upon disclosing the investments in Kings Garden, and its contribution to rental revenue, Defendants were duty bound to disclose but omitted the full truth that Michael King and Kings Garden were, in Defendants' words, "fraudsters," and that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices.

156.    On August 4, 2021, Defendants issued a press release titled, "Innovative Industrial Properties Reports Second Quarter 2021 Results, Investments and Portfolio Performance Drive Q2 Y-O-Y Growth of 101% in Total Revenues, 124% in Net Income and 104% in AFFO." In the August 4, 2021, press release and in the Q2 2021 10-Q, Defendants included IIPR's Financial Results. IIPR reported net real estate held for investment at the end of the quarter of approximately $1.3 billion, revenues of approximately $48.9 million, and income from operations of approximately $32.9 million.

157.    The foregoing was materially false and/or misleading because Defendants recklessly:

(a)      In violation of GAAP provision ASC 842, failed to record the advances IIPR made to Parallel and Kings Garden in connection with sale-leaseback transactions with these tenants;

(b)      In violation of GAAP provision ASC 842, improperly included in the cost of IIPR's real estate assets the advances IIPR made to Parallel and Kings Garden in connection with sale-leaseback transactions with these tenants;

(c)      In violation of GAAP provision ASC 842, failed to allocate any portion of lease payments IIPR received from Kings Garden or Parallel to debt service on advances IIPR made to these tenants in connection with sale-leaseback transactions with these tenants;

(d)      In violation of GAAP provision ASC 360, failed to timely record a $4.0 million impairment of the Parallel properties;

(e)      As a result of these GAAP violations, Defendants overstated IIPR's net real estate held for investment balance by approximately $90.1 million (or 7.6%) and failed to report the approximately $88.9 million balance of advances to Parallel and Kings Garden on IIPR's balance sheet at the end of Q2 2021;

(f)    As a result of these GAAP violations, Defendants overstated IIPR's Q2 2021 quarterly revenues by approximately $1.9 million (or 4.1%) and operating income by $908,000 (or 2.8%).

158.    On November 4, 2021, Defendants filed with the SEC IIPR's Q3 2021 10-Q for the period ended September 30, 2021. Defendants incorporated relevant risk warnings from the 2020 10-K, warning that, "the success of our investments will be materially dependent on the financial stability of these tenants." They continued, "[w]e rely on our management team to perform due diligence investigations of our potential tenants, related guarantors and their properties, operations and prospects, of which there is generally little or no publicly available operating and financial information." In addition, they warned, that they "may not learn all of the material information we need to know regarding these businesses through our investigations, and these businesses are subject to numerous risks and uncertainties, including but not limited to regulatory risks and the rapidly evolving market dynamics of each state's regulated cannabis program. As a result," they concluded, "it is possible that we could enter into a sale-leaseback arrangement with tenants or otherwise lease properties to tenants that ultimately are unable to pay rent to us, which could adversely impact our cash available for distributions."

159.    With respect to risk management, the Q3 2021 10-Q incorporated the 2020 10-K disclosure that "[w]e evaluate the credit quality of our tenants and any

guarantors on an ongoing basis by reviewing, where available, the publicly filed financial reports, press releases and other publicly available industry information regarding our tenants and any guarantors." Defendants continued that,"[i]n addition, we monitor the payment history data for all of our tenants and, in some instances, we monitor our tenants by periodically conducting site visits and meeting with the tenants to discuss their operations," concluding that "[i]n many instances, we will generally not be entitled to financial results or other credit-related data from our tenants."

160.   About Kings Garden, the Q3 2021 10-Q repeated the details of the February 5, 2021, transaction in which IIPR lent $1.35 million to purchase land on which Kings Garden purportedly agreed to build two buildings of a combined 180,000 rentable square feet "for which [IIPR] agreed to provide reimbursement of up to approximately $51.4 million." With respect to "Concentration of Credit Risk," Defendants stated, that Kings Garden was among the top five contributors to IIPR revenue, accounting for 8% of rental revenue for the three months ended September 30, 2021.

161.   The foregoing was false and misleading because, for the reasons stated above, Defendants recklessly disregarded but were duty bound to disclose that:

(a)    The risks warned of had materialized. A simple investigation of public records revealed that Michael King was, as Defendants described him,

a "fraudster." In fact, from well before the start of the Class Period, King and Kings Garden had submitted material forged and fraudulent Draw Requests and invoices that Defendants did not verify. Kings Garden was stealing from IIPR. Defendants had not performed a "due diligence investigation[] of our potential tenants, related guarantors and their properties, operations and prospects," and had not "evaluated the credit quality of our tenants and any guarantors *on an ongoing basis*" by reviewing publicly filed information;

(b)    Upon disclosing the investments in Kings Garden, and its contribution to rental revenue, Defendants were duty bound to disclose but omitted the full truth that Michael King and Kings Garden were, in Defendants' words, "fraudsters," and that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices.

162.  On November 3, 2021, IIPR issued a press release regarding its financial results for Q3 2021. On November 4, 2021, the Company filed its Q3 2021 10-Q, for the period ended September 30, 2021. In both filings Defendants reported net real estate held for investment at the end of the quarter of approximately $1.4 billion, revenues of approximately $53.9 million, and income from operations of approximately $36.3 million.

163.  The foregoing was materially false and/or misleading because Defendants recklessly:

(a)    In violation of GAAP provision ASC 842, failed to record the advances IIPR made to Parallel and Kings Garden in connection with sale-leaseback transactions with these tenants;

(b)    In violation of GAAP provision ASC 842, improperly included in the cost of IIPR's real estate assets the advances IIPR made to Parallel and Kings Garden in connection with sale-leaseback transactions with these tenants;

(c)    In violation of GAAP provision ASC 842, failed to allocate any portion of lease payments IIPR received from Kings Garden or Parallel to debt service on advances IIPR made to these tenants in connection with sale-leaseback transactions with these tenants;

(d)    In violation of GAAP provisions ASC 360, failed to timely record a $4.0 million impairment of the Parallel properties;

(e)    As a result of these GAAP violations, Defendants overstated IIPR's net real estate held for investment balance by approximately $90.0 million (or 6.8%) and failed to report the approximately $88.4 million balance of advances to Parallel and Kings Garden on IIPR's balance sheet at the end of Q3 2021;

(f)    As a result of these GAAP violations, Defendants overstated IIPR's Q3 2021 quarterly revenues by approximately $2.2 million (or 4.2%) and operating income by approximately $1.0 million (or 2.9%).

164.    On February 24, 2022, Defendants filed the 2021 10-K, for the year ended December 31, 2021. Defendants warned that, "the success of our investments will be materially dependent on the financial stability of these tenants." They continued, "[w]e rely on our management team to perform due diligence investigations of our potential tenants, related guarantors and their properties, operations and prospects, of which there is generally little or no publicly available operating and financial information." In addition, they warned, that they "may not learn all of the material information we need to know regarding these businesses through our investigations, and these businesses are subject to numerous risks and uncertainties, including but not limited to regulatory risks and the rapidly evolving market dynamics of each state's regulated cannabis program. As a result," they concluded, "it is possible that we could enter into a sale-leaseback arrangement with tenants or otherwise lease properties to tenants that ultimately are unable to pay rent to us, which could adversely impact our cash available for distributions."

165.    With respect to risk management the 2021 10-K disclosed that "[w]e evaluate the credit quality of our tenants and any guarantors *on an ongoing basis* by reviewing, where available, the publicly filed financial reports, press releases and

other publicly available industry information regarding our tenants and any guarantors." Defendants continued that,"[i]n addition, we monitor the payment history data for all of our tenants and, in some instances, we monitor our tenants by periodically conducting site visits and meeting with the tenants to discuss their operations," concluding that "[i]n many instances, we will generally not be entitled to financial results or other credit-related data from our tenants."

166.    About "Tenant Concentration," the 2021 10-K disclosed that as of December 31, 2021, Kings Garden was among the "five tenants in our property portfolio that represented the largest percentage of our total rental revenue," itself contributing 8% of rental revenue. The 2021 10-K also notes that as of December 31, 2021, Kings Garden was the tenant with the second great total square footage with 544,000 and the largest of IIPR's investments with over $82 million invested plus "remaining aggregate improvement allowances at certain properties totaling approximately $65.0 million."

167.    The foregoing was false and misleading because, for the reasons stated above, Defendants recklessly disregarded but were duty bound to disclose that:

(a)    The risks warned of had materialized. A simple investigation of public records revealed that Michael King was, as Defendants described him, a "fraudster." In fact, from well before the start of the Class Period, King and Kings Garden had submitted material forged and fraudulent Draw Requests

and invoices that Defendants did not verify. Kings Garden was stealing from IIPR. Defendants had not performed a "due diligence investigation[] of our potential tenants, related guarantors and their properties, operations and prospects," and had not "evaluated the credit quality of our tenants and any guarantors **on an ongoing basis**" by reviewing publicly filed information;

(b)    Upon disclosing the investments in Kings Garden, and its contribution to rental revenue, Defendants were duty bound to disclose but omitted the full truth that Michael King and Kings Garden were, in Defendants' words, "fraudsters," and that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices.

168.    About tenants, including Kings Garden, the 2021 10-K warned:

> Because we lease our properties to a limited number of tenants, and to the extent we depend on a limited number of tenants in the future, the inability of any single tenant to make its lease payments could adversely affect our business and our ability to make distributions to our stockholders. As of December 31, 2021, we owned 103 total properties. Five of our tenants, PharmaCann Inc. (at five of our properties), Parallel (at four of our properties), Ascend Wellness Holdings, Inc. (at three of our properties), Cresco Labs Inc. (at five of our properties) and Kings Garden Inc. (at six of our properties), represented approximately 12%, 10%, 9%, 8% and 8%, respectively, of our rental revenues (including tenant reimbursements) for the year ended December 31, 2021. Lease payment defaults by any of our tenants or a significant decline in the value of any single property would materially adversely affect our business, financial position and results of operations, including our ability to make

distributions to our stockholders. Our lack of diversification also increases the potential that a single underperforming investment or tenant could have a material adverse effect on our cash flows and the price we could realize from the sale of our properties. Any adverse change in the financial condition of any of our tenants, including but not limited to the state cannabis markets not developing and growing in ways that we or our tenants projected, or any adverse change in the political climate regarding cannabis where our properties are located, would subject us to a significant risk of loss.

In addition, failure by any of our tenants to comply with the terms of its lease agreement with us could require us to find another lessee for the applicable property. We may experience delays in enforcing our rights as landlord and may incur substantial costs in protecting our investment and re-leasing that property. Furthermore, we cannot assure you that we will be able to re-lease that property for the rent we currently receive, or at all, or that a lease termination would not result in our having to sell the property at a loss. The result of any of the foregoing risks could materially and adversely affect our business, financial condition and results of operations and our ability to make distributions to our stockholders.

169.    The foregoing was false and misleading because, for the reasons stated above, Defendants recklessly disregarded but were duty bound to disclose that:

(a)    The risks warned of had materialized. A simple investigation of public records revealed that Michael King was, as Defendants described him, a "fraudster." In fact, from well before the start of the Class Period, King and Kings Garden had submitted material forged and fraudulent Draw Requests and invoices that Defendants did not verify. Kings Garden was stealing from

IIPR. Defendants had not performed a "due diligence investigation[] of our potential tenants, related guarantors and their properties, operations and prospects," and had not "evaluated the credit quality of our tenants and any guarantors *on an ongoing basis*" by reviewing publicly filed information;

(b)    Upon disclosing the investments in Kings Garden, and its contribution to rental revenue, Defendants were duty bound to disclose but omitted the full truth that Michael King and Kings Garden were, in Defendants' words, "fraudsters," and that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices.

170.    On February 23, 2022, IIPR issued a press release regarding its financial results for Q4 2021 and for the year ended December 31, 2021. On February 24, 2022, the Company filed its 2021 10-K, for the period ended December 31, 2021. In both filings, IIPR reported that net real estate held for investment at the end of the year of approximately $1.64 billion, annual revenues of approximately $204.6 million, income from operations of approximately $135.4 million, net income attributable to common stockholders of approximately $112.6 million, and net income attributable to common stockholders per diluted share of $4.55.

171.    The foregoing was materially false and/or misleading because Defendants recklessly:

(a)     In violation of GAAP provision ASC 842, failed to record the advances IIPR made to Parallel and Kings Garden in connection with sale-leaseback transactions with these tenants;

(b)     In violation of GAAP provision ASC 842, improperly included in the cost of IIPR's real estate assets the advances IIPR made to Parallel and Kings Garden in connection with sale-leaseback transactions with these tenants;

(c)     In violation of GAAP provision ASC 842, failed to allocate any portion of lease payments IIPR received from Kings Garden or Parallel to debt service on advances IIPR made to these tenants in connection with sale-leaseback transactions with these tenants;

(d)     In violation of GAAP provision ASC 360, failed to record a $42.5 million impairment of the Parallel properties;

(e)     In violation of GAAP provision ASC 360, failed to record a $6.3 million impairment of the Kings Garden properties;

(f)     As a result of these GAAP violations, Defendants overstated IIPR's net real estate held for investment balance by approximately $132.7 million (or 8.8%) and failed to report the approximately $87.8 million balance of advances to Parallel and Kings Garden on IIPR's balance sheet at the end of 2021;

(g)    As a result of these GAAP violations, Defendants overstated IIPR's 2021 annual revenues by approximately $7.9 million (or 4.0%), operating income by approximately $48.6 million (or 56.1%), net income attributable to common stockholders by approximately $42.7 million (or 61.0%), and net income attributable to common stockholders per diluted share by $1.62 (or 55.3%).

172.  On February 24, 2022, defendants convened an Earnings Conference Call ("Q4 2021 Call"). Defendant Regin discussed IIPR's top ten operators, including Kings Garden. He described Kings Garden as "a tenant partner . . . across 6 properties in Southern California, representing a total commitment of about $148 million and which is expected to encompass over 500,000 square feet of space upon completion of development and redevelopment at certain properties." Regin continued that "Kings Garden has developed a truly distinguished brand in California and consistently ranks as a top producer in sales in a state that represents the largest market in the world." He noted that upon completing its facilities, Kings Garden "expect[ed] . . . generat[e] approximately 140,000 pounds to 150,000 pounds of finished cannabis per year in addition to concentrates." Regin continued, "[w]ith their brand reputation and operational expertise driving financial results, the Kings Garden team has also been one of the uniquely positioned operators to return capital to its long-term owners in the form of dividends, including $3 million in each of the

last 2 years," concluding, "[w]e are excited to be working closely with Kings Garden as they complete full build-out of their production capacity in the months to come."

173.   The foregoing was false and misleading because, for the reasons stated above, Defendants recklessly disregarded but were duty bound to disclose that:

(a)   The risks warned of had materialized. A simple investigation of public records revealed that Michael King was, as Defendants described him, a "fraudster." In fact, from well before the start of the Class Period, King and Kings Garden had submitted material forged and fraudulent Draw Requests and invoices that Defendants did not verify. Kings Garden was stealing from IIPR. Defendants had not performed a "due diligence investigation[] of our potential tenants, related guarantors and their properties, operations and prospects," and had not "evaluated the credit quality of our tenants and any guarantors *on an ongoing basis*" by reviewing publicly filed information;

(b)   Upon disclosing the investments in Kings Garden, and its contribution to rental revenue, Defendants were duty bound to disclose but omitted the full truth that Michael King and Kings Garden were, in Defendants' words, "fraudsters," and that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices;

(c)   Having discussed and praised Kings Garden, Defendants were duty bound to disclose but omitted the full truth that Michael King and Kings

Garden were, in Defendants' words, "fraudsters," and that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices.

## **THE TRUTH BEGINS TO EMERGE**

174.   On April 14, 2022, before the market opened, Blue Orca released its report. As discussed above in detail, Blue Orca wrote about the fraud allegations leveled against Michael King even before IIPR entered into any contracts with kings Garden, and of later, additional fraud allegations against Michael king and Kings Garden brought by Michael King's own brother. Blue Orca further revealed that IIPR was overvaluing the fair value of it purchases in its financial statements, creating a false impression of IIPR's financial health for investors.

175.   On this disclosure IIPR's stock fell by 7.5%, falling from $183.44 at the close of trading on April 13, 2022, to close at $169.68 on April 14, 2022, damaging investors.

176.   Before the market closed on April 14, 2022, Defendants responded stating:

> Innovative Industrial Properties, Inc. (IIP), the first and only real estate company on the New York Stock Exchange (NYSE: IIPR) focused on the regulated U.S. cannabis industry, today announced that it is aware of a short-seller report released earlier today, that contains numerous false and misleading statements about IIP. Similar to a short-seller report previously issued in 2020, this short-seller report is flawed and demonstrates a basic

lack of understanding of commercial real estate generally, the regulated cannabis industry and IIP's straightforward, simple business model.

In particular, it is IIP's opinion that this short-seller fails to have any comprehension of the scope of significant infrastructure improvements that are needed for the transformation of a standard industrial building to a mission-critical facility with the enhanced environmental controls and other building systems necessary for regulated cannabis cultivation and processing. In addition, the writers do not understand the process that IIP employs for underwriting those improvements, and that any IIP reimbursements relate only to verified, qualified improvements to the buildings for these purposes, and never as funding for any type of "loan" to be utilized for any other purpose.

Given the flawed nature and disinformation contained in this short-seller report, other than the clarification set forth above, the short-seller report's content does not warrant a response from IIP.

177.   The foregoing was false and misleading because, for the reasons stated above, Defendants recklessly disregarded but were duty bound to disclose that:

(a)     The risks warned of had materialized. A simple investigation of public records revealed that Michael King was, as Defendants described him, a "fraudster." In fact, from well before the start of the Class Period, King and Kings Garden had submitted material forged and fraudulent Draw Requests and invoices that Defendants did not verify. Kings Garden was stealing from IIPR. Defendants had not performed a "due diligence investigation[] of our potential tenants, related guarantors and their properties, operations and

prospects," and had not "evaluated the credit quality of our tenants and any guarantors *on an ongoing basis*" by reviewing publicly filed information;

(b)    Upon disclosing the investments in Kings Garden, and its contribution to rental revenue, Defendants were duty bound to disclose but omitted the full truth that Michael King and Kings Garden were, in Defendants' words, "fraudsters," and that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices.

178.   On May 5, 2022, Defendants filed with the SEC IIPR's Q1 2022 10-Q for the period ended March 31, 2021. Incorporating by reference the 2021 10-K's risk factors, Defendants warned that, "the success of our investments will be materially dependent on the financial stability of these tenants." They continued, "[w]e rely on our management team to perform due diligence investigations of our potential tenants, related guarantors and their properties, operations and prospects, of which there is generally little or no publicly available operating and financial information." In addition, they warned, that they "may not learn all of the material information we need to know regarding these businesses through our investigations, and these businesses are subject to numerous risks and uncertainties, including but not limited to regulatory risks and the rapidly evolving market dynamics of each state's regulated cannabis program. As a result," they concluded, "it is possible that we could enter into a sale-leaseback arrangement with tenants or otherwise lease

properties to tenants that ultimately are unable to pay rent to us, which could adversely impact our cash available for distributions."

179.   With respect to risk management, incorporating 2021 10-K risk factors, the Q1 2022 10-Q disclosed that "[w]e evaluate the credit quality of our tenants and any guarantors on an ongoing basis by reviewing, where available, the publicly filed financial reports, press releases and other publicly available industry information regarding our tenants and any guarantors." Defendants continued that,"[i]n addition, we monitor the payment history data for all of our tenants and, in some instances, we monitor our tenants by periodically conducting site visits and meeting with the tenants to discuss their operations," concluding that "[i]n many instances, we will generally not be entitled to financial results or other credit-related data from our tenants."

180.   About "Concentration of Credit Risk," the Q1 2022 10-Q disclosed that as of March 31, 2022, Kings Garden was among the "five tenants in our property portfolio that represented the largest percentage of our total rental revenue," contributing 8% of rental revenue. The Q1 2022 10-Q also notes that for the quarter ended March 31, 2022, IIPR had invested another $8 million in another Kings Garden property with 23,000 rentable square feet.

181.   The foregoing was false and misleading because, for the reasons stated above, Defendants recklessly disregarded but were duty bound to disclose that:

(a)     The risks warned of had materialized. A simple investigation of public records revealed that Michael King was, as Defendants described him, a "fraudster." In fact, from well before the start of the Class Period, King and Kings Garden had submitted material forged and fraudulent Draw Requests and invoices that Defendants did not verify. Kings Garden was stealing from IIPR. Defendants had not performed a "due diligence investigation[] of our potential tenants, related guarantors and their properties, operations and prospects," and had not "evaluated the credit quality of our tenants and any guarantors *on an ongoing basis*" by reviewing publicly filed information;

(b)     Upon disclosing the investments in Kings Garden, and its contribution to rental revenue, Defendants were duty bound to disclose but omitted the full truth that Michael King and Kings Garden were, in Defendants' words, "fraudsters," and that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices;

(c)     Having discussed and praised Kings Garden, Defendants were duty bound to disclose but omitted the full truth that Michael King and Kings Garden were, in Defendants' words, "fraudsters," and that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices.

182.   During their May 5, 2022, Earnings Conference Call ("Q1 2022 Call")

Defendants continued to boast of Kings Garden's quality as a tenant. Defendant

Regin stated, stated:

> We made our initial investment with Kings Garden in April 2019, acquiring a 5-property portfolio in Southern California, consisting of approximately 102,000 square feet of industrial space, all of which was operational at the time of our acquisition for approximately $27 million or roughly $266 per square foot. At that time, we evaluated Kings Garden, as a leading indoor cannabis operator in California with profitable operations and a distribution agreement with one of the largest distributors in the state, delivering Kings Garden products to over 60% of the state's regulated dispensaries.

> In May of 2020, we followed with the acquisition of a fully operational property comprised of approximately 70,000 square feet of industrial space for $17.5 million or $250 per square foot. Shortly after that closing, Kings Garden announced the initiation of a quarterly dividend to its stockholders, something that was and is considered highly unusual among any prominent brand in the industry and which demonstrates their belief in the long-term prospects in the business. In November of 2020, we made another investment with Kings Garden agreeing to purchase 192,000 square foot building from a third party in San Bernardino for approximately $25 million or approximately $130 per square foot. And to provide reimbursement to Kings Garden for improvements at that facility of another $25 million for key infrastructure requirements for the regulated cannabis cultivation or another $130 per square foot, such that our total investment in the facility was expected to be $260 per square foot. In February 2021, we acquired 3.5 acres adjacent to one of our first acquisitions with Kings Garden for approximately $1.4 million, amending the lease for that property and providing for reimbursement to Kings Garden up to $51.4 million for the construction of 2 brand-

new facilities totaling 180,000 square feet of space or about $285 per square foot. At that time, Kings Garden was projected to have approximately 665,000 square feet of indoor operations and over $300 million in revenue starting in 2024. With the expectation that upon completion of all facilities under development or redevelopment that Kings Garden would be producing approximately 140,000 pounds of finished cannabis product annually in California. Finally, earlier this year, we acquired a 23,000 square foot facility in Cathedral City for $8.2 million, equating to about $353 per square foot. The single-story building is being renovated from office space to a fully operational cultivation facility with a holdback in the purchase price to the seller until the seller completes the final improvements. Kings Garden continues to be one of the largest indoor cultivation operators in California with 3,400 flowering lights producing in [excess] of 36,000 pounds of indoor flower annually, which does not include at all the approximately 395,000 square feet of projects slated to come online in the coming months, as Griffin will discuss. I'll pass along to Griffin to discuss our Kings Garden property portfolio. Griffin?

183. During that same Q1 2022 Call, about Kings Garden, Griffin Marquart, IIPR's Director of Construction Management stated:

As Ben mentioned, we have a number of properties leased to Kings Garden. Of that portfolio, 6 properties comprising of approximately 172,000 square feet are operational with no additional improvements in process. Of the properties under development or redevelopment, I will touch on those individually. In San Bernardino, the 192,000 square foot project is located on approximately 7 acres. As Ben mentioned, our base cost for the industrial building was roughly $130 per square foot, and we have provided an improvement in allowance of an additional $130 per square foot for conversion of the facility to

cannabis cultivation. Of that $25 million allowance, approximately $5 million relates to base building improvements, $8.7 million to electrical upgrades, $8.2 million to mechanical systems and a little over $3 million to plumbing and sprinklers. The interior of the building has been demolished and the new second floor has been installed, consisting of steel columns and decking and concrete deck topping. At completion, the facility is expected to have 14 flower rooms, 4 dry rooms, a mother room, clone room, trim room, packaging room, bedroom, and small head house space for employees and security. We have funded approximately $18 million of the $25 million and expect the remaining to be drawn over the coming months. Improvement disbursements have been made for design, permitting, interior demolition, material procurement due to long lead times and the construction of the new steel structure and metal decking of the second floor. For the 19th Street project, as Ben mentioned, we acquired the land adjacent to our existing property and amended the existing lease with Kings Garden to incorporate that property and provide funding of up to $51.4 million for 2 brand-new industrial cultivation buildings expected to comprise 180,000 square feet. Together with the existing facility on the property, the completed site is expected to be 236,000 square feet and project costs are expected to be about $67.7 million, equating to about $287 per square foot. The site is currently being graded with anticipated pad certification for all buildings in a few months. Kings Garden, again, is procuring the long lead time items given the supply chain challenges of the current environment, including many of the same items requested for San Bernardino that I mentioned previously. At this point, we have funded approximately $27 million of the $51.4 million allowance for improvements. At completion, each building is expected to have 11 flower rooms, 4 dry rooms, a mother room, clone room, trim room, packaging room, bedroom and small head house space for employees and security.

184.    With that extensive background, already knowing of the specific allegations in the Blue Orca Report, Defendant Gold stated:

> Again, very challenging to [convince] thoughts on underwriting the properties and market dynamics in the span of a few minutes and appreciate Ben's and Griffin's detail and effort to do so. ***We have been Kings Garden's partner for 3 years now and believe Michael King and his team have one of the best reputations for product quality and consistency and perhaps the single largest cannabis market in the world***. While we are disappointed in how the California state and local governments have performed in the rollout and administration of the regulated adult-use cannabis program with continued heavy and even increasing tax burdens in certain jurisdictions and lack of enforcement for illicit activities by non-licensed operators, we believe Kings Garden has navigated this environment well. And our firm believers that high-quality producers like Kings Garden will continue to effectively adapt to the changing landscape in California. While we touched on just 2 of our tenants today, we apply a similar multifaceted approach to underwriting our tenants, the properties and the markets across our portfolio. I would also like to point out that it is our belief that our portfolio has a replacement cost that is well above our current basis, driven by the significant and continuing increases across the board in building costs that we are all experiencing. As one example among many, structural steel costs have increased by over 40% in just the last 15 months.

185.    The foregoing was false and misleading because, for the reasons stated above, Defendants recklessly disregarded but were duty bound to disclose that:

(a)    Kings Garden was a fraud and was not complying with the terms of its lease. Having denied and dismissed the information in the Blue Orca Report, Defendants had three weeks to investigate and to verify the truth about

97

Kings Garden, but knowingly or recklessly failed to do so;

(b)    The risks warned of had materialized. A simple investigation of public records revealed that Michael King was, as Defendants described him, a "fraudster." In fact, from well before the start of the Class Period, King and Kings Garden had submitted material forged and fraudulent Draw Requests and invoices that Defendants did not verify. Kings Garden was stealing from IIPR. Defendants had not performed a "due diligence investigation[] of our potential tenants, related guarantors and their properties, operations and prospects," and had not "evaluated the credit quality of our tenants and any guarantors *on an ongoing basis*" by reviewing publicly filed information;

(c)    Upon disclosing the investments in Kings Garden, and its contribution to rental revenue, Defendants were duty bound to disclose but omitted the full truth that Michael King and Kings Garden were, in Defendants' words, "fraudsters," and that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices; Having discussed and praised Kings Garden, Defendants were duty bound to disclose but omitted the full truth that Michael King and Kings Garden were, in Defendants' words, "fraudsters," and that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices;

(d)    Having discussed and praised Kings Garden, Defendants were

duty bound to disclose but omitted the full truth that Michael King and Kings Garden were, in Defendants' words, "fraudsters," and that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices.

186.    On July 14, 2022, after the market closed, Defendants filed with the SEC a Current Report on Form 8-K, disclosing:

> IIP-CA 2 LP ("Landlord"), an indirect, wholly owned subsidiary of Innovative Industrial Properties, Inc. (the "Company"), previously entered into leases (collectively, the "Leases") with Kings Garden Inc., as tenant ("Tenant"), for each of the six properties that Landlord owns.

> On July 13, 2022, Tenant defaulted on its obligations to pay base rent and property management fees for the month of July under each of the Leases, and defaulted on its obligations to reimburse Landlord for certain insurance premiums at the properties incurred by Landlord that are payable by Tenant as operating expenses under the Leases. Tenant's monetary default under all of the Leases was approximately $2.2 million in the aggregate, consisting of approximately $1.8 million of base rent and property management fees for the month of July and approximately $382,000 of insurance premiums, but excluding applicable late charges and default interest.

> The Company is continuing discussions with Tenant regarding the Leases, and has commenced discussions with other operators regarding potential re-leasing of certain of such properties.

187.    The foregoing was false and misleading because, for the reasons stated above, Defendants recklessly disregarded but were duty bound to disclose that:

(a)    Kings Garden was a fraud and was not complying with the terms of its lease. Having denied and dismissed the information in the Blue Orca Report, in the twelve weeks since the Blue Orca report Defendants had ample opportunity to investigate and to disclose the truth about Kings Garden. Instead, they recklessly failed to disclose the truth;

(b)    The risks warned of had materialized. A simple investigation of public records revealed that Michael King was, as Defendants described him, a "fraudster." In fact, from well before the start of the Class Period, King and Kings Garden had submitted material forged and fraudulent Draw Requests and invoices that Defendants did not verify. Kings Garden was stealing from IIPR. Defendants had not performed a "due diligence investigation[] of our potential tenants, related guarantors and their properties, operations and prospects," and had not "evaluated the credit quality of our tenants and any guarantors *on an ongoing basis*" by reviewing publicly filed information;

(c)    Upon disclosing the investments in Kings Garden, and its contribution to rental revenue, Defendants were duty bound to disclose but omitted the full truth that Michael King and Kings Garden were, in Defendants' words, "fraudsters," and that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices; Having discussed and praised Kings Garden, Defendants were duty bound to

disclose but omitted the full truth that Michael King and Kings Garden were, in Defendants' words, "fraudsters," and that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices;

(d)     Having discussed and praised Kings Garden, Defendants were duty bound to disclose but omitted the full truth that Michael King and Kings Garden were, in Defendants' words, "fraudsters," and that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices.

188.   In direct response to this news, IIPR's stock price fell by 14.3%, from a close of $111.61 on July 14, 2022, to a July 15, 2022 closing price of $95.70, damaging investors.

189.   On August 4, 2022, after the market closed, Defendants filed IIPR's Quarterly Report on Form 10-Q for the period ended June 30, 2022. About Kings Garden, Defendants finally disclosed sufficient information to enable investors to evaluate Kings Gardens as a tenant and it contribution to IIPR's cash flows, stating.

> Kings Garden Lawsuit
>
> On July 13, 2022, one of our tenants, Kings Garden Inc. ("Kings Garden"), defaulted on its obligations to pay base rent and property management fees for the month of July under each of its six leases with our indirect, wholly owned subsidiary, IIP-CA 2 LP, and defaulted on its obligations to reimburse us for certain insurance premiums at the properties incurred by us that are payable by Kings Garden as operating expenses under such leases. Kings

Garden's monetary default under its leases with us was approximately $2.2 million in the aggregate, consisting of approximately $1.8 million of base rent and property management fees for the month of July and approximately $382,000 of insurance premiums, but excluding applicable late charges and default interest. We applied a portion of the security deposits under the leases, totaling approximately $2.3 million, as payment for these amounts, as well as applicable late charges and default interest through July 13, 2022. Of the six properties leased to Kings Garden, four were operational, with an expansion project at one of those properties, and the other two properties were in development or redevelopment as of June 30, 2022.

On July 25, 2022, IIP-CA 2 LP filed a lawsuit against Kings Garden. The case was named IIP-CA 2 LP, a Delaware limited partnership v. Kings Garden Inc., a Nevada corporation, CK Endeavors, Inc., a California corporation, and JM Endeavors, Inc., a California corporation, and was filed in the Superior Court of the State of California. The lawsuit asserts claims for breach of contract, declaratory relief, and injunctive relief. On August 2, 2022, the case was amended to be named IIP-CA 2 LP, a Delaware limited partnership v. Kings Garden Inc., a Nevada corporation, CK Endeavors, Inc., a California corporation, JM Endeavors, Inc., a California corporation, Michael King, an individual, Gary LaSalle, an individual, Charles Kieley, an individual, and Laurie Kibby, an individual, and *to include claims relating to construction at the expansion project and the property that was under redevelopment as of June 30, 2022 for breach of implied covenant of good faith and fair dealing, fraud, negligent misrepresentation, conversion, theft by false pretenses, money had and received, and violations of the Racketeer Influenced and Corrupt Organization Act (18 U.S.C. Section 1962(c))*. We are seeking monetary damages, interest, attorneys' fees, and declaratory and injunctive relief. Although there is at least a reasonable possibility that a loss may have been incurred

in connection with the default by Kings Garden and the related construction projects, as of June 30, 2022, we are unable to make such an estimate.

\*\*\*

Subsequent Events

Tenant Default

We previously entered into leases (collectively, the "Kings Garden Leases") with Kings Garden, as tenant, for six properties located in southern California. On July 13, 2022, Kings Garden defaulted on its obligations to pay base rent and property management fees for the month of July under each of the Kings Garden Leases, and defaulted on its obligations to reimburse us for certain insurance premiums at the properties incurred by us that are payable by Kings Garden as operating expenses under the Kings Garden Leases. Kings Garden's monetary default under all of the Kings Garden Leases was approximately $2.2 million in the aggregate, consisting of approximately $1.8 million of base rent and property management fees for the month of July and approximately $382,000 of insurance premiums, but excluding applicable late charges and default interest. We applied a portion of the security deposits under the Kings Garden Leases, totaling approximately $2.3 million, as payment for these amounts, as well as applicable late charges and default interest through July 13, 2022. As of August 4, 2022, we had not received any additional payments from Kings Garden under any of the Kings Garden Leases, and have approximately $373,000 remaining of security deposits under the Kings Garden Leases.

190.    In direct response to this news, IIPR's stock price fell by 4%, from a close of $98.40 on August 4, 2022, to an August 5, 2022 closing price of $94.41,

damaging investors.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

191.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired IIPR securities publicly traded on the NYSE during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of IIPR, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

192.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, IIPR securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands, of members in the proposed Class.

193.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

194.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class

and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

195.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of IIPR;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused IIPR to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of IIPR securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

196.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

197.   Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- IIPR securities met the requirements for listing, and were listed and actively traded on the NYSE, an efficient market;

- As a public issuer, IIPR filed public reports;

- IIPR regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as

communications with the financial press and other similar reporting services;

- IIPR's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- IIPR was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

198. Based on the foregoing, the market for IIPR securities promptly digested current information regarding IIPR from all publicly available sources and reflected such information in the prices of the common units, and Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

199. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I
### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against Defendants IIPR, Smithers, Hastings, Gold, and Regin

200.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

201.   This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

202.   During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

203.   Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of IIPR's securities during the Class Period.

204.   Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of IIPR were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of IIPR, their control over, and/or receipt and/or modification of IIPR's allegedly materially misleading statements, and/or their associations with IIPR which made them privy to confidential proprietary information concerning IIPR, participated in the fraudulent scheme alleged herein.

205.   Individual Defendants, who are or were senior executives and/or directors of IIPR, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements

made by them or other Innovative Industrial Properties personnel to members of the investing public, including Plaintiffs and the Class.

206.   As a result of the foregoing, the market price of IIPR securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of IIPR securities during the Class Period in purchasing IIPR securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

207.   Had Plaintiffs and the other members of the Class been aware that the market price of IIPR securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased IIPR securities at the artificially inflated prices that they did, or at all.

208.   As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

209.   By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of IIPR securities during the Class Period.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

210.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

211.   During the Class Period, the Individual Defendants participated in the operation and management of IIPR, and conducted and participated, directly and indirectly, in the conduct of IIPR's business affairs. Because of their senior positions, they knew the adverse non-public information about IIPR's misstatement of revenue and profit and false financial statements.

212.   As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to IIPR's financial condition and results of operations, and to correct promptly any public statements issued by IIPR which had become materially false or misleading.

213.   Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which IIPR disseminated in the marketplace during the Class Period concerning IIPR's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause IIPR to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of IIPR

within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of IIPR securities.

214.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by IIPR.

## **PRAYER FOR RELIEF**

**WHEREFORE**, plaintiffs, on behalf of themselves and the Class, pray for judgment and relief as follows:

(a)    declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and Named Plaintiff as class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiffs' counsel as Lead Counsel;

(b)    awarding damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)    awarding plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    awarding plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiffs hereby demand a trial by jury.

Dated: September 29, 2022 **THE ROSEN LAW FIRM, P.A**

/s/ Gonen Haklay
Gonen Haklay
Jacob A. Goldberg
101 Greenwood Avenue, Suite 440
Dresher, PA 19046
Tel: (215) 600-2817
Fax: (973) 833-0399
Email: ghaklay@rosenlegal.com
        jgoldberg@rosenlegal.com


Laurence M. Rosen, Esq.
One Gateway Center, Suite 2600
Newark, NJ 07102
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

***Counsel for Plaintiffs and the Class***