<u>**NOT FOR PUBLICATION**</u>

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

MICHAEL V. MALLOZZI,
*Individually and on behalf of all others similarly
situated*, et al.

                                Plaintiffs,

        v.

INNOVATIVE INDUSTRIAL PROPERTIES,
INC., PAUL SMITHERS, CATHERINE
HASTINGS, and ANDY BUI,

                                Defendants.

Case No. 22cv2359 (EP) (JRA)

**OPINION**

**PADIN, District Judge.**

Defendant Innovative Industrial Properties ("IIPR"), a publicly traded real estate investment trust ("REIT") in the cannabis industry, was defrauded by one of its tenants. This securities class action arises out of IIPR's and its executives' ("Individual Defendants") conduct before and after a negative report about IIPR and this tenant was released. Plaintiffs are individuals who purchased or otherwise acquired IIPR securities during the relevant period. *See* D.E. 34 (the First Amended Complaint, or "FAC").

Defendants move to dismiss the FAC under Federal Rule of Civil 12(b)(6). D.E. 42 ("Mot."). The Court has reviewed the parties' briefs and supplemental authority and decides the motion on the papers. *See* Fed. R. Civ. P. 78(b); L.Civ.R. 78(b). For the reasons below, Defendants' motion will be **GRANTED** and the FAC **DISMISSED without prejudice**.

I.      **BACKGROUND**[1]

A.  **The Parties, Kings Garden, and the Properties**

The named Plaintiffs filed this federal securities class action on behalf of a class consisting of all persons or entities, besides Defendants, who purchased or otherwise acquired IIPR securities between August 7, 2020, and August 4, 2022 ("Class Period").  FAC ¶ 1.

Defendant IIPR is a publicly traded REIT that specializes in the "acquisition, ownership, and management of . . . industrial properties [that are] leased to experienced, state-licensed operators for the[ operators'] regulated, state-licensed cannabis facilities." *Id.* ¶ 16.  IIPR acquires these properties "through sale-leaseback transactions and third-party purchases." *Id.* ¶ 30.   In these transactions, "IIPR leases its properties under long-term, triple-net lease agreements, where the tenant is responsible for all aspects of and costs related to the property and its operation during the lease term . . . ." *Id.*  IIPR then profits by collecting rent and earning interest on loans IIPR provides to the tenants.  *See id.* ¶ 36.

The Individual Defendants are various IIPR executives.  "Defendant Smithers co-founded IIPR[] and has served as IIPR's Chief Executive Officer ('CEO'), President and a Director since IIPR's founding." *Id.* ¶ 17.  Defendant Gold is another co-founder and "at all relevant times has served as the Executive Chairman of IIPR's Board of Directors." *Id.* ¶ 19.  Defendant Hastings has been Chief Financial Officer ("CFO") since June 2017 and Treasurer since January 2017, and served as Chief Accounting Officer ("CAO") from January 2017 until January 2021.  *Id.* ¶ 18. Defendant Hager has served as Vice President of Asset Management since October 2019.  *Id.* ¶ 20.  Defendant Regin has served as Vice President of Investments since January 2020, and was

---

[1] This section derives mainly from the FAC and the parties' briefings. On a motion to dismiss, the Court takes all well-pleaded facts in the complaint as true. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

previously Director of Finance & Investments, beginning in 2017.  *Id.* ¶ 21. And Defendant Bui has served as CAO and Vice President since January 2021, previously serving as Controller, beginning in May 2017.  *Id.* ¶ 22.

Kings Garden, a non-party, was founded in 2015 by its Founder, Chairman, and CEO Michael King.  *Id.* ¶ 34.  In 2019, Kings Garden was licensed to cultivate and distribute cannabis in California.  *Id.*  Between April 16, 2019, and March 25, 2021, IIPR's subsidiary, IIP-CA 2 LP ("IIPR Subsidiary") "acquired several properties and entered into leases for the properties with Kings Garden as the tenant in California."  Mot. at 10 (citing FAC ¶ 34).  At many points, Kings Garden was one of IIPR's largest operators, accounting for a large percentage of rental revenues.  *Id.* ¶¶ 37-39.  IIPR's financial investment in Kings Garden was among IIPR's largest investments in any operator.  *See id.* ¶¶ 40-42.

"In mid-2021, Kings Garden began construction on multiple additional facilities" ("Properties").  Mot. at 11.  Pursuant to the Properties' leases, Kings Garden would submit "draw requests" to the IIPR Subsidiary; a draw request is a request for reimbursement for improvement-related expenses ("Draw Requests").   *See* FAC ¶ 51; Mot. at 11.  Ultimately, Kings Garden submitted six Draw Requests, the first on July 29, 2021, and the last on June 1, 2022.  FAC ¶ 53.  IIPR paid these Draw Requests from mid-2021 until June 2022.  *See* FAC ¶ 62; Mot. at 11.

### B.  The Blue Orca Report and Defendants' Response

On April 14, 2022, "before the market opened," Blue Orca Capital[2] ("Blue Orca") released a report ("Blue Orca Report") detailing that Michael King, Kings Garden's co-founder and CEO, "had a background filled with fraud and theft allegations, name changes, and litigation," including a lawsuit filed against Michael King by his brother in May 2021.  FAC ¶ 2.  The Blue Orca Report

---

[2] A stock market short seller.  FAC ¶ 2.

3

claimed that "this information was available from early 2019," prior to IIPR's contracts with Kings Garden. *Id.* Additionally, the Blue Orca Report stated that IIPR "purchased properties at far higher prices than the sellers they entered into sale-leaseback transactions [with] had paid for the properties . . . ." *Id.* Because IIPR "record[ed] the fair value of the properties as the purchase price" that IIPR—not the tenants—paid, this meant that "IIPR was hiding its true financial condition." *Id.* Following the release of the Blue Orca Report, IIPR's stock "fell by 7.5%, falling from $183.44 . . . on April 13, 2022, to . . . $169.68 on April 14, 2022, damaging investors." *Id.* The afternoon of April 14, 2022, "IIPR released a statement dismissing the Blue Orca [R]eport in its entirety" and stating it "contain[ed] false and misleading statements" and "did not warrant a [further] response from IIPR." *Id.* ¶ 3 (internal quotation marks omitted).

A few weeks later, IIPR "[d]oubl[ed] down" on this stance during a May 5, 2022, earnings conference call. *Id.* For example, Defendant Gold stated:

- "We have been Kings Garden's partner for 3 years now and believe Michael King and his team have one of the best reputations for product quality and consistency and perhaps the single largest cannabis market in the world."
- "[W]e believe Kings Garden has navigated [the California state and local regulatory] environment well."
- "Our firm believe[s] that high-quality producers like Kings Garden will continue to effectively adapt to the changing landscape in California."

*Id.* (cleaned up). Also during the conference, Defendant Regin stated:

- In May 2020, on the heels of a $17.5 million investment in Kings Garden, on top of a $27 million 2019 investment, that Kings Garden announced the initiation of a quarterly dividend to its stockholders.

*Id.* (cleaned up). Defendant Regin then "conceded that [the fact that] Kings Garden [had been] paying its own shareholders a dividend" was "highly unusual among any prominent brand in the

industry" but that the dividend ultimately "demonstrate[d] their belief in the long-term prospects in the business." *Id.* (internal quotation marks omitted).

After the Blue Orca Report, in June 2022, IIPR "went back and looked closely" at Kings Garden's Draw Requests, which totaled $21.6 million. *Id.* ¶¶ 50, 53. The first five Draw Requests had been received, approved, and paid prior to the Blue Orca Report. *Id.* When examining the sixth Draw Request that Kings Garden submitted in June 2022, IIPR personnel "[n]otic[ed] that the numbers . . . simply did not match the supporting documentation . . . ." *Id.* ¶ 57.

When IIPR confronted Kings Garden, it admitted that all six Draw Requests were forged and informed IIPR that Kings Garden "was out of money and would not be paying its July 2022 rent" or "any more rent whatsoever." *Id.* ¶¶ 57, 62. IIPR reviewed the previous five Draw Requests and noticed that the first Draw Request contained "inconsistent font types and text boxes that appeared to have been added to an old invoice" and metadata indicating that the base form for the PDF was created in 2017. *Id.* ¶ 58.

On July 14, 2022, after the market closed, "IIPR announced that Kings Garden had failed to pay its July 2022 rent under any of its leases." *Id.* ¶ 4. "In direct response to this news, IIPR's stock price fell by 14.3%, from . . . $111.61 on July 14, 2022, to [$95.70 on] July 15, 2022[,] . . . damaging investors." *Id.* On August 4, 2022, after the market closed, IIPR filed its quarterly report with the Securities Exchange Commission ("SEC") stating that it had sued Kings Garden, Michael King, and related parties on July 25, 2022. *Id.* ¶ 5. "In direct response to this news, IIPR's stock price fell by 4%, from a close of $98.40 on August 4, 2022, to an August 5, 2022[,] closing price of $94.41, damaging investors." *Id.*

**C.  IIPR's Pre- and Post-Blue Orca Report Conduct**

Plaintiffs highlight additional misconduct by Defendants.[3]  In summary, the misconduct falls into four categories: (1) IIPR's risk warnings ("Risk Warnings"), (2) comments on conference calls, (3) quarterly or yearly filings with the SEC, and (4) IIPR's Generally Accepted Accounting Principles violations ("GAAP Violations").

*1.  Risk Warnings*

Throughout the Class Period but prior to the Blue Orca Report, "Defendants incorporated by reference, in their entirety, the risk factors" from their annual reports filed with the SEC into their quarterly reports. *Id.* ¶¶ 120-21, 126-27, 132-34, 143-44, 149-50, 158-59; *see also id.* ¶¶ 164-65, 168 (examples of Risk Warnings in annual report).  During the Class Period and after the Blue Orca Report, Defendants did the same. *Id.* ¶¶ 178-79.

Overall, these Risk Warnings contained similar, if not identical, language.  First, the Risk Warnings stated that IIPR's management team would "perform due diligence investigations of our potential tenants, related guarantors, and their properties, operations, and prospects . . . ." *Id.* ¶ 120; *see also id.* ¶¶ 126, 133, 143, 149, 158, 164, 178.  Second, the Risk Warnings stated that monitoring the credit quality and payment history data for all current tenants would be performed "on an ongoing basis[,]" and "in some instances," IIPR would monitor tenants "by periodically conducting site visits and meeting with the tenants to discuss their operations . . . ." *Id.* ¶ 121; *see also id.* ¶¶ 127, 134, 144, 150, 159, 165, 179.  Lastly, the Risk Warnings warned that IIPR "may not learn all of the material information [it] need[s] to know regarding these businesses"; that "these businesses are subject to numerous risks and uncertainties"; and as a result, "it is possible

---

[3] For brevity, the Court summarizes the alleged conduct.  *See* FAC ¶¶ 120-87.

that [IIPR] could enter into a sale-leaseback arrangement with tenants . . . that ultimately are unable to pay rent to [IIPR] . . . ." *Id.* ¶ 120; *see also id.* ¶¶ 126, 133, 143, 149, 158, 164, 178.

        2.   *Comments on conference calls and statements in the SEC filings*

Throughout the Class Period and prior to the Blue Orca Report, Defendants also allegedly made statements that were false and misleading on various conference calls and in SEC filings regarding IIPR's investments in Kings Garden and Kings Garden generally.

On August 6, 2020, Defendant Gold stated that IIPR had invested at least $17.5 million in Kings Garden. *Id.* ¶ 122. During other conference calls and in SEC filings, Defendants also made false and misleading comments about IIPR's investments in Kings Garden.[4]

On February 25, 2021, Defendant Regin stated that "Kings Garden is one of the top operators" in California's cannabis market and that IIPR was a "proud partner[] of Michael King and his great team[,] and [IIPR] look[s] forward to supporting them . . . to continue to deliver" high-quality cannabis. *Id.* ¶ 139. Later on the same call, Defendant Regin stated IIPR was "thrilled to team with Kings Garden . . . ." *Id.* Also, Defendant Gold stated that IIPR "add[s] new growers very carefully" and "evaluate[s] and underwrite[s] every single [transaction with tenants] individually" to determine "what IIPR think[s] is an appropriate yield for the capital [it] intend[s] to offer." *Id.* ¶ 140 (internal quotation marks omitted).

On August 5, 2021, Defendant Regin stated that Kings Garden was one of IIPR's "most significant tenants"; a "truly distinguished brand in California [that] consistently ranks as a top producer in sales"; and "focused on long-term, responsible, sustainable production." *Id.* ¶ 153

---

[4] FAC ¶ 128 (2020 second quarter filing); ¶135 (2020 yearly filing); ¶139 (February 25, 2021, earnings call); ¶142 (May 5, 2021, press release); ¶151 (2021 second quarter filing); ¶¶ 153-154 (August 5, 2021, earnings call); ¶160 (2021 third quarter filing); ¶166 (2021 yearly filing); ¶172 (February 24, 2021, earnings call); ¶180 (2021 first quarter filing).

(internal quotation marks omitted). Additionally, Defendants Gold and Hastings commented on IIPR's feelings towards its tenants. *Id.* ¶ 154. Specifically, Defendant Gold stated that IIPR was "thrilled with the quality of [IIPR's] tenant roster" and their "strength and resilience . . . ." *Id.* (internal quotation marks omitted). Defendant Hastings stated that IIPR was "proud to continue to partner with many of [its] tenant operators . . . ." *Id.* (internal quotation marks omitted).

On February 24, 2022, Defendant Regin stated that "Kings Garden has developed a truly distinguished brand in California and consistently ranks as a top producer . . . ." *Id.* ¶ 172 (internal quotation marks omitted). Defendant Regin also stated that "upon completing its facilities, Kings Garden was "expect[ed to] . . . generat[e] approximately 140,000 pounds to 150,000 pounds of finished cannabis per year in addition to concentrates." *Id.* (internal quotation marks omitted). Additionally, Defendant Regin commented on the "unique[] position[]" of Kings Garden to be able to "return capital to its long-term owners in the form of dividends . . . ." *Id.* (internal quotation marks omitted). Defendant Regin concluded by noting that IIPR was "excited to be working closely with Kings Garden as they complete full build-out of their production capacity in the months to come." *Id.*

After the Blue Orca Report, on May 5, 2022, during a conference call, Defendants discussed its investments with Kings Garden and "continued to boast of Kings Garden's quality as a tenant." *Id.* ¶¶ 182-84 (internal quotation marks omitted) (Defendant Gold stating that IIPR "believe[s] Michael King and his team have one of the best reputations for product quality and consistency and perhaps the single largest cannabis market in the world."); *see also supra* Section II(B).

### 3.   *GAAP Violations*

GAAP "refers to the framework of guidelines for financial accounting used to prepare financial statements" issued by the Financial Accounting Standards Board.  FAC ¶ 81.  "SEC rules and regulations require that publicly traded companies include GAAP-compliant financial statements in their annual and quarterly reports filed with the SEC."  *Id.* ¶ 83.  If a financial statement filed with the SEC does not comply with GAAP, it "will be presumed to be misleading or inaccurate."  *Id.* (internal quotation marks omitted).

Throughout the Class Period, IIPR "listed the fair values of properties it purchased at the purchase price, even as the operators themselves had paid substantially less for the properties, sometime only a day earlier."  *Id.* ¶ 9.  IIPR did this with Kings Garden and Parallel, another one of IIPR's top five operators.  *Id.* ¶ 70 n.11.  IIPR allegedly violated GAAP by (1) "fail[ing] to record the advances IIPR made to Parallel and Kings Garden in connection with sale-leaseback transactions[,]" (2) "improperly includ[ing] in the cost of IIPR's real estate assets the advances IIPR made to Parallel and Kings Garden in connection with sale-leaseback transactions[,]" and (3) "fail[ing] to allocate any portion of lease payments IIPR received from Kings Garden or Parallel to debt service on advances IIPR made to these tenants in connection with sale-leaseback transactions with these tenants[.]"[5]  *Id.* ¶ 125; *see also id.* ¶¶ 131, 138, 148, 157, 163, 171.

As a result, when Defendants would issue press releases that included IIPR's financial results ("Press Releases"), these Press Releases would "overstate[] IIPR's net real estate held for investment balance[,]" fail to report the "balance of advances to Parallel and Kings Garden on IIPR's balance sheet[,]" and overstate IIPR's quarterly revenues.  *Id.* ¶ 125; *see also id.* ¶¶ 131,

---

[5] The FAC states that this conduct violated GAAP provision ASC 842.

157, 138, 148, 163, 171.  Additionally, this practice meant that IIPR failed to develop an estimate of expected credit losses on its advances to cannabis producers, also in violation of GAAP.[6]

### D.  Procedural History

On April 25, 2022, Plaintiff Michael V. Mallozzi filed the initial complaint bringing this securities class action on behalf of individuals who purchased or otherwise acquired IIPR securities during the Class Period.  D.E. 1.  On September 29, 2022, Plaintiffs Alejandro Handal and Stephen R. Forrestor filed the FAC.  *See* FAC.  Plaintiffs allege violations of Sections 10(b) (Count One) and 20(a) (Count Two) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Securities and Exchange Commission Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  Count One is brought against Defendants IIPR, Smithers, Hastings, Gold, and Regin, and Count Two is brought against the Individual Defendants.  *Id.* at 108, 111.

Defendants now move to dismiss the FAC.  *See* Mot.  Plaintiffs oppose.  D.E. 47 ("Opp'n").  Defendants have replied.  D.E. 51 ("Reply").

## II.    LEGAL STANDARDS

When deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court accepts all well-pleaded facts as true, construes the complaint in the plaintiff's favor, and determines "whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotation marks omitted).  Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain a "'short and plain statement of the claim showing that the pleader is entitled to relief.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

---

[6] This violated GAAP provision ASC 360 because IIPR's balance sheet was "subject to evaluation for impairment . . . ."  *Id.* ¶ 111; *see also* ¶¶ 138, 147, 156, 163, 170.

To survive a motion to dismiss, the plaintiff's claims must be facially plausible, meaning that the well-pleaded facts "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.  The allegations must be "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  In deciding the motion, "a court must consider only the complaint, exhibits attached to the complaint, [and] matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

Federal Rule of Civil Procedure 9(b) "imposes a heightened pleading requirement of factual particularity with respect to allegations of fraud." *In re Rockefeller Ctr. Props. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002).  A plaintiff must state the circumstances of their alleged cause of action with "sufficient particularity to place the defendant on notice of the 'precise misconduct with which [it is] charged.'" *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (quoting *Lum v. Bank of Am.*, 361 F.3d 217, 223-24 (3d Cir. 2004)).  At a minimum, this requires that the plaintiff allege the "'who, what, when, where and how'" of the events at issue." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 76-77 (3d Cir. 2006) (quoting *In re Rockefeller*, 311 F.3d at 216).

The PSLRA heightens the pleading standard for private securities fraud actions.  *In re Suprema*, 438 F.3d at 276.  First, the complaint must "specify each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity." *Winer Family Trust v. Queen*, 503 F.3d 319, 326 (3d Cir. 2007).  Second, the complaint must, "with respect to each act or omission alleged to violate this [chapter], state with particularity facts giving rise to a strong inference that the defendant acted

11

with the required state of mind." 15 U.S.C. § 78u-4(b)(2).  Like Rule 9(b), both provisions of the

PSLRA require facts to be pled with "particularity."  *In re Advanta Corp. Sec. Litig.*, 180 F.3d

525, 534 (3d Cir. 1999) (finding that the PSLRA pleading standard "requires plaintiffs to plead

the who, what, when, where and how: the first paragraph of any newspaper story").

## III.    ANALYSIS

### A.  Plaintiffs Do Not Plead a Violation of Section 10(b) and Rule 10b-5

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with

the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in

contravention of such rules and regulations as the [SEC] may prescribe[.]"  15 U.S.C. § 78j(b).

Rule 10b-5, promulgated thereunder by the SEC, makes it unlawful to "make any untrue statement

of a material fact or to omit to state a material fact in order to make the statements made in light

of the circumstances under which they were made, not misleading . . . in connection with the

purchase or sale of any security." 17 C.F.R. § 240.10b-5.  To state a claim for relief under Section

10(b) and Rule 10b-5, a plaintiff must show: "(1) a material misrepresentation or omission by the

defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the

purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic

loss; and (6) loss causation."  *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148,

157 (2008).

Defendants argue that the FAC fails to state a Section 10(b) claim in accordance with Rule

9(b) and the PSLRA because it does not allege with particularity that (1) any of the challenged

statements were materially misleading or (2) Defendants acted with fraudulent intent.  Mot. at 15-

16, 25.  The Court agrees and will dismiss Plaintiffs' Section 10(b) claim (Count One) without prejudice.[7]

1. *Plaintiffs have not alleged particularized facts demonstrating a materially false or misleading statement*

The first element of a Section 10(b) claim requires a plaintiff to "'identify a false representation of material fact or omission that makes a disclosed statement materially misleading.'" *In re Aurora Cannabis, Inc. Sec. Litig.*, 2021 WL 2821167, at *11 (D.N.J. July 6, 2021) (quoting *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002)).  Liability attaches for both affirmative misstatements and misleading omissions, but the latter can only give rise to liability where the defendant had an affirmative duty to disclose the information in question. *Oran v. Stafford*, 226 F.3d 275, 285-86 (3d Cir. 2000).  The statement or omission is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *In re Advanta Corp. Sec. Litig.*, 180 F.3d at 538 (citations omitted).  A statement is not material if it involves "subjective analysis or extrapolations, such as opinions, motives and intentions, or general statements of optimism." *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 872 (3d Cir. 2000); *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1427 (noting "claims that these kinds of vague expressions of hope by corporate managers could dupe the market have been almost uniformly rejected by the courts").

---

[7] Because the Court finds amendment would not be futile, all dismissals of Plaintiffs' claims are without prejudice, affording Plaintiffs the opportunity to cure any pleading deficiencies.  *See Prudential Ins. Co. of Am. v. Bank of Am., Nat'l Ass'n*, 14 F. Supp. 3d 591, 596 (D.N.J. 2014) (quoting *New York v. Hill*, 528 U.S. 110, 118 (2000)) (Dismissal of a complaint with prejudice is a "'harsh remedy'" that "is [only] appropriate if amendment would be inequitable or futile.").

Defendants argue that the FAC fails to adequately plead that any of the cited statements are false or misleading. Mot. at 15-16. The Court agrees.

a.    *Defendants' Risk Warnings are not false or misleading*

Defendants first argue that the Risk Warnings are not adequately pleaded as false or misleading. *Id.* The Court agrees.

The FAC alleges that the Risk Warnings, which included statements that IIPR conducted due diligence before entering a transaction and on an ongoing basis, were "false and misleading" because "the risks warned of"—Kings Garden's fraudulent behavior—"had materialized." FAC ¶ 123; *see, e.g.*, *id.* ¶ 129. Specifically, "[a] simple investigation of public records [would have] revealed that Michael King was . . . a fraudster." *Id.* ¶ 123 (internal quotation marks omitted). Additionally, "from well before the start of the Class Period, [Michael] King and Kings Garden had submitted material forged and fraudulent Draw Requests and invoices that Defendants did not verify[,]" thus allowing Kings Garden to "steal[] from IIPR." *Id.* As such, "Defendants were duty bound to disclose but omitted the full truth that Michael King and Kings Garden were fraudsters" and defrauding IIPR. *Id.*

The crux of Plaintiffs' argument is that had IIPR conducted due diligence, then Kings Garden could not have defrauded IIPR. Opp'n at 5-7. Plaintiffs cite the following to support that IIPR knew or should have known that Michael King and Kings Garden were "fraudsters:" (1) a January 2019 lawsuit filed in California state court by Swiss American Investment Corporation ("Swiss American Lawsuit"), one of Kings Garden's investors[8]; (2) the May 2021 lawsuit filed against Michael King by his brother[9]; and (3) the fraudulent Draw Requests. *See id.*; FAC ¶ 123.

---

[8] *Swiss American Inv. Corp. v. Kings Garden, LLC et al.,* No. 37-2019-00005548-CU-WM-CTL (Cal Sup. Ct., Cty. Of San Diego). FAC at 27 n.9.
[9] *Paul King v. Michael King, et al*., No. 21-23889 (S.D. Fla. 2021). FAC at 28 n.10.

However, the second and third red flags did not occur until May 2021 and July 2022, respectively. FAC ¶¶ 53, 68. An event that happened after a Risk Warning was stated cannot retroactively demonstrate that the Risk Warning was false or misleading. *See NAHC*, 306 F.3d at 1330 (Defendants "are not obligated to predict future events unless there is reason to believe that they will occur."). And the first alleged red flag, the Swiss American Lawsuit, was referred to non-public arbitration at a time unspecified by the FAC. *Id.* at 27 n.9. Thus, the FAC fails to allege with particularity how and when IIPR could have accessed that information.

Further, Plaintiffs are required to plead "true facts" sufficient to show that IIPR was being defrauded by Kings Garden at the time the allegedly false or misleading statements, the Risk Warnings, were made. *Williams v. Globus Med., Inc.*, 869 F.3d 235, 244 (3d Cir. 2017) (a statement is not actionable as false or misleading when plaintiffs "rely on conjecture based on subsequent events"). Kings Garden did not begin to defraud IIPR until it submitted its first fraudulent Draw Request on July 29, 2021.[10] *See id.*; FAC ¶ 123. Thus, any potentially actionable Risk Warning must have been made after July 29, 2021. *See Tanaskovic v. Realogy Holdings Corp.*, 2021 WL 211049, at *6 (D.N.J. Jan. 21, 2021) (internal quotation marks omitted) ("[A] purported claim of securities fraud based merely on information that became apparent after the fact, with no indication that the speaker was aware, or at least should have been aware . . . at the time of his earlier statement, is [a] . . . fraud by hindsight argument that the Third Circuit has long rejected as improper.").

As for the Risk Warnings made after July 29, 2021,[11] Plaintiffs fail to address why they were insufficient. *See Aurora Cannabis*, 2021 WL 2821167, at *12 (dismissing where the

---

[10] *See* FAC ¶¶ 120-21, 126-27, 132-34, 143-44 (Risk Warnings before July 29, 2021).
[11] *See id.* ¶¶ 149-50, 158-59, 164-65, 168, 178-79 (Risk Warnings after July 29, 2021).

plaintiffs failed to address why the disclosures were insufficient).  Plaintiffs only allege generally that the Risk Warnings were false because IIPR was, at that time, being defrauded, and thus could not have conducted any due diligence; Plaintiffs do not particularize how those specific Risk Warnings false or misleading when they were made, and what specific information was available to Defendants at that time.  *See, e.g.*, FAC ¶ 146.  Indeed, the FAC makes no distinctions among the pre- and post-Draw Requests Risk Warnings.  *See, e.g.*, *id.* ¶ 123  (citing Risk Warnings incorporated in 2020, but claiming they are false and misleading in part because of forged Draw Requests).  Without more, Plaintiffs fail to plead meet the PSLRA's high pleading standard of specifying, *with particularity*, *each* allegedly misleading statement[ and] *why the statement was misleading* . . . ."  *Winer Family Trust*, 503 F.3d at 326 (emphasis added); *see also Rockefeller*, 311 F.3d at 223 (Plaintiffs in a securities fraud action "may not benefit from inferences flowing from vague or unspecific allegations . . . .").[12]

Accordingly, the Risk Warnings are not false or misleading statements.

b. *Defendants' statements abouts IIPR's investments in Kings Garden are not false or misleading*

Defendants also argue that Plaintiffs do not adequately plead that Defendants' statements about IIPR's investments in Kings Garden are false or misleading.  The Court agrees.

The FAC mentions various instances where over a conference call, "Defendants repeatedly bragged about their increasing investment in Kings Garden and its importance to IIPR's rent revenues."  Opp'n at 16.  The FAC also alleges that IIPR's quarterly and yearly disclosures to the SEC, which included information regarding Kings Garden's revenue, were false and misleading.

---

[12] The FAC's allegations about the Risk Warnings prior to July 29, 2021, would fail for the same reasons.

*Id.* at 17 n.13 (citing FAC).[13]  Plaintiffs argue these statements were false and misleading because "[u]pon disclosing the investments in Kings Garden, and its contribution to rental revenue, Defendants were duty bound to disclose" that Michael King and Kings Garden were "fraudsters" who had "submitted material forged and fraudulent Draw Requests and invoices."  FAC ¶ 161 (internal quotation marks omitted).

Defendants again argue that any actionable statement about IIPR's investments in Kings Garden must have been made after the first fraudulent Draw Request on July 29, 2021.  Mot. at 18-19; *see, e.g.*, FAC  ¶ 129 (alleging that Defendants' statement was false because Kings Garden submitted forged and fraudulent Draw Requests prior to the first Draw Request).  As noted above, Plaintiffs cannot rely on a "fraud by hindsight" argument, and thus any actionable statement about IIPR's investments in Kings Garden must have been made after the first fraudulent Draw Request on July 29, 2021.[14]  *Tanaskovic*, 2021 WL 211049, at *6.

As for statements about IIPR's investments in Kings Garden made after July 29, 2021, that occurred during a conference call,[15] Defendants argue that they are not false or misleading because they are "forward-looking" statements "regarding [IIPR's] expectations for its landlord-tenant relationship with Kings Garden . . . ."  Mot. at 19 (providing some specific examples of the nature of the statements).  Because Plaintiffs do not challenge this argument, the Court finds for Defendants.

The PSLRA provides a safe harbor provision for forward-looking statements so long as those statements are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking

---

[13] *See supra* n.4.
[14] *See* FAC ¶¶ 122, 128, 139, 142 (statements made before July 29, 2021).
[15] *See id.* ¶¶ 153, 172, 182-83.

statement."  15 U.S.C. § 78u-5(c)(1)(A)(i).  Where a forward-looking statement is accompanied by meaningful cautionary language, the alleged false or misleading statement is rendered immaterial as a matter of law.  *EP MedSystems, Inc. v. EchoCath, Inc.*, 235 F3d 865, 873 (3d Cir. 2000).  Cautionary language is sufficient if it is "extensive, specific, and directly related to the alleged misrepresentation."  *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 243 n.3 (3d Cir. 2004).

Defendants argue that the forward-looking statements are entitled to this safe harbor. Plaintiffs do not contest this argument.  Rather, Plaintiffs state that "the [FAC] does not allege any such statements are false."  Opp'n at 11 (citing Mot. at 19-21).  Thus, the Court finds that these statements are not false and misleading.  *See, e.g., Sang Geoul Lee v. Won II Park*, 720 Fed. App'x 663, 666 (3d Cir. 2017) (failure to respond to an argument acts as a concession of that argument); *Johnson v. East Orange VA Med. Ctr.*, 2023 WL 2770423, at *5 (D.N.J. Apr. 4, 2023) (same).

The remaining statements regarding IIPR's investments in Kings Garden involve quarterly and annual reports filed with the SEC.[16]  Again, the FAC alleges that these were false and misleading because "[u]pon disclosing the investments in Kings Garden, and its contribution to rental revenue, Defendants were duty bound to disclose" that Michael King and Kings Garden were "fraudsters" who had "submitted material forged and fraudulent Draw Requests and invoices."  FAC ¶ 161 (internal quotation marks omitted).  And again, the FAC fails to state "with particularity" why the numbers reported in these filings were false, such as what specific information was available to Defendants at each time.  Indeed, like previously mentioned, these filings are alleged to be false and misleading for the same reasons, including fraudulent Draw Requests, as filings before the first Draw Request.  *See, e.g., id.* ¶ 128-29 (2020 filing); *Winer*

---

[16] *See* FAC ¶¶ 150-151, 160, 166, 180.

*Family Trust*, 503 F.3d at 326 (emphasis added); *Rockefeller*, 311 F.3d at 223 (Plaintiffs in a securities fraud action "may not benefit from inferences flowing from vague or unspecific allegations . . . .").[17]

Accordingly, statements during conference calls or in the SEC filings are not false or misleading statements.

### c.   *The GAAP Violations are not false or misleading*

Defendants next argue that the statements alleged to be GAAP Violations[18] are not actionable because impairments and fair market values are a matter of opinion, and thus require Plaintiffs to allege more than simply the provision at issue, how it was violated, and the consequences of the violation.  Mot. at 23-24.  Plaintiffs do not respond to this argument.  *See* Opp'n at 20 (arguing (1) that the GAAP Violations are adequately pleaded because the FAC identifies the GAAP provision violated, how it was violated, and how it impacted IIPR's financial appearance).  Thus, the Court considers this argument conceded.  *See, e.g.*, *Sang Geoul Lee*, 720 Fed. App'x at 666.

However, due to its relevance below, the Court will briefly address the argument and why it agrees with Defendants.  Generally, "statements about GAAP compliance . . . are opinions" due to their subjective nature.  *In re Hertz Global Holdings, Inc. Sec. Litig.*, 2017 WL 1536223, at *11 (D.N.J. Apr. 27, 2017) (citing *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 182 (2015)); *see also In re Ikon Office Sols., Inc.*, 277 F.3d 658, 675 n.22 (3rd Cir. 2002) ("GAAP is a term of art that encompasses a wide range of acceptable procedures.").

---

[17] The FAC's allegations about the SEC filings prior to July 29, 2021, would fail for the same reasons.
[18] FAC ¶¶ 111, 138, 147, 156, 163, 170 (impairments); ¶¶ 125, 131, 138, 148, 157, 163, 171 (fair market value).

Here, the alleged GAAP Violations are opinions.  *See Hertz*, 2017 WL 1536223, at *11 (citing cases and discussing how determinations of impairment and fair market value are generally matters of subjective opinion).

Because the Court determined the GAAP Violations are matters of opinion, it must now determine whether those opinions are actionable.  *See id.* at *12.  An opinion is actionable "(1) as an untrue statement of material fact if the opinion is both incorrect (*i.e.*, objectively false) and not genuinely believed (*i.e.*, subjectively false), or (2) as misleading if the speaker omits material facts underlying the basis for the opinion 'if those facts conflict with what a reasonable investor would take from the statement itself.'"  *Id.* (quoting *Omnicare*, 575 U.S. at 189); *see also City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 170 (3d Cir. 2014) ("Opinions are only actionable under the securities law if they are not honestly believed and lack a reasonable basis.").

The FAC does not specifically allege why Defendants did not honestly believe or have a reasonable basis for each GAAP calculation, and thus fails to meet the *Omnicare* pleading standard for opinions.

Accordingly, the GAAP Violations are not false or misleading statements.

    *d.   The remaining statements are not false or misleading*

Defendants next argue that the remaining allegedly false and misleading statements[19] are non-actionable puffery.  Mot. at 22-23.  Defendants point to statements like:

- "Kings Garden is a leading cannabis cultivation, processing and manufacturing operator, having developed a tremendous brand and reputation for consistent top-shelf quality."  FAC ¶ 122 (cleaned up); *see also id.* ¶¶ 139, 153 173, 182, 184 (similar statements regarding Kings Garden's status and/or reputation as a cannabis producer).

---

[19] *See* FAC ¶¶ 122, 139, 153-154, 173, 182, 184.

- "We have been fairly active in California in recent months with our 2 transactions with Kings Garden . . . ." *Id.* ¶ 139 (cleaned up).

- Defendants are "proud partners of Michael King and his great team and look forward to supporting them through the development and redevelopment of state-of-the-art facilities to dramatically expand production capacity and continue to deliver the highest-quality product that they are known for." *Id.* ¶ 139 (cleaned up); *see also id.* ¶¶ 139, 154, 173 (similar statements regarding Defendants being "thrilled" or "excited" about Kings Garden and/or IIPR's tenant roster).

- "We highlighted a number of environmental initiatives of our tenant partners in their operations and our inaugural ESG report posted to our website.  And Kings Garden is yet another example of our tenant partners focused on long-term, responsible, sustainable production." *Id.* (cleaned up).

The FAC alleges these were false and misleading because "[h]aving discussed and praised Kings Garden, Defendants were duty bound to disclose but omitted" that Michael King and Kings Garden were "fraudsters" who had "already submitted material forged and fraudulent Draw Requests and invoices." *Id.* ¶ 173; *see, e.g., id.* ¶ 155.  Plaintiffs argue that these statements are not puffery due to their conclusory nature and potential importance to an investor.  Opp'n at 18 n.14.

Vague and optimistic statements are considered "puffery," and because "a reasonable investor would not base decisions on such statements," they are not material.  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1427; *Fan v. StoneMor Partners LP*, 927 F.3d 710, 716 (3d Cir. 2019).  But, depending on the context, if a company repeatedly addresses a particular subject, then the company effectively transforms the statement into a material one by signaling to a reasonable investor that they may rely on the statement.  *See Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992) (finding that where a defendant repeatedly addresses and affirmatively characterizes management practices as 'adequate,' 'conservative,' 'cautious,' and the like, the subject 'is in play'").

The Court agrees with Defendants that some of these statements are puffery. Statements like being "excited," "thrilled," or "proud," are expressions of optimism and hope, and general and non-quantitative statements of environmental sustainability are vague. *See Glassman v. Computervision Corp.*, 90 F.3d 617, 636 (1st Cir. 1996) (finding mild statements of hope for a positive future are puffery); *see In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1427-28 (citing *Glassman* approvingly). But, the Court agrees with Plaintiffs that to the extent these statements provide specific numbers or repeatedly address subjects like Kings Garden's status and reputation as a producer, these statements may go beyond the general and vague. FAC ¶¶ 182 (providing specific numbers regarding Kings Garden's cannabis production); *id.* ¶¶ 122, 139, 153 173, 182, 184 (similar statements regarding Kings Garden's "distinguished brand" and reputation as a "top producer" in the cannabis market); *see In re NUI Sec. Litig.*, 314 F. Supp. 2d 388, 409 (D.N.J. 2004) (finding that portions of statements, couched in puffery, were actionable to the extent they made "specific representations" about earnings); *Shapiro*, 964 F.2d at 282.

However, the Court finds that the FAC's allegations as to why each statement is false or misleading are too vague to satisfy PSLRA's heightened standard. The FAC does not particularize why each specific statement was false or misleading. For example, the first and last statements, made at the beginning and end of IIPR's relationship with Kings Garden, are both alleged to be false and misleading because Michael King and Kings Garden were "fraudsters" and "that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices." *Id.* ¶ 123; *cf. id.* ¶ 185 (same). But the FAC also alleges that the first Draw Request was not submitted until July 29, 2021—approximately one year after the first allegedly false and misleading statement was made. These vague and chronologically inconsistent allegations do not satisfy the PSLRA's stringent pleading requirements.

Accordingly, because the remaining statements are not false or misleading statements, Plaintiffs fail to satisfy the first element of its Section 10(b) claim and will dismiss Count One without prejudice.

2. *Plaintiffs have not alleged particularized facts giving rise to a strong inference that Defendants acted with scienter*

The second element of a Section 10(b) claim requires a plaintiff to plead that a defendant acted with scienter, or a culpable, fraudulent mind. A complaint adequately alleges scienter under the PSLRA "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 325 (2007). In the Third Circuit, the alleged facts must give rise to a "strong inference of either reckless or conscious behavior." *Inst'l Invs. Grp. v. Avaya Inc.*, 564 F.3d 242, 267-68 (3d Cir. 2009). For a statement to be reckless, it must "involv[e] not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *In re Advanta Corp. Sec. Litig.*, 180 F.3d at 535. "The pertinent question is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Inst'l Investors Grp.*, 564 F.3d at 267-68 (cleaned up). "Omissions and ambiguities count against inferring scienter." *Id.* (cleaned up). Lastly, the existence or lack of a defendant's motive "can be a relevant consideration, . . . [but t]he absence of a motive allegation . . . is not fatal . . . ." *Tellabs*, 551 U.S. at 310.

Defendants argue that the FAC also fails because it does not adequately plead scienter. Mot. at 25. The Court agrees and finds that even if Plaintiffs had adequately pleaded material

misstatements or omissions, the claims against Defendants would be dismissed for failure to sufficiently plead facts supporting a strong inference of scienter.

   a.   *The GAAP Violations do not support an inference of scienter*

Plaintiffs argue that the GAAP Violations, when viewed with the other alleged reckless conduct, "further support Defendants' extreme departure from the standards of ordinary care." Opp'n at 32.  The Court disagrees.

As noted above, the FAC fails to demonstrate that Defendants violated GAAP because the alleged GAAP Violations are opinions and subjective in nature.  *See Hertz*, 2017 WL 1536223, at *11.  Indeed, it logically follows that if the FAC does not demonstrate that Defendants violated GAAP—which provides guidelines for final statements—then there is not a strong inference that they made an extreme departure from the standards of ordinary care.   Rather, Plaintiffs' "allegations more plausibly yield the inference that" the alleged GAAP Violations "were judgment calls—reasonable at the time they were made . . . ."  *In re Ascena Retail Grp., Inc. Sec. Litig.*, 2022 WL 2314890, at *10 (D.N.J. June 28, 2022) (cleaned up); *see id.* (When the principles governing GAAP "are plainly not matters of objective fact but rather are inherently subjective[,]" even "rosy assessments of [the defendant's] assets" do not support an inference of scienter.).

Accordingly, the GAAP Violations do not support an inference of scienter.

   b.   *The FAC fails to sufficiently allege motive, and the motives argued after the fact do not support an inference of scienter*

Plaintiffs argue that the FAC "demonstrates motive and relates it to the fraud, supporting a strong inference."  Opp'n at 34.  Specifically, Plaintiffs claim: (1) from the beginning of the Class Period, "[i]n the face of suspicious conduct," Defendants had a motive to "avoid recrimination from analysts and investors" regarding IIPR's expenditures on Kings Garden and (2) IIPR's proxy statements demonstrate that the Individual Defendants had incentive to increase their

compensation by "deploying capital" to Kings Garden, which would be considered by the compensation committee. Opp'n at 34-35. The Court disagrees.

To demonstrate motive, a plaintiff cannot merely assert that an inference of motive and opportunity "rationally *could* be drawn." *Tellabs*, 551 U.S. at 323 (emphasis in original). Rather, the complaint must plead that the defendant: "(1) 'benefitted in a concrete and personal way from the purported fraud;' (2) 'engaged in deliberately illegal behavior;' (3) 'knew facts or had access to information suggesting that their public statements were not accurate;' or (4) 'failed to check information they had a duty to monitor.'" *Nat'l Junior Baseball League v. Pharmanet Development Grp. Inc.*, 720 F. Supp. 2d 517, 549 (D.N.J. 2010) (quoting *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 284 (D.N.J. 2007)).

Notably, Plaintiffs' arguments lack any citation to the FAC. *See* Opp'n at 34-35. Even if Plaintiffs' arguments as to motive *could* rationally be drawn from the FAC, this does not support an inference of motive. *See Tellabs*, 551 U.S. at 323.

However, Plaintiffs' arguments fail for additional reasons. If a motive is one that is generally possessed by most corporations and/or its officers, then it "cannot be read as an indication that an interest in achieving these goals would provide a concrete and personal motive to commit fraud." *Intelligroup*, 527 F. Supp. 2d at 341. A defendant's desire to maintain or increase executive compensation is considered one such commonly held motive that cannot support an inference of scienter, (*id.* (citation omitted)) as is a desire to protect a company's image (*Ascena*, 2022 WL 2314890, at *11).

Accordingly, the purported motives of Defendants do not support an inference of scienter.

c.  *The FAC does not adequately plead recklessness*

Plaintiffs argue that "[t]he multiple instances of willful blindness [that the FAC] particularizes constitute a pattern of extreme departures from the standards of ordinary care." Opp'n at 23.  In sum, Plaintiffs point to (1) Defendants' failure to conduct due diligence by not discovering the Swiss American Lawsuit and Michael King and Kings Garden's other "sketchy" history; and (2) various "red flags" that Defendants ignored: (a) Kings Garden's "unique" payments of dividends to owners; (b) Defendants' possession of Kings Garden's suspicious financial statements and the forged Draw Requests; and (c) the Blue Orca Report and Defendants' two dismissals of it, some of which was true.  *Id.* at 25-30.

For a statement to be reckless, it must "involv[e] not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  *In re Advanta Corp. Sec. Litig.*, 180 F.3d at 535.  Scienter requires "a misrepresentation so recklessly made that the culpability attaching to such reckless conduct closely approaches that which attaches to conscious deception."  *In re Digital Land Sec. Litig.*, 357 F.3d 322, 332 (3d Cir. 2004) (cleaned up).  "Recklessness is not intended to encompass claims essentially grounded on corporate mismanagement."  *Id.* (internal quotation marks omitted).  Lastly, "[w]here motive is not apparent," circumstantial allegations of conscious behavior or recklessness "must be correspondingly greater."  *GSC Partners*, 368 F.3d at 238 (cleaned up).

The FAC does not specify what due diligence would have uncovered and when.  For example, the Swiss American Lawsuit was eventually referred to non-public arbitration—the FAC does not state when.  *See* FAC ¶ 27 n.9.  Nor does the FAC specifically note at what point the other

"sketchy" background information on Michael King and Kings Garden existed.  *See id.* ¶ 63; *cf. Strougo v. Mallinckrodt Pub. Ltd. Co.*, 2022 WL 17740482, at *8 (D.N.J. Dec. 16, 2022) (declining to dismiss the complaint when it stated the dates upon which information was available).

As for the alleged "red flags," even if they "approach reckless ignorance," the FAC does not allege a "strong inference of it."  *Hertz*, 2017 WL 1536223, at *23.  First, the FAC does not sufficiently allege Defendants' motive to commit fraud, making the pleading requirements here more stringent.  *Cf. U.S. S.E.C. v. Infinity Grp. Co.*, 212 F.3d 180, 195 (3d Cir. 2000) (finding scienter in part where "the evidence is inconsistent with [the defendant being] a mere victim[;] [r]ather, it appears that several scoundrels were sleeping in the same bed, and these defendants are amongst them"); *In re Cendant Corp. Litig.*, 60 F. Supp. 2d 354, 371 (D.N.J. 1999) (finding scienter in part where the complaint demonstrated motive to commit fraud).  Additionally, the red flags boil down to Defendants' mismanagement, which Plaintiffs have not sufficiently alleged "that red flags were present[ that] would've put [Defendants] on notice of their mismanagement . . . ."  *Hertz*, 2017 WL 1536223, at *17.  As such, the FAC does not sufficiently allege reckless conduct.[20]

Accordingly, because the FAC fails to support an inference of scienter, Plaintiffs also fail to satisfy the second element of its Section 10(b) claim.  Count One will be dismissed without prejudice.

---

[20] In a footnote, Plaintiffs argue that the FAC adequately pleads IIPR's "corporate scienter" because the construction team purportedly reviewed and verified the Draw Requests.  Opp'n at 39 n.39.  Because the Court finds that the alleged facts do not create a strong inference of scienter, the Court will not apply corporate scienter to IIPR.  *See Hertz*, 2017 WL 1536223, at *23 (declining to apply corporate scienter where attribution of the allegations would not create a strong inference of scienter).

**B.  Plaintiffs Fail to Sufficiently Plead a Violation of Section 20(a)**

Defendants argue that because Plaintiffs fail to state claim under Section 10(b), the Section 20(a) claim must fail.  Mot. at 39.  The Court agrees and will dismiss Plaintiffs' Section 20(a) claim (Count Two) without prejudice.

Section 20(a) of the Exchange Act provides for liability for controlling persons. 15 U.S.C. § 78t.  "Every person who, directly or indirectly, controls any person liable for securities fraud shall also be liable jointly and severally with and to same extent as such controlled person."  *In re Synchronoss Sec. Litig.*, 705 F. Supp. 2d 367, 404 (D.N.J. 2010).  For liability to attach, "plaintiffs must prove not only that one person controlled another person, but also that the 'controlled person' is liable under the [Exchange] Act."  *Turfnofsky v. electroCore, Inc.*, 2021 WL 3579057, at *49-50 (D.N.J. Aug. 13, 2021) (quoting *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 484 (3d Cir. 2013)).  But a Section 20(a) claim cannot survive without an underlying violation of the Exchange Act.  *See Shapiro*, 964 F.2d at 279.  Here, Plaintiffs allege that the Individual Defendants are all controlling persons.  FAC ¶ 210.  Because Plaintiffs have not adequately alleged an underlying securities violation, the Section 20(a) claim against the Individual Defendants fails.

Accordingly, the Court will dismiss Count Two without prejudice.

**IV.   CONCLUSION**

For the reasons stated herein, the Court will **GRANT** Defendants' motion and **DISMISS** the FAC **without prejudice**.  Plaintiffs will have 30 days to file an amended complaint.  An appropriate Order accompanies this Opinion.

Dated: September 19, 2023

_Evelyn Padin_
Evelyn Padin, U.S.D.J.

28