## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MICHAEL V. MALLOZZI, Individually and on behalf of all others similarly situated,<br><br>  Plaintiff,<br><br>  v.<br><br>INNOVATIVE INDUSTRIAL PROPERTIES, INC., PAUL SMITHERS, CATHERINE HASTINGS, and ANDY BUI,<br><br>  Defendants. | Case No: 2:22-cv-02359-EP-JRA<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>JURY TRIAL DEMANDED</u> |

# **TABLE OF CONTENTS**

I.     NATURE OF THE ACTION ........................................................................1

II.    JURISDICTION AND VENUE ..................................................................8

III.   PARTIES ......................................................................................................8

IV.    SUBSTANTIVE ALLEGATIONS ............................................................13

      A.     Background ......................................................................................13

      B.     IIPR Claims to Conduct Extensive Due Diligence on Tenants and
            Their Principals ...............................................................................16

      C.     IIPR Claims to Monitor Tenants and Their Principals
            Continuously ...................................................................................17

      D.     IIPR's Purchase-Lease Transactions with Kings Garden ..................19

      E.     At All Relevant Times, IIPR's Investment in and Rents
            Received from Kings Garden Were Material to IIPR's
            Financial Statements.........................................................................21

      F.     Conducting No Due Diligence into Kings Garden or Michael
            King, Defendants Recklessly Disregarded Material
            Pre-Existing Facts About Michael King and Kings Garden
            Before IIPR Purchased Property from Kings Garden........................23

      G.     Notwithstanding that, According to Defendants, Michael King
            was a Fraudster and Kings Garden a Ponzi Scheme, Defendants
            Praised Michael King and Kings Garden Throughout the Class Period
            Without Any Basis Whatsoever .........................................................29

      H.     After Leasing Back Properties from IIPR, Kings Garden Misused
            and Stole Funds IIPR Disbursed after Failing to Monitor and
            Verify Improvements and Draw Requests ..........................................32

      I.      The Blue Orca Report.......................................................................38

V.     FALSE AND MISLEADING STATEMENTS AND OMISSIONS............40

VI.     THE TRUTH BEGINS TO EMERGE...........................................................64

VII.    PLAINTIFFS' CLASS ACTION ALLEGATIONS......................................76

VIII.   COUNTS .........................................................................................................80

IX.     PRAYER FOR RELIEF ................................................................................83

X.      JURY TRIAL DEMANDED.........................................................................84

Lead Plaintiff Alejandro Handal, and Named Plaintiff Stephen R. Forrester (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants Innovative Industrial Properties, Inc. ("IIPR"), Paul Smithers ("Smithers"), Catherine Hastings (Hastings"), Alan D. Gold ("Gold"), and Benjamin C. Regin ("Regin") (collectively, "Defendants"), alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, and announcements made by Defendants, public filings, filings in other lawsuits involving Defendants, wire and press releases published by and regarding IIPR, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of a class consisting of all persons or entities other than Defendants who purchased or otherwise acquired IIPR's common stock between August 7, 2020 and August 4, 2022, both dates inclusive ("Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws under Sections 10(b) and 20(a) of the

Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against IIPR and certain of its top officials.

2.      On April 14, 2022, before the market opened, short seller Blue Orca Capital ("Blue Orca") released a report[1] detailing that Michael King, co-founder and CEO of one of IIPR's largest tenants, Kings Garden, Inc. ("Kings Garden"), had been credibly accused of fraud and theft and was a defendant in several different cases material to his ownership of Kings Garden. That information was available from early 2019, before IIPR contracted with Kings Garden. Defendants would later admit that Michael King was a fraudster and Kings Garden a Ponzi scheme. These allegations rendered false Defendants' Class Period statements that IIPR had conducted due diligence and subsequently monitored Kings Garden. They did neither.

3.      In addition, throughout the Class Period, Defendants touted their belief in the reputations of Michael King and Kings Garden. That Michael King and Kings Garden had defrauded investors before IIPR's first sale-leaseback transaction and subsequently stole IIPR funds paid to Kings Garden, satisfying fraudulent draw requests (draw requests are reimbursement requests for "qualified" improvements on specific properties that Defendants claimed to, but did not "verify" were correct),

_____

[1] Attached as Exhibit 1 is the April 14, 2022, Blue Orca report.

eclipsed all other facts on which Defendants may have based their beliefs. That is, no reasonable investor would have believed Defendants' opinions in light of Michael King's and Kings Garden's wrongdoing both before and during their relationship with IIPR.

4.    In response to the Blue Orca Report, IIPR's stock fell by 7.5%, falling from $183.44 at the close of trading on April 13, 2022, to close at $169.68 on April 14, 2022, damaging investors.

5.    That same afternoon, April 14, 2022, IIPR released a statement dismissing the Blue Orca report in its entirety, stating that it was altogether wrong, containing "false and misleading statements" and "disinformation" about IIPR, that the author "fails to have any comprehension" about IIPR's business, and that the report "does not warrant a [further] response from" IIPR.

6.    Doubling down during IIPR's May 5, 2022, earnings conference call— three weeks after the Blue Orca report and with ample time to investigate Kings Garden and the monies IIPR had paid to it—Defendant Gold touted the reputations of Michael King and Kings Garden, designating Kings Garden a "high-quality producer" that "will continue to effectively adapt to the changing landscape in California."

7.    Also praising Kings Garden and Michael King, during IIPR's May 5, 2022 earnings call, Defendant Regin reiterated that in May 2020, in the context of

IIPR's investing $44.5 million purchasing and leasing back Kings Garden facilities, Defendants were aware of but ignored a red flag. Regin reminded that Kings Garden had paid a dividend to its equity holders, "highly unusual among any prominent brand in the industry." Defendant Regin touted the dividend payment, claiming it "demonstrates their belief in the long-term prospects in the business." Defendants touted the dividend nine months after IIPR had paid to Kings Garden the first of several multi-million down draws, ostensibly for improving Kings Garden's facilities, which was fraudulent on its face.

8.    On July 14, 2022, after the market closed, and in spite of Defendants' vociferous denial of Kings Garden's and Michael King's fraudulent draw requests, IIPR announced that Kings Garden had failed to pay its July 2022 rent under any of its leases. In direct response to this news, IIPR's stock price fell by 14.3%, from a close of $111.61 on July 14, 2022, to a July 15, 2022, closing price of $95.70, damaging investors.

9.    On August 4, 2022, after market close, IIPR filed its Q2 2022 10-Q, stating that on July 25, 2022, IIPR had filed a civil lawsuit against Kings Garden, Michael King, and related parties, alleging fraud, theft, and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). In direct response to this news, IIPR's stock price fell by 4%, from a close of $98.40 on August 4, 2022, to an August 5, 2022 closing price of $94.41, damaging investors.

4

10.     Throughout the Class Period, Defendants told investors that they had performed extensive background checks on Michael King and Kings Garden, and withheld cash from tenants from them until IIPR assured itself that the money had been spent on approved projects. For example, during an August 5, 2021, earnings conference call, Defendant Gold stated that IIPR spent "a great deal of time focus[ed] not only on the … proposed real estate transaction," but "a lot of time with the management team" doing "background checks on these tenants, understanding where they've come from and their reputations . . . ." This was a lie.

11.     Defendants were severely reckless in continuing to praise Kings Garden and IIPR's investment therein because Kings Garden and Michael King were fraudsters and thieves, something that Defendants should have known, but ignored, even before their first transaction with Kings Garden, but certainly no later than August of 2020. During the Class Period IIPR accepted without checking all of Kings Garden's obviously forged and false draw requests and paid Kings Garden $49 million for work and improvements that had not been done.

12.     A background check of Michael King would have uncovered, as Defendants admitted after the Class Period, that Michael King and Kings Garden were, from the outset, thieves. In an amended complaint filed by IIPR on August 2,

2022, in a suit against Kings Garden and Michael King,[2] and in an *ex parte* application to appoint a receiver filed in the same case on August 16, 2022,[3] IIPR stated that Kings Garden was not a "legitimate business enterprise," and its actions constituted "red-flags of a Madoff-style Ponzi Scheme."[4] As for Michael King, he had changed his name in 2006, was a serial litigator, and had been sued for fraud by his own brother and others. Further, during the Class Period IIPR paid Kings Garden $49 million dollars for work that Kings Garden had not performed, based on multiple forged invoices and draw requests. Defendants admit that they discovered that the work had never been performed *with a single phone call*. Further, Defendants admit that it took no great effort to discover that the draw requests and invoices were obvious forgeries. Finally, Defendants admit that the Kings Garden

---

[2] Attached as Exhibit 2 is the Amended Complaint in *IIP-CA 2 LP v. Kings Garden, Inc., et al.*, No. CVPS2202975 0000029320444 (Sup. Ct. of Calif., Cty. Of Riverside Aug. 2, 2022). Among many counts, the Action alleged that defendants committed fraud, theft, and civil RICO violations. In papers filed in the lawsuit, IIPR calls Kings Garden and Michael King "fraudsters." IIP-CA 2 LP is a wholly owned subsidiary of IIPR.

[3] Attached as Exhibit 3 is IIPR's August 16, 2022, "*Ex Parte* Application to Appoint Receiver and for Order to show Cause re Confirmation, or, in the Alternative, for a Temporary Restraining Order and Order to Show Cause re Preliminary Injunction," filed in the same lawsuit.

[4] In a Form 8-K filed on September 16, 2022, IIPR announced that the parties to the lawsuit entered into a "confidential, conditional settlement agreement."

financial statements provided to IIPR during the Class Period showed millions of dollars disappearing from Kings Garden's accounts, with no obvious explanation.

13.    IIPR never conducted the satisfactory, ongoing due diligence it stated that it conducted, its statement that it had are false, as is IIPR's reckless failure to disclose negative information about King and Kings Garden.

14.    Further, Defendants did not monitor the work supposedly completed for reimbursement through draw requests, despite their statements that they had done so, and they never verified that the work had been performed

15.    On July 14, 2022, after the market closed, and in spite of Defendants' vociferous denial of misdeeds by Kings Garden and by Michael King, IIPR announced that Kings Garden had failed to pay its July 2022 rent under any of its leases. In direct response to this news, IIPR's stock price fell by 14.3%, from a close of $111.61 on July 14, 2022, to a July 15, 2022 closing price of $95.70, damaging investors.

16.    On August 4, 2022, after the market closed, IIPR filed its Q2 2022 10-Q, stating that on July 25, 2022, IIPR had filed a civil lawsuit against Kings Garden, Michael King, and related parties, alleging fraud, theft, and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). In direct response to this news, IIPR's stock price fell by 4%, from a close of $98.40 on August 4, 2022, to an August 5, 2022 closing price of $94.41, damaging investors.

## II.    JURISDICTION AND VENUE

17.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

18.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

19.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

20.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

21.    Lead Plaintiff Alejandro Handal, as set forth in his Certification attached as an exhibit to his Lead Plaintiff Motion, (Dkt. No. 14-5), incorporated by reference herein, purchased IIPR common stock during the Class Period and

suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

22.    Named Plaintiff Stephen R. Forrester, as set forth in his Certification attached as an exhibit to the earlier Amended Complaint, (Dkt. No. 34-2), purchased IIPR common stock during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

23.    IIPR, founded on June 15, 2016, is an internally-managed real estate investment trust ("REIT") focused on the acquisition, ownership, and management of specialized industrial properties leased to experienced, state-licensed tenants for their regulated state-licensed cannabis facilities. IIPR is incorporated in Maryland, with its headquarters located at 1389 Center Drive, Suite 200, Park City, Utah 84098. IIPR's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "IIPR" and IIPR's preferred stock trades on the NYSE under the ticker symbol "IIPR-PA."

24.    Defendant Smithers co-founded IIPR, and has served as IIPR's Chief Executive Officer ("CEO"), President, and a Director since IIPR's founding.

25.    Defendant Hastings served as IIPR's Chief Financial Officer ("CFO") at all relevant times, as IIPR's Treasurer since January 2017, and served as IIPR's Chief Accounting Officer ("CAO") from January 2017 through January 2021.

9

26.     Defendant Gold is a co-founder of IIRP, and at all relevant times has served as the Executive Chairman of IIPR's Board of Directors.

27.     Defendant Regin has served as IIPR's Vice President of Investments since January 2020, and before that as IIPR's Director of Finance & Investments since 2017.

28.     Defendants Smithers, Hastings, Gold, and Regin are collectively referred to herein as the "Individual Defendants."

29.     For IIPR's quarterly reports for the periods ending: June 30, 2020 ("Q2 2020 10-Q"); September 30, 2020 ("Q3 2020 10-Q"); March 31, 2021 ("Q1 2021 10-Q"); June 30, 2021 ("Q2 2021 10-Q"); September 30, 2021 ("Q3 2021 10-Q"); May 31, 2022 ("Q1 2022 10-Q"); and for the annual reports for the periods ending December 31, 2019 ("2019 10-K"), December 31, 2020 ("2020 10-K"), and December 31, 2021 ("2021 10-K"), Defendants Smithers and Hastings each certified, Pursuant to Section 302 of the Sarbanes-Oxley Act of 2022, that:

> 1)     I have reviewed this [Quarterly Report on Form 10-Q/Annual Report on Form 10-K] of Innovative Industrial Properties, Inc.;
>
> 2)     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3)     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present

in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4)    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c)    Disclosed in this report, any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5)    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

11

(a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting, which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

30.    Defendants Smithers and Hastings each further certified in each filing listed above that, "pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002," the quarterly and annual filings "fully compl[y] with the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934," and that the "information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of IIPR."

31.    Each of the Individual Defendants, because of their positions with IIPR, possessed the power and authority to control the contents of IIPR's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of IIPR's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their

positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

32.     IIPR is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

33.     The scienter of the Individual Defendants and other employees and agents of IIPR is similarly imputed to IIPR under *respondeat superior* and agency principles.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Background

34.     Founded in 2016, IIPR is an internally managed real estate investment trust ("REIT") focused on the acquisition, ownership, and management of specialized industrial properties leased to experienced, state-licensed tenants for their regulated, state-licensed cannabis facilities.

35.     IIPR acquires specialized cannabis facilities and leases them back to

the experienced, state-licensed tenants from whom IIPR purchased them. IIPR leases its properties under long-term, triple-net lease agreements, where the tenant is responsible for all aspects of and costs related to the property and its operation during the lease term, including capital improvements, structural repairs, maintenance, real estate taxes, and insurance. IIPR's typical leases with its tenants are from 15-20 years.

36.    Initially, tenants use the sale proceeds—often millions of dollars—to enhance their cannabis operations. In the 2019 10-K, IIPR stated, about its "sale-leaseback strategy," that "we serve as a source of capital to these licensed regulated cannabis operators, allowing them to redeploy their sale proceeds into their core operations to grow their business and achieve higher returns." In addition, IIPR funds tenants' improvements. Again, the 2019 10-K continues, "[w]e may also purchase properties from third parties and fund the necessary improvements through a long-term lease with an identified tenant, which provides those tenants with increased cash flow to deploy in their operating businesses."

37.    The sole source of IIPR's taxable income are rents it collects from tenants. As a REIT, IIPR must pay 90% of that taxable income as dividends to its shareholders. As such, it relies upon its tenants to run their facilities profitably and in compliance with the complex legal and regulatory obligations with which cannabis growers must comply. Due to the legal and operational complexity of

running large cannabis-growing operations, and the limited number of state-licensed tenants in the industry, IIPR must be careful in selecting and sensitive to the problems of its tenants, as, according to Defendants, "Because we lease our properties to a limited number of tenants, and to the extent we depend on a limited number of tenants in the future, the inability of any single tenant to make its lease payments could adversely affect our business and our ability to make distributions to our stockholders."

38.    IIPR continued:

In addition, failure by any of our tenants to comply with the terms of its lease agreement with us could require us to find another lessee for the applicable property. We may experience delays in enforcing our rights as landlord and may incur substantial costs in protecting our investment and re-leasing that property. Furthermore, we cannot assure you that we will be able to re-lease that property for the rent we currently receive, or at all, or that a lease termination would not result in our having to sell the property at a loss. For example, the tenant at our property located in Los Angeles, California is in receivership and defaulted on its obligation to pay rent to us for January and February 2020. The result of any of the foregoing risks could materially and adversely affect our business, financial condition and results of operations and our ability to make distributions to our stockholders.

39.    Because the federal government has not legalized cannabis, banks will not lend money to cannabis growers, forcing growers to seek capital elsewhere. IIPR took advantage of this, buying land from tenants at prices far higher than the growers themselves had paid for the property, with the excess sales price (sometimes 300% higher than the actual value of the property) extended back to the tenant to invest

15

and buy the necessary equipment to successfully farm and sell cannabis. Because of the newness of the market and the lack of available traditional financing sources, IIPR was able to charge high interest rates on its financings, usually approximately 11%-15%.

### B.    IIPR Claims to Conduct Extensive Due Diligence on Tenants and Their Principals

40.    From no later than 2019, before it engaged in its first sale-leaseback transaction with Michael King and Kings Garden, IIPR stressed the importance of due diligence before buying a property. IIPR falsely claimed to perform extensive due diligence on both potential tenants and their principals, including background checks.

41.    In every periodic report during the Class Period, discussing the need for future acquisition to grow, IIPR stated that before consummating property purchases, IIPR, through management, conducted "due diligence investigations of our potential tenants, related guarantors and their properties, operations and prospects …."

42.    During a February 25, 2021, Earnings Conference Call ("Q4 2020 Call"), Defendant Gold assured investors that IIPR "add[ed] new growers very carefully and with a lot of consideration because of that commitment to be able to provide them future capital." Repeating that refrain, during an August 5, 2021, earnings conference call ("Q2 2021 call"), Defendant Gold affirmed that IIPR spent

16

"a great deal of time focus[ed] not only on the … proposed real estate transaction," but "a lot of time with the management team" doing "background checks on these tenants, understanding where they've come from and their reputations …." Thus, not only did Defendants claim to have spent considerable time conducting due diligence in advance of entering transactions with tenants, but they specified that they focused on the backgrounds and reputation of tenants and their principals.

### C.    IIPR Claims to Monitor Tenants and Their Principals Continuously

43.    Defendants purported commitment to protecting the interests of IIPR and its shareholders, however, did not end with extensive due diligence investigations of tenants, principals, and facilities. With respect to risk management the IIPR stated in annual and quarterly statements preceding its business with Kings Garden and continuing through the Class Period that "[w]e evaluate the credit quality of our tenants and any guarantors *on an ongoing basis* by reviewing, where available, the publicly filed financial reports, press releases and other publicly available industry information regarding our tenants and any guarantors."

44.    IIPR claimed to verify draw requests and invoices before paying any such request. With respect to the 19th Street Property and the San Bernardino Project properties, IIPR agreed to reimburse Kings Garden for specific "verified, qualified" improvements to the properties. Specifically, with respect to the 19th Street Property, IIPR authorized potential reimbursement of up to $51.4 million for such

17

improvements. With respect to the San Bernardino Project property, IIPR authorized potential reimbursement of up to $25 million.

45.    "Qualified" means that IIPR needed to confirm that specific improvements to these properties fit within the parameters of the improvements permitted to be reimbursed from the defined funds. This required IIPR to understand the properties, what already existed, and what improvements served IIPR's long-term needs and goals as the property owner.

46.    Reimbursement of completed improvements required the submission of "draw requests," as mandated by IIPR's leases with Kings Garden. A draw request consisted of the required Form AIA G-702, prepared and authenticated by the general contractor, and signed by the contractor and the architect, summarizing the improvements, as well as invoices from the contractor, sub-contractor, supporting that the "qualified" improvements were completed for the amount requested to be reimbursed. Ex. 2, ¶¶23, 32.

47.    Once submitted, Defendants stated that they "verified" all improvements, the invoices, and the amounts requested. This required IIPR to monitor the construction as it proceeded and visit the site to see that the approved improvements had been completed. Further, "verification" required communication with the contractors and architect to ensure that the invoices were correct, the work had been performed, and related only to the "qualified" improvements. *See* Ex. 2,

¶23 ("review for accuracy and compliance with acceptable construction parameters"). If actually verified as correct, IIPR had 15 days from submission of the draw request to reimburse the cost of the improvements. *Id.*

48.    IIPR, however, neither monitored nor verified the completion of the work or the accuracy of the draw requests and invoices for any Kings Garden property. Even aside from the very first draw request that Defendants stated was an obvious forgery on its face, IIPR received draw requests that on their face were missing required signatures. For example, in IIPR's lawsuit against Kings Garden, it reprinted a draw request Kings Garden submitted that was missing an architect's signature. Ex. 2, ¶23. IIPR admits that only after receiving the last draw request on June 1, 2022, did it even begin a "detailed retro-active review" of the 11 previous draw requests, which IIPR had paid. Ex. 3 at 6. Defendants further admit they performed no monitoring or verification, stating that they "relied" that Kings Garden was honest and had submitted only correct information, ex. 2, ¶86, instead of doing the monitoring and verification work they told investors they had done.

### D.    IIPR's Purchase-Lease Transactions with Kings Garden

49.    Michael King founded Kings Garden in 2015. In 2019, Kings Garden received its California license to cultivate and distribute cannabis. Michael King served as Kings Garden's Chairman and CEO. While California granted licenses to

Kings Garden and two of its other principals, Michael King, himself, does not have a license to cultivate and distribute cannabis.

50.    Beginning in 2019, IIPR bought 6 Kings Garden cannabis facilities located in California at prices materially higher than Kings Garden had paid for the properties. IIPR then leased those properties back to Kings Garden on triple-net leases. Kings Garden was, therefore, "responsible for all aspects of and costs related to the property and its operation during the lease term, including structural repairs, maintenance, real estate taxes and insurance." IIPR collected rents from Kings Garden from its first sale-leaseback transaction through July 2022 when Kings Garden failed to pay rent.

51.    IIPR entered into the following sale-leaseback transactions with Kings Garden in 2019 and 2020 to purchase the following 6 properties:

(a)    In April 2019, IIPR purchased its first property from Kings Garden, the N. 19th Avenue Property, for $15 million ("19th Street Property"). One year earlier, in April 2018, Kings Garden had acquired the property for $3.9 million.

(b)    Also in April 2019, IIPR purchased the N. Anza Road #1 Property from Kings Garden for $5.8 million. In January 2017, Kings Garden had acquired the property for $2.5 million.

(c)    In April 2019, IIPR also purchased the N. Anza Road #2 Property from Kings Garden for $6.3 million. In May 2016, Kings Garden had acquired the property for $3.3 million.

(d)    In May 2020, IIPR acquired the McLane Street Property from Kings Garden for $17.5 million. The McLane Street Property had been acquired by Kings Garden in May 2017 for only $3.75 million.

(e)    Property at 68860 Perez Road, Cathedral City, CA 92234.

(f)    Property at 736 Inland Center Drive, San Bernardino, CA 92408 ("San Bernardino Project").

### E.    At All Relevant Times, IIPR's Investment in and Rents Received from Kings Garden Were Material to IIPR's Financial Statements

52.    Immediately after IIPR's Kings Garden purchases, Kings Garden became IIPR's third largest tenant. In the Q2 2020 10-Q, IIPR recorded that a year earlier, during the second quarter of 2019, ending on June 30, 2019, Kings Garden accounted for 10% of IIPR's renal revenue. In the Q3 2020 10-Q, IIPR recorded that a year earlier, during the third quarter of 2019, ending September 30, 2019, Kings Garden accounted for 8% of IIPR's rental revenue.

53.    In the Q2 2020 10-Q, Defendants stated that for the three months ended June 30, 2020, IIPR had acquired properties affiliated with Kings Garden representing 70,000 rentable square feet for $17.5 million.

54.     In the 2020 10-K, IIPR disclosed that as of December 31, 2020, its largest investment in any tenant was in Kings Garden, with an investment of approximately $70 million.

55.     In its Q2 2021 10-Q, IIPR disclosed that in Q2 of 2021, Kings Garden accounted for 7% of its rental revenues, the fifth highest of any tenant.

56.     In IIPR's Q3 2021 10-Q, Defendants disclosed that in the third quarter, Kings Garden accounted for 8% of its rental revenues, the third highest of any tenant.

57.     IIPR's 2021 10-K states that for the full year 2020, Kings Garden accounted for 8% of IIPR's total rental revenue, IIPR's fifth largest tenant in terms of rental revenue, and that IIPR's investment in Kings Garden was approximately $83 million, its third largest investment in any tenant. The 2021 10-K also notes that as of December 31, 2021, Kings Garden was the tenant with the second great total square footage with 544,000 and the largest of IIPR's investments with over $82 million invested plus "remaining aggregate improvement allowances at certain properties totaling approximately $65.0 million."

58.     In its Q1 2022 10-Q, IIPR disclosed that Kings Garden represented 8% of its total rental revenue.

**F.    Conducting No Due Diligence into Kings Garden or Michael King, Defendants Recklessly Disregarded Material Pre-Existing Facts About Michael King and Kings Garden Before IIPR Purchased Property from Kings Garden**

59.    Notwithstanding their unequivocal statements that they conducted extensive due diligence, including background checks, Defendants performed no due diligence with respect to Michael King or Kings Garden. In July 2022, Kings Garden failed to pay rent. Shortly thereafter, IIPR sued Kings Garden and Michael King, alleging fraud, theft, and breach of contract, among other counts. In its complaint, IIPR[5] alleged that after Kings Garden's failure to pay rent, it had discovered with minimal effort that Kings Garden and Michael King were fraudsters. Ex. 3 at 1. Had Defendants conducted any due diligence investigation whatsoever *before* buying properties from Kings Garden, they would have discovered material facts about Michael King's past and Kings Garden business, indicating that the principal and the enterprise were fraudsters.

60.    For example, IIPR admitted that it "relied heavily" on the newly acquired California licensure and IIPR's "long-standing reputation" in choosing to contract with Kings Garden. Ex. 2, ¶19. IIPR further stated that it knew that Michael King did not personally have a license to cultivate and distribute cannabis in California, but that it accepted his "personal represent[ation]" that the United States

---

[5] Plaintiffs refer to IIPR and its wholly owned subsidiaries as "IIPR."

Department of Justice had cleared him for federal licensing and that he had been "screened and cleared at all levels." Ex. 2, ¶20.

61.     Federal law criminalizes growing and selling cannabis for recreational use, and neither the Department of Justice nor any other federal agency licenses anybody for recreational cannabis cultivation. A Google search would have revealed that the United States only licenses growers who supply cannabis to research facilities that are typically on university campuses and only for research.[6] In fact, no person can have a federal license unless they have a valid state license, and Defendants knew that Michael King did not have a state license. Michael King does not, did not, and could not have had a federal license. Michael King, therefore, lied to IIPR upon first meeting Defendants. IIPR failed, from the start, to perform even rudimentary due diligence.

62.     On January 29, 2019, a shareholder in Kings Garden, Swiss American Investment Corporation, alleged possible fraud against Kings Garden and Michael King. Swiss American filed a "Verified Petition for Writ of Mandate for the Production of Corporate Books and Records."[7] Swiss American alleged that the

---

[6] https://www.deadiversion.usdoj.gov/drugreg/marihuana.htm.

[7] The Verified Petition is attached hereto as Exhibit 4. The action is *Swiss American Investment Corp. v. Kings Garden, LLC et al.*, No. 37-2019-00005548-CU-WM-CTL (Cal Sup. Ct., Cty. of San Diego). The case was eventually referred to non-public arbitration.

parties' agreement required Kings Garden to pay allocations and quarterly distributions to Swiss American. Kings Garden had failed to pay.

63.     After Swiss American received some financial documents from Kings Garden, the Verified Petition for Writ further alleged that Kings Garden engaged in troubling transactions, including loans worth millions of dollars to managing members (Michael King was one of three managing members), execution of a convertible promissory note from an LLC controlled by a Kings Garden managing member, and numerous interested transactions and service contracts between Kings Garden and multiple entities owned or controlled by its managing members.

64.     Swiss American filed its Verified Petition against Kings Garden on January 29, 2019. As such, reasonable due diligence, including a search for litigation involving either Kings Garden or Michael King, would have revealed Swiss American's specific allegations of fraud against Michael King and Kings garden *before* IIPR executed its first sale-leaseback with Kings Garden.

65.     Just as it provided some financial records to Swiss American, starting in November 2019, Kings Garden provided quarterly and annual financial information, including balance sheets and income statements, to IIPR.[8]

---

[8] Michael King stated as much in a Declaration filed in the IIPR lawsuit against him and Kings Garden. *See IIP-CA 2 LP v. Kings Garden, Inc., et al.* (No. CVPS220975 0000033280630), filed September 9, 2022.

66.    IIPR does not deny that it received financial statements from Kings Garden. Ex. 2, ¶24. In its lawsuit, IIPR claimed that when it finally looked at those financial records at the end of the Class Period, it discovered that approximately $15 million had disappeared without explanation from Kings Garden's accounts. Ex. 3 at 7. By failing to scrutinize Kings Garden's financial records available to IIPR before and even look at the available Swiss American lawsuit that similarly alleged money mysteriously disappearing from Kings Garden's accounts, IIPR failed to perform the due diligence it told investors it had performed.

67.    Indeed, Michael King had not always been Michael King. Rather, in 2006 Michael Buyanovsky changed his name to Michael King. Again, a search for litigation would have revealed King's petition to change his name. IIPR states that it only discovered the name change when it finally investigated Michael King after Kings Garden failed to pay rent. IIPR alleged that Michael King's name change—information available before IIPR first invested in Kings Garden—"concerned" Defendants, causing them to perform further due diligence they had failed earlier to perform. Ex. 3 at 7. Defendants' finding Michael King's name change in 2022 and designating it as material establishes that they should have known about it in 2019.

68.    More, in *Zaslavskiy v. Michael King et al.*, a lawsuit alleging breach of contract filed against Michael King on December 30, 2016,[9] the plaintiff, Zaslavskiy, alleged that Michael King entered into loan documents concerning a property in Florida, and that King substituted a different person as the buyer of the property, replacing Zaslavskiy without Zaslavskiy's consent. The lawsuit was available to IIPR in 2016. On November 11, 2022, the circuit court granted Zaslavskiy's partial summary judgment motion, writing that "there is no genuine dispute of material fact that there was no writing … modifying the Loan Documents," and that King "was in breach of the Loan Documents."[10]

69.    Still further, in 2017, before the first sale-leaseback transaction involving Kings Garden, authorities arrested Michael King for felony fraud ("Grand Theft 1st Degree") committed in 2011-12.[11] Similar to the allegations in the Zaslavskiy lawsuit, the Arrest Warrant states that Michael King sold a condominium belonging to a Mr. Sorokin without his approval or knowledge, while Mr. Sorokin was in Russia. With the assistance of his mother, Sophia King, Michael King caused an attorney, who received emails from a fake email account in Mr.

---

[9] 2016-033252-CA-01 (11th Judicial Cir. for Miami-Dade Cty., FL).

[10] The Partial Summary Judgment Order is attached hereto as Exhibit 5. The case is ongoing.

[11] The May 15, 2017, "Affidavit in Support of Arrest Warrant" for Michael King is attached hereto as Exhibit 6.

Sorokin's name and thought he was acting at Mr. Sorokin's request, but was actually provided with forged documents and fraudulently notarized documents, to transfer over $780,000 to a bank account, from which Michael King, his wife, and another person withdraw most of the money. Emails showed that Michael King told Sorokin the property had not been sold when it actually had been sold.

70.     Indeed, IIPR's 2022 lawsuit against Michael King and Kings Garden includes Michael's King's "history of over 32 lawsuits, felony charges, and alleged fraudulent misconduct," that while available to IIPR, Defendants stated was "unbeknownst to [IIPR]" until 2022. Ex. 3 at 3.

71.     Further, upon finally obtaining the information in 2022, Defendants concluded that Michael King's history of "deception and misconduct" was concealed from California's cannabis licensing Department by obtaining California licenses in names other than Michael King. Ex. 3 at 3. Defendants concede, therefore, that California would not have licensed Michael King, and Defendants would not have entered into contracts with Michael King and Kings Garden.

72.     All of these material, adverse facts undermining the legitimacy of both Michael King and Kings Garden were available to Defendants before IIPR first invested in Kings Garden. Even as they claimed they had performed due diligence with respect to Michael King and Kings Garden, Defendants performed none.

G. **Notwithstanding that, According to Defendants, Michael King was a Fraudster and Kings Garden a Ponzi Scheme, Defendants Praised Michael King and Kings Garden Throughout the Class Period Without Any Basis Whatsoever**

73.    Throughout the Class Period, Defendants lauded IIPR's relationship with Kings Garden, and indeed lauded Michael King personally.

74.    As early as May 2020, and thereafter, Defendants praised Kings Garden's "highly unusual" and "highly unique" dividend payments to Kings Garden's shareholders. The dividend, however, itself was an obvious "red flag," that IIPR not only ignored but spun positively. The "highly unique" nature of this payment to shareholders, including Michael King—an unlicensed cultivator—should have caused IIPR to conduct the due diligence, and then monitoring, it had failed to conduct.

75.    During the February 25, 2021, earnings conference call, Defendant Regin championed both Kings Garden and Michael King:

> Kings Garden is one of the top tenants in California, consistently ranking in the top 5 of flower and concentrate sales in the state, and as you may recall, was ***one of the first cannabis tenants to commence regular quarterly dividends to its shareholders in June 2020, a remarkable achievement*** for a company continuing on its rapid expansion path.
>
>                           ***
>
> ***We are proud partners of Michael King and his great team*** and look forward to supporting them through the development and redevelopment of state-of-the-art facilities to dramatically expand production capacity and

> continue to deliver the highest-quality product that they are known for.
>
> ***
>
> But needless to say, we are thrilled to team with Kings Garden in California.[12]

76.   During the August 5, 2021 earnings conference call, Defendants continued lionizing Kings Garden, even as Kings Garden had already submitted an obviously forged and false draw request and invoices to IIPR just seven days earlier, beginning their theft of what IIPR admits was "millions of dollars."[13] For example, Defendant Regin stated:

> Kings Garden has developed a truly distinguished brand in California and consistently ranks as a top producer in sales in a state that represents the largest market in the world
>
> ***
>
> Kings Garden is yet another example of our tenant partners focused on long-term, responsible, sustainable production.

77.   Also during the August 5, 2021 call, in response to an analyst question about how IIPR evaluates whether to make investments in potential tenants,

---

[12] All emphasis added unless otherwise noted.

[13] In a filing in its lawsuit against Kings Garden and Michael King, IIPR states that there is "[u]ndisputed evidence that Defendants obtained $49 million in construction funds using forged general contractor forms AIA G-702." *IIP-CA 2 LP v. Kings Garden, Inc., et al.* ("Plaintiff IIP-CA G 2 LP Supplemental Reply in Support of Application to Appoint Receiver") (No. CVPS2202975 0000033454127) (filed August 26, 2022).

Defendant Gold stated:

> We spent a great deal of time focused not only on the real estate -- the proposed real estate transaction that brings those tenants to IIPR. ***But we spent a lot of time with the management team, evaluating their skills and expertise*** in running not only a business, but in marketing and then most specifically in growing. ***And we utilize our existing network of growers to do background checks on these tenants, understanding where they've come from and their reputations in the specific state or just in the industry in general.***

78.     During the February 24, 2022 earnings conference call, Defendants continued praising Kings Garden, with Defendant Regin stating:

> With their ***brand reputation and operational expertise driving financial results, the Kings Garden team has also been one of the uniquely positioned tenants to return capital to its long-term owners in the form of dividends***, including $3 million in each of the last 2 years. We are excited to be working closely with Kings Garden as they complete full build-out of their production capacity in the months to come.

79.     Finally, during the May 5, 2022 earnings conference call, held seven weeks after Blue Orca released its report, described herein, setting out multiple allegations of fraud and thievery against Michael King, and after IIPR's swift and aggressive public rejection of everything in the Blue Orca report, Defendants went full-bore extolling both Kings Garden and IIPR's investment decisions. After Defendant Gold told investors that "we plan to focus on … our tenant partner[], Kings Garden, and do a deeper dive into our underwriting fundamentals, as applied

31

specifically to [Kings Garden]," Defendant Regin stated:

> ***We made our initial investment with Kings Garden in April 2019 …. [a]t that time, we evaluated Kings Garden***, as a leading indoor cannabis tenant in California with profitable operations and a distribution agreement with one of the largest distributors in the state, delivering Kings Garden products to over 60% of the state's regulated dispensaries. In May of 2020, we followed with the acquisition of a fully operational property …. ***[s]hortly after that closing, Kings Garden announced the initiation of a quarterly dividend to its stockholders, something that was and is considered highly unusual among any prominent brand in the industry and which demonstrates their belief in the long-term prospects in the business***.[14]

### H.    After Leasing Back Properties from IIPR, Kings Garden Misused and Stole Funds IIPR Disbursed after Failing to Monitor and Verify Improvements and Draw Requests

80.    According to two of the leases IIPR and Kings Garden entered into between April 16, 2019, and March 25, 2021, IIPR agreed to reimburse Kings Garden for "qualified" improvements to the 19th Street Property and the San Bernardino Project properties. Kings Garden was required under the leases to supply supporting documentation in support of any reimbursement, including the draw request form signed by the general contractor and architect, and invoices for all work

---

[14] Through the end of the Class Period, Defendants did not address whether the "highly unusual" and "highly unique" dividends Kings Garden issued to its stockholders, including Michael King, were in any way related to the millions of dollars that mysteriously left Kings Garden that IIPR "noticed" in the Kings Garden financial statements it reviewed only after the theft was complete.

performed by the contractor, sub-contractors, and architect. To avoid even the possibility of fraud, Defendants disclosed, IIPR's "Construction Team," which reported to Defendant, CFO Hastings, was supposed to scrutinize and verify draw requests. IIPR did not reimburse Kings Garden without the CFO's approval.

81.     According to IIPR, the Construction Team "review[ed any request for reimbursement] for accuracy and compliance with acceptable construction parameters." IIPR stated that its Construction Team "regularly requested, and received, construction updates and/or site visits directly from [Kings Garden][.]" This was a lie, as IIPR failed to monitor either the construction itself, or the draw requests and accompanying documentation, with some draw requests obvious forgeries on their face, and all false.

82.     Between July 29, 2021, and June 1, 2022, Kings Garden submitted five draw requests totaling approximately $21.6 million for the San Bernardino Project. IIPR received, approved, and paid four of these draw requests before Blue Orca released its report on April 14, 2022.

83.     Between September 3, 2021, and June 1, 2022, Kings Garden submitted six draw requests totaling approximately $26.9 million for the 19th Street Property. IIPR received, approved, and paid all but the last draw request for the 19th Street Property before Blue Orca released its report on April 14, 2022.

84.     Gary LaSalle, Kings Garden's VP of operations, submitted all of Kings Garden's draw requests to IIPR. LaSalle transmitted the first draw request, for the San Bernardino Project, on July 29, 2021, for just short of $1.5 million. The form LaSalle submitted for the July 29, 2021, draw request was a forgery, something Defendants stated was evident on its face, just by looking at the document.

85.     In addition to failing to scrutinize and verify Kings Garden draw requests, in direct contradiction to Class Period statements, in their lawsuit against Michael King and Kings Garden, Defendants admitted that they neither monitored nor conducted site visits to Kings Garden's properties. IIPR did not call the general contractor and architect who were required to sign and submit the draw request, nor any subcontractors who allegedly worked on the project and for whom LaSalle and Kings Garden submitted invoices, nor did they do a site visit. Even if the forgery was not evident just by looking at the draw request, the phone calls and site visit would have revealed the fraud.

86.     In IIPR's lawsuit against Kings Garden, Defendants expose how even a cursory look at the first draw request revealed it was a forgery, belying their affirmative statements that they monitor IIPR's tenants. IIPR stated:

> For example, in the first Draw Request for the San Bernardino Project, Tenant requested reimbursement for an invoice of $1,436,200 for electrical work. Upon close inspection of this invoice, Landlord noticed inconsistent type fonts and text boxes that appeared to have been added to an old invoice:

34

| Customer ID | | Department | Payment Terms | |
|---|---|---|---|---|
| KGSB | | CONST | DUE UPON RECEIPT | |
| Order Taken By | | | Starting Date | Date Completed |
| JOINT 5 | | | August 1, 2021 | August 6, 2021 |
| Quantity | Description | | Unit Price | Extension |
| | Per proposal #KGSB062521<br><br>50% payment to secure electrical equipment | | | $1,436,200.00 |

> Indeed, the metadata from the *pdf of this particular form indicated that the base form was created in 2017, five years before the June 2022 Draw Request. The invoice also appears to be based on a document from an electrical company previously owned directly by LaSalle.[15]

87.    Defendants neither monitored Kings Garden nor scrutinized nor verified draw requests until after King's Garden's LaSalle submitted the last draw request, for the 19th Street Property, on June 1, 2022. Only sometime after June 16th, 2022 did Defendants perform a "close inspection" of the very first draw request, submitted on June 29, 2021, and concluded it was a forgery simply by looking at it. That a visual inspection revealed the forgery establishes that IIPR did not monitor or verify the accuracy of the draw request and invoices when the draw request was actually submitted. Indeed, Defendants admit that they punted on their repeatedly declared monitoring efforts, stating that they "relied on the information contained in

---

[15] Ex. 2, ¶33. Defendants err in stating "five years before the June 2022 Draw Request. The very first draw request was submitted on June 29, 2021, so its base form was created four years earlier.

the falsified Draw Requests and supporting documentation …." Ex. 2, ¶86.

88.     Defendants similarly failed to perform monitoring and visits after Kings Garden submitted draw requests for the San Bernardino Project on November 22, 2021, February 7, 2022, April 7, 2022, and June 1, 2022. IIPR paid each, in full.

89.     Nor did Defendants perform monitoring and visits after King's Garden's LaSalle submitted draw requests for the 19th Street Property on September 3, 2021, November 22, 2021, January 7, 2022, February 7, 2022, and April 7, 2022. IIPR approved and paid them all.

90.     In total, IIPR paid approximately $48.5 million in Draw Requests. Defendants admit that *all* of Kings Garden's Draw Requests were false and forgeries, and accused Kings Garden and Michael King of running a "Ponzi scheme," using IIPR's money to enrich Michael King and Kings Garden's management, in part by using the money to buy back shares, increasing the value of the shares held by Michael King and the other Kings Garden managing members, and by paying back loans. Ex. 2, ¶49; Ex. 3 at 7.

91.     When Defendants finally looked at the sixth draw request for the 19th Street Property, submitted by LaSalle on June 1, 2022, they noticed the numbers did not match. IIPR called LaSalle who admitted that he, not the general contractor, had prepared every Kings Garden Draw Request. Yet LaSalle had submitted a draw request for the San Bernardino Project that very same day, June 1, 2022, yet IIPR

did not look closely at the documents and monitor and visit to assure accuracy, and IIPR "reimbursed" for that draw request.

92.    IIPR's Construction Team then belatedly contacted the contractors who appeared on invoices for both the 19th Street Property and the San Bernadino Project. The contractors told IIPR that there were many forged invoices, documents, and signatures, and in some case the contractors had not actually performed work at the 19th Street Property or the San Bernadino Project. Ex. 3 at 7. The total of the forged invoices, according to IIPR, was "millions of dollars." Ex. 3 at 7, which IIPR says Michael King and Kings Garden "embezzled." Ex. 3 at 11.

93.    IIPR's Construction Team then belatedly contacted parties that had allegedly actually performed work on the two Projects, and, despite claiming earlier that they had done site visits, actually visited the Kings Garden's properties for which LaSalle had submitted draw requests. The Construction Team learned that the discrepancy between the invoices paid and the value of actual work performed was also in the millions of dollars.

94.    IIPR's Construction Team then belatedly visited a San Bernadino Project and 19th Street Property facility, seeing for themselves that the work Kings Garden claimed it had completed did not match the invoices received, and that Kings Garden had stolen "millions of dollars" through false and forged Draw Requests and invoices. Ex. 3 at 7. Further, simply by visiting Kings Garden's San Bernadino and

19th Street properties, IIPR's discovered evidence of ongoing theft and damage to the property, creating a risk of "fire damage, theft, and trespass." *Id.* at 10-11.

95.    Defendants state that after discovering that all of the draw requests had been false, it went back to the financial records that Kings Garden had been providing since November 2019, and found "well over $15 million leaving" Kings Garden's accounts in 2021 and 2022, allegations similar to those made by Swiss American three years earlier. Ex. 3 at 3.

96.    In June 2022 IIPR told Kings Garden that it would withhold funding for draw requests until all discrepancies were resolved. In response, Kings Garden told IIPR that "it was out of money and would not be paying its July 2022 rent on the Premises." Ex. 3 at 5.

97.    In documents filed in its lawsuit against Kings Garden, IIPR called Kings Garden's forgeries a "Madoff-style Ponzi Scheme," carried out through "pervasive" forgeries. Ex. 3 at 3. Suddenly succeeding in investigating Michael King's background, IIPR discovered "a history of deception: over 32 lawsuits, felony charges, name changes, and fraudulent misconduct," as well as that Michael King has been sued for fraud by his own family members. Ex. 3 at 3.

## I.    The Blue Orca Report

98.    On April 14, 2022, before the market opened, Blue Orca released its report. Among other things, the Report sourced, in detail, material adverse

38

information about Michael King and Kings Garden—information that, once again, pre-dated IIPR's first sale-leaseback transaction with Kings Garden.

99.    Blue Orca reported on the January 2019 Swiss American Investment Corporation lawsuit brought by one of Kings Garden's investors. January 2019 was months before IIPR entered into its first transaction with Kings Garden. Swiss American alleged, as Blue Orca summarized, "self-dealing, poor corporate governance, and a lack of transparency around its financial affairs." Specifically, Swiss American alleged that Kings Garden had never paid it any of the quarterly distributions owed to it under the terms of its investment with Kings Garden.

100.    The Blue Orca report further detailed Swiss American's claims that it had "discovered a series of 'irregular' transactions involving millions of dollars between Kings Garden and its managing directors, including loans of [millions of dollars] made to purchase real estate which was then leased back to IIPR." Swiss American also alleged multiple related-party transactions between Kings Garden and entities owned or controlled by its managing members.

101.    The Blue Orca report also detailed a May 2021 lawsuit brought by Paul King, a co-founder of Kings Garden and Michaels King's brother, against Michael King and Kings Garden.[16] Paul King alleged that Michael King "deliberately and

---

[16] The lawsuit is *Paul King v. Michael King, et al.*, No. 21-23889 (S.D. Fla. 2021).

blatantly falsified books and records to personally enrich himself, and swindle money from investors." Michael King also "repeatedly misrepresented that funds were being used for business purposes when in fact they were exclusively used for M. King's personal benefit." Further, "M. King used and continues to use Kings Garden as his personal piggy back thereby … decreasing the value of … investors' ownership interests in IIPR by millions of dollars."

102.    Perhaps more troubling, Paul King's lawsuit accused Kings Garden of selling millions of dollars' worth of cannabis on the black market, in violation of state and local laws, and putting at risk the "permits, licenses and regulatory approvals held by Kings Garden and its subsidiaries." Paul King also claimed Kings Garden committed fraud with respect to its financial, regulatory, and tax reporting.

## V.    FALSE AND MISLEADING STATEMENTS AND OMISSIONS

103.    On August 7, 2020, IIPR filed with the SEC its Q2 2020 10-Q. For the first time in an SEC filing, IIPR disclosed its relationship with Kings Garden, including that Kings Garden then comprised 10% of IIPR's rental revenue. In the Q2 2020 10-Q, Defendants incorporated by reference, in their entirety, the risk factors from their 2019 10-K.

104.    In the context of listing Kings Garden as one of IIPR's largest tenants, Defendants described the due diligence they conducted on tenants. The 2019 10-K disclosed that IIPR spent "a great deal of time focus[ed] not only on the … proposed

real estate transaction," but "a lot of time with the management team" doing "background checks on these tenants, understanding where they've come from and their reputations . . . ." In that context, in the 2019 10-K, Defendants affirmatively stated that IIPR's "*management team [] perform[ed] due diligence investigations of our potential tenants, related guarantors and their properties, operations and prospects, of which there is generally little or no publicly available operating and financial information*."

105. Further, in the context of Defendants' stating that IIPR's growth depended upon future acquisitions, Defendants affirmatively stated that IIPR did not purchase properties until its management team conducted "satisfactory completion of due diligence investigations," concluding that IIPR "may spend significant time and money and divert management attention on potential acquisitions that we do not consummate."

106. The foregoing affirmative statements about the due diligence Defendants conducted before transacting with Kings Garden and the time and expense Defendants spent on those efforts for Kings Garden were materially false. As of the date of IIPR's first transaction with Kings Garden on April 16, 2019 (or thereafter), Defendants did no background check on Kings Garden or Michael King and had no understanding "where they've come from and their reputations." Defendants recklessly ignored material negative information that they subsequently

41

easily found that Michael King was a fraudster and Kings Garden a Ponzi scheme by which it embezzled tens of millions of dollars from IIPR.

107.    During an August 6, 2020, earnings conference call, Defendant Regin stated that IIPR "leased 5 properties to Kings Garden. . . totaling 102,000 square feet that we acquired in April of last year." Regin continued that "Kings Garden is a leading cannabis cultivation, processing and manufacturing tenant, having developed a tremendous brand and reputation for consistent top-shelf quality."

108.    The foregoing statement praising Kings Garden and its reputation was materially false and misleading. In the context of praising Kings Garden, Defendants were duty-bound to disclose that Michael King was a fraudster and Kings Garden a fraud. Before ever contracting with IIPR, Michael King and Kings Garden had defrauded investors. Swiss American had sued Kings Garden and Michael King, alleging they had stolen money from Kings Garden's accounts. In addition, Michael King had a felony arrest for *crimen falsi*, that he changed his name, which "concerned" Defendants, that he had been the subject of multiple lawsuits alleging fraud, and that Michael King and Kings Garden had lied about Michael King's having a federal cannabis license. This information eclipsed all other facts on which Defendants based their statements of support for Kings Garden. That is, no reasonable investor would have believed Defendants' opinions in light of Michael King's and Kings Garden's wrongdoing.

109.    During the August 7, 2020 conference call, Defendant Regin, continued that "[n]otably and highly unique in this industry, Kings Garden declared its first quarterly dividend in June of this year to its equity investors."

110.    The foregoing statement that [n]otably and highly unique in this industry, Kings Garden declared its first quarterly dividend in June of this year to its equity investors," was also false. The statement was a stark, obvious "red flag," which IIPR not only ignored but told investors was a positive, and which required IIPR conduct the due diligence it had failed to conduct. Defendants were duty-bound to disclose that Michael King was a fraudster and Kings Garden a fraud. Before ever contracting with IIPR, Michael King and Kings Garden had defrauded investors. Swiss American had sued Kings Garden and Michael King, alleging they had stolen money from Kings Garden's accounts. In addition, Michael King had a felony arrest for *crimen falsi*, that he changed his name, which "concerned" Defendants, that he had been the subject of multiple lawsuits alleging fraud, and that Michael King and Kings Garden had lied about Michael King's having a federal cannabis license. This information eclipsed all other facts on which Defendants based their statements of support for Kings Garden. That is, no reasonable investor would have believed Defendants' opinions in light of Michael King's and Kings Garden's wrongdoing.

111.    On November 5, 2020, Defendants filed with the SEC their Q3 2020 10-Q for the period ended September 30, 2020. Defendants incorporated their 2019

43

10-K risk warnings into the Q3 2020 10-Q by reference.

112.   In the context of listing Kings Garden as one of IIPR's largest tenants, Defendants described the due diligence they conducted on tenants. The 2019 10-K disclosed that IIPR spent "a great deal of time focus[ed] not only on the … proposed real estate transaction," but "a lot of time with the management team" doing "background checks on these tenants, understanding where they've come from and their reputations . . . ." In that context, in the 2019 10-K, Defendants affirmatively stated that IIPR's "*management team [] perform[ed] due diligence investigations of our potential tenants, related guarantors and their properties, operations and prospects, of which there is generally little or no publicly available operating and financial information*."

113.   Further, in the context of Defendants' stating that IIPR's growth depended upon future acquisitions, Defendants affirmatively stated that IIPR did not purchase properties until its management team conducted "satisfactory completion of due diligence investigations," concluding that IIPR "may spend significant time and money and divert management attention on potential acquisitions that we do not consummate."

114.   The foregoing affirmative statements about the due diligence Defendants conducted before transacting with Kings Garden and the time and expense Defendants spent on those efforts for Kings Garden were materially false.

As of the date of IIPR's first transaction with Kings Garden on April 16, 2019 (or thereafter), Defendants did no background check on Kings Garden or Michael King and had no understanding "where they've come from and their reputations." Defendants recklessly ignored material negative information that they subsequently easily found that Michael King was a fraudster and Kings Garden a Ponzi scheme by which it embezzled tens of millions of dollars from IIPR.

115.    On February 24, 2021, Defendants issued a press release, disclosing IIPR's financial results for the year ended December 31, 2020. About Kings Garden, the 2020 10-K disclosed that as of December 31, 2020, Kings Garden accounted for the second most rentable square feet in IIPR's portfolio for the largest single investment in any tenant of nearly $70 million, including "four properties acquired on April 16, 2019, one property acquired on May 12, 2020, consisting of 70,000 square feet for a purchase price of $17.5 million, and one property acquired on November 16, 2020," consisting of 192,000 rentable square feet for an initial purchase price of $17.5 million.

116.    On February 26, 2021, IIPR filed its 2020 10-K with the SEC. IIPR stated that its investment in Kings Garden was approximately $70 million, and that it 2020 it had purchased a property from Kings Garden for $17.5 million.

117.    In the context of listing Kings Garden as one of IIPR's largest tenants, Defendants described the due diligence they conducted on tenants. The 2019 10-K

disclosed that IIPR spent "a great deal of time focus[ed] not only on the … proposed real estate transaction," but "a lot of time with the management team" doing "background checks on these tenants, understanding where they've come from and their reputations . . . ." In that context, in the 2019 10-K, Defendants affirmatively stated that IIPR's "*management team [] perform[ed] due diligence investigations of our potential tenants, related guarantors and their properties, operations and prospects, of which there is generally little or no publicly available operating and financial information*."

118.    Further, in the context of Defendants' stating that IIPR's growth depended upon future acquisitions, Defendants affirmatively stated that IIPR did not purchase properties until its management team conducted "satisfactory completion of due diligence investigations," concluding that IIPR "may spend significant time and money and divert management attention on potential acquisitions that we do not consummate."

119.    The foregoing affirmative statements about the due diligence Defendants conducted before transacting with Kings Garden and the time and expense Defendants spent on those efforts for Kings Garden were materially false. As of the date of IIPR's first transaction with Kings Garden on April 16, 2019 (or thereafter), Defendants did no background check on Kings Garden or Michael King and had no understanding "where they've come from and their reputations."

46

Defendants recklessly ignored material negative information that they subsequently easily found that Michael King was a fraudster and Kings Garden a Ponzi scheme by which it embezzled tens of millions of dollars from IIPR.

120.   On February 25, 2021, Defendants convened the Q4 2020 Call. About Kings Garden, Defendant Regin stated, "[w]e have been fairly active in California in recent months with our 2 transactions with Kings Garden . . . ." He continued that in California's robust cannabis market "Kings Garden is one of the top tenants . . ., consistently ranking in the top 5 of flower and concentrate sales in the state." Defendants Regin noted that IIPR now leased six properties to Kings Garden, "representing well over 0.5 million square feet, including projects under development and a total investment of nearly $150 million, including commitments to fund future development and redevelopment." He expressed that IIPR were "proud partners of Michael King and his great team and look forward to supporting them through the development and redevelopment of state-of-the-art facilities to dramatically expand production capacity and continue to deliver the highest-quality product that they are known for." Later in the Q4 2020 Call, Regin stated that IIPR was "thrilled to team with Kings Garden in California, one of the top tenants in the largest regulated cannabis market in the world."

121.   The foregoing statements that IIPR was "thrilled to team with Kings Garden in California, that Kings Garden was "one of the top tenants in the largest

regulated cannabis market in the world," and that IIPR was "proud partners of Michael King and his great team," were materially false and misleading. Having never conducted any due diligence investigation on Michael King and Kings Garden, Defendants had no understanding of whether Kings Garden was a "top tenant," and whether Michael King had a "great team." Defendants were duty-bound to disclose information available to IIPR before its first lease with Kings Garden, that Michael King was a fraudster and Kings Garden a fraud. Before ever contracting with IIPR, Michael King and Kings Garden had defrauded investors. Swiss American had sued Kings Garden and Michael King, alleging they had stolen money from Kings Garden's accounts. In addition, Michael King had a felony arrest for *crimen falsi*, that he changed his name, which "concerned" Defendants, that he had been the subject of multiple lawsuits alleging fraud, and that Michael King and Kings Garden had lied about Michael King's having a federal cannabis license. This information eclipsed all other facts on which Defendants based their statements of support for Kings Garden. That is, no reasonable investor would have believed Defendants' opinions in light of Michael King's and Kings Garden's wrongdoing.

122.   Regin continued that "[n]otably and highly unique in this industry, was one of the first cannabis tenants to commence regular quarterly dividends to its shareholders in June 2020, a remarkable achievement for a company continuing on its rapid expansion path."

123.    The foregoing statement that "[n]otably and highly unique in this industry, Kings Garden "was one of the first cannabis tenants to commence regular quarterly dividends to its shareholders in June 2020, *a remarkable achievement* for a company continuing on its rapid expansion path," was false. The statement was a stark, obvious "red flag," which IIPR not only ignored but told investors was a positive, and which required IIPR conduct the due diligence it had failed to conduct. Defendants were duty-bound to disclose that Michael King was a fraudster and Kings Garden a fraud. Before ever contracting with IIPR, Michael King and Kings Garden had defrauded investors. Swiss American had sued Kings Garden and Michael King, alleging they had stolen money from Kings Garden's accounts. In addition, Michael King had a felony arrest for *crimen falsi*, that he changed his name, which "concerned" Defendants, that he had been the subject of multiple lawsuits alleging fraud, and that Michael King and Kings Garden had lied about Michael King's having a federal cannabis license. This information eclipsed all other facts on which Defendants based their statements of support for Kings Garden. That is, no reasonable investor would have believed Defendants' opinions in light of Michael King's and Kings Garden's wrongdoing.

124.    Supporting these comments, generally, during the Q4 2020 Call, in response to analysts' questions, Defendant Gold stated that "we tend to add new growers very carefully and with a lot of consideration because of that commitment

49

to be able to provide them future capital" and with respect to yields from deals with new tenants versus existing tenants, "[w]e evaluate and underwrite every single one of our transactions individually. We underwrite the quality of the tenant, the quality of the location, the deal terms and the complexity of the transaction," creating what IIPR "think[s] is an appropriate yield for the capital that we intend to offer."

125.    The foregoing affirmative statements about "evaluat[ing]" and "underwrit[ing] the quality of the tenant were materially false. As of the date of IIPR's first transaction with Kings Garden on April 16, 2019 (or thereafter), Defendants did no background check on Kings Garden or Michael King and had no understanding of the "quality of the tenant."

126.    On May 6, 2021, Defendants filed IIPR's Q1 2021 10-Q. Defendants incorporated by reference their risk disclosures from the 2020 10-K.

127.    In the context of discussing Kings Garden as one of IIPR's largest tenants, Defendants described the due diligence they conducted on tenants. The 2019 10-K disclosed that IIPR spent "a great deal of time focus[ed] not only on the … proposed real estate transaction," but "a lot of time with the management team" doing "background checks on these tenants, understanding where they've come from and their reputations . . . ." In that context, in the 2019 10-K, Defendants affirmatively stated that IIPR's "***management team [] perform[ed] due diligence investigations of our potential tenants, related guarantors and their properties,***

***operations and prospects, of which there is generally little or no publicly available operating and financial information***."

128.   Further, in the context of Defendants' stating that IIPR's growth depended upon future acquisitions, Defendants affirmatively stated that IIPR did not purchase properties until its management team conducted "satisfactory completion of due diligence investigations," concluding that IIPR "may spend significant time and money and divert management attention on potential acquisitions that we do not consummate."

129.   The foregoing affirmative statements about the due diligence Defendants conducted before transacting with Kings Garden and the time and expense Defendants spent on those efforts for Kings Garden were materially false. As of the date of IIPR's first transaction with Kings Garden on April 16, 2019 (or thereafter), Defendants did no background check on Kings Garden or Michael King and had no understanding "where they've come from and their reputations." Defendants recklessly ignored material negative information that they subsequently easily found that Michael King was a fraudster and Kings Garden a Ponzi scheme by which it embezzled tens of millions of dollars from IIPR.

130.   On August 5, 2021, Defendants filed with the SEC IIPR's Q2 2021 10-Q, for the period ended June 30, 2021. Defendants incorporated by reference their risk disclosures from the 2020 10-K. About Kings Garden, the Q2 2021 10-Q

repeated the details of the February 5, 2021, transaction in which IIPR lent $1.35 million to purchase land on which Kings Garden purportedly agreed to build two buildings of a combined 180,000 rentable square feet "for which [IIPR] agreed to provide reimbursement of up to approximately $51.4 million." With respect to "Concentration of Credit Risk," Defendants stated that Kings Garden was among the top five contributors to IIPR revenue, accounting for 7% of total rental revenue for the three months ended June 30, 2021.

131.   In the context of listing Kings Garden as one of IIPR's largest tenants, Defendants described the due diligence they conducted on tenants. The 2019 10-K disclosed that IIPR spent "a great deal of time focus[ed] not only on the … proposed real estate transaction," but "a lot of time with the management team" doing "background checks on these tenants, understanding where they've come from and their reputations . . . ." In that context, in the 2019 10-K, Defendants affirmatively stated that IIPR's "*management team [] perform[ed] due diligence investigations of our potential tenants, related guarantors and their properties, operations and prospects, of which there is generally little or no publicly available operating and financial information*."

132.   Further, in the context of Defendants' stating that IIPR's growth depended upon future acquisitions, Defendants affirmatively stated that IIPR did not purchase properties until its management team conducted "satisfactory completion

of due diligence investigations," concluding that IIPR "may spend significant time and money and divert management attention on potential acquisitions that we do not consummate."

133.    The foregoing affirmative statements about the due diligence Defendants conducted before transacting with Kings Garden and the time and expense Defendants spent on those efforts for Kings Garden were materially false. As of the date of IIPR's first transaction with Kings Garden on April 16, 2019 (or thereafter), Defendants did no background check on Kings Garden or Michael King and had no understanding "where they've come from and their reputations." Defendants recklessly ignored material negative information that they subsequently easily found that Michael King was a fraudster and Kings Garden a Ponzi scheme by which it embezzled tens of millions of dollars from IIPR.

134.    With respect to risk management the Q2 2021 10-Q includes the 2020 10-K disclosure that "[w]e evaluate the credit quality of our tenants and any guarantors *on an ongoing basis* by reviewing, where available, the publicly filed financial reports, press releases and other publicly available industry information regarding our tenants and any guarantors." Defendants continued that, "[i]n addition, … we monitor our tenants by periodically conducting site visits and meeting with the tenants to discuss their operations …."

135.   The foregoing statements about monitoring Kings Garden, evaluating tenants on an ongoing basis, and conducting site visits, were false and misleading. Defendants did not conduct site visits or otherwise monitor Kings Garden on an ongoing basis. Indeed, they did not scrutinize draw requests that were fraudulent on their face. Kings Garden did not actually complete the specified work for which it requested reimbursement from IIPR, and for which IIPR paid. Defendants' failure to monitor, including their failure to conduct site visits or to contact contractors, therefore, caused them to recklessly disregard that Kings Garden had not done the work for which it had submitted draw requests and that the draw requests, themselves, were, on their face, forgeries.

136.   Further, Kings Garden had submitted its first, visibly forged draw request just 7 days earlier, on July 29, 2021.

137.   Defendants recklessly disregarded but were duty-bound to disclose that IIPR paid the forged draw request without verifying any of the information. Further, IIPR was duty-bound to disclose that King's Garden's financials showed millions of dollars disappearing from its accounts. Defendants were duty-bound to disclose that Michael King was a fraudster and Kings Garden a fraud. Before ever contracting with IIPR, Michael King and Kings Garden had defrauded investors. Swiss American had sued Kings Garden and Michael King, alleging they had stolen money from Kings Garden's accounts. In addition, Michael King had a felony arrest for

*crimen falsi*, that he changed his name, which "concerned" Defendants, that he had been the subject of multiple lawsuits alleging fraud, and that Michael King and Kings Garden had lied about Michael King's having a federal cannabis license.

138.   On August 5, 2021, Defendants convened the Q2 2021 Call. Discussing IIPR's "most significant tenants," Defendant Regin stated that Kings Garden, "represent[ed] a total commitment of nearly $150 million and which is expected to encompass over 500,000 square feet of space upon completion of development and redevelopment at certain properties."

139.   Regin continued that "Kings Garden has developed a truly distinguished brand in California and consistently ranks as a top producer in sales in a state that represents the largest market in the world." More specifically, Regin noted, "[w]ith production of 40,000 pounds of cannabis flower annually and continuing to ramp significantly, it is the leading top-quality producer in the state." He boasted of Kings Garden's recycling, water reclamation, and environmentally friendly power efforts. He concluded, "[w]e highlighted a number of environmental initiatives of our tenant partners in their operations and our inaugural ESG report posted to our website. And Kings Garden is yet another example of our tenant partners focused on long-term, responsible, sustainable production."

140.   Parroting Defendant Regin during the Q2 2021 Call, Defendant Gold referred to tenants like Kings Garden, stating "we are thrilled with the quality of our

tenant roster and the continued demonstrated strength and resilience of our tenant partners and their execution on operations." Defendant Hastings stated, "As Ben previously mentioned, we've been proud to continue to partner with many of our tenant and amend the leases to provide for additional expansion capital at our facilities for a corresponding increase in base rent."

141.    The foregoing opinions of being "proud to partner" with Kings Garden, praising Kings Garden for its "distinguished brand," that it was "responsible," praising Kings Garden's environmental acts and policies, and stating that IIPR was "proud to continue to partner" with Kings Garden were materially false and misleading. Having thus praised Kings Garden, Defendants were duty-bound to disclose that Michael King was a fraudster and Kings Garden a fraud. Before ever contracting with IIPR, Michael King and Kings Garden had defrauded investors. Swiss American had sued Kings Garden and Michael King, alleging they had stolen money from Kings Garden's accounts. In addition, Michael King had a felony arrest for *crimen falsi*, that he changed his name, which "concerned" Defendants, that he had been the subject of multiple lawsuits alleging fraud, and that Michael King and Kings Garden had lied about Michael King's having a federal cannabis license. This information eclipsed all other facts on which Defendants based their statements of support for Kings Garden. That is, no reasonable investor would have believed Defendants' opinions in light of Michael King's and Kings Garden's wrongdoing.

142.   On November 4, 2021, Defendants filed with the SEC IIPR's Q3 2021 10-Q for the period ended September 30, 2021. Defendants incorporated by reference risk warnings from the 2020 10-K.

143.   In the context of listing Kings Garden as one of IIPR's largest tenants, Defendants described the due diligence they conducted on tenants. The 2019 10-K disclosed that IIPR spent "a great deal of time focus[ed] not only on the … proposed real estate transaction," but "a lot of time with the management team" doing "background checks on these tenants, understanding where they've come from and their reputations . . . ." In that context, in the 2019 10-K, Defendants affirmatively stated that IIPR's ***management team [] perform[ed] due diligence investigations of our potential tenants, related guarantors and their properties, operations and prospects, of which there is generally little or no publicly available operating and financial information*.**"

144.   Further, in the context of Defendants' stating that IIPR's growth depended upon future acquisitions, Defendants affirmatively stated that IIPR did not purchase properties until its management team conducted "satisfactory completion of due diligence investigations," concluding that IIPR "may spend significant time and money and divert management attention on potential acquisitions that we do not consummate."

145. The foregoing affirmative statements about the due diligence Defendants conducted before transacting with Kings Garden and the time and expense Defendants spent on those efforts for Kings Garden were materially false. As of the date of IIPR's first transaction with Kings Garden on April 16, 2019 (or thereafter), Defendants did no background check on Kings Garden or Michael King and had no understanding "where they've come from and their reputations." Defendants recklessly ignored material negative information that they subsequently easily found that Michael King was a fraudster and Kings Garden a Ponzi scheme by which it embezzled tens of millions of dollars from IIPR.

146. With respect to risk management the Q2 2021 10-Q includes the 2020 10-K disclosure that "[w]e evaluate the credit quality of our tenants and any guarantors **on an ongoing basis** by reviewing, where available, the publicly filed financial reports, press releases and other publicly available industry information regarding our tenants and any guarantors." Defendants continued that, "[i]n addition, … we monitor our tenants by periodically conducting site visits and meeting with the tenants to discuss their operations …."

147. The foregoing statements about monitoring Kings Garden on an ongoing basis and conducting site visits were false and misleading. Defendants did not conduct site visits or otherwise monitor Kings Garden on an ongoing basis. Indeed, they did not scrutinize draw requests that were fraudulent on their face.

Kings Garden did not contract to accomplish specified work for which it requested reimbursement from IIPR, and for which IIPR paid. Defendants failure to monitor, including their failure to conduct site visits or to contact contractors, therefore, caused them to recklessly disregard that Kings Garden had not done the work for which it had submitted draw requests and that the draw requests, themselves, were, on their face, forgeries.

148.   On February 24, 2022, Defendants filed the 2021 10-K, for the year ended December 31, 2021. The 2021 10-K disclosed that as of December 31, 2021, Kings Garden was among the "five tenants in our property portfolio that represented the largest percentage of our total rental revenue," itself contributing 8% of rental revenue. The 2021 10-K also notes that as of December 31, 2021, Kings Garden was the tenant with the second great total square footage with 544,000 and the largest of IIPR's investments with over $82 million invested plus "remaining aggregate improvement allowances at certain properties totaling approximately $65.0 million."

149.   In the context of listing Kings Garden as one of IIPR's largest tenants, Defendants described the due diligence they conducted on tenants. The 2019 10-K disclosed that IIPR spent "a great deal of time focus[ed] not only on the … proposed real estate transaction," but "a lot of time with the management team" doing "background checks on these tenants, understanding where they've come from and their reputations . . . ." In that context, in the 2019 10-K, Defendants affirmatively

stated that IIPR's "***management team [] perform[ed] due diligence investigations of our potential tenants, related guarantors and their properties, operations and prospects, of which there is generally little or no publicly available operating and financial information***."

150.    Further, in the context of Defendants' stating that IIPR's growth depended upon future acquisitions, Defendants affirmatively stated that IIPR did not purchase properties until its management team conducted "satisfactory completion of due diligence investigations," concluding that IIPR "may spend significant time and money and divert management attention on potential acquisitions that we do not consummate."

151.    The foregoing affirmative statements about the due diligence Defendants conducted before transacting with Kings Garden and the time and expense Defendants spent on those efforts for Kings Garden were materially false. As of the date of IIPR's first transaction with Kings Garden on April 16, 2019 (or thereafter), Defendants did no background check on Kings Garden or Michael King and had no understanding "where they've come from and their reputations." Defendants recklessly ignored material negative information that they subsequently easily found that Michael King was a fraudster and Kings Garden a Ponzi scheme by which it embezzled tens of millions of dollars from IIPR.

152.   With respect to risk management the Q2 2020 10-Q includes the 2019 10-K disclosure that "[w]e evaluate the credit quality of our tenants and any guarantors *on an ongoing basis* by reviewing, where available, the publicly filed financial reports, press releases and other publicly available industry information regarding our tenants and any guarantors." Defendants continued that,"[i]n addition, … we monitor our tenants by periodically conducting site visits and meeting with the tenants to discuss their operations …."

153.   The foregoing statements about monitoring Kings Garden on an ongoing basis and conducting site visits were false and misleading. Defendants did not conduct site visits or otherwise monitor Kings Garden on an ongoing basis. Indeed, they did not scrutinize draw requests that were fraudulent on their face. Kings Garden did not contract to accomplish specified work for which it requested reimbursement from IIPR, and for which IIPR paid. Defendants failure to monitor, including their failure to conduct site visits or to contact contractors, therefore, caused them to recklessly disregard that Kings Garden had not done the work for which it had submitted draw requests and that the draw requests, themselves, were, on their face, forgeries.

154.   On February 24, 2022, defendants convened an Earnings Conference Call ("Q4 2021 Call"). Defendant Regin discussed IIPR's top ten tenants, including Kings Garden. He described Kings Garden as "a tenant partner . . . across 6

61

properties in Southern California, representing a total commitment of about $148 million ….” Regin continued that “Kings Garden has developed a truly distinguished brand in California and consistently ranks as a top producer in sales in a state that represents the largest market in the world,” “[w]ith their brand reputation and operational expertise driving financial results, concluding, “[w]e are excited to be working closely with Kings Garden as they complete full build-out of their production capacity in the months to come.”

155.   The foregoing statement about Kings Garden’s “distinguished brand,” “operational expertise driving financial results,” and “brand reputation” were materially false and misleading. Having thus praised Kings Garden, Defendants were duty-bound to disclose that King’s Garden’s financials showed millions of dollars disappearing from its accounts, Michael King was a fraudster and Kings Garden a fraud. Before ever contracting with IIPR, Michael King and Kings Garden had defrauded investors. Swiss American had sued Kings Garden and Michael King, alleging they had stolen money from Kings Garden’s accounts. In addition, Michael King had a felony arrest for *crimen falsi*, that he changed his name, which “concerned” Defendants, that he had been the subject of multiple lawsuits alleging fraud, and that Michael King and Kings Garden had lied about Michael King’s having a federal cannabis license. Further, Defendants were duty-bound to disclose that Kings Garden had submitted multiple false draw requests, and that Kings

Garden was stealing millions of dollars from IIPR by siphoning off money that IIPR paid for improvements and construction that had not been done, which IIPR called a "Ponzi scheme." This information eclipsed all other facts on which Defendants based their statements of support for Kings Garden. That is, no reasonable investor would have believed Defendants' opinions in light of Michael King's and Kings Garden's wrongdoing.

156.   Regin continued, stating that the Kings Garden team has also been one of the uniquely positioned tenants to return capital to its long-term owners in the form of dividends, including $3 million in each of the last 2 years."

157.   IIPR's statement that "Kings Garden team has also been one of the uniquely positioned tenants to return capital to its long-term owners in the form of dividends, including $3 million in each of the last 2 years," was also false and misleading. The statement was a stark, obvious "red flag," which IIPR not only ignored but told investors was a positive, and which required IIPR conduct the due diligence it had failed to conduct. Defendants were duty-bound to disclose that Michael King was a fraudster and Kings Garden a fraud. Before ever contracting with IIPR, Michael King and Kings Garden had defrauded investors. Swiss American had sued Kings Garden and Michael King, alleging they had stolen money from Kings Garden's accounts. In addition, Michael King had a felony arrest for *crimen falsi*, that he changed his name, which "concerned" Defendants, that he had

been the subject of multiple lawsuits alleging fraud, and that Michael King and Kings Garden had lied about Michael King's having a federal cannabis license. This information eclipsed all other facts on which Defendants based their statements of support for Kings Garden. That is, no reasonable investor would have believed Defendants' opinions in light of Michael King's and Kings Garden's wrongdoing.

## VI.    THE TRUTH BEGINS TO EMERGE

158.    On April 14, 2022, before the market opened, Blue Orca released its report. As discussed above in detail, Blue Orca wrote about the fraud allegations leveled against Michael King even before IIPR entered into any contracts with Kings Garden, and of later, additional fraud allegations against Michael King and Kings Garden brought by Michael King's own brother.

159.    On this disclosure IIPR's stock fell by 7.5%, falling from $183.44 at the close of trading on April 13, 2022, to close at $169.68 on April 14, 2022, damaging investors.

160.    Before the market closed on April 14, 2022, Defendants responded, attacking the Blue Orca Report, calling it flawed and accusing Blue Orcas of "a basic lack of understanding of commercial real estate generally, the regulated cannabis industry and IIP's straightforward, simple business model." Defendants continued, stating that:

> In particular, it is IIP's opinion that this short-seller fails
> to have any comprehension of the scope of significant

infrastructure improvements that are needed for the transformation of a standard industrial building to a mission-critical facility with the enhanced environmental controls and other building systems necessary for regulated cannabis cultivation and processing. In addition, the writers do not understand the process that IIP employs for underwriting those improvements, and that ***any IIP reimbursements relate only to verified, qualified improvements to the buildings for these purposes***, and never as funding for any type of "loan" to be utilized for any other purpose.

Given the flawed nature and disinformation contained in this short-seller report, other than the clarification set forth above, the short-seller report's content does not warrant a response from IIP.

161.    Defendants' statement that "any IIP reimbursements relate only to verified, qualified improvements to the buildings" was materially false and misleading. Defendants had neither monitored the draw requests, all of which it admits were fraudulent forgeries, nor conducted site visits. As such none of the improvements had been "verified," and Kings Garden and Michael King were simply stealing tens of millions of dollars in "reimbursements" from IIPR for work that it had not done. As Defendants stated in their lawsuit against Kings Garden, rather than monitor the work or look closely at the draw requests, Defendants "relied" on Kings Garden to provide real and truthful draw requests and supporting documentation. *See* Ex. 2, ¶86.

162.    On May 5, 2022, Defendants filed with the SEC IIPR's Q1 2022 10-Q for the period ended March 31, 2021, which incorporated by reference the 2021 10-

K's risk factors. The Q1 2022 10-Q disclosed that as of March 31, 2022, Kings Garden was among the "five tenants in our property portfolio that represented the largest percentage of our total rental revenue," contributing 8% of rental revenue. The Q1 2022 10-Q also notes that for the quarter ended March 31, 2022, IIPR had invested another $8 million in another Kings Garden property with 23,000 rentable square feet.

163.    In the context of listing Kings Garden as one of IIPR's largest tenants, Defendants described the due diligence they conducted on tenants. The 2019 10-K disclosed that IIPR spent "a great deal of time focus[ed] not only on the … proposed real estate transaction," but "a lot of time with the management team" doing "background checks on these tenants, understanding where they've come from and their reputations . . . ." In that context, in the 2019 10-K, Defendants affirmatively stated that IIPR's "***management team [] perform[ed] due diligence investigations of our potential tenants, related guarantors and their properties, operations and prospects, of which there is generally little or no publicly available operating and financial information***."

164.    Further, in the context of Defendants' stating that IIPR's growth depended upon future acquisitions, Defendants affirmatively stated that IIPR did not purchase properties until its management team conducted "satisfactory completion of due diligence investigations," concluding that IIPR "may spend significant time

66

and money and divert management attention on potential acquisitions that we do not consummate."

165.    The foregoing affirmative statements about the due diligence Defendants conducted before transacting with Kings Garden and the time and expense Defendants spent on those efforts for Kings Garden were materially false. As of the date of IIPR's first transaction with Kings Garden on April 16, 2019 (or thereafter), Defendants did no background check on Kings Garden or Michael King and had no understanding "where they've come from and their reputations." Defendants recklessly ignored material negative information that they subsequently easily found that Michael King was a fraudster and Kings Garden a Ponzi scheme by which it embezzled tens of millions of dollars from IIPR.

166.    With respect to risk management the Q2 2020 10-Q includes the 2019 10-K disclosure that "[w]e evaluate the credit quality of our tenants and any guarantors *on an ongoing basis* by reviewing, where available, the publicly filed financial reports, press releases and other publicly available industry information regarding our tenants and any guarantors." Defendants continued that,"[i]n addition, … we monitor our tenants by periodically conducting site visits and meeting with the tenants to discuss their operations …."

167.    The foregoing statements about monitoring Kings Garden on an ongoing basis and conducting site visits were false and misleading. Defendants did

not conduct site visits or otherwise monitor Kings Garden on an ongoing basis. Indeed, they did not scrutinize draw requests that were fraudulent on their face. Kings Garden did not contract to accomplish specified work for which it requested reimbursement from IIPR, and for which IIPR paid. Defendants failure to monitor, including their failure to conduct site visits or to contact contractors, therefore, caused them to recklessly disregard that Kings Garden had not done the work for which it had submitted draw requests and that the draw requests, themselves, were, on their face, forgeries.

168.    During their May 5, 2022, Earnings Conference Call ("Q1 2022 Call") Defendants continued to boast of Kings Garden's quality as a tenant. Defendant Regin stated, stated:

> We made our initial investment with Kings Garden in April 2019, acquiring a 5-property portfolio in Southern California …. At that time, we evaluated Kings Garden, as a leading indoor cannabis tenant in California with profitable operations and a distribution agreement with one of the largest distributors in the state, delivering Kings Garden products to over 60% of the state's regulated dispensaries.
>
> In May of 2020, we followed with the acquisition of a fully operational property comprised of approximately 70,000 square feet of industrial space for $17.5 million or $250 per square foot. ***Shortly after that closing, Kings Garden announced the initiation of a quarterly dividend to its stockholders, something that was and is considered highly unusual among any prominent brand in the industry and which demonstrates their belief in the long-***

*term prospects in the business.*

Kings Garden continues to be one of the largest indoor cultivation tenants in California with 3,400 flowering lights producing in [excess] of 36,000 pounds of indoor flower annually….

169.    The foregoing statement that "Kings Garden announced the initiation of a quarterly dividend to its stockholders, something that was and is considered highly unusual among any prominent brand in the industry and which demonstrates their belief in the long-term prospects in the business," is recklessly false. The statement was a stark, obvious "red flag," which IIPR not only ignored but told investors was a positive, and which required IIPR conduct the due diligence it had failed to conduct. Defendants were duty-bound to disclose that IIPR had given tens of millions of dollars to Kings Garden based on forged and fraudulent draw requests, and that Kings Garden financial statements for 2021 and 2022, which IIPR had, showed millions of dollars leaving Kings Garden's account without valid reason. Defendants were further duty-bound to disclose that Michael King was a fraudster and Kings Garden a fraud. Before ever contracting with IIPR, Michael King and Kings Garden had defrauded investors. Swiss American had sued Kings Garden and Michael King, alleging they had stolen money from Kings Garden's accounts. In addition, Michael King had a felony arrest for *crimen falsi*, that he changed his name, which "concerned" Defendants, that he had been the subject of multiple lawsuits alleging fraud, and that Michael King and Kings Garden had lied about Michael

King's having a federal cannabis license. This information eclipsed all other facts on which Defendants based their statements of support for Kings Garden. That is, no reasonable investor would have believed Defendants' opinions in light of Michael King's and Kings Garden's wrongdoing.

170.   During that same Q1 2022 Call, about Kings Garden, Griffin Marquart, IIPR's Director of Construction Management stated:

> As Ben mentioned, we have a number of properties leased to Kings Garden …. In San Bernardino, the 192,000 square foot project is located on approximately 7 acres.
>
> We have funded approximately $18 million of the $25 million [in improvements subject to draw requests.]
>
> For the 19th Street project … [at] this point, we have funded approximately $27 million of the $51.4 million allowance for improvements.

171.   The statement that IIPR had funded approximately $18 million for improvements to the San Bernardino Project, and that IIPR had funded $27 million in draw requests for "improvements" at the 19th Street Property, were materially false and misleading. Contrary to their statements Defendants had not monitored the draw requests or conducted site visits, the "reimbursements" were in fact funds stolen from IIPR by Kings Garden as part of a "Ponzi scheme," and the improvements shown in the draw requests were false and were forgeries.

172.   With that extensive background, already knowing of the specific allegations in the Blue Orca Report, Defendant Gold stated:

> Again, very challenging to [convince] thoughts on underwriting the properties and market dynamics in the span of a few minutes and appreciate Ben's and Griffin's detail and effort to do so. ***We have been Kings Garden's partner for 3 years now and believe Michael King and his team have one of the best reputations for product quality and consistency and perhaps the single largest cannabis market in the world***.

173.    In the context of Kings Garden's Ponzi scheme and large-scale theft, the statement that "We have been Kings Garden's partner for 3 years now and believe Michael King and his team have one of the best reputations for product quality and consistency and perhaps the single largest cannabis market in the world," was recklessly false. Defendants were duty-bound to disclose that Michael King was a fraudster and Kings Garden a fraud. Before ever contracting with IIPR, Michael King and Kings Garden had defrauded investors. Swiss American had sued Kings Garden and Michael King, alleging they had stolen money from Kings Garden's accounts. In addition, Michael King had a felony arrest for *crimen falsi*, that he changed his name, which "concerned" Defendants, that he had been the subject of multiple lawsuits alleging fraud, and that Michael King and Kings Garden had lied about Michael King's having a federal cannabis license. This information eclipsed all other facts on which Defendants based their statements of support for Kings Garden. That is, no reasonable investor would have believed Defendants' opinions in light of Michael King's and Kings Garden's wrongdoing.

174.   On July 14, 2022, after the market closed, Defendants filed with the

SEC a Current Report on Form 8-K, disclosing:

> IIP-CA 2 LP ("Landlord"), an indirect, wholly owned subsidiary of Innovative Industrial Properties, Inc. (the "Company"), previously entered into leases (collectively, the "Leases") with Kings Garden Inc., as tenant ("Tenant"), for each of the six properties that Landlord owns.
>
> On July 13, 2022, Tenant defaulted on its obligations to pay base rent and property management fees for the month of July under each of the Leases, and defaulted on its obligations to reimburse Landlord for certain insurance premiums at the properties incurred by Landlord that are payable by Tenant as operating expenses under the Leases. Tenant's monetary default under all of the Leases was approximately $2.2 million in the aggregate, consisting of approximately $1.8 million of base rent and property management fees for the month of July and approximately $382,000 of insurance premiums, but excluding applicable late charges and default interest.
>
> The Company is continuing discussions with Tenant regarding the Leases, and has commenced discussions with other tenants regarding potential re-leasing of certain of such properties.

175.   The foregoing statement about Kings Garden's failure to pay rent was

materially false and misleading because Defendants were duty-bound to disclose that

Kings Garden was a Ponzi scheme designed to, and accomplishing, the

embezzlement of tens of million dollars via forged and fraudulent draw requests.

Defendants further failed in their duty to disclose that all 11 draw requests submitted

by Kings Garden were fraudulent and forgeries, and that Kings Garden's financial

records, that IIPR possessed, showed $15 million dollars fraudulently disappearing from Kings Garden's accounts in 2021 and 2022. Further, Defendants failed in their duty to disclose that Michael King and Kings Garden had been accused of such behavior before, and that Michael King had a history of fraud complaints and lawsuits.

176.   In direct response to this news, IIPR's stock price fell by 14.3%, from a close of $111.61 on July 14, 2022, to a July 15, 2022 closing price of $95.70, damaging investors.

177.   On August 4, 2022, after the market closed, Defendants finally revealed the full truth about Michael King and Kings Garden in IIPR's Quarterly Report on Form 10-Q for the period ended June 30, 2022. About Kings Garden, Defendants finally disclosed sufficient information to enable investors to evaluate Kings Gardens as a tenant and it contribution to IIPR's cash flows, stating.

> Kings Garden Lawsuit
>
> On July 13, 2022, one of our tenants, Kings Garden Inc. ("Kings Garden"), defaulted on its obligations to pay base rent and property management fees for the month of July under each of its six leases with our indirect, wholly owned subsidiary, IIP-CA 2 LP, and defaulted on its obligations to reimburse us for certain insurance premiums at the properties incurred by us that are payable by Kings Garden as operating expenses under such leases. Kings Garden's monetary default under its leases with us was approximately $2.2 million in the aggregate, consisting of approximately $1.8 million of base rent and property management fees for the month of July and approximately

$382,000 of insurance premiums, but excluding applicable late charges and default interest. We applied a portion of the security deposits under the leases, totaling approximately $2.3 million, as payment for these amounts, as well as applicable late charges and default interest through July 13, 2022. Of the six properties leased to Kings Garden, four were operational, with an expansion project at one of those properties, and the other two properties were in development or redevelopment as of June 30, 2022.

On July 25, 2022, IIP-CA 2 LP filed a lawsuit against Kings Garden. The case was named IIP-CA 2 LP, a Delaware limited partnership v. Kings Garden Inc., a Nevada corporation, CK Endeavors, Inc., a California corporation, and JM Endeavors, Inc., a California corporation, and was filed in the Superior Court of the State of California. The lawsuit asserts claims for breach of contract, declaratory relief, and injunctive relief. On August 2, 2022, the case was amended to be named IIP-CA 2 LP, a Delaware limited partnership v. Kings Garden Inc., a Nevada corporation, CK Endeavors, Inc., a California corporation, JM Endeavors, Inc., a California corporation, Michael King, an individual, Gary LaSalle, an individual, Charles Kieley, an individual, and Laurie Kibby, an individual, and *to include claims relating to construction at the expansion project and the property that was under redevelopment as of June 30, 2022 for breach of implied covenant of good faith and fair dealing, fraud, negligent misrepresentation, conversion, theft by false pretenses, money had and received, and violations of the Racketeer Influenced and Corrupt Organization Act (18 U.S.C. Section 1962(c))*. We are seeking monetary damages, interest, attorneys' fees, and declaratory and injunctive relief. Although there is at least a reasonable possibility that a loss may have been incurred in connection with the default by Kings Garden and the related construction projects, as of June 30, 2022, we are unable to make such an estimate.

74

\*\*\*

Subsequent Events

Tenant Default

We previously entered into leases (collectively, the "Kings Garden Leases") with Kings Garden, as tenant, for six properties located in southern California. On July 13, 2022, Kings Garden defaulted on its obligations to pay base rent and property management fees for the month of July under each of the Kings Garden Leases, and defaulted on its obligations to reimburse us for certain insurance premiums at the properties incurred by us that are payable by Kings Garden as operating expenses under the Kings Garden Leases. Kings Garden's monetary default under all of the Kings Garden Leases was approximately $2.2 million in the aggregate, consisting of approximately $1.8 million of base rent and property management fees for the month of July and approximately $382,000 of insurance premiums, but excluding applicable late charges and default interest. We applied a portion of the security deposits under the Kings Garden Leases, totaling approximately $2.3 million, as payment for these amounts, as well as applicable late charges and default interest through July 13, 2022. As of August 4, 2022, we had not received any additional payments from Kings Garden under any of the Kings Garden Leases, and have approximately $373,000 remaining of security deposits under the Kings Garden Leases.

178.    In direct response to this news, IIPR's stock price fell by 4%, from a close of $98.40 on August 4, 2022, to an August 5, 2022 closing price of $94.41, damaging investors.

## VII.   PLAINTIFFS' CLASS ACTION ALLEGATIONS

179.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired IIPR common stock publicly traded on the NYSE during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of IIPR, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

180.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, IIPR securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands, of members in the proposed Class.

181.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

182.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class

and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

183.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of IIPR;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused IIPR to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of IIPR securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

184.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

185.   Plaintiffs will establish transaction causation, in part, based upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- IIPR securities met the requirements for listing, and were listed and actively traded on the NYSE, an efficient market;

- As a public issuer, IIPR filed public reports;

- IIPR regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as

communications with the financial press and other similar reporting services;

- IIPR's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- IIPR was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

186.    Based on the foregoing, the market for IIPR securities promptly digested current information regarding IIPR from all publicly available sources and reflected such information in the prices of the common units, and Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

187.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## VIII.  COUNTS

### COUNT I

### For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Against All Defendants

188.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

189.   This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

190.   During the Class Period, in violation of Rule 10b-5(b), Defendants, individually and in concert, disseminated or approved the false statements specified above, that they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

191.   Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of IIPR were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These

defendants by virtue of their receipt of information reflecting the true facts of IIPR, their control over, and/or receipt and/or modification of IIPR's allegedly materially misleading statements, and/or their associations with IIPR which made them privy to confidential proprietary information concerning IIPR, participated in the fraudulent scheme alleged herein.

192.    The Individual Defendants, senior executives and/or directors of IIPR, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Innovative Industrial Properties personnel to members of the investing public, including Plaintiffs and the Class.

193.    As a result of the foregoing, the market price of IIPR securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of IIPR securities during the Class Period in purchasing IIPR securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

194.    Had Plaintiffs and the other members of the Class been aware that the market price of IIPR securities had been artificially and falsely inflated by

Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased IIPR securities at the artificially inflated prices that they did, or at all.

195.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

196.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of IIPR securities during the Class Period.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

197.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

198.    During the Class Period, the Individual Defendants participated in the operation and management of IIPR, and conducted and participated, directly and indirectly, in the conduct of IIPR's business affairs. Because of their senior positions, they knew the adverse non-public information about IIPR's misstatement of revenue and profit and false financial statements.

199.    As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to IIPR's financial

condition and results of operations, and to correct promptly any public statements issued by IIPR which had become materially false or misleading.

200.   Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which IIPR disseminated in the marketplace during the Class Period concerning IIPR's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause IIPR to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of IIPR within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of IIPR securities.

201.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by IIPR.

## IX.   PRAYER FOR RELIEF

WHEREFORE, plaintiffs, on behalf of themselves and the Class, pray for judgment and relief as follows:

(a)    declaring this action to be a proper class action, designating Lead Plaintiff and Named Plaintiff as class representatives under Rule 23 of the

Federal Rules of Civil Procedure and designating plaintiffs' counsel as Lead Counsel;

(b)    awarding damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)    awarding plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    awarding plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## X.    JURY TRIAL DEMANDED

202.    Plaintiffs demand a trial by jury.

Dated: October 19, 2023                    **THE ROSEN LAW FIRM, P.A**

/s/ *Gonen Haklay*
Jacob A. Goldberg
Gonen Haklay
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Tel: (215) 600-2817
Fax: (973) 833-0399
Email: ghaklay@rosenlegal.com
          jgoldberg@rosenlegal.com

Laurence M. Rosen, Esq.
One Gateway Center, Suite 2600
Newark, NJ 07102
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

***Counsel for Plaintiffs and the Class***

84