<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MICHAEL V. MALLOZZI,<br>*Individually and on behalf of all others similarly<br>situated, et al.*,<br><br>            Plaintiffs,<br><br>      v.<br><br>INNOVATIVE INDUSTRIAL PROPERTIES,<br>INC., PAUL SMITHERS, CATHERINE<br>HASTINGS, and ANDY BUI,<br><br>            Defendants. | No. 22cv2359 (EP) (JRA)<br><br>**OPINION** |

**PADIN, District Judge.**

Defendant Innovative Industrial Properties, Inc. ("IIPR"), a publicly traded real estate investment trust ("REIT") focused on the cannabis industry, was defrauded by one of its tenants Michael King ("King"). This securities class action arises out of IIPR's and its executives' ("Individual Defendants")[1] conduct before and after the release of a negative report about IIPR and King. Plaintiffs are individuals who purchased or otherwise acquired IIPR securities during the relevant period. *See* D.E. 57 ("Second Amended Complaint" or "SAC").

Defendants move to dismiss the SAC under Fed. R. Civ. P. 12(b)(6). D.E. 60 ("Motion" or "Mot."); 60-1 ("Br."). The Court decides the motion without oral argument. *See* Fed. R. Civ. P. 78(b); L.Civ.R.78(b). For the reasons set forth below, the Court will **GRANT** Defendants' Motion and will **DISMISS** the SAC *with prejudice*.

---

[1] The Individual Defendants are Paul Smithers ("Smithers"), Alan D. Gold ("Gold"), Catherine Hastings ("Hastings"), and Benjamin C. Regin ("Regin").

# I.    BACKGROUND[2]

## A.  The Parties, Kings Garden, and the Properties

The named Plaintiffs filed this federal securities class action on behalf of a class consisting of all persons or entities, besides Defendants, who purchased or otherwise acquired IIPR securities between August 7, 2020 and August 4, 2022 ("Class Period").  SAC ¶ 1.

Defendant IIPR is an internally-managed REIT focused on the "acquisition, ownership, and management of . . . industrial properties [that are] leased to experienced, state-licensed tenants for their regulated state-licensed cannabis facilities."  *Id.* ¶ 23.  IIPR acquires these properties and leases them back to tenants "under long-term, triple-net lease agreements, where the tenant is responsible for all aspects of and costs related to the property and its operation during the lease term[.]"  *Id.* ¶¶ 35-36.  IIPR's taxable income derives from rent it collects from tenants.  *Id.* ¶ 37.

The Individual Defendants are various IIPR executives.  Defendant Smithers "co-founded IIPR" and has served as "Chief Executive Officer ("CEO"), President, and a Director since IIPR's founding."  *Id.* ¶ 24.  Defendant Gold, another co-founder, served as the Executive Chairman of IIPR's Board of Directors.  *Id.* ¶ 26.  Defendant Hastings was IIPR's Chief Financial Officer ("CFO") at all relevant times, and served as IIPR's Treasurer since January 2017, and as Chief Accounting Officer ("CAO") from January 2017 through January 2021.  *Id.* ¶ 25.  Defendant Regin "has served as IIPR's Vice President of Investments since January 2020, and before that as IIPR's Director of Finance & Investments since 2017."  *Id.* ¶ 27.

Non-party Kings Garden was founded in 2015 by its Founder, Chairman, and CEO Michael King.  *Id.* ¶ 49.  In 2019, Kings Garden was licensed to cultivate and distribute cannabis in

---

[2] The facts in this section derive from the Second Amended Complaint's well-pled factual allegations, which the Court presumes to be true for purposes of resolving this Motion.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

California. *Id.* Beginning in 2019, IIPR bought six Kings Garden cannabis facilities in California and leased those properties back to Kings Garden on triple-net leases. *Id.* ¶ 50. Kings Garden became IIPR's third largest tenant after the purchases, and during the second quarter of 2019, "Kings Garden accounted for 10% of IIPR's ren[t]al revenue." *Id.* ¶ 52.

"In mid-2021, Kings Garden began construction on multiple additional facilities" (the "Properties"). Br. at 8 (citing Ex. 2 to SAC ¶ 25). Pursuant to two of the leases between IIPR and Kings Garden, IIPR had to reimburse Kings Garden for qualified improvements.[3] SAC ¶ 80. Kings Garden sought reimbursement through submission of "Draw Requests." *Id.* Between July 29, 2021 and June 1, 2022, Kings Garden submitted five Draw Requests for the San Bernardino Project, four of which were approved and paid for by IIPR. *Id.* ¶ 82. Between September 3, 2021 and June 1, 2022, Kings Garden submitted six Draw Requests for the 19th Street Property, five of which were approved and paid for by IIPR. *Id.* ¶ 83. IIPR paid these Draw Requests from mid-2021 until June 2022. *Id.* ¶ 87.

### B. The Blue Orca Report and Defendants' Response

On April 14, 2022, "before the market opened," Blue Orca Capital[4] ("Blue Orca") released a report (the "Blue Orca Report") detailing how Kings Garden's CEO, King, "had been credibly accused of fraud and theft and was a defendant in several different cases material to his ownership of Kings Garden." *Id.* ¶ 2. That information was allegedly available from early 2019, before IIPR contracted with Kings Garden. *Id.* The Blue Orca Report stated that "historical transactions suggest that the Kings Garden properties are worth substantially less than IIPR carries them on its balance sheet[.]" Ex. 1 to SAC at 17. Following the release of the Blue Orca Report, IIPR's stock

---

[3] The improvements related to the San Bernardino Project and 19th Street Property properties. SAC ¶ 80.

[4] A stock market short seller. *Id.* ¶ 2.

fell by 7.5%, from $183.44 at the close of trading on April 13, 2022 to $169.68 at the close of trading on April 14, 2022. SAC ¶ 4. In the afternoon of April 14, 2022, IIPR released a statement dismissing the Blue Orca Report, stating it contained "false and misleading statements" and "disinformation" about IIPR, that the author "fails to have any comprehension" about IIPR's business, and that the report warranted no further response from IIPR. *Id.* ¶ 5 (internal marks omitted).

A few weeks later during IIPR's May 5, 2022 earnings conference call, IIPR "[d]oubl[ed] down." *Id.* ¶ 6. Defendant Gold "touted the reputations of Michael King and Kings Garden, designating Kings Garden a 'high-quality producer' that 'will continue to effectively adapt to the changing landscape in California.'" *Id.* Defendant Regin also touted Kings Garden's May 2020 dividend payment, which came on the heels of IIPR's $44.5 million investment into purchasing and leasing back Kings Garden facilities. *Id.* ¶ 7. Defendant Regin characterized this dividend as "highly unusual among any prominent brand in the industry," but stated it "demonstrates [IIPR's] belief in the long-term prospects in the business." *Id.* (internal marks omitted).

The scope of Kings Garden's fraud soon came to light. IIPR paid approximately $48.5 million in Draw Requests. *Id.* ¶ 90. Kings Garden submitted six Draw Requests for the 19th Street Property between September 3, 2021 and June 1, 2022, totaling approximately $26.9 million. *Id.* ¶ 83. IIPR approved and paid for all but the sixth Draw Request before the Blue Orca Report. *Id.* When Defendants looked at the sixth Draw Request for the 19th Street Property, submitted on June 1, 2022, "they noticed the numbers did not match." *Id.* ¶ 91. Prior to this inspection, "Defendants neither monitored Kings Garden nor scrutinized nor verified draw requests[.]" *Id.* ¶ 87. Only sometime after June 16, 2022 did "Defendants perform a 'close inspection' of the very first draw request, submitted on June 29, 2021, and concluded it was a forgery simply by looking at it." *Id.*

IIPR's Construction Team—responsible for scrutinizing and verifying Draw Requests—then contacted the contractors who appeared on invoices for the 19th Street Property and the San Bernardino Project, who reported that "there were many forged invoices, documents, and signatures, and in some case[s] the contractors had not actually performed work" at the properties. *Id.* ¶¶ 80, 92. The Construction Team visited the facilities and saw "for themselves that the work Kings Garden claimed it had completed did not match the invoices received" and that Kings Garden stole millions of dollars "through false and forged Draw Requests and invoices." *Id.* ¶ 94. After this discovery, Defendants sifted through Kings Garden's financial records since November 2019 and found "well over $15 million leaving' Kings Garden's accounts in 2021 and 2022[.]" *Id.* ¶ 95. IIPR informed Kings Garden in June 2022 it would withhold funding, and Kings Garden responded that "it was out of money and would not be paying its July 2022 rent on the Premises." *Id.* ¶ 96 (internal marks omitted).

**C. IIPR's Pre- and Post-Blue Orca Report Conduct**

Plaintiffs' allegations of Defendants' misconduct extend beyond the Blue Orca Report's revelations and Defendants' response. Generally, Plaintiffs allege that Defendants lied about conducting adequate due diligence into King and Kings Garden, as a routine background check would have uncovered the fraud. SAC ¶¶ 12-13. They further allege that Defendants lied about monitoring Kings Garden and verifying Draw Requests when they did neither. *Id.* ¶ 14. Defendants' purported misstatements stem from three categories: (1) statements regarding IIPR's due diligence prior to contracting with Kings Garden; (2) statements regarding IIPR's continued monitoring of tenants after contracting with Kings Garden; and (3) statements of praise concerning Kings Garden's transactions or its business generally.

### 1. Due diligence statements

Plaintiffs re-allege that throughout the Class Period but prior to the Blue Orca Report, "Defendants incorporated by reference, in their entirety, the risk factors" from their annual reports filed with the SEC into their quarterly reports. *Id.* ¶ 103. The Risk Warnings contained similar language: that IIPR's management team would perform "due diligence investigations of our potential tenants, related guarantors and their properties, operations and prospects, of which there is generally little or no publicly available operating and financial information." *Id.* ¶¶ 104, 112, 117, 127, 131, 143, 149, 163. Defendants also stated that agreements for the acquisition of properties are subject to conditions such as "satisfactory completion of due diligence investigations[.]" *Id.* ¶ 105.

Plaintiffs also allege that the Individual Defendants made false statements regarding due diligence. For example, Defendant Gold stated on an August 5, 2021 earnings conference call, "we spent a lot of time with the management team, evaluating their skills and expertise" and "we utilize our existing network of growers to do background checks on these tenants, understanding where they've come from and their reputations in the specific state or just in the industry in general." *Id.* ¶ 77.

### 2. Monitoring statements

Defendants also, allegedly untruthfully, "stated in annual and quarterly statements preceding its business with Kings Garden and continuing through the Class Period that '[w]e evaluate the credit quality of our tenants and any guarantors on an ongoing basis by reviewing, where available, the publicly filed financial reports, press releases and other publicly available industry information regarding our tenants and any guarantors.'" *Id.* ¶ 43. Specifically, Defendants claimed to monitor tenants by "periodically conducting site visits and meeting with

the tenants to discuss their operations . . . ." *Id.* ¶ 134. According to IIPR, the Construction Team "regularly requested, and received, construction updates and/or site visits directly from [Kings Garden][.]" *Id.* ¶ 81.

### 3. Statements of praise

Throughout the Class Period and prior to the Blue Orca Report, Defendants also allegedly made statements that were false or misleading on various conference calls regarding IIPR's investments in Kings Garden and Kings Garden generally.

Defendant Regin made various such statements at quarterly calls. On February 25, 2021, Defendant Regin referred to Kings Garden as one of IIPR's "top tenants" and expressed that IIPR were "proud partners of Michael King and his great team and look forward to supporting them through the development and redevelopment of state-of-the-art facilities[.]" *Id.* ¶ 120. On August 5, 2021, Defendant Regin characterized Kings Garden as a "top producer in sales" with production of "40,000 pounds of cannabis flower annually," making it "the leading top-quality producer in the state." *Id.* ¶ 139. On February 24, 2022, Defendant Regin again praised Kings Garden, a "distinguished brand" and tenant partner that "represent[ed] a total commitment of about $148 million" and "consistently ranks as a top producer in sales in a state that represents the largest market in the world." *Id.* ¶ 154. Defendant Regin expressed excitement "to be working closely with Kings Garden" given their "brand reputation and operational expertise driving financial results." *Id.* On May 5, 2022, following the release of the Blue Orca Report, Defendant Regin touted Kings Garden's May 2020 dividend payment. *Id.* ¶ 7.

Defendant Gold, similarly, referring to tenants like Kings Garden on the August 2021 call, stated "we are thrilled with the quality of our tenant roster[.]" *Id.* ¶ 140. Following the release of the Blue Orca Report, Defendant Gold also touted the reputations of Michael King and Kings

Garden on a May 5, 2022 earnings conference call, characterizing Kings Garden as a "high-quality producer" that "will continue to effectively adapt to the changing landscape in California." *Id.* ¶ 6. Defendant Hastings stated "we've been proud to partner with many of our tenant[s] and amend the leases to provide for additional expansion capital at our facilities for a corresponding increase in base rent." *Id.* ¶ 140.

### 4. Stock Price Drops and IIPR Lawsuit

On July 14, 2022, after the close of market, "IIPR announced that Kings Garden had failed to pay its July 2022 rent under any of its leases." *Id.* ¶ 8. IIPR's stock price fell by 14.3%, from $111.61 at close on July 14, 2022 to $95.70 at close on July 15, 2022. *Id.* On August 4, 2022, after the close of market, IIPR filed its quarterly report with the Securities Exchange Commission ("SEC") stating that it had sued Kings Garden, Michael King, and related parties on July 25, 2022. *Id.* ¶ 9. The lawsuit alleged fraud, theft, and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). *Id.* Plaintiffs rely heavily on this civil lawsuit as the basis for Defendants' purported admissions that they did not conduct due diligence or monitoring of Kings Garden. *See generally id.*; Ex. 2 to SAC (the "IIPR Lawsuit"). For the reasons below, the Court disagrees that these pleadings are admissions. IIPR's stock price fell by 4%, from $98.40 at close on August 4, 2022 to $94.41 at close on August 5, 2022. *Id.*

## II.    PROCEDURAL HISTORY

On April 25, 2022, Plaintiff Michael V. Mallozzi filed the initial complaint on behalf of individuals who purchased or otherwise acquired IIPR securities during the Class Period. D.E. 1. On September 29, 2022, Plaintiffs Alejandro Handal and Stephen R. Forrester filed the First Amended Complaint. D.E. 34. Plaintiffs alleged violations of Section 10(b) (Count I) and 20(a) (Count II) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and

78t(a), and Securities and Exchange Commission Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Defendants moved to dismiss the First Amended Complaint. D.E. 41. The Court granted that motion and dismissed the First Amended Complaint without prejudice. D.E. 55 ("Opinion").

Plaintiffs timely filed the SAC. *See* SAC. They re-allege the same two Counts. Count I is brought against Defendants IIPR, Smithers, Hastings, Gold, and Regin. *Id.* ¶¶ 188-96. Count II is brought against only the Individual Defendants. *Id.* ¶¶ 197-201. Defendants now move to dismiss the SAC. *See* Mot. Plaintiffs oppose. D.E. 63 ("Opp'n"). Defendants reply. D.E. 64 ("Reply").

## III.    LEGAL STANDARD

When deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court accepts all well-pleaded facts as true, construes the complaint in the plaintiff's favor, and determines "whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (internal marks omitted). Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain a "'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 677-78 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

To survive a motion to dismiss, the plaintiff's claims must be facially plausible, meaning that the well-pleaded facts "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. The allegations must be "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. In deciding the motion, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents

if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

Federal Rule of Civil Procedure 9(b) "imposes a heightened pleading requirement of factual particularity with respect to allegations of fraud." *In re Rockefeller Ctr. Props. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002). A plaintiff must state the circumstances of their alleged cause of action with "sufficient particularity to place the defendant on notice of the 'precise misconduct with which [it is] charged.'" *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (quoting *Lum v. Bank of Am.*, 361 F.3d 217, 223-24 (3d Cir. 2004)). At a minimum, this requires that the plaintiff allege the "'who, what, when, where and how'" of the events at issue." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276-77 (3d Cir. 2006) (quoting *In re Rockefeller*, 311 F.3d at 217)).

Like Rule 9(b), both provisions of the Private Securities Litigation Reform Act ("PSLRA") require facts to be pled with "particularity." *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir. 1999). First, the complaint must "specify each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity." *Winer Family Trust v. Queen*, 503 F.3d 319, 326 (3d Cir. 2007). Second, the complaint must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

## IV.    ANALYSIS

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe[.]" *Santa Fe Indus., Inc.*

*v. Green*, 430 U.S. 462, 464 n.1 (1977) (quoting 15 U.S.C. § 78j).   Rule 10b-5, promulgated thereunder by the SEC, makes it unlawful for "issuers of registered securities to 'make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 260 (2024) (quoting 17 C.F.R. § 240.10b-5 (2022)).   To state a claim for relief under Section 10(b) and Rule 10b-5, a plaintiff must show: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008).

Defendants argue that the SAC fails to state a Section 10(b) claim because it (1) does not allege with particularity that the challenged statements were materially misleading and (2) Plaintiffs fail to allege facts that give rise to a strong inference of scienter.  Br. at 13.

### A.  Plaintiffs Plead Certain Material Misstatements

To prevail on their Section 10(b) claim, Plaintiffs must first "identify a false representation of material fact or omission that makes a disclosed statement materially misleading."  *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002).  A fact or omission is material "only if 'there is a substantial likelihood that it would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information' available to the investor."  *Id.* (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)).

*1.  Plaintiffs do not adequately plead falsity of the due diligence statements*

The SAC alleges, much like the First Amended Complaint, that the Risk Warning statements about due diligence were "materially false" because "Defendants recklessly ignored

material negative information that they subsequently easily found that Michael King was a fraudster and Kings Garden a Ponzi scheme by which it embezzled tens of millions of dollars from IIPR." SAC ¶ 106.  Plaintiffs argue they do not "allege the materialization of any risk" and instead that "Defendants claimed to perform robust due diligence, but did none with respect to Kings Garden." Opp'n at 12 n.6.  They ask the Court to draw an "inference" that Defendants did not do a background check based on the information available to them.  *Id.* at 13.

"[T]he PSLRA requires a complaint, which asserts a Section 10(b) claim, set forth 'each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'" *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 299 (D.N.J. 2001) (quoting 15 U.S.C. § 78u-4(b)(1)).  "These 'true facts' allegations cannot rely exclusively on hindsight, but must be sufficient to show that the challenged statements were 'actionably unsound when made.'" *Williams v. Globus Med., Inc.*, 869 F.3d 235, 244 (3d Cir. 2017) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1430 (3d Cir. 1997)).  Plaintiffs point to (1) Defendants' purported "admissions" made in the IIPR Lawsuit and (2) the purportedly available, damning information about Kings Garden and Michael King as support.  Opp'n at 11-16.

The Court is unpersuaded that Defendants' allegations in the IIPR Lawsuit are "admissions" that IIPR did not conduct any due diligence.  IIPR's acknowledgement that King "personally represented" that he had been cleared by California and "had been screened and cleared at all levels" does not constitute an admission that Defendants did not conduct due diligence.  IIPR Lawsuit ¶ 20.  In that same complaint, IIPR's subsidiary also pleaded that it relied

on California's license process before entering into a business relationship with Kings Garden, *id.* ¶ 19, and looked into Kings Garden's financial condition, *id.* ¶ 21.

Plaintiffs also cite to the following as evidence IIPR knew or should have known about the fraud: (1) Michael King's lack of a California license, SAC ¶ 60; (2) a January 2019 lawsuit filed in California state court by Swiss American Investment Corporation ("Swiss American Lawsuit"), one of Kings Garden's investors,[5] *id.* ¶¶ 62-64; (3) the "unique" dividends Kings Garden paid to its own members, *id.* ¶¶ 74, 109, 122, 156; (4) a December 2016 lawsuit alleging breach of contract filed against Michael King in Florida state court,[6] *id.* ¶ 68; (5) Michael King's felony fraud arrest in 2017, *id.* ¶ 69; (6) and Michael King's name change in 2006, *id.* ¶ 67. The Court previously explained that the Swiss American Lawsuit "was referred to non-public arbitration at a time unspecified by the FAC," Opinion at 15, and the same is true here.[7] SAC ¶ 62 n.7. Plaintiffs again fail to plead with specificity how and when IIPR could have access that information.

The Court is also unconvinced that the remaining "red flags" make the Risk Warnings misleading. Plaintiffs rely heavily on *Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*, No. 20-4737, 2021 WL 4864421 (N.D. Cal. Oct. 19, 2021). The *Bayer* court found sufficient allegations concerning due diligence efforts, but those statements were much more robust than those here. *Id.* at *3. For example, those defendants conveyed to investors "(1) they had fully informed themselves as to the significant legal and reputational risks of acquiring

---

[5] *Swiss American Inv. Corp. v. Kings Garden, LLC et al.,* No. 37-2019-00005548-CU-WM-CTL (Cal. Sup. Ct., Cnty. of San Diego), *id.* ¶ 62 n.7.

[6] *Zaslavskiy v. Michael King et al.,* 2016-033252-CA-01 (11th Judicial Cir. for Miami-Date Cnty., FL), *id.* ¶ 68 n.11.

[7] Although Plaintiffs do not argue as much in opposition, they re-allege that the lawsuit between Michael King and his brother was a red flag that indicated Defendants did not conduct due diligence. SAC ¶¶ 12, 101, 158. The Court also held that this was insufficient, as "[a]n event that happened after a Risk Warning was stated cannot retroactively demonstrate that the Risk Warning was false or misleading." Opinion at 15 (citing *NAHC*, 306 F.3d at 1330).

Monsanto. . . (2) during the due diligence process, they thoroughly evaluated the benefits and risks of Monsanto's business, including by reviewing Monsanto's internal documents . . . ."  N.D. Cal., No. 20-4737, D.E. 73 at 17.  The *Bayer* court therefore held that defendants' statements concerning their due diligence could have "give[n] a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists, *namely that Bayer had assessed Monsanto's litigation risks, and had reviewed non-public information to inform that review*."  *Bayer*, 2021 WL 4864421, at *3 (cleaned up) (emphasis added).  In *Bayer*, the case involved an allegedly affirmative misstatement regarding the extent of research conducted, not the failure to conduct any, as is alleged here.

The statements here are less authoritative and narrower in scope.  The Risk Warnings state that Defendants conduct "satisfactory completion of due diligence investigations[.]"  SAC ¶ 118.  "[W]here a defendant affirmatively characterizes management practices as 'adequate,' 'conservative,' 'cautious,' and the like, the subject is 'in play' and "the securities laws are clearly implicated if it nevertheless intentionally or recklessly omits certain facts contradicting these representations."  *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992).  Plaintiffs allege that Defendants did *no* due diligence, which would of course contradict a representation that satisfactory due diligence was conducted.  *See, e.g.*, SAC ¶¶ 59, 106, 114, 119.  Nonetheless, Kings Garden's May 2020 dividend payments, however "unique," do not indicate how Defendants' statements that it conducted due diligence were untrue.  *Id.* ¶ 74.

The remaining flags pertain to Michael King only—his name change, lack of a California license, December 2016 lawsuit, and felony fraud arrest.  Defendants note that the Risk Warnings refer to due diligence concerning potential tenants, not "concerning the executives or employees of potential tenants."  Br. at 14 n.4.  Plaintiffs ignore this point in opposition.  The Risk Warnings

also state that "[w]e may not learn all of the material information we need to know regarding these *businesses* through our investigations[.]"  Ex. A to Br. at 26 (emphasis added).  Plaintiffs may begrudge Defendants' alleged insufficient due diligence into King, the co-founder and CEO of Kings Garden.  However, this information fails to demonstrate that a statement that due diligence was conducted into the tenant "was unactionably unsound when made."  *In re Burlington*, 114 F.3d at 1430.  Accordingly, Plaintiffs again fail to plead falsity with respect to the Risk Warnings about Defendants' due diligence into its tenant.

Plaintiffs also allege that Defendant Gold's statement on the August 5, 2021 earnings call was false.  SAC ¶ 77.  Defendant Gold stated "we spent a lot of time with the management team, evaluating their skills and expertise" and that they "utilize our existing network of growers to do background checks on these tenants, understanding where they've come from and their reputations in the specific state or just in the industry in general."  *Id.*  Defendants note that Defendant Gold's statement was in response to a question about different tenants.  Br. at 17.  Plaintiffs counter that viewed in context, Defendant Gold referred to the same process he applied to Kings Garden. Opp'n at 13 n.8.  The Court disagrees and reads that statement as referring to tenants Sozo and Temescal.  As such, Plaintiffs do not adequately plead falsity with respect to Defendant Gold's statement.

### 2. *Defendants' Risk Warnings regarding conducting site visits and statement after the Blue Orca Report are misleading*

Plaintiffs also allege that Defendants' Risk Warnings regarding ongoing monitoring were false: that Defendants "evaluate the credit quality of [their] tenants and any guarantors on an ongoing basis by reviewing, where available, the publicly filed financial reports"[8] and "by

---

[8] Plaintiffs allege that IIPR did not adequately scrutinize Kings Garden records available beginning in November 2019.  *Id.* ¶ 65-66; *id.* ¶ 65 n.8.  Defendants argue that they did not have that

periodically conducting site visits and meeting with the tenants to discuss their operations. . . ." SAC ¶ 134. Kings Garden began to defraud IIPR when it submitted its first fraudulent Draw Request on July 29, 2021. SAC ¶ 136. And Defendants allegedly "did not conduct site visits or otherwise monitor Kings Garden on an ongoing basis." *Id.* ¶ 135. Defendants did not "scrutinize draw requests that were fraudulent on their face" or "conduct site visits or [] contact contractors." *Id.* With respect to Defendants' purported failure to scrutinize Draw Requests, Plaintiffs have failed to plead how a statement to monitor publicly filed financial reports was false, instead simply referring to the Draw Request as an "obvious forgery[.]" Opp'n at 19 (citing SAC ¶ 8; IIPR Lawsuit ¶ 23).

Conversely, Plaintiffs do adequately plead that Defendants' site visit statements were materially misleading. The exact language in the IIPR Lawsuit is that "[t]he Construction team also *requested, and received, construction updates and/or site visits directly from King and LaSalle*[.]" IIPR Lawsuit ¶ 29 (emphasis added). Plainly read, the foregoing "admission" indicates that Kings Garden executives provided updates on construction, rather than Defendants visiting the site. Accordingly, Plaintiffs sufficiently allege that the post-Draw Requests Risk Warnings regarding construction site monitoring were materially misleading. Nonetheless, as discussed below, Plaintiffs fail to adequately plead scienter.

Plaintiffs also allege that Defendants' statement following the release of the Blue Orca Report was materially false and misleading, particularly that "any IIPR reimbursements relate only

---

information until later. Br. at 19 (citing Ex. 3 to SAC at 3 ("*Ex Parte* Application")). Defendants' citation does not state exactly what it argues. Either way, Plaintiffs fail to allege with particularity which statement is false or misleading because of the availability of the financial records, instead only broadly stating "IIPR failed to perform the due diligence it told investors it had performed." SAC ¶ 66. Defendants seem to recognize this oversight by relying on these two paragraphs from the SAC in the relevant section of their brief. *See* Opp'n at 18 (citing SAC ¶¶ 65-66).

to verified, qualified improvements to the buildings." SAC ¶¶ 160-61.  Plaintiffs allege Defendants did not monitor the Draw Requests or conduct site visits, and as such, no improvements were verified.  *Id.* ¶ 161.  They rely on a supposed admission in the IIPR Lawsuit that Defendants did not monitor or look closely at the Draw Requests, and instead only "relied on Kings Garden to provide real and truthful draw requests and supporting documentation."  *Id.* (citing IIPR Lawsuit ¶ 86).  This statement alone, admission or not, does not adequately plead that the foregoing statement is false or misleading.

Plaintiffs' primary argument for falsity is the temporal proximity between Defendants' assurances and the damning Blue Orca Report.  Opp'n at 20 (citing *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 686 (3d Cir. 2023)).  In *City of Warren*, the amended complaint alleged that an analysis published by Prudential created an inference that a reserve charge of $208 million meant the company's Individual Life[9] mortality experience was not "slightly negative," as stated at Prudential's Investor Day conference prior to the corrective action. 70 F.4th at 690.  Prudential's own sensitivity analysis contravening its numbers, a confidential internal statement that Prudential's reserves would need to be increased as a result of negative mortality experience, plus the temporal proximity to the corrective disclosures, sufficed to plead a materially misleading statement.  *Id.* at 690-91.

Here, while less robust, the information meets the heightened pleading standards.  Without needing to rely on statements from the IIPR Lawsuit, Plaintiffs plead that Defendants had access to fraudulent documentation at the time they stated reimbursements relate "only to verified, qualified improvements."  SAC ¶ 161.  This statement was made shortly after the release of the

---

[9] Individual Life was Prudential's business segment, "which offers terms, variable, and universal life insurance policies."  *Id.* at 677.

Blue Orca Report, and was functionally corrected by Defendants when they acknowledged issues with Kings Garden's construction projects. *Id.* ¶ 177.  Although this teeters close to the line of a fraud-by-hindsight pleading, "later developments may allow a reasonable inference that prior statements were untrue or misleading when made," particularly for purposes of allegations of falsity. *City of Warren,* 70 F.4th at 693.[10]  At least at the motion to dismiss stage, Plaintiffs have adequately alleged that this statement was materially misleading, though similarly fails to plead scienter.

### 3.  Certain statements of praise are adequately pleaded as misleading

Plaintiffs allege that various statements made by the Individual Defendants were false. Defendants characterize the statements as forward-looking and protected by statutory safe harbor, Br. at 21, or mere puffery, *id.* at 23.

The PSLRA provides a safe harbor provision for forward-looking statements so long as those statements are "'accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement.'" *EP MedSystems, Inc. v. EchoCath, Inc.*, 235 F3d 865, 873 (3d Cir. 2000) (quoting 15 U.S.C. § 78u-5(c)(1)(A)(i) (West Supp. 2000)).  Where a forward-looking statement is accompanied by meaningful cautionary language, the alleged false or misleading statement is rendered immaterial as a matter of law.  *Id.* Cautionary language is sufficient if it is "extensive," "specific," and "directly related to the alleged misrepresentation."  *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 243 n.3 (3d Cir. 2004) (cleaned up).

---

[10] Of relevance later, the Third Circuit also noted that "[t]he fraud-by-hindsight prohibition has its greatest potency in the context of otherwise deficient allegations of *scienter*[.]"  *Id.* at 693.

Defendants argue that a sampling of statements was accompanied by the appropriate cautionary language. Br. at 21. Plaintiffs do not substantively engage with this argument, and instead argue that the relevant excerpts they allege to be false are not forward-looking. Opp'n at 24-25. To the extent any of the statements cited by Defendants do contain forward-looking statements, therefore, the Court therefore finds they are not false and misleading. *See, e.g., Sang Geoul Lee v. Won Il Park*, 720 Fed. App'x 663, 666 (3d Cir. 2017) (failure to respond to an argument acts as a concession of that argument); *Johnson v. East Orange VA Med. Ctr.*, No. 22-721, 2023 WL 2770423, at *5 (D.N.J. Apr. 4, 2023) (same).

Defendants characterize several other statements made by the Individual Defendants during earning calls as non-actionable puffery. Plaintiffs counter that the below statements are actionable because they "reasonably impl[y] untrue facts and omit[] appropriate qualifying language." Opp'n at 21 (quoting *City of Warren*, 70 F.4th at 686, further citing *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015)).

- **February 25, 2021**: Defendant Regin referred to Kings Garden as one of IIPR's "top tenants" and expressed that IIPR were "proud partners of Michael King and his great team and look forward to supporting them through the development and redevelopment of state-of-the-art facilities[.]" *Id.* ¶ 120.

- **August 5, 2021**: Defendant Regin characterized Kings Garden as a "top producer in sales" with production of "40,000 pounds of cannabis flower annually," making it "the leading top-quality producer in the state." *Id.* ¶ 139. Defendant Gold, similarly, referring to tenants like Kings Garden on the call, stated "we are thrilled with the quality of our tenant roster[.]" *Id.* ¶ 140.

- **February 24, 2022**: Defendant Regin again praised Kings Garden as a "distinguished brand" and tenant partner that "represent[ed] a total commitment of about $148 million" and "consistently ranks as a top producer in sales in a state that represents the largest market in the world." *Id.* ¶ 154.

- **May 5, 2022**: Following the release of the Blue Orca Report, Defendant Regin touted Kings Garden's May 2020 dividend payment as "highly unusual among any prominent brand in the industry" and claiming it "demonstrates their belief in the long-term prospects in the business." *Id.* ¶ 7.

19

These are false, Plaintiffs allege, because Defendants "omit[ted] that Michael King lied about federal cannabis licensure, that he had a felony arrest . . . and that King had been sued for theft in a civil case." Opp'n at 22. For the same reasons underlying the Court's reasoning regarding the due diligence Risk Warnings, the King-specific information does not render these statements false. Neither does Plaintiffs' reliance on the Swiss American Lawsuit. *Id.*

As for the remaining information, the submission of false Draw Requests, *id.*, and Kings Garden's financial statements showing "millions of dollars disappearing from its accounts," *id.* at 23 (citing SAC ¶¶ 12, 48, 92), Plaintiffs argue that a "reasonable investor would understand that IIPR performed due diligence and monitored Kings Garden, and that this work informed their opinions. But Defendants did none of those things." Opp'n at 22. For clarity's sake, the SAC only specifically alleges the February 24, 2022 and May 5, 2022 statements were false, in part, due to the availability of this information. The February 24, 2022 statements were allegedly false because "Kings Garden had submitted multiple false draw requests, and [] Kings Garden was stealing millions of dollars from IIPR by siphoning off money that IIPR paid for improvements and construction that had not been done," SAC ¶ 155, while the May 5, 2022 statements were allegedly false because the dividend was touted "nine months after IIPR had paid to Kings Garden the first of several multi-million down draws, ostensibly for improving Kings Garden's facilities, which was fraudulent on its face." *Id.* ¶ 7. The Court, therefore, will only analyze the sufficiency of falsity pleadings based on this information as to those specific statements.

The Court recognizes the challenge in pleading an omission-based falsity via a failure to unearth fraudulent activity, particularly as Plaintiffs are still required to plead "true facts" to show the statements made were misleading, typically in the form of "contemporaneous sources" rather than "conjecture based on subsequent events." *Williams*, 869 F.3d at 244. Rather, under the

omission-based opinion theory Plaintiffs proffer, they must plead "facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare*, 575 U.S. at 194.

The Court is satisfied that Plaintiffs plead the availability of fraudulent Draw Requests and financial statements through contemporaneous sources. Unlike with the due diligence Risk Warnings, the false Draw Requests—and, in turn, false financial statements—were available to Defendants at the time of these statements. Plaintiffs plead that the total of forged invoices submitted by Kings Garden was "millions of dollars" and that a review of Kings Garden's financial records found "well over $15 million leaving" their accounts in 2021 and 2022. SAC ¶¶ 92, 95. As such, Plaintiffs adequately plead that the February 24, 2022 and May 5, 2022 statements were misleading. Nonetheless, for the reasons articulated below, Plaintiffs fail to state a Section 10(b) claim as they do not adequately plead scienter.

### B. Plaintiffs Fail to Adequately Plead Scienter

The second element of a Section 10(b) claim requires a plaintiff to plead that a defendant acted with scienter, or a culpable, fraudulent mind. A complaint adequately alleges scienter under the PSLRA "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). In the Third Circuit, the alleged facts must give rise to a "strong inference of either reckless or conscious behavior." *Inst'l Invs. Grp. v. Avaya Inc.*, 564 F.3d 242, 267 (3d Cir. 2009) (cleaned up). For a statement to be reckless, it must "'involv[e] not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers

21

that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 535 (3d Cir. 1999), (quoting *McLean v. Alexander*, 599 F.2d 1190, 1997 (3d Cir. 1979), *abrogated on other grounds recognized by City of Warren*, 70 F.4th at 680 (citing *Tellabs*, 551 U.S. at 323-34).

Plaintiffs must plead with particularity facts giving rise to a "strong inference" of scienter, requiring courts to weigh "plausible nonculpable explanations for the defendant's conduct" against the "inferences favoring the plaintiff." *Avaya*, 564 F.3d at 267 (internal marks and citation omitted). "The pertinent question is 'whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" *Id.* at 267-28 (quoting *Tellabs*, 551 U.S. at 323).[11] For the Section 10(b) claim to survive, Plaintiffs must plead a strong inference of scienter as to the Individual Defendants. *In re Hertz Glob. Holdings Inc.,* 905 F.3d 106, 121 n.6 (3d Cir. 2018) ("We have neither accepted nor rejected [the doctrine of corporate scienter] and decline to do so here[.]"); *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 246 (3d Cir. 2013) (noting the same, and describing the doctrine as a plaintiff's ability to "plead an inference of scienter against a corporate defendant without raising the same inferences required to attribute scienter to an individual defendant.").

Plaintiffs argue that *Avaya* is directly on point. Opp'n at 28. *Avaya* established that where misrepresentations involved "'core matters' of central importance" to a company and its executives, an inference of scienter may be appropriate. *Avaya*, 564 F.3d at 268. The Court tends

---

[11] Defendants make much out of the lack of factual allegations as to motive or opportunity to commit fraud, Br. at 27-29, but "evidence of motive and opportunity is no longer an independent means of establishing scienter absent evidence of facts from which to infer defendants' knowing deceit or recklessness." *In re Anadigics, Inc., Sec. Litig*., No. 08-5572, 2011 WL 4594845, at *32 (D.N.J. Sept. 30, 2011). Motive and opportunity may "bolster[] the "required state of mind" of "either reckless or conscious" behavior. *Id.* at *14 (cleaned up).

to agree with Plaintiffs that Kings Garden was "important" to IIPR.  However, "*Avaya* has limited precedential value in this case because in *Avaya* [the Third Circuit] cited approvingly to an opinion" reciting that "'corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter-at least absent some additional allegations of specific information conveyed to management and related to fraud.'"  *Rahman*, 736 F.3d at 246-47 (quoting *Metzler Investment GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1068 (9th Cir. 2008)).  Moreover, the individuals in *Avaya* who made the subject denials "were responding to pointed inquiries from analysts during multiple conference calls that addressed pricing problems. No such circumstances are present here." *Id.* at 246.

Nonetheless, the Court must conduct a holistic review of recklessness and determine whether guilty inferences are at least as likely as competing innocent inferences.  *Avaya*, 564 F.3d at 267.  Defendants dispute the adequacy of Plaintiffs' pleadings, chiefly that Plaintiffs fail to particularize facts regarding the Individual Defendants' scienter, and that the SAC holistically fails to plead recklessness.  Br. at 27-29.  The SAC's only allegations as to Defendant Smithers pertain to his executive position[12] at IIPR and the fact that he signed IIPR's SEC filings.  SAC ¶¶ 24, 29-30.  Plaintiffs appear to abandon any argument to the contrary in opposition, and therefore fail to plead scienter as to Defendant Smithers.

As to Defendant Gold, Plaintiffs allege that he was familiar with the background check process for tenants and defended Kings Garden after the Blue Orca Report came out.  *Id.* ¶¶ 77, 79.  Plaintiffs allege that Defendant Hastings managed the Construction Team, responsible for verifying Draw Requests.  *Id.* ¶ 80.  Defendant Regin was allegedly familiar enough with Kings Garden's business to note the uniqueness of its May 2020 dividend and to repeatedly describe, and

---

[12] Plaintiffs do the same for the other Individual Defendants.

praise, its business. *See, e.g., id.* ¶ ¶ 7, 75-76, 78-79, 107. Beyond this, Plaintiffs do not allege with particularity how the Individual Defendants could or should have known IIPR was being defrauded at the time. Plaintiffs point to the allegations that but-for a lack of diligence and monitoring, the fraud would easily have been unearthed and therefore supports a finding of recklessness. *See generally* SAC. This is further bolstered, Plaintiffs aver, by the emphatic denial of the Blue Orca Report and later investigation revealing the depths of the fraud. *Id.* ¶¶ 161, 177. Defendants' innocent explanation is that IIPR did not discover Kings Garden's fraud until June 2022 and took appropriate action after doing so. Br. at 37.

Plaintiffs' allegations are not meaningfully different from those in the First Amended Complaint. Primarily, they allege that adverse information about Michael King discoverable through due diligence was available; obviously forged Draw Requests and financial information were provided to Defendants during the Class Period; and Defendants failed to monitor the construction sites or financial information. *See generally* SAC. Defendants' failure to tap into this obviously available information, therefore, rendered statements praising Kings Garden, or assuring investors that the financial information was verified, reckless.

The Court finds this falls short of an inference of scienter. *See Wu v. GSX Techedu Inc.*, No. 20-4457, 2023 WL 2207422, at *14 (D.N.J. Feb. 24, 2023) ("There are no particularized facts showing how the Individual Defendants knew or should have known that these financial results, or the Individual Defendants' direct denials of the short-seller reports, were false."). The exposure of Kings Garden's fraud surely impacted investors; however, the inference drawn from the Second Amended Complaint as a whole was not that Defendants recklessly lied about their faith in Kings Garden or that they monitored it—a misrepresentation that would suggest complicity in their own theft. Rather, the inference sounds closer to corporate mismanagement "and, at most, negligent

misstatements." *In re Hertz*, 905 F.3d at 121.  Accordingly, Plaintiffs fail to state a Section 10(b) claim and the Court will **DISMISS** Count I *with prejudice*.  As Plaintiffs have amended this Complaint twice, and the Court finds that the facts do not give rise to a strong inference that Defendants acted with scienter, further amendments would be futile.  *Winer Family Trust*, 503 F.3d at 334.

### C.  Plaintiffs Fail to Plead a Violation of Section 20(a)

Defendants again argue that because Plaintiffs fail to state a claim under Section 10(b), the Section 20(a) claim must fail.  Br. at 38.  For the same reasons expressed in its prior Opinion, the Court agrees.  Section 20(a) of the Exchange Act provides for liability for controlling persons.  15 U.S.C. § 78t.  "'[E]very person who, directly or indirectly, controls any person liable [for securities fraud] shall also be liable jointly and severally with and to same extent as such controlled person.'"  *In re Synchronoss Sec. Litig.*, 705 F. Supp. 2d 367, 404 (D.N.J. 2010) (quoting 15 U.S.C. § 78t(a)).  For liability to attach, "plaintiffs must prove not only that one person controlled another person, but also that the 'controlled person' is liable under the [Exchange] Act."  *Turfnofsky v. electroCore, Inc.*, No. 19-18400, 2021 WL 3579057, at *49-50 (D.N.J. Aug. 13, 2021) (quoting *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 484 (3d Cir. 2013)).  But a Section 20(a) claim cannot survive without an underlying violation of the Exchange Act.  *See Shapiro*, 964 F.2d at 279.

Here, Plaintiffs allege that the Individual Defendants are all controlling persons.  SAC ¶ 200.  Because Plaintiffs have not adequately alleged an underlying securities violation, the Section

20(a) claim against the Individual Defendants fails.  Accordingly, the Court will **DISMISS** Count II *with prejudice*, given the Court will dismiss the Section 10(b) claim with prejudice as well.

## V.    CONCLUSION

For the above reasons, the Court will **GRANT** Defendants' Motion, D.E. 60.  An appropriate Order follows.


Dated: September 25, 2024

Evelyn Padin, U.S.D.J.