PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 24-2829

ALEJANDRO HANDAL, Individually and on behalf of all other persons similarly situated; MICHAEL V. MALLOZZI, Individually and on behalf of all other persons similarly situated; STEPHEN R. FORRESTER, Individually and on behalf of all other persons similarly situated

v.

INNOVATIVE INDUSTRIAL PROPERTIES, INC.; PAUL SMITHERS; CATHERINE HASTINGS; ALAN D. GOLD; BENJAMIN C. REGIN

Alejandro Handal; Stephen R. Forrester,
Appellants

On Appeal from the United States District Court
for the District of New Jersey
D.C. Civil No. 2:22-cv-02359
District Judge: Honorable Evelyn Padin

Argued: June 17, 2025

Before: CHAGARES, *Chief Judge,* MONTGOMERY-REEVES and McKEE, *Circuit Judges*

(Filed: October 15, 2025)

Michael A. Cohen
Rosen Law Firm
275 Madison Avenue
40th Floor
New York, NY 10016

Jacob A. Goldberg **[ARGUED]**
Gonen Haklay
Rosen Law Firm
101 Greenwood Avenue
Suite 440
Jenkintown, PA 19046

*Counsel for Appellants Alejandro Handal and Stephen R. Forrester*

Andrew A. Howell
Stacy R. Obenhaus **[ARGUED]**
Foley & Lardner
2021 McKinney Avenue
Suite 1600
Dallas, TX 75201

*Counsel for Appellees Innovative Industrial Properties, Inc., Paul Smithers, Catherine Hastings, Alan D. Gold, and Benjamin C. Regin*

---

OPINION OF THE COURT

---

MONTGOMERY-REEVES, *Circuit Judge.*

In this case, Innovative Industrial Properties, Inc. ("Innovative"), a real estate investment trust ("REIT"), was defrauded of millions of dollars by one of its tenants, a company called Kings Garden. After discovering the fraud, Innovative sued Kings Garden, alleging that Kings Garden bore hallmarks of a Ponzi scheme.

As often happens after an announcement of corporate trauma, a group of stockholders brought a putative class action suit alleging violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. Their Second Amended Complaint (the "Complaint") asserts that Kings Garden's fraud and Innovative's failure to stop it rendered certain *statements* false or misleading. And when the market discovered the statements were false or misleading, Innovative's stock price declined, injuring the company's stockholders.

But corporate trauma alone does not constitute securities fraud, and neither does ordinary negligence. Further, "the antifraud provisions of federal securities law are not a general charter of shareholder protection." *Beck v. Dobrowski*, 559 F.3d 680, 683 (7th Cir. 2009) (Posner, J.). "[R]ather, [Section 10(b)] trains on conduct involving manipulation or deception" in connection with the purchase or sale of a security. *United States v. O'Hagan*, 521 U.S. 642, 655 (1997). To plead claims under Section 10(b) and Rule 10b-5, a plaintiff

must identify a fraudulent scheme perpetrated by a defendant or statements that were false or misleading by omission. Because the stockholders here chose the latter course, they had to identify specific statements and plead with particularity that those statements were false or misleading at the time they were made. *See* 15 U.S.C. § 78u-4(b)(1). Then, for any statement so pleaded, the stockholders had to "state with particularity facts giving rise to a strong inference that" the statement's maker acted with scienter. *Id.* § 78u-4(b)(2)(A).

The stockholders did not meet those conditions. Many of the challenged statements are opinions—and although those opinions plausibly were ill-advised or wrong, such qualities do not make them fraudulent under the securities laws. Other statements simply are not false or misleading on the facts alleged. And while one statement is plausibly alleged to be false or misleading, the facts pleaded do not yield a strong inference that the statement's maker uttered it with scienter. As such, the underlying corporate conduct and injury could not sustain any claim under Section 10(b) and Rule 10b-5, and the District Court properly dismissed the Complaint with prejudice. Accordingly, we will affirm the District Court's judgment.

## I. BACKGROUND

The facts outlined below derive from the Complaint and the documents attached to and incorporated into the Complaint.

### A. Innovative's Business and Its Tenant's Fraud

As a REIT, Innovative's business is fairly simple. It purchases real estate from cannabis companies and leases that real estate back to them. Innovative's leases are "triple-net,"

meaning "the tenant is responsible for all aspects of and costs related to the property . . . during the lease term," including repairs, taxes, and insurance. Appendix 273 (hereinafter "App._").

Sometimes, however, Innovative agrees to finance tenants' capital improvements, like HVAC systems, grow lighting, and electrical upgrades. These essentially are reimbursement arrangements, in which Innovative allocates a defined amount of money for a project and a tenant seeks reimbursement from Innovative for its qualifying expenses. To obtain reimbursement, a tenant must submit a "draw request," which consists of a standard form plus accompanying documents and certifications from any contractor or architect substantiating the work performed. A team reporting to Innovative's Chief Financial Officer then reviews the form and supporting documentation and decides whether to disburse funds from the allocated pool.

Kings Garden, a cannabis-cultivation company founded by Michael King ("King") and based in California, became an Innovative tenant in 2019. In 2020 and 2021, Kings Garden entered a reimbursement arrangement with Innovative. Innovative agreed to finance capital improvements at two of Kings Garden's six properties—one in San Bernardino, California, and one in Palm Springs, California—allocating $25 million and $51.4 million, respectively, to those projects. From 2021 through 2022, Kings Garden submitted several draw requests to Innovative, and based on those requests, Innovative paid Kings Garden more than $48 million.

On June 1, 2022, Kings Garden sent Innovative a draw request for the Palm Springs project. This draw request sparked Innovative's suspicion that something was amiss

because the amount of money Kings Garden requested did not match the values in Kings Garden's supporting documentation, and the form was not signed as required. Innovative called the Kings Garden executive who submitted the draw request, and the executive admitted that he—not the general contractor, as required—had prepared the request.

That admission prompted Innovative to investigate. First, Innovative reviewed Kings Garden's previous draw requests and found many irregularities, like inconsistent fonts and metadata. Then, Innovative received financial statements from King that appeared to Innovative to show millions of dollars flowing from Kings Garden to "unknown individuals." App. 173. Next, Innovative contacted the contractors who supposedly had performed work for which Kings Garden was reimbursed. And finally, Innovative visited the Palm Springs and San Bernardino properties. Innovative's investigation revealed that some purported contactors had performed no work, and in other instances, the value of work received did not match the amounts reimbursed.

Innovative told Kings Garden that it had identified irregularities in Kings Garden's draw requests and informed Kings Garden that reimbursements would not be forthcoming until those irregularities were resolved. Kings Garden responded that "it was out of money and would not be paying its July 2022 rent." App. 89.

When Kings Garden followed through on its promise not to pay rent, Innovative sued Kings Garden and certain of its executives in California state court, seeking injunctive and other equitable relief. Innovative levied many of the allegations set forth above and claimed Kings Garden exhibited "red-flags of a Madoff-style Ponzi scheme."

App. 222. Innovative also claimed to have discovered during its investigation that King had "changed his name from Michael Buyanovsky," App. 228, and had "a history of over 32 lawsuits, felony charges, and alleged fraudulent misconduct," App. 216. In Innovative's words, the facts "evidence[d] a business conducting a fraudulent criminal enterprise." App. 216. Innovative disclosed its suit to the market in a Form 10-Q filed on August 4, 2022.[1]

### B. The Allegedly False or Misleading Statements

Three Innovative stockholders—Alejandro Handal, Stephen R. Forrester (together, "Appellants") and Michael V. Mallozzi[2]—sued Innovative's Chief Executive Officer, Paul Smithers; Chief Financial Officer, Catherine Hastings; Executive Chairman, Alan D. Gold; and Vice President of Investments, Benjamin C. Regin (collectively, the "Individual Defendants"), plus Innovative itself (with the Individual Defendants, "Appellees") for violations of Section 10(b) (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5). Appellants additionally allege the Individual Defendants are liable as control persons under Section 20(a) of the Exchange

---

[1] Innovative initially sued Kings Garden and related entities on July 25, 2022, alleging only breach of contract and seeking declaratory and injunctive relief. On August 2, 2022, Innovative amended its complaint to include the individual Kings Garden executives and to raise claims related to Kings Garden's alleged reimbursement fraud. The August 4, 2022 Form 10-Q disclosed the suit as amended.

[2] Mallozzi is not named in the Notice of Appeal and is not a participant in this appeal.

Act (15 U.S.C. § 78t). Appellants claim that Kings Garden's fraud renders false or misleading numerous statements made by Innovative or its personnel over the three-year period of Kings Garden's tenancy. The statements alleged to be false or misleading may be organized into five categories: (1) statements about Innovative's evaluation and diligence of potential tenants; (2) statements about Innovative's ongoing evaluation and monitoring of existing tenants; (3) statements of praise for Kings Garden and its leaders; (4) statements about Innovative's reimbursement arrangements; and (5) Innovative's statement about Kings Garden's nonpayment of July 2022 rent.

#### 1. Evaluation-and-Diligence Statements

Innovative's securities filings described, in general but consistent terms, the company's process for conducting diligence on prospective tenants. First, Innovative represented that it "rel[ies] on [its] management team to perform due diligence investigations of [its] potential tenants, related guarantors and their properties, operations and prospects, of which there is generally little or no publicly available operating and financial information."[3] App. 285. Second, Innovative cautioned that its "agreements for the acquisition of properties are typically subject to closing conditions, including satisfactory completion of due diligence investigations, and we may spend significant time and money and divert management

[3] Without including the disclosure's reliance language, Appellants alleged that Innovative "affirmatively stated that [its] 'management team [] perform[ed] due diligence investigations.'" App. 101. For completeness, we reproduce the full and unaltered disclosure here.

attention on potential acquisitions that we do not consummate." App. 284.

On August 5, 2021, Gold supplied additional detail in response to an investment analyst's question on an earnings call. Referencing two Innovative tenants other than Kings Garden, the analyst asked Gold how Innovative "go[es] about evaluating these early-stage companies and determining whether or not to make investments in the real estate assets." App. 306. Gold responded that "we spent a lot of time with the management team, evaluating their skills and expertise . . . . And we utilize our existing network of growers to do background checks on these tenants, understanding where they've come from and their reputations in the specific state or just in the industry in general." App. 82 (emphasis omitted). Gold did not mention Kings Garden.[4]

---

[4] At oral argument, Appellants referenced additional evaluation-and-diligence statements by Innovative executives during a May 5, 2022 earnings call. We omit those statements here and do not consider them in the analysis that follows because Appellants did not plead them (or even attach them to the Complaint). Just as "it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss," *Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) (citation and alterations omitted), Appellants may not amend their complaint on appeal of a motion to dismiss that was granted. *See generally* Fed. R. Civ. P. 15(a).

### 2. Ongoing-Evaluation-and-Monitoring Statements

Innovative's securities filings also repeated multiple descriptions of its processes for monitoring the health of its tenants. First, Innovative disclosed that it "evaluate[s] the credit quality of [its] tenants and any guarantors on an ongoing basis by reviewing, where available, the publicly filed financial reports, press releases and other publicly available industry information regarding" those tenants and guarantors. App. 104 (emphasis omitted). Second, Innovative stated that, "in some instances," it "monitor[ed] [its] tenants by periodically conducting site visits and meeting with the tenants to discuss their operations." Innovative Indus. Props., Inc., Annual Report (Form 10-K) 13 (Mar. 2, 2020).[5] Finally, Innovative cautioned investors that "[i]n many instances, we will generally not be entitled to financial results or other credit-related data from our tenants." *Id.*

### 3. Statements of Praise

Before Innovative discovered Kings Garden's fraud, Innovative's officers praised Kings Garden and its principals during periodic earnings calls. Typically, those statements lauded Kings Garden's commercial reputation, praised Kings Garden's practice of issuing dividends to its owners, reported on developments in Kings Garden's business, or updated the market on the commercial relationship between Kings Garden

[5] Appellants' Complaint reproduces this disclosure without including the "in some instances" caveat. Again, we reproduce the relevant disclosure from the source to include all relevant context.

and Innovative. The statements of praise at issue in this appeal are as follows:[6]

- "Kings Garden has developed a truly distinguished brand in California and consistently ranks as a top producer in sales in a state that represents the largest market in the world . . . . With production of 40,000 pounds of cannabis flower annually and continuing to ramp significantly, it is the leading top-quality producer in the state . . . . We highlighted a number of environmental initiatives of our tenant partners in their operations and our inaugural ESG report posted to our website. And Kings Garden is yet another example of our tenant partners focused on long-term, responsible, sustainable production." App. 106.

- "[W]e've been proud to continue to partner with many of our tenant operators and amend the leases to provide for additional expansion capital at our facilities for a corresponding increase in base rent." App. 107.

---

[6] While Appellants pleaded several other such statements, they do not argue on appeal that any are actionable and thus have abandoned any such argument. *See Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist.*, 877 F.3d 136, 145 (3d Cir. 2017) ("We have long recognized, consistent with Federal Rule of Appellate Procedure 28(a) and Third Circuit Local Appellate Rule 28.1, that an appellant's opening brief must set forth and address each argument the appellant wishes to pursue in an appeal.").

- Kings Garden is "a tenant partner . . . across 6 properties in Southern California, representing a total commitment of about $148 million . . . . Kings Garden has developed a truly distinguished brand in California and consistently ranks as a top producer in sales in a state that represents the largest market in the world" with Kings Garden's "brand reputation and operational expertise driving financial results . . . . We are excited to be working closely with Kings Garden as they complete full build-out of their production capacity in the months to come." App. 112–13 (citation modified).

- "In May of 2020, we followed with the acquisition of a fully operational property comprised of approximately 70,000 square feet of industrial space for $17.5 million or $250 per square foot. Shortly after that closing, Kings Garden announced the initiation of a quarterly dividend to its stockholders, something that was and is considered highly unusual among any prominent brand in the industry and which demonstrates their belief in the long-term prospects in the business." App. 119–20 (emphasis omitted).

**4. Statements Concerning Reimbursement Arrangements**

On April 14, 2022—about six weeks before Kings Garden sparked Innovative's suspicion—a short-seller named Blue Orca Capital ("Blue Orca") released a report criticizing certain Innovative tenants and arguing that Innovative's stock was overvalued. Mining public records, Blue Orca unearthed multiple lawsuits alleging Kings Garden and King had

committed fraud in connection with the operation of Kings Garden's business. One suit, brought in May 2021 by King's brother—himself a co-founder of Kings Garden—claimed King had "falsified books and records to personally enrich himself, and swindle money from investors" while selling cannabis on the black market. App. 151–52. Another suit, brought by Kings Garden investor Swiss American Investment Corp. ("Swiss American") in January 2019, sought Kings Garden's books and records and alleged that Kings Garden had engaged in "troubling" related-party transactions. App. 153. Notably, Blue Orca's report did not comment on Innovative's reimbursement arrangement with Kings Garden, though it alleged another tenant had received suspicious reimbursements.

Innovative responded to the short-seller's report the same day, in a statement titled "Innovative Industrial Properties Responds to Short-Seller Report." App. 337. Innovative charged that Blue Orca did "not understand the process that [Innovative] employs for underwriting [tenants'] improvements, and that *any* [Innovative] reimbursements relate only to verified, qualified improvements to the buildings for these purposes, and never as funding for any type of 'loan' to be utilized for any other purpose." *Id.* (emphasis added).

On May 5, 2022, Innovative convened a call with investment analysts to discuss its second-quarter earnings and to discuss the two tenants most prominently featured in the Blue Orca report, one of which was Kings Garden. On the call, Innovative's Director of Construction Management, Griffin Marquardt, discussed Innovative's two reimbursement projects with Kings Garden. Referring to the San Bernardino project, Marquardt stated that "[w]e have funded approximately $18 million of the $25 million and expect the remaining to be

drawn over the coming months." App. 315. And for the Palm Springs project, "we have funded approximately $27 million of the $51.4 million allowance for improvements." *Id.* Marquardt did not mention Kings Garden's fraud, which Innovative did not discover for about another month.

#### 5. Statement Concerning Kings Garden's Nonpayment of July 2022 Rent

On July 13, 2022, Innovative disclosed on a Form 8-K that Kings Garden had defaulted on its July rent and related monetary obligations, to the tune of about $2.2 million. Innovative informed the market that it was "continuing discussions" with Kings Garden but also had "commenced discussions with other operators regarding potential re-leasing of certain" Kings Garden properties. App. 293. Although Innovative had commenced its investigation of Kings Garden weeks earlier and filed the first iteration of its lawsuit against Kings Garden twelve days later, Innovative did not mention Kings Garden's reimbursement fraud or the other allegations it later included in legal filings.

### C. This Litigation's Procedural History

After one dismissal, Appellants filed the operative Complaint. The District Court granted with prejudice Appellees' motion to dismiss, holding that some statements were actionably false or misleading but that Appellants had failed to plead the required strong inference of scienter. In the District Court's view, garden-variety mismanagement and negligence more plausibly explained Innovative's statements, absent particularized allegations about "how the [Appellees] could or should have known [Innovative] was being defrauded at the time." App. 27. Appellants appealed.

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction under 15 U.S.C. § 78aa(a) and 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291.

"When considering an appeal from a denial of a motion to dismiss, this Court exercises plenary review, accepting as true the facts alleged in the complaint and the reasonable inferences that can be drawn from those facts." *Keystone Redevelopment Partners, LLC v. Decker*, 631 F.3d 89, 95 (3d Cir. 2011) (citation modified). "We also exercise plenary review over the dismissal of a complaint for failure to satisfy the heightened pleading standards of the [Private Securities Litigation Reform Act of 1995 ("PSLRA")] and over the District Court's interpretation of federal securities laws." *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 166 (3d Cir. 2014). "In considering the propriety of the District Court's ruling, this Court may also consider," in addition to the complaint, "matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case." *Keystone Redevelopment Partners*, 631 F.3d at 95 (citation and internal quotation marks omitted); *see also Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000) (holding that this Court may "take judicial notice of properly-authenticated public disclosure documents filed with the SEC").

## III. DISCUSSION

The Exchange Act "regulates the trading of securities on the secondary market." *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 679 (3d Cir. 2023) (citation omitted). The "centerpiece of [the Exchange Act's] antifraud framework" is Section 10(b), which "prohibits the

use of 'any manipulative or deceptive device or contrivance' in violation of regulations promulgated by the SEC." *Id.* (quoting 15 U.S.C. § 78j(b)). The SEC exercised that rulemaking authority to create Rule 10b-5, which prohibits "mak[ing] any untrue statement of a material fact or [omitting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b); *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011) ("Rule 10b-5 implements" Section 10(b).). "Together, [Section] 10(b) and Rule 10b-5 imply a private cause of action for securities fraud." *City of Warren*, 70 F.4th at 679 (citing *Basic, Inc. v. Levinson*, 485 U.S. 224, 230–31 (1988)). A plaintiff alleging violations of Section 10(b) and Rule 10b-5 may also bring claims under Section 20(a) of the Exchange Act, "which imposes joint and several liability on persons who control an individual or entity that violates [Section] 10(b) and Rule 10b-5." *Id.* (citations omitted).

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must plead six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives*, 563 U.S. at 37–38 (citation and internal quotation marks omitted). Only the first two elements are at issue in this appeal.

When pleading these elements, a plaintiff must also "satisfy [two] heightened pleading rules codified in the PSLRA[,] . . . both of which must be met in order for a complaint to survive a motion to dismiss." *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009). First, a

complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). That requires a plaintiff to "plead the who, what, when, where, and how: the first paragraph of any newspaper story." *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir. 1999) (citations and internal quotation marks omitted), *abrogated on other grounds by Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308 (2007). Second, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

With these standards in mind, we will first analyze the statements alleged by Appellants to be actionable. Second, we will determine whether, for any statements plausibly alleged to be actionable, the Complaint permits a strong inference that the makers of those statements uttered the statements with scienter. Third, and finally, we will assess Appellants' Section 20 claims.

### A. Whether Any Statements Were False or Misleading

When analyzing a motion to dismiss a Section 10 and Rule 10b-5 claim based on an alleged false or misleading statement, courts must apply the PSLRA's pleading requirements to each challenged statement because each one could sustain a claim. That means that for each such statement, a court must consider the precise language of the statement and ask whether, taking the pleaded facts as true and drawing all reasonable inferences from those facts, the statement was

actually untrue or "omitted to state a material fact necessary in order to make the statement[] made, in the light of the circumstances in which [it was] made, not misleading." 15 U.S.C. § 78u-4(b)(1)(B). In doing so, a court must be mindful that, "[t]o be actionable, a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events." *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002) (citation omitted). So, while "later developments may allow a reasonable inference that prior statements were untrue or misleading when made," a plaintiff cannot speculatively plead "fraud-by-hindsight." *City of Warren*, 70 F.4th at 693 (citation omitted).

Further, Section 10(b) and Rule 10b-5 do not target "ordinary business operations" or corporate conduct generally. *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 161 (2008). They do not make it unlawful to do bad business, act negligently, breach fiduciary duties, or otherwise to fail to take care in managing corporate affairs.[7]

---

[7] *See, e.g.*, *Stoneridge Inv. Partners*, 552 U.S. at 161–62; *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 210 (1976) ("[T]he judicially created private damages remedy under [Section] 10(b) which has no comparable restrictions—cannot be extended, consistently with the intent of Congress, to actions premised on negligent wrongdoing."); *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 473, 476 (1977) ("The language of § 10(b) gives no indication that Congress meant to prohibit any conduct not involving manipulation or deception." Section 10(b) and Rule 10b-5 do not make unlawful "a breach of fiduciary duty by majority stockholders, without any deception, misrepresentation, or nondisclosure."); *Advanta*,

Those are the subjects of other potential causes of action. Instead, Section 10(b) and Rule 10b-5 "prohibit[] only the making of a material misstatement (or omission) or the commission of a manipulative act" touching a purchase or sale of securities. *Cent. Bank of Denv., N.A. v. First Interstate Bank of Denv., N.A.*, 511 U.S. 164, 177 (1994); *see also Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 264 (2024) ("Logically and by its plain text, [Rule 10b-5] requires identifying affirmative assertions (*i.e.*, 'statements made') before determining if other facts are needed to make those statements 'not misleading.'"); *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977). Thus, in a case like this one, where liability is based on allegedly false or misleading statements, the falsity inquiry must focus on whether each individual statement the plaintiff has identified was, as written or spoken and at the time the statement was made, actually false or misleading by omission.

### 1. Evaluation and Diligence

Appellants allege that Innovative's securities filings repeatedly and "affirmatively stated" that Innovative "did not purchase properties until its management team conducted 'satisfactory completion [sic] of due diligence investigations.'" App. 92. According to Appellants, Innovative claimed with similar definitiveness that its "management team performed due diligence investigations of . . . potential tenants, related guarantors and their properties, operations and prospects, of

---

180 F.3d at 540 ("[C]laims essentially grounded on corporate mismanagement are not cognizable under federal law." (citation omitted)).

which there is generally little or no publicly available operating and financial information." *Id*. (citation modified).

Ordinarily, we would take those allegations as true at the pleading stage. Here, however, we may look directly at "the very [filings] alleged to contain [these] misrepresentations or omissions," *Oran*, 226 F.3d at 289 (quoting *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)), because we may "take judicial notice of properly-authenticated public disclosure documents filed with the SEC," *id.* And Innovative's representations in those filings were different from Appellants' allegations in two important ways.

First, Innovative did not affirmatively warrant that all its purchases followed satisfactory completion of due diligence investigations. In fact, Innovative disclosed that its purchase agreements "are *typically* subject to closing conditions" that include the "satisfactory completion of due diligence investigations." App. 284 (emphasis added). But the Complaint does not allege that Innovative's real estate purchases do not *typically* have a diligence-related closing condition. Indeed, the Complaint refers only to Innovative's transactions with Kings Garden; there is no basis to infer what Innovative has or has not done, *typically*, across its portfolio.

Second, Innovative claimed not that its "management team performed due diligence investigations," *see* App. 97, but that it "rel[ies] on [its] management team to perform due diligence investigations." App. 285. Even if we construed that as a promise to perform diligence on every tenant, the Complaint and attached documents identify statements by Innovative and its executives describing the diligence Innovative performed on Kings Garden and other tenants. For example, Innovative claimed in its lawsuit against Kings

Garden that before Innovative "entered into [its] Leases" with Kings Garden, it communicated with Kings Garden's management "in meetings, e-mails, teleconferences, and video calls" about Kings Garden's "financial condition." App. 167. Appellants do not allege those assertions are false.

Appellants' argument, in essence, is that Innovative's diligence was inadequate at best. Indeed, Innovative's decision to purchase Kings Garden's properties, despite the public litigation history that Innovative discovered with apparent ease in 2022, may plausibly imply that Innovative's diligence was subpar. But Innovative never promised that its diligence would meet any particular standard of thoroughness.[8] Instead, Innovative represented that it relied on management (as opposed to third parties or other actors) and typically subjected deals to closing conditions. The Complaint and attached documents show that disclosure is true. Innovative relied on its management team to conduct due diligence, and such an investigation occurred. Even if Innovative missed obvious red flags, including King's litigation history and the

[8] Appellants contend that a promise to perform diligence "implies thorough review," citing our purported holding in *GSC Partners CDO Fund v. Washington*, 368 F.3d 228 (3d Cir. 2004), that "due diligence [implies] 'thorough scrutiny.'" Opening Br. 51. *Washington* did not so hold, nor did it announce any rule concerning the implied meaning of a company's general promise to perform due diligence. In *Washington*, we used the phrase "thorough scrutiny" only to describe the diligence conducted in that case. *See* 368 F.3d at 232 ("Before finalizing the deal, Washington began its due diligence process, which entailed thorough scrutiny of [a counterparty's] financial statements and projections.").

Swiss American lawsuit, that fact cannot sustain a securities claim.

The remaining statements about Innovative's evaluation and diligence of potential tenants are Gold's remarks on August 5, 2021, that Innovative "spent a lot of time with the management team, evaluating their skills and expertise," and "utilize[s] [its] existing network of growers to do background checks on these tenants, understanding where they've come from and their reputations." App. 82 (emphasis omitted). But those statements are not plausibly false or misleading. The transcript of the August 5, 2021 earnings call shows that Gold was responding to a question about two other tenants, and the Complaint pleads no facts explaining why, in that context, a reasonable investor would have understood Gold's statement to refer to Kings Garden. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015) ("[W]hether a statement is 'misleading' depends on the perspective of a reasonable investor."). As such, Innovative's alleged misstatements concerning evaluation and diligence are not actionably false or misleading.

### 2. Ongoing Evaluation and Monitoring

Appellants claim that Innovative made two recurrent representations about its ongoing evaluation and monitoring: that Innovative reviews "publicly filed financial reports, press releases, and other publicly available industry information" concerning tenants and guarantors, and that Innovative "conduct[s] site visits and meet[s] with [its] tenants to discuss their operations." App. 104. Appellants claim these statements are actionable because Innovative failed to "scrutinize draw requests that were fraudulent on their face," and otherwise failed to detect that Kings Garden had not

obtained the work for which Innovative reimbursed. App. 112. Even if Innovative failed to scrutinize the draw requests, Innovative's statements are not actionable.

Start with Innovative's claim to review "publicly filed financial reports, press releases and other publicly available industry information." App. 104. Appellants have not alleged that Kings Garden's draw requests and the documents that accompanied them were publicly available, those materials were not financial reports or press releases, and there is no claim that they were industry information. So even if Innovative completely failed to scrutinize Kings Garden's draw requests, Innovative's disclosure about the tenant materials it reviews would not be false or misleading.

Superficially, Innovative's alleged statement that it ". . . monitor[s] our tenants by periodically conducting site visits," App. 109, is more problematic—and, indeed, the District Court determined that statement was misleading. If Innovative's personnel had visited the Palm Springs or San Bernardino properties, Innovative plausibly would have discovered that Kings Garden had not obtained the work for which it was reimbursed. Innovative itself later claimed that it made that discovery when conducting site visits after receiving the suspicious June 1, 2022 draw request.

But Innovative did not make a blanket promise to conduct site visits or discuss with tenants their operations. The ellipsis reproduced above omits three critical words: "*in some instances*, we monitor our tenants by periodically conducting site visits and meeting with the tenants to discuss their operations." *E.g.*, Innovative Indus. Props., Inc., Annual Report (Form 10-K) 13 (Mar. 2, 2020) (emphasis added). Those words change the disclosure's meaning significantly,

requiring Appellants to allege that Innovative categorically does not conduct site visits or meet with tenants across its portfolio to discuss their operations. While the Complaint plausibly alleges that Innovative did not visit Kings Garden's Palm Springs or San Bernardino properties to audit the work it had paid for, the Complaint does not contain the portfolio-wide claims required to render Innovative's disclosure false or misleading. Properly read, then, Innovative's site-visits disclosure, like its document-review disclosure, is not actionable.

#### 3. Statements of Praise

Turning now to Innovative's statements of praise, we depart from the realm of pure fact to a more nuanced genre: statements of opinion. The District Court correctly recognized that Appellees' statements of praise for Kings Garden's business, for the reputations of Kings Garden and its principals, and for certain decisions Kings Garden and its principals made, are essentially opinion statements. The District Court's analysis of those statements turned on whether information contradicting a given opinion was available to the speaking Defendant at the time the opinion was offered. On that basis, the District Court concluded that two statements of praise are actionable, but the rest are not. The first actionable statement was Regin's comment, on February 24, 2022, that Kings Garden "represent[ed] a total commitment of about $148 million" and "has developed a truly distinguished brand in California and consistently ranks as a top producer in sales in a state that represents the largest market in the world." App. 113. The second is Regin's statement, on May 5, 2022, that a dividend paid in May 2020 by Kings Garden "was and is considered highly unusual among any prominent brand in the

industry and . . . demonstrates their belief in the long-term prospects in the business." App. 119–20 (emphasis omitted).

Now, Appellants argue that if those statements are actionable, two statements of praise made on Innovative's August 5, 2021 earnings call must also be actionable, as there is no meaningful distinction between them. Those are Regin's statement that Kings Garden was a "top producer" and "focused on long-term, responsible, sustainable production," Opening Br. 48; App. 106; and Hastings's statement that Innovative was "proud to continue to partner" with Kings Garden, Opening Br. 48; App. 107.

Before assessing these four statements, we pause to explain the framework in which statements of opinion like these are evaluated. In *Omnicare*, the Supreme Court explained that federal securities liability for statements of opinion is circumscribed and may exist in one of three situations.[9] 575 U.S. at 184, 185–86, 188–89; *see also* 17 C.F.R. § 240.10b-5(b) (prohibiting making "any untrue statement of a material fact or [the omission of a] material fact" that renders a statement misleading). First, if the speaker does not believe what they say, their opinion statement is false. *Omnicare*, 575 U.S. at 184. "Second, opinion statements that contain expressly 'embedded' factual assertions are misleading if any of the embedded factual assertions are untrue." *City of Warren*, 70 F.4th at 685 (quoting *Omnicare*, 575 U.S. at 185). Third, an opinion statement may be misleading when the

[9] Although *Omnicare* dealt with Section 11 of the Securities Act of 1933, we have held that its reasoning applies equally to Section 10(b) of the Exchange Act and Rule 10b-5. *See City of Warren*, 70 F.4th at 685.

speaker "omits material facts about [its] inquiry into or knowledge" of the facts underlying the opinion, and "those facts conflict with what a reasonable investor would take from the statement itself."[10] *Omnicare*, 575 U.S. at 189. In such a case, "whether an omission makes an expression of opinion misleading always depends on context." *Id.* at 190. For example, if a corporate executive stated his belief that his company's "conduct is lawful," but omitted that the company's lawyers offered "contrary advice, or . . . that the Federal Government was taking the opposite view," the stated opinion would not "fairly align[] with the information in the issuer's possession at the time," and thus would mislead a "reasonable investor." *Id.* at 188–89.

[10] As the Court's reference to "inquiry" implies, a speaker need not always have actual knowledge of contradictory facts for her opinion to mislead. In some cases, a speaker might know there are facts bearing on the veracity of her opinion but fail to undertake "the expected inquiry" into those facts before opining. *Omnicare*, 575 U.S. at 189 n.6. For example, if an executive stated her belief "that her company's TV had the highest resolution available on the market, [but] had failed to review any of her competitors' product specifications," her "subjective belief" in the truth of her opinion "would not insulate her from liability." *Id.* As that example shows, however, a speaker's "inquiry" is only "expected" when she *knows* there is available material information that foreseeably could affect the truth of her opinion. *Id.* Thus, when a speaker opines after failing to inquire (or to disclose her non-inquiry), *Omnicare* permits liability only when the speaker knew there was something to inquire about in the first place.

Here, we deal with the third *Omnicare* scenario, since Appellants do not allege that Regin's or Hastings's statements were insincere or embedded false factual assertions. Appellants argue all four statements of praise were misleading because, on the dates when each statement was uttered, Innovative possessed at least one fraudulent draw request and some Kings Garden financial statements "show[ing] millions of dollars disappearing from [Kings Garden's] accounts." Opening Br. 49.

The problem for Appellants is that in the third *Omnicare* scenario, the speaker is aware of what she is omitting or that there is foreseeably material information that could affect the veracity of her opinion and that she has failed to investigate. Here, Regin and Hastings evidently were unaware of the information that allegedly undercut their opinions. The Complaint does not allege that Regin and Hastings knew or suspected that Innovative was being defrauded until the June 2022 draw request—that is, after all four opinion statements alleged to be false or misleading. Innovative had not yet discovered the irregularities in Kings Garden's draw requests, and, in court documents attached to the Complaint, Innovative claimed it had not received financial statements showing cash outflows from Kings Garden until July 2022.[11] Thus, when

[11] Regin's reference to Kings Garden as a "top producer," App. 106, and claim that Kings Garden's dividend "was and is considered highly unusual," App. 119 (emphasis omitted), face additional issues. The "top producer" statement refers generically to the relative commercial success of Kings Garden's cannabis production operations—something Appellants do not challenge. Regin's passive-voice discussion of Kings Garden's dividend describes a general industry

they praised Kings Garden as a top producer with a prominent brand and a great team, Regin and Hastings could not have "sa[id] one thing and [held] back another"; there was nothing for them to hold back, particularly with respect to the three statements uttered before the Blue Orca report.[12] *Omnicare*, 575 U.S. at 192. Because we cannot draw another plausible

---

perception of Kings Garden's dividend payment. Again, Appellants do not dispute that industry participants viewed dividend payments in general, or Kings Garden's in particular, as unusual.

[12] We note that the generality of Regin's and Hastings's statements further undermines the claim that a failure to investigate rendered those statements misleading. *See Omnicare*, 575 U.S. at 190 n.8 ("[A] reasonable investor generally considers the specificity of an opinion statement in making inferences about its basis."). Regin and Hastings expressed no opinion related to the San Bernardino or Palm Springs properties, Kings Garden's reimbursement arrangements with Innovative more generally, or Kings Garden's financial statements; they spoke only in broad terms about Kings Garden's commercial success and bright outlook. These statements more closely resemble "vague and general statements of optimism," which "are non-actionable" and "immaterial," *Fan v. StoneMor Partners LP*, 927 F.3d 710, 716 (3d Cir. 2019) (internal quotation marks omitted), than *Omnicare*'s examples of opinions concerning particular courses of conduct, inventory figures, and product specifications, *see* 575 U.S. at 188–90 & nn.6, 8. *See also Advanta*, 180 F.3d at 539 (stating that "accurate reports of past [performance] and . . . expressions of optimism for the future" were not actionable).

inference, Appellants have insufficiently alleged that Regin's and Hastings's statements of praise were actionably misleading by omission.

### 4. Statements Concerning Innovative's Reimbursements

By contrast, Innovative's two statements about its reimbursement arrangements, in the wake of the Blue Orca report, were statements of fact. The first statement, made on April 14, 2022 by Innovative in a press release hours after the report was issued, affirmatively represented that "*any* [Innovative] reimbursements relate only to verified, qualified improvements to the buildings for [infrastructure improvements], and never as funding for any type of 'loan' to be utilized for any other purpose" (the "April 14 Statement").[13] App. 337 (emphasis added). The second statement, by Marquardt on the May 5, 2022 earnings call, likewise offered two facts about Innovative's construction reimbursements to Kings Garden: "[w]e have funded approximately $18 million of the $25 million" for the San Bernardino project, and for the Palm Springs project, "we have funded approximately $27 million of the $51.4 million allowance for improvements." App. 121. All these statements "express[] certainty about a thing," and thus are statements of fact. *Omnicare*, 575 U.S. at 183. The first statement describes what Innovative's

[13] Although the Blue Orca report did not mention Innovative's reimbursement arrangement with Kings Garden—only Innovative's arrangement with another tenant—Innovative's response did not differentiate between tenants.

reimbursements relate to. The second describes amounts reimbursed and allocated for the two projects.

As pleaded, the April 14 Statement plausibly is false. The Complaint pleads with particularity that, as of April 14, 2022, some Innovative reimbursements were unrelated to verified, qualified improvements. In fact, Innovative had reimbursed Kings Garden for reimbursements that neither qualified for reimbursement nor were verified by Innovative. *Cf. Babb v. Wilkie*, 589 U.S. 399, 405 n.2 (2020) (explaining the "expansive" meaning of the word "any"). Thus, the "certainty" expressed by Innovative's statement was incorrect, and the statement is actionable.[14] *Omnicare*, 575 U.S. at 183.

The May 5 statement, however, is not false. The Complaint alleges that Innovative did, in fact, give Kings Garden the stated amounts for the Palm Springs and San Bernardino projects; that is one of the Complaint's key premises. So, if Marquardt's statement is actionable, it must be because he "omit[ted] to state a material fact," 17 C.F.R. § 240.10b-5(b), that made his statement misleading "in context," *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 873 (3d Cir. 2000). Marquardt did not mention that Kings Garden misappropriated many of the reimbursed funds, and

[14] Because Innovative's statement was an assertion of fact, not opinion, this analysis does not account for Innovative's state of mind at the moment it spoke. Said differently, the falsity of Innovative's statement does not depend on whether it knew or was sufficiently reckless in not knowing the facts that made the statement false or misleading. That is a subject for our separate scienter analysis. At this analytical step, it suffices to say that Innovative's statement was, as a matter of fact, wrong.

that information could have "be[en] important to a reasonable investor." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3d Cir. 1997). But Appellants do not claim that Kings Garden's misappropriation was "then known" to Marquardt. *Williams v. Globus Med., Inc.*, 869 F.3d 235, 241 (3d Cir. 2017) (quoting *Kline v. First W. Gov't Sec., Inc.*, 24 F.3d 480, 491 (3d Cir. 1994)). As noted above, Innovative did not suspect malfeasance until June 1, 2022. Without a plausible allegation that Marquardt contemporaneously knew, or at least was willfully ignorant of, the material fact he did not include, there can be no liability for "omit[ting] to state" that fact, 17 C.F.R. § 240.10b-5(b).[15] *Williams*, 869 F.3d at 240. Thus, while Innovative's April 14 Statement is an actionably false statement of fact, Marquardt's May 5 statement is neither false nor misleading by omission.

[15] To understand what it means to "omit," we may also consult dictionaries dating to Rule 10b-5's promulgation, in 1942. *See United States v. Lucidonio*, 137 F.4th 177, 183 n.8 (3d Cir. 2025). Consistent with our precedent's focus on contemporaneous knowledge, definitions of "omit" emphasize an omission's affirmative character—that is, that the omitter had something to omit, which he then "le[ft] out or unmentioned." *Omit*, Webster's New Int'l Dictionary of the English Language (2d ed. 1934); *see also id.* (defining further as "not to insert, include or name"; "[t]o forbear or fail to perform or to make use of"); *Omission*, Black's Law Dictionary (3d ed. 1933) ("The neglect to perform what the law requires.").

**5. Innovative's July 14, 2022 Form 8-K**

Finally, the Complaint claims that Innovative's Form 8-K disclosure of Kings Garden's failure to pay July 2022 rent was "materially false and misleading because [Appellees] were duty-bound to disclose that Kings Garden was a Ponzi scheme designed to, and accomplishing, the embezzlement of tens of million dollars [sic] via forged and fraudulent draw requests." App. 123. Appellants also allege that Appellees culpably failed to disclose in the Form 8-K King's history of dishonesty and the indicia of fraud in Kings Garden's financial statements.

The Complaint pleads no facts plausibly suggesting that Innovative's statement was false. The Complaint in fact offers every reason to believe that Kings Garden failed to make its July 2022 rent payments, and there is no indication that any other averment in the Form 8-K was untrue.

Nor is the Form 8-K misleading by omission. The subject of Innovative's disclosure was Kings Garden's failure to pay rent; a reasonable investor would not have expected Innovative to *also* disclose the results of its then-unfinished investigation of Kings Garden's reimbursement fraud. In any case, Appellants' allegations do not imply that Innovative had an affirmative obligation to talk about Kings Garden's fraud. "Even non-disclosure of material information will not give rise to liability under Rule 10b–5 unless the defendant had an affirmative duty to disclose that information." *Oran*, 226 F.3d at 285. Appellants do not plead facts indicating that Innovative had such a duty here.[16]

---

[16] *Oran* enumerates three circumstances in which a duty to disclose may arise: "insider trading, a statute requiring

**B. Whether Any False or Misleading Statements Were Made with Scienter**

After identifying any adequately pleaded false or misleading statements, a court must assess the scienter of the statement's "maker." *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). That, in turn, requires a court to ask three basic questions: Who made the statement?[17] *See id.* at 141–42 (defining a statement's "maker"). Did the maker have the requisite scienter when he, she, or it made the statement? And, if so, is the maker's scienter imputable to any

---

disclosure, or an inaccurate, incomplete or misleading prior disclosure." 226 F.3d at 285–86. Appellants do not allege the first two and have not argued that Innovative had a "duty to correct" or a "duty to update" any misleading prior disclosures, which might give rise to failure-to-disclose liability. *Id.* at 286; *see generally City of Edinburgh*, 754 F.3d at 176 ("[A] duty to update applies only in narrow circumstances involving more fundamental corporate changes such as mergers, takeovers, or liquidations, as well as when subsequent events produce an extreme or radical change in the continuing validity of [an] original statement." (citation modified)).

[17] Of course, liability may exist when someone disseminates or otherwise employs a false or materially misleading statement in a "device, scheme, or artifice to defraud." 17 C.F.R. § 240.10b-5(a); *see Lorenzo v. SEC*, 587 U.S. 71, 77–79 (2019). In such a case, the question who made the relevant statement would be replaced with a similar question capturing the conduct alleged to have violated Rule 10b-5. In this case, however, we address the alleged making of false or misleading statements.

(other) defendant? *See Avaya*, 564 F.3d at 251–52 (holding that an individual's scienter may be imputed to a corporation when the individual had "apparent authority" to make the relevant statement). Only those defendants with the requisite scienter may remain in the case.

Before proceeding to our scienter analysis, it is worth clarifying exactly which statement and whose scienter we are analyzing. Here, the subject statement is the April 14 Statement about reimbursements—the only statement we have identified as false or misleading by omission. And where, as here, plaintiffs assert liability for making false or misleading statements (as opposed to disseminating them or otherwise wielding them in a scheme to defraud, *see Lorenzo v. SEC*, 587 U.S. 71, 78 (2019)), the only scienter that matters is the scienter of the person who "make[s]" the false or misleading statement. 17 C.F.R. § 240.10b-5(b); *Janus*, 564 U.S. at 141 (explaining that a defendant "must have 'made' the material misstatement[]" to be liable under Rule 10b-5(b)). Thus, we must determine who made the April 14 Statement—that is, "the person or entity with ultimate authority over [the] statement." *Janus*, 564 U.S. at 143 n.6.

That is Innovative itself. At oral argument, Appellants argued that the April 14 Statement is Hastings's responsibility because she was "the person who crafted the statement," was listed as the "[c]ontact[]," App. 337, and was generally familiar with the April 14 Statement's subject matter. Tr. of Oral Arg. 4–5. Those arguments fail. The April 14 Statement's title ("Innovative Industrial Properties Responds to Short-Seller Report") and first sentence ("[Innovative] . . . today announced . . .") make clear that Innovative was speaking. App. 337. The Complaint does not plead that Hastings wrote the document, but that fact would be irrelevant under *Janus* anyway: "One

who prepares or publishes a statement on behalf of another is not its maker." *Janus*, 564 U.S. at 142. Instead, "attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed." *Id.* at 142–43. The April 14 Statement repeatedly is attributed to Innovative and is written in its voice.

Thus, we must determine whether Innovative, the corporation, made the April 14 Statement with scienter. Scienter consists of "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Advanta*, 180 F.3d at 539 (citations omitted). "[E]ven inexcusable negligence" will not suffice. *Id.* (citations omitted). To survive Appellees' motion to dismiss, the Complaint must "state with particularity facts giving rise to a strong inference that [Innovative] acted with th[at] required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). To be "strong," the inference must "be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314 (internal quotation marks omitted). "The inquiry . . . is whether all of the facts alleged, taken collectively," permit such an inference. *Id.* at 322–23 (emphasis omitted).

When assessing the scienter of a corporate defendant that, like Innovative, lacks a mind of its own, the analysis reduces to multiple questions. First, does the complaint adequately allege that any individuals had scienter? If so, may we impute that individual's (or those individuals') scienter to the corporation? For purposes of this case, we also ask whether, if no imputation is possible, we still may infer that Innovative made the April 14 Statement with scienter based on

a corporate scienter theory. Finally, we address the application of our decision in *Avaya*, which Appellants argue supports a strong inference of scienter.

### 1. Individuals' Scienter

It is clear enough from the Complaint that, as of April 14, Kings Garden had submitted false draw requests to Innovative, and Innovative had paid Kings Garden the money requested. The Complaint does not allege, however, that as of that date anyone at Innovative knew or suspected the company was being defrauded. As the District Court recognized, such an allegation would implausibly imply that Innovative turned a blind eye to its own victimization.

Perhaps to avoid that odd result, Appellants argue that Innovative "should have known of Kings Garden's wrongdoing."[18] Opening Br. 29. Appellants note that, in at least some cases, Kings Garden's draw requests facially presented indicia of fraud that Innovative overlooked in the first instance, and Innovative failed to perform the site visits or third-party verification that would have uncovered Kings Garden's fraud earlier. In Appellants' view, at least Hastings,

[18] At times, Appellants frame this argument as a claim that Innovative "assum[ed] the affirmative duty to monitor Kings Garden." Opening Br. 16. But Innovative assumed no such duty with respect to the draw requests or the reimbursement program more generally. As explained above, Innovative said only that it would review publicly available industry information and financial reports concerning tenants and their guarantors—not the nonpublic draw requests relevant to the April 14 Statement.

the leader of the team responsible for paying draw requests, should have known that the team had failed to perform this work.

Taking the Complaint's allegations as true, Innovative plausibly should have discovered earlier, from the information in its possession, that Kings Garden was swindling it. Reasonable investors might be dissatisfied with the performance of Innovative's personnel on that score. Indeed, Appellants' "should have known" argument might even resemble a claim for negligence or a state-law claim that the failure of oversight breached fiduciary duties. *See generally In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967–71 (Del. Ch. 1996) (finding such a claim under Delaware law). But "Rule 10b–5 . . . requires 'more than negligent nonfeasance as a precondition to the imposition of civil liability.'" *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 493 (3d Cir. 2013) (citation modified) (quoting *Ernst & Ernst*, 425 U.S. at 215); *see also Advanta*, 180 F.3d at 535. And "[g]eneralized imputations of knowledge do not suffice, regardless of [a] defendant['s] position[] within the company." *Advanta*, 180 F.3d at 539.

Still, Appellants argue it is reckless for a speaker to turn a blind eye to red flags and then speak about the relevant subject matter publicly, never mind whether the speaker knew about the underlying issues. We have not squarely considered whether this type of willful ignorance can constitute actionable scienter. But several of our sister circuits have, and they are in harmony: "[A]n egregious refusal to see the obvious, or to investigate the doubtful" can support a strong inference of scienter when the facts left undiscovered are those that made a statement false or misleading. *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (citation and internal quotation marks

omitted); *see also PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 695 (6th Cir. 2004); *SEC v. Shanahan*, 646 F.3d 536, 544 (8th Cir. 2011); *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1098 (9th Cir. 2011); *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 700 (5th Cir. 2005). We agree. Remaining willfully blind to potentially material matters and then making public statements that are false or misleading because of the matters to which the speaker blinded himself may constitute an "egregious" or "extreme departure from the standards of ordinary care."[19] *Advanta*, 180 F.3d at 539–40.

That is not strongly inferable here. We are prepared to believe that Innovative's decision to release a same-day response to Blue Orca's report with a blanket statement about all its reimbursements was rash. But it was not willfully ignorant. Appellants do not plead that any particular Innovative employee noticed that something was amiss with Kings Garden's draw requests and then failed to investigate. And while "it is not necessary to plead motive to establish that a defendant acted with scienter," it "is significant" that the Complaint does not allege what would have motivated Innovative or its agents to bury their heads in the sand about the company's own victimization. *Rahman v. Kid Brands,*

[19] We note that the speaker's willful ignorance of the underlying issues does not *itself* show scienter. Again, the question is not whether a defendant-speaker committed an underlying wrong with scienter; it is whether the act covered by Section 10(b) and Rule 10b-5—here, making a false or misleading statement—was committed with scienter. *Cf. Cent. Bank of Denv.*, 511 U.S. at 177–78 ("We cannot amend the statute to create liability for acts that are not themselves manipulative or deceptive within the meaning of the statute.").

*Inc.*, 736 F.3d 237, 245 (3d Cir. 2013). Without specific facts about individuals' willful ignorance or "facts to support an assertion that [any Innovative employee] had a motive to engage in wrongful conduct," *id.* at 246, the Complaint fails to plead with the particularity required by the PSLRA that any individual had scienter with respect to the April 14 Statement. And, because Appellants have failed to plead that any individual had scienter, Appellants have failed also to plead that anyone's scienter may be imputed to Innovative.

**2. Corporate Scienter**

Without any individual's scienter available for imputation to Innovative, Appellants propose another way to show Innovative made the April 14 Statement with scienter: the doctrine of corporate, or collective, scienter. On this theory of scienter, "it is possible to draw a strong inference of [a corporation's] scienter without being able to name the individuals who concocted and disseminated the fraud." *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008). Thus, in theory, "[a] plaintiff can use corporate or collective scienter to plead an inference of scienter against a corporate defendant without raising the same inferences required to attribute scienter to an individual defendant." *Rahman*, 736 F.3d at 246. Appellants argue we should adopt and apply the doctrine here because of Innovative's small size and the strength of Appellants' "allegations of no site visits, no contacting contractors, and possessing documents that were incomplete or altered on their face." Reply Br. 4 n.6.

Our sister circuits have approached the corporate scienter doctrine differently, to the extent they recognize the doctrine at all. *See In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 473–77 (6th Cir. 2014) (discussing the different

approaches). We "have neither accepted nor rejected th[e] doctrine." *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 121 n.6 (3d Cir. 2018); *see also Rahman*, 736 F.3d at 246. We decline to do so here, too. Setting aside the fact that Appellants raised the corporate scienter doctrine for the first time in their reply brief, which normally results in forfeiture, *see Kost v. Kozakiewicz*, 1 F.3d 176, 182 n.3 (3d Cir. 1993), "the [Complaint's] allegations would not give rise to corporate scienter under any recognized theory of that doctrine," *Hertz*, 905 F.3d at 121 n.6.

In circuits that recognize corporate scienter, the doctrine typically is reserved for "exceedingly rare" cases, *Jackson v. Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020), involving statements that are "dramatically false," *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014) (citation and internal quotation marks omitted). These have included, in theory or in actuality, "General Motors announc[ing] that it had sold one million SUVs . . . [when] the actual number was zero," and a CEO repeatedly and grossly misstating demand for products that were as important to his company "as Windows XP and Vista [were] to Microsoft." *Tellabs*, 513 F.3d at 709–10. On the facts pleaded, we cannot say Innovative's lone misstatement is of similar magnitude. We therefore leave for another day the propriety of the corporate scienter doctrine and note only that application of such a doctrine would not change the result here.

**3. *Avaya***

Finally, we address our scienter analysis in *Avaya*. There, the defendant corporation's Chief Financial Officer was repeatedly asked "focused questions" on earnings calls about his company's pricing, and the executive repeatedly denied,

"in statements evincing certitude," that the company was discounting prices like its competitors were. 564 F.3d at 270. "Because of the context (specific analyst queries) and content (consistent denials[)]" of the executive's statements, we held that the executive "might be culpable as long as what he *knew* made obvious the risk that his confident, unhedged denials of unusual discounting would mislead investors." *Id.* (emphasis added). Appellants argue that *Avaya* holds that, when posed with a "pointed inquiry about a matter at the core of one's business, it is reckless to deny with certainty material, knowable, adverse facts." Opening Br. 34. It follows, in Appellants' view, that Innovative's April 14 Statement was reckless.

We disagree. First, as explained above, there is no allegation that "what [Innovative] *knew* made obvious" that its confident declaration about reimbursement payments was false. *Avaya*, 564 F.3d at 270 (emphasis added). Second, the Blue Orca report was not the equivalent of the "focused questions" in *Avaya*. *Id.* In *Avaya*, those questions, and the CFO's alleged misstatements, came in three conference calls held over several days. *See id.* at 269–70. The Blue Orca report did not mention Kings Garden's reimbursement arrangement at all, let alone raise pointed questions about it, and Innovative responded to the report once, the same day it was released. The nature of the analysts' questions in *Avaya* was key to our holding, and "distin[guished] th[at] case [from] those in which defendants win dismissal on a showing that defendants were most likely simply ignorant of the facts that made their statements false." *Id.* at 270. Finally, in *Avaya*, the discounting issue was not "restricted to only a few products or customers," in which case "nonculpable ignorance might [have] be[en] the more likely explanation." *Id.* The falsehood

in Innovative's April 14 Statement, on the other hand, was restricted to one subject concerning one tenant.

So, if anything, *Avaya* reinforces that nonculpable ignorance is the most natural inference from the Complaint's allegations. Without the strong inference of scienter required by the PSLRA, the Complaint does not adequately plead that the April 14 Statement violated Section 10(b) or Rule 10b-5. The District Court thus properly held that the Complaint fails to plead actionable misstatements and properly dismissed Count I of the Complaint.

### C. Section 20(a) Claims

Count II of the Complaint contains a claim for control-person liability against the Individual Defendants under Section 20(a) of the Exchange Act. *See* 15 U.S.C. § 78t(a). That provision "creates a cause of action against individuals who exercise control over a 'controlled person,' including a corporation, who has committed a [S]ection 10(b) violation." *City of Edinburgh*, 754 F.3d at 177 (quoting 15 U.S.C. § 78t(a)). A control-person claim can only exist, however, where there is "a predicate [S]ection 10(b) violation." *Id.* "Because we find there was no violation under Section 10(b), and no other violations are alleged, there is no [control-person] liability under Section 20." *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 285 (3d Cir. 2010). "The District Court, upon finding no liability under Section 10(b), properly dismissed the derivative claims under Section 20(a)." *Id.*

## IV. CONCLUSION

For the reasons discussed above, we will affirm the District Court's judgment.